UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
FRANKFORT DIVISION

MID-AMERICA MILLING COMPANY, LLC &
BAGSHAW TRUCKING INC.,

        Plaintiffs,

v.

U.S. DEPARTMENT OF TRANSPORTATION,
PETER P. BUTTIGIEG, SHAILEN BHATT, &
TODD JETER,

        Defendants.

## VERIFIED COMPLAINT

Plaintiffs allege their complaint against Defendants as follows:

## INTRODUCTION

1.    The largest, and perhaps oldest affirmative action program in U.S. history is called the "disadvantaged business enterprise" (DBE) program. Under this program, the federal government finances the American transportation system, including highway construction, with a series of race and gender preferences they call "goals." But in effect, these "goals" amount to discriminatory barriers, preventing many construction companies from competing for contracts on an equal footing with firms owned by women and certain racial minorities. Because the DBE program violates the Constitution's "promise of equal treatment," it must be permanently dismantled. *Students for Fair Admissions, Inc. (SFFA) v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 228 (2023) (citation omitted).

2.      Despite running the DBE program for over four decades, Defendants have said in similar lawsuits—and will undoubtedly say again in this lawsuit—that "the needle has not moved." *Bruckner v. Biden*, No. 8:22cv1582, ECF 29-1:18 (M.D. Fla. 2022); *Nuziard v. Minority Bus. Dev. Agency*, No. 4:23cv278, ECF 20:29 (N.D. Tex. 2023). In other words, the problem Defendants hope to remedy—statistical racial and gender disparities among highway construction companies—persists even after decades of discriminatory preferences and set-asides. Defendants' DBE program has utterly failed to bring people in and, ironically, has only succeeded in keeping many people out.

3.      Yet, apparently undeterred by this abject record of failure, Defendants still run the DBE program. The DBE program was most recently reauthorized in November 2021 when President Biden signed the Infrastructure Investment and Jobs Act, P.L. 117-58 (the "Infrastructure Act"). As part of this legislation, Congress mandated that 10% of all new surface transportation funding—over $37 billion— "shall be expended through small business concerns owned and controlled by socially and economically disadvantaged individuals." PL 117-58, Sec. 11101(e), 135 Stat. 429 (Nov. 15, 2021). The word "disadvantaged" is simply code for women and certain minorities. *See id.*

4.      Upon close and exacting scrutiny, neither the DBE program's race nor gender preferences can survive. Although Defendants will claim the program is necessary to remedy past discrimination, they cannot precisely show, with concrete evidence, that the program (1) "target[s] a specific episode" of (2) "*intentional*

discrimination in the past" (3) that the Defendants "had a hand in." *Vitolo v. Guzman*, 999 F.3d 353 (6th Cir. 2021) (emphasis in original). In other words, Defendants may only resort to racial preferences if they can point to "identified instances of past discrimination that violated the Constitution or a statute." *SFFA*, 600 U.S. at 207.

5.      Moreover, even if they could meet this high bar, Defendants cannot prove that the DBE program is narrowly tailored because, among other deficiencies, the program relies on racial categories that are "overbroad," "underinclusive," "imprecise," "arbitrary," and "undefined," just like the racial categories recently criticized by the Supreme Court. *See SFFA,* 600 U.S. at 216–18. As just one example, Defendants will give a racial preference to a small business owner from Peshawar, Pakistan, but not to a small business owner who grew up 80 miles away in Jalalabad, Afghanistan. Defendants have never even attempted to justify these outrageous racial categories.

6.      If all this was not enough, the DBE program harms Plaintiffs because Defendants use race as a "negative" and a "stereotype"—two more constitutionally forbidden features. *SFFA*, 600 U.S. at 218. Defendants automatically designate black Americans and certain other races as "disadvantaged." As a result, other, non-designated racial groups, such as white Americans or those from the Middle East, are excluded and therefore disfavored—apparently having been deemed "advantaged" without any accounting for personal circumstances whatsoever beyond skin color. Thus, these disfavored racial groups must compete with the preferred racial groups on an unequal footing.

7.      Moreover, upon examination of the gender preferences (the DBE program also favors women-owned businesses), this Court will likewise find that Defendants cannot point to an "exceedingly persuasive" justification or prove that the "the discriminatory means employed are substantially related to the achievement of those objectives." *United States v. Virginia*, 518 U.S. 515, 572 (1996).

8.      Plaintiffs have a long history of participating in federally financed road-construction projects and a long history of being discriminated against by the DBE program. Month after month and year after year, new federal highway contracts are let, and Plaintiffs remain at a disadvantage because of their race and gender.  Despite being the lowest bidder on several federally funded projects, Plaintiffs have lost out (and, absent a remedy from this Court, will continue to lose out) to DBE firms based on race and gender.

9.      The DBE program must end. As the Court recently said, the "time for making distinctions based on race [has] passed." *SFFA*, 600 U.S. at 204. The Constitution contains a "pledge of racial equality" that demands "equality of treatment before the law for all persons without regard to race." *Id.* In fact, the "core purpose" of the equal protection doctrine is this: "doing away with all governmentally imposed discrimination based on race." *Id.* at 206. And there is no fundamentally different reason why the gender preference should not also fall.

10.     Plaintiffs therefore seek a preliminary and permanent injunction, along with a declaratory judgment, ending the DBE program once and for all.

## THE PARTIES

11.    Plaintiff Mid-America Milling Company, LLC ("MAMCO") is a milling company. Milling is the process of removing and recycling the surface of a paved road to prepare for repaving. MAMCO bids for milling contracts and completes milling projects in both Kentucky and Indiana, including federally funded surface transportation projects in this District. MAMCO is qualified, willing, and able to bid on construction contracts impacted by the federal DBE program. MAMCO is an Indiana limited liability company with its headquarters in Jeffersonville, Indiana.

12.    Plaintiff Bagshaw Trucking Inc. is a hauling company, boasting one of the largest truck fleets in northern Kentucky and southern Indiana. Bagshaw routinely bids for hauling contracts and restoration projects in both Kentucky and Indiana, including federally funded surface transportation projects in this District. Bagshaw is qualified, willing, and able to compete for contracts impacted by the federal DBE program. Bagshaw is an Indiana corporation with its headquarters in Memphis, Indiana.

13.    Defendant United States Department of Transportation (USDOT) maintains offices at its Kentucky Division Office, Federal Highway Administration, John C. Watts Federal Building, 330 West Broadway, Frankfort, Kentucky 40601. USDOT is responsible for implementing the DBE program in Kentucky, Indiana, and elsewhere, which is the subject of this lawsuit.

14.    Defendant Peter P. Buttigieg is the Secretary of Transportation and oversees the United States Department of Transportation. Under the Infrastructure

5

Act and other laws, Defendant Buttigieg is required to administer portions of the law's appropriations, including the reauthorization of the DBE program in Section 11101(e)(3). He is sued in his official capacity.

15.     Defendant Shailen Bhatt is the Administrator of the Federal Highway Administration, United States Department of Transportation. He is responsible for overseeing federally funded highway transportation projects, including those funded through the DBE program. The Federal Highway Administration is an operating administration involved in the DBE program. He is sued in his official capacity.

16.     Defendant Todd Jeter is the Division Administer of the Kentucky Division of the Federal Highway Administration. Upon information and belief, he resides in Franklin County, Kentucky, and performs his official duties in Franklin County, Kentucky. He is responsible for the administration of requirements governing federally funded highway projects in Kentucky, include those projects containing racial preferences. He is sued in his official capacity.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this complaint under 28 U.S.C. §§ 1331 and 2201, and 5 U.S.C. §§ 702 and 704, because this case presents a substantial question of federal law—specifically, whether the DBE program violates the guarantees of equal protection under the United States Constitution and 5 U.S.C. § 706. This Court has authority to issue a declaratory judgment and to order injunctive relief and other relief that is necessary and proper pursuant to 28 U.S.C. §§ 2201, 2202, and 2412, and 5 U.S.C. §§ 702, 705, and 706.

18.     Venue is appropriate in this district under 28 U.S.C. § 1391(e)(1). Defendant USDOT maintains an office at 330 West Broadway, Frankfort, Kentucky 40601, and upon information and belief, Defendant Jeter resides in Franklin County, *see* 28 U.S.C. § 1391(e)(1)(A), and performs his official duties in Franklin County, *see* LCivR 3.2(e). Finally, a substantial part of the events giving rise to this claim occurred in this District and Franklin County, because Plaintiffs are impacted by Defendants' implementation of the DBE program in this District, which includes contracts offered and projects to be completed within this District and specifically Franklin County. *See* 28 U.S.C. § 1391(e)(1)(B); LCivR 3.2(d).

## FACTUAL BACKGROUND

19.     The DBE program has been in place since 1980, when the "minority/women's business enterprise program" was established by regulation under Title VI of the Civil Rights Act of 1964. *See* 64 Fed. Reg. 5096, 5096 (Feb. 2, 1999).

20.     In 1983, Congress enacted, and President Reagan signed, the first statutory DBE program. *See* Pub. L. No. 97-424, § 105(f) (1983). Since then, Congress has reauthorized the DBE program for highway and transit projects in surface transportation bills. *See* Pub. L. No. 100-17, § 106(c) (1987); Pub. L. No. 102-240, § 1003(b)(1) (1991); Pub. L. No. 105-178, § 1101(b)(1) (1998); Pub. L. No. 109-59, §1101(b)(2) (2005); Pub. L. No. 112-141, § 1101(b)(3) (2012); Pub. L. No. 114-94, § 1101(b)(3) (2015).

21.     The DBE program has not materially changed in scope or definition for decades.

22.    On November 15, 2021, President Biden signed into law the Infrastructure Act. In Section 11101(e)(3), the Infrastructure Act reauthorizes the DBE program, providing that "not less than 10 percent of the amounts made available for any program under this division (other than section 14004), division C, and section 403 of title 23, United States Code, shall be expended through small business concerns owned and controlled by socially and economically disadvantaged individuals." This language translates to "more than $37 billion." *See* White House, Fact Sheet: The Bipartisan Infrastructure Law, Nov. 23, 2021.[1] Moreover, according to the White House, the Infrastructure Act appropriates $50 billion to the DBE program. *See* President Joe Biden and Senior Advisor Mitch Landrieu, *Building a Better America*, pg. 51 (May 2022).[2]

23.    Under Section 11101(e)(2), the Infrastructure Act explicitly adopts definitions from the Small Business Act, including the definitions of "small business concern" (15 U.S.C. § 632; *see* 13 C.F.R. pt. 121), "socially disadvantaged" (15 U.S.C. § 637(d); *see* 13 C.F.R. § 124.103), and "economically disadvantaged" (15 U.S.C. § 637(d); *see* 13 C.F.R. § 124.104).

24.    "Socially disadvantaged individuals are those who have been subjected to racial or ethnic prejudice or cultural bias within American society because of their

---

[1] Link available here: https://www.whitehouse.gov/briefing-room/statements-releases/2021/11/23/fact-sheet-the-bipartisan-infrastructure-law-will-revitalize-main-street/.

[2] Link available here: https://www.whitehouse.gov/wp-content/uploads/2022/05/BUILDING-A-BETTER-AMERICA-V2.pdf.

identities as members of groups and without regard to their individual qualities." 13 C.F.R. § 124.103(a).

25.     Federal regulations contain a presumption that the following racial or ethnic groups are automatically "socially disadvantaged": "Black Americans; Hispanic Americans; Native Americans (Alaska Natives, Native Hawaiians, or enrolled members of a Federally or State recognized Indian Tribe); Asian Pacific Americans (persons with origins from Burma, Thailand, Malaysia, Indonesia, Singapore, Brunei, Japan, China (including Hong Kong), Taiwan, Laos, Cambodia (Kampuchea), Vietnam, Korea, The Philippines, U.S. Trust Territory of the Pacific Islands (Republic of Palau), Republic of the Marshall Islands, Federated States of Micronesia, the Commonwealth of the Northern Mariana Islands, Guam, Samoa, Macao, Fiji, Tonga, Kiribati, Tuvalu, or Nauru); Subcontinent Asian Americans (persons with origins from India, Pakistan, Bangladesh, Sri Lanka, Bhutan, the Maldives Islands or Nepal)." 13 C.F.R. § 124.103(b)(1).

26.     Individuals who are members of other racial and ethnic groups—such as white Americans, along with those individuals from the Middle East and north and west Asia—are presumed *not* to be "socially disadvantaged."

27.     "Economically disadvantaged individuals are socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same or similar line of business who are not socially disadvantaged." 13 C.F.R. § 124.104.

Notably, a person cannot be "economically disadvantaged" unless they are first "socially disadvantaged."

28.    Under the Infrastructure Act and the relevant DBE program regulations, women are deemed automatically "socially and economically disadvantaged individuals." *See* Section 11101(e)(2)(B).

29.    While the Infrastructure Act's reauthorization of the DBE program explicitly incorporates the Small Business Act and its definitions as explained *supra*, Defendants have chosen to implement the DBE program through regulations at 49 C.F.R. pt. 26, which USDOT itself has described as a "patchwork quilt of a regulation." 64 Fed. Reg. 5096, 5096 (Feb. 2, 1999). At times in their history, these regulations have "created confusion and inconsistency in program administration." *See id*. Despite this inconsistency between the explicit language of the Infrastructure Act (adopting the Small Business Act definitions) and Defendants' definitions in 49 C.F.R. pt. 26, the racial and gender preferences are functionally similar.

30.    In practice under either the SBA or USDOT legal frameworks, a DBE must be "at least 51 percent owned [and controlled] by one or more individuals who are both socially and economically disadvantaged." 49 C.F.R. § 26.5. *See also* 15 U.S.C. § 637(d) and 13 C.F.R. § 124.101 (defining small business concern owned and controlled by socially and economically disadvantaged individuals). And both frameworks contain a rebuttable presumption that women and certain minorities are "socially and economically disadvantaged." *Compare* 49 C.F.R. § 26.5 (definition of

10

"socially and economically disadvantaged") *with* 13 C.F.R. §§ 124.103–.104 (sections entitled "who is socially disadvantaged?" and "who is economically disadvantaged?").

31. In the Infrastructure Act, Congress attempted to justify these race-and-gender classifications through findings of "race and gender discrimination," but none of these findings establish that Congress is attempting to remedy a specific and recent episode of intentional race discrimination that the federal government has had a hand in. Nor do these findings establish that the gender-based classification serves important governmental objectives in which the means employed are substantially related to the achievement of those objectives.

32. The Infrastructure Act and its implementing regulations do not afford Plaintiffs either a race or gender preference. As a result, the federal DBE program has negatively impacted Plaintiffs and is currently in effect, discriminating against Plaintiffs on the basis of race and gender. Because of this program, Plaintiffs have not been on equal footing, and going forward, will not be on equal footing, with DBE firms.

33. Consistent with the longstanding statutory "10 percent" requirement, most recently reauthorized under Section 11101(e)(3) of the Infrastructure Act, federal regulations require recipients of federal highway funding, such as state transportation agencies, to set DBE goals. *See, e.g.*, 49 C.F.R. § 26.45 ("How do recipients set overall goals?"). According to Defendants, state transportation agencies

11

"must either meet or show that they used good faith" to meet these goals.[3] State transportation agencies "must award the contract only to a bidder/offeror who makes good faith efforts to meet [a DBE goal]." 49 C.F.R. § 26.53.

34.     Kentucky and Indiana both construct highways with federal aid.

35.     Kentucky and Indiana have established DBE goals according to the federal regulations. Every month, both states advertise contracts open for bid. Most contracts contain a "DBE participation goal," meaning that the states are implementing their federally mandated DBE goal, and DBE businesses will have an advantage when bidding for contracts or subcontracts.

36.     Moreover, both Kentucky and Indiana have implemented federal requirements for DBE goals through race-conscious means.

37.     Plaintiffs regularly bid on and compete for federally funded highway contracts that contain Kentucky's and Indiana's DBE participation goals as required by the federal DBE program.

38.     In the past, Plaintiffs have competed for and lost out on federally funded contracts to DBE firms. In some cases, Plaintiffs had lower bids on the same projects, yet the DBE firms prevailed.

39.     Moreover, presently, and in the future, DBE-owned firms will have an advantage over Plaintiffs.

---

[3] USDOT, Federal Highway Admin., Disadvantaged Business Enterprise Program, *available at*: https://www.fhwa.dot.gov/civilrights/programs/dbe/.

40.     Plaintiffs are qualified, willing, and able to bid on these contracts or subcontracts, yet have not been, and will not be, on an equal footing with DBE contractors.

41.     While Defendants' DBE program impacts contracts and subcontracts offered by non-parties (such as Kentucky, Indiana, prime contractors, or subcontractors), Plaintiffs seek relief against Defendants alone, because it is Defendants' DBE program and regulations that are causing harm to Plaintiffs. Defendants' DBE program and regulations deny Plaintiffs the constitutional guarantee of equal protection.

42.     Plaintiffs desire the opportunity to be considered on equal footing without regard to race and seek redress for the race and gender discrimination and harms to dignity caused by Defendants, *not* by those state, local, or private entities or actors that merely operate under the rules of Defendants' discriminatory program.

## COUNT 1
## EQUAL PROTECTION VIOLATIONS

43.     Plaintiffs reallege and incorporate by reference the allegations set forth above as if fully set forth herein.

44.     The Constitution forbids "discrimination by the general government . . . against any citizen because of his race." *Gibson v. Mississippi*, 162 U.S. 565, 591 (1896).

45.     Gender discrimination is also unconstitutional. Courts "carefully inspect[ ] official action that closes a door or denies opportunity to women (or to men)." *Virginia*, 518 U.S. at 532.

46.     "The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws." *United States v. Windsor*, 570 U.S. 744, 774 (2013).

47.     "[A]ll racial classifications imposed by the government must be analyzed by a reviewing court under strict scrutiny." *Johnson v. California*, 543 U.S. 499, 505 (2005) (citation omitted). "Under strict scrutiny, the government has the burden of proving that racial classifications are narrowly tailored measures that further compelling governmental interests." *Id.* (citation omitted).

48.     Likewise, as the court held in *Virginia*, when gender discrimination is employed, the burden "rests entirely" on the government to offer an "exceedingly persuasive" justification for the classification, proving that the "classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." 518 U.S. at 533 (citations and internal quotation marks omitted).

49.     The federal DBE program, and specifically Sections 11101(e)(2)–(3) of the Infrastructure Act, impose racial and gender classifications and grant benefits (namely, preferences, presumptions, or priorities) based on those racial and gender classifications.

50.     Defendants are responsible for interpreting and implementing the federal DBE program and Sections 11101(e)(2)–(3) of the Infrastructure Act, including the race and gender presumptions.

51.     Plaintiffs are qualified, willing, and able to apply for federal highway and surface transportation contracts, but because the federal DBE program treats individuals differently based on race and gender, Plaintiffs cannot compete for contracts on an equal footing.

52.     The racial classifications in the federal DBE program, including those specifically mentioned in Sections 11101(e)(2) and (3) of the Infrastructure Act and in corresponding regulations, are unconstitutional because they violate the equal protection guarantee in the United States Constitution. These racial classifications in the Infrastructure Act are not narrowly tailored to serve a compelling government interest.

53.     The gender-based classification in the federal DBE program, including those specifically mentioned in Sections 11101(e)(2) and (3) of the Infrastructure Act and in corresponding regulations, are unconstitutional because they violate the equal protection guarantee in the United States Constitution. This gender-based classification is not supported by an exceedingly persuasive objective, and the discriminatory means employed are not substantially related to the achievement of that objective.

## COUNT 2
## ADMINISTRATIVE PROCEDURE ACT VIOLATION

54.     Plaintiffs reallege and incorporate the allegations set forth above as if fully set forth herein.

55.     Under the Administrative Procedure Act (APA), courts shall "hold unlawful and set aside agency action, findings, and conclusions found to be—contrary to [a] constitutional right." 5 U.S.C. § 706(2)(B).

56.     The federal DBE program is controlled by regulations that impose unconstitutional race and gender classifications—those found at 49 C.F.R. pt. 26 and 13 C.F.R. pt. 124, including 49 C.F.R. § 26.5 (definition of "socially and economically disadvantaged") and 13 C.F.R. §§ 124.103–.104 ("who is socially disadvantaged?" and "who is economically disadvantaged?").

57.     Defendants are responsible for implementing these regulatory race and gender presumptions in violation of equal protection guaranteed under the Fifth Amendment's Due Process Clause.

58.     Therefore, the Court should set aside these regulations as unconstitutional.

## RELIEF REQUESTED

Plaintiffs respectfully request that this Court:

A.     Enter a preliminary injunction enjoining Defendants from applying all unconstitutional and illegal race and gender-based classifications in the federal DBE program, including those set out in Sections 11101(e)(2)–(3) of the Infrastructure Act, the Small Business Act, 49 C.F.R. pt. 26, and 13 C.F.R. pt. 124.

B.     Enter a declaratory judgment that the race and gender-based classifications in the federal DBE program, including those set out in Sections

11101(e)(2)–(3) of the Infrastructure Act, the Small Business Act, 49 C.F.R. pt. 26, and 13 C.F.R. pt. 124, are unconstitutional and otherwise violate the APA.

C.      Enter an order permanently enjoining Defendants from applying race and gender-based classifications in the federal DBE program.

D.      Set aside the race and gender classifications in 49 C.F.R. pt. 26 and 13 C.F.R. pt. 124.

E.      Award Plaintiffs their attorney fees under 28 U.S.C. § 2412 or other relevant laws.

F.      Grant Plaintiffs such other and further relief as the court deems appropriate.

Dated: October 26, 2023

EMBRY MERRITT SHAFFAR WOMACK, PLLC

*/s/ D. Eric Lycan*
D. Eric Lycan
201 East Main Street Suite 1402
Lexington, KY 40507
Telephone: (859) 543-0453
Fax: (800) 505-0113
eric.lycan@emwnlaw.com

WISCONSIN INSTITUTE FOR LAW & LIBERTY, INC.

*/s/ Daniel P. Lennington*
Richard M. Esenberg (*pro hac vice pending*)
Daniel P. Lennington (*pro hac vice pending*)
Kate Spitz (*pro hac vice pending*)
Cara Tolliver (*pro hac vice pending*)
330 East Kilbourn Avenue, Suite 725
Milwaukee, WI 53202
Telephone: (414) 727-9455
Fax: (414) 727-6385
Rick@will-law.org
Dan@will-law.org
Kate@will-law.org
Cara@will-law.org

*Attorneys for Plaintiffs*

## VERIFICATION OF JAMES P. HUGHES

1.      I am the Chairman of the Board of Directors of Mid-America Milling Company, LLC.

2.      I have personal knowledge of Mid-America Milling Company, LLC, its business, operations, activities, and intentions, which are set forth in the foregoing Verified Complaint. If called upon to testify, I would competently testify as to the matters relevant to me and Mid-America Milling Company, LLC's claims.

3.      I verify under the penalty of perjury under the laws of the United States that the factual statements in this Verified Complaint concerning Mid-America Milling Company, LLC, are true and correct.

Dated: 10/24/23          Signature _____

Printed Name: James P. Hughes

## VERIFICATION OF GREG BAGSHAW

1.     I am Vice President of Bagshaw Trucking Inc., which is a plaintiff in this case.

2.     I have personal knowledge of Bagshaw Trucking Inc., its business, operations, activities, and intentions, which are set forth in the foregoing Verified Complaint. If called upon to testify, I would competently testify as to the matters relevant to me and Bagshaw Trucking Inc.'s claims.

3.     I verify under the penalty of perjury under the laws of the United States that the factual statements in this Verified Complaint concerning Bagshaw Trucking Inc. are true and correct.

Dated: _10/16/2023_          Signature _Greg L. Bagshaw_

Printed Name: Greg Bagshaw