IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY

MID-AMERICA MILLING COMPANY, LLC, et al.,

      Plaintiffs,

      v.                                              Case No. 3:23-cv-72

UNITED STATES DEPARTMENT
OF TRANSPORTATION, et al.,

      Defendants.

## BRIEF IN SUPPORT OF PLAINTIFFS'
## MOTION FOR PRELIMINARY INJUNCTION

## INTRODUCTION

"The equal protection clause requires equality of treatment before the law for all persons without regard to race or color." *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 205 (2023) (citation omitted). Yet despite this clear constitutional command, the federal government continues to engage in the "sordid business" of dividing "us up by race." *Vitolo v. Guzman*, 999 F.3d 353, 364 (6th Cir. 2021) (citation omitted).

For decades, the federal government has enlisted the so-called "disadvantaged business enterprise" or "DBE" program to actively discriminate on the basis of race and gender in the awarding of highway contracts. But the DBE program may only be upheld if the Court finds strong evidence that the program targets a "specific episode" of "intentional discrimination" that the government "participated in." *Ultima Servs. Corp. v. U.S. Dep't of Agric.*, 2:20-cv-00041-DCLC-CRW, 2023 WL 4633481, at *12–14 (E.D. Tenn. 2023) (quoting *Vitolo*, 999 F.3d at 361). Even if Defendants could meet such a high standard, race may never be used as a "negative," or a "stereotype," and the chosen means must be "narrowly tailored." *SFFA*, 600 U.S. at 218, 207, 213.

Defendants cannot meet any of these standards, much less all of them. Defendants have said—and will likely continue to say—that the DBE program is necessary because there are disparities in America and that they must give certain preferences to "fix" this problem. Yet despite the untold billions of dollars spent over the past four decades, Defendants have readily conceded that the "needle did not move" in response to their preferences. *Cf. Nuziard v. Minority Bus. Dev. Agency*, --- F. Supp. 3d ---, 2023 WL 3869323, at *6 (N.D. Tex. 2023). In short, preferences don't work. As today's case shows once again, the only "way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Vitolo*, 999 F.3d at 365–66 (citation omitted).

Given the DBE's unconstitutional use of race and gender, and the irreparable harm to Plaintiffs, this program should be enjoined while the case proceeds.

1

**FACTUAL BACKGROUND**

The "disadvantaged business enterprise" program (the "DBE Program") is the largest and perhaps oldest affirmative action program in the United States. ECF 1: ¶ 1. The DBE Program establishes participation "goals" in roadbuilding and surface transportation projects for certain groups deemed "disadvantaged," including women and designated racial groups. Although the government insists that these are not quotas, 49 C.F.R. § 26.43, the fact is that the DBE Program is subject to a gender- and race-based mandate: 10% of all new surface transportation funding—over $37 billion in the most recent federal spending legislation—"shall be expended through small business concerns owned and controlled by socially and economically disadvantaged individuals." P.L. 117-58, § 11101(e)(3) (Nov. 15, 2021); 49 C.F.R. § 26.41; White House, Fact Sheet: The Bipartisan Infrastructure Law Will Revitalize Main Street (Nov. 23, 2021).[1]

The DBE Program began in 1980 as a regulation under Title VI of the Civil Rights Act and was officially enshrined in statute in 1983. ECF 1 ¶ 19–21. Since then, the DBE Program has been reauthorized by Congress in various surface transportation bills at least six times but has had no material changes. *Id.* The 2021 Infrastructure Investment and Jobs Act (the "Infrastructure Act") sets forth the most recent iteration of the DBE Program. The national 10% figure, dedicating federal highway and transit spending to DBE contracting, has remained the same since 1983.

Under federal law, fund recipients, such as state departments of transportation, are required to have a DBE Program and must set a DBE participation goal "based on demonstrable evidence of the availability of ready, willing and able DBEs relative to all businesses ready, willing and able to participate on" federally funded contracts. 49 C.F.R. §§ 26.21, 26.45(a)–(b). Race-neutral means must be used to facilitate DBE participation; however, race-conscious contracting goals are

---

[1] Link available here: https://www.whitehouse.gov/briefing-room/statements-releases/2021/11/23/fact-sheet-the-bipartisan-infrastructure-law-will-revitalize-main-street/.

required if recipients do not anticipate being able to meet their overall DBE goal. 49 C.F.R. § 26.51.[2] Fund recipients can be penalized if they do not ensure that bidders make "good faith efforts" to meet race-conscious contracting goals, including "those [efforts] that one could reasonably expect a bidder to take if the bidder is actively and aggressively trying to obtain DBE participation sufficient to meet the DBE contract goal." 49 C.F.R. pt. 26, App. A at II; 49 C.F.R. §§ 26.47, 26.53. For example, while a prime contractor may not be denied a contract if it fails to meet the goal, it must demonstrate "adequate" efforts to meet it, including targeted advertising to DBEs and efforts to assist DBEs in obtaining bonding or credit and other necessary equipment and supplies. 49 C.F.R. pt. 26, App. A at IV. An "insufficient good faith effort" includes the rejection of a DBE "as being unqualified" due to "[t]he contractor's standing within its industry" or "the rejection of [a] DBE because its quotation for the work was not the lowest received"—business considerations otherwise frequently relied upon when DBE status is *not* taken into account. *Id.* at IV.D.(2), E.(1).

A DBE is defined using the race- and gender-based presumptions of social and economic disadvantage found in the Small Business Administration (SBA) Act and its regulations, though Defendants also employ a similar set of regulations at Title 49. In practice under either the SBA or USDOT legal frameworks, a DBE must be "at least 51 percent owned [and controlled] by one or more individuals who are both socially and economically disadvantaged." 49 C.F.R. §§ 26.5, 26.69; *see* 13 C.F.R. §§ 124.101 (an eligible small business concern must be "unconditionally owned and controlled by one or more socially and economically disadvantaged individuals"), 124.105. Likewise, both frameworks contain a rebuttable presumption that women and certain

---

[2] Notably, so-called "race-neutral means" remain committed to increasing DBE participation toward the overall DBE goal and even are directed particularly at DBEs. *See* 49 C.F.R. § 26.51(b) (calling out DBEs for special focus in assistance efforts).

3

minorities are "socially and economically disadvantaged," having been "subjected to racial or ethnic prejudice or cultural bias within American society because of their identities as members of groups and without regard to their individual qualities." *See* P.L. 117-58, § 11101(e)(2)(B); 13 C.F.R. §§ 124.103(b), 124.104; 49 C.F.R § 26.5. Thus, under this scheme, women and members of certain racial groups (such as "Black Americans," "Hispanic Americans," and "Native Americans," among others) are presumed disadvantaged and need never demonstrate that he or she suffered from discrimination. *Id.*

Conversely, non-designated groups, such as individuals from Northern or Western Asia, the Middle East, North Africa, and whites are presumed *not* to be disadvantaged. *Id.* The disfavored latter groups not only fail to receive the benefit of the statutory presumption, but also if they wish to affirmatively prove their disadvantage, they face an uphill battle in doing so. *See* 13 C.F.R. 124.103(c)(5) (agency "*will* discount or disbelieve statements" from applicant "where such statements are inconsistent with other evidence contained in the record") (emphasis added). While the presumption for favored groups can be rebutted if the business owner has a personal net worth above $1.32 million or demonstrates capability to accumulate substantial wealth, absent such evidence, the individual's race or gender provides access to DBE opportunities that individuals of a disfavored race or gender cannot access. 49 C.F.R. § 26.67.

Plaintiff Mid-America Milling Company, LLC provides milling services, which include removing and recycling the surface of a paved road to prepare it for repaving. ECF 1 ¶ 11. Plaintiff Bagshaw Trucking Inc. is a hauling company with one of the largest truck fleets in northern Kentucky and southern Indiana. *Id.* ¶ 12. Plaintiffs are able and ready to bid (and in fact do regularly bid) on contracts impacted by Defendants' implementation of the federal DBE program in both Indiana and Kentucky, including this District. *Id.* at ¶¶ 11–12, 37. However, the 10 percent

"goal" is not merely aspirational in practice. It is a consideration that bars companies like Plaintiffs from competing on equal footing with DBE enterprises, and it has a very real financial impact. Indeed, Plaintiffs have lost out on federally funded contracts to DBE firms *even when Plaintiffs' bids were lower* and remain at a disadvantage. *Id*. at ¶¶ 36–39. Thus, not only are Plaintiffs denied the opportunity to compete on equal footing—the heart of this equal protection violation, *Ne. Fla. Ch. of Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993)—but also, taxpayers pay the ultimate price, paying more money for the same work.

## ARGUMENT

### I.     Preliminary injunction standard.

In determining whether to grant a preliminary injunction, the Court considers: "(1) the likelihood of success on the merits; (2) irreparable harm absent injunctive relief; (3) substantial harm to others from the proposed injunction; and (4) the broader public interest." *Nat'l Credit Union Admin. Bd. v. Jurcevic*, 867 F.3d 616, 622 (6th Cir. 2017) (citation omitted). "None of these factors is a prerequisite to injunctive relief." *Id.* Instead, this balancing test "ineffably permit[s] the balancing to occur in all manner of ways." *Id.* In a case in which "a party seeks a preliminary injunction on the basis of a potential constitutional violation, 'the likelihood of success on the merits often will be the determinative factor.'" *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (quoting *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009)).

Here, Plaintiffs meet the criteria for a preliminary injunction, and this Court should immediately enjoin the use of all race and gender preferences in the DBE Program as an unconstitutional violation of the Equal Protection Guarantee.

## II.     Plaintiffs are likely to succeed on the merits.

Defendants' DBE Program illegally discriminates against Plaintiffs based on race and sex in violation of the Constitution's Equal Protection Guarantee. Courts "evaluate equal protection claims against the federal government under the Fifth Amendment just as [they] would evaluate equal protection claims against state and local governments under the Fourteenth Amendment." *Ctr. for Bio-Ethical Reform Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011).

### A.     The DBE Program discriminates based on race in violation of the Constitution.

"Racial and ethnic distinctions of any sort are inherently suspect." *SFFA*, 600 U.S. at 209 (quoting *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 291 (1978) (Powell, J.)). "[P]olicies that classify people by race are presumptively invalid." *Vitolo*, 999 F.3d at 360 (citations omitted). Any racial distinctions must survive a "daunting" examination in which "the government has the burden of proving that racial classifications 'are narrowly tailored measures that further compelling government interests.'" *Johnson v. California*, 543 U.S. 499, 505 (2005) (quoting *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227 (1995)). The test is designed to "'smoke out' illegitimate uses of race," including those motivated by "illegitimate notions of racial inferiority or simple racial politics." *Adarand*, 515 U.S. at 226 (citation omitted).

#### 1.     The DBE Program does not serve a compelling governmental interest.

To establish a compelling interest, Defendants must prove that their program is aimed at "remediating specific, identified instances of past discrimination that violated the Constitution or a statute*." SFFA*, 600 U.S. at 207 (citing *id*. at 250–51) (Thomas, J. concurring) (describing permissible "discrete remedial measures" that "work to equalize treatment against a concrete baseline of government-imposed inequality.").

The Sixth Circuit has provided a recent and clear statement of what Defendants must show to demonstrate a compelling government interest in remedying past discrimination. In *Vitolo v.*

*Guzman*, the court set out a three-part test: 1) the remedy or policy must address specific episodes of past discrimination, and cannot rest on a general statement that there has been discrimination in an entire industry; 2) the past discrimination must have been intentional; and 3) the government must have had a hand in that discrimination. 999 F.3d at 361. In *Vitolo*, the Sixth Circuit evaluated the SBA's restaurant revitalization program, which prioritized federal funds for restaurants owned at least 51% by a "socially and economically disadvantaged" individual, a woman, or a veteran. Those outside these groups, including plaintiff Vitolo, could apply, but their applications were held until funds were disbursed to those in the preferred groups (or until the funding ran out). There, as here, social and economic disadvantage was defined via a presumption based on membership in certain racial groups. *Id.* at 357. The court concluded these race-based presumptions did not serve a compelling interest. The *Vitolo* analysis controls here. The DBE Program fails all three prongs of the compelling interest test.

        **i.     The DBE Program does not target specific episodes of discrimination.**

The DBE Program fails the compelling interest test because it does not target specific episodes of past discrimination. Instead, it relies on broad observations, asserting that "discrimination and related barriers continue to pose significant obstacles for minority- and women-owned businesses seeking to do business in federally assisted surface transportation markets across the United States." P.L. 117-58 § 1101(e)(1)(A). But "an effort to alleviate the effects of societal discrimination is not a compelling interest." *Shaw v. Hunt*, 517 U.S. 899, 909–10 (1996). Nor is the government justified in reserving or targeting a certain percentage of work for minority- and women-owned businesses because outright racial balancing is "patently unconstitutional." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 723 (2007) (plurality) (citation omitted).

7

To renew the DBE Program, Congress relied upon disparity studies to conclude that such discrimination exists. These studies typically reflect statistical comparisons between the number of available people of a certain background who might be available to work in an industry and the number of people of that background working in that industry. This type of generalized evidence has been held insufficient to justify a compelling interest in race-based relief by the Supreme Court for over thirty years. In *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989), the Court rejected the lower court's reliance on the "highly conclusory statement" "that there was racial discrimination in the construction industry." *Id.* at 500. Simply put, legislative bodies may not rely upon findings of societal discrimination to establish a compelling interest in a race-based classification. *Id.* at 496–98. Such an interest presents "'an amorphous concept of injury that may be ageless in its reach into the past,'" *SFFA*, 600 U.S. at 209 (quoting *Bakke*, 438 U.S. at 307), permitting a court to uphold remedies that are "timeless in their ability to affect the future." *Wygant v. Jackson Bd. of Ed.*, 476 U.S. 267, 276 (1986) (plurality).

More recently, in *Ultima Servs. v. U.S. Dep't of Ag.*, 2023 WL 4655481 (E.D. Tenn. July 19, 2023), a district court in this circuit addressed the use of the SBA's nationwide rebuttable presumption to address statistical disparities of the sort DOT uses here. There, the government argued that Congress enacted the SBA's race-based program "to remedy specific discriminatory practices that prevented MBEs from accessing capital and credit and competing equally in the free market." *Id.* at *12. But the court rejected this explanation, observing that "Defendants do not identify a specific instance of discrimination which they seek to address with the use of the rebuttable presumption" and that its reliance on disparity statistics "shows societal discrimination rather than a specific instance." *Id.*

8

So too here. To simply paint with a broad brush based on a gestalt view about race to authorize a nationwide 10% DBE threshold, or *any threshold at all*, in every surface transportation market across the country, goes against the longstanding rule that the reasons for race-based action "be clearly identified and unquestionably legitimate." *Croson*, 488 U.S. at 505 (citation omitted). But that is precisely what the DBE Program does. A racial disparity study does not identify specific episodes of racial discrimination. Instead, it demonstrates general observations about race in society insufficient for justifying a compelling governmental interest in race-conscious action. It is a means to a sought-after end, not a remedial response to specific instances of discrimination.

### ii.   The DBE Program is not supported by any evidence of intentional discrimination.

Even if Defendants could point to specific instances of discrimination in support of the DBE Program, there is no evidence that such discrimination was *intentional* discrimination. As *Vitolo* put it, "[w]hen the government promulgates race-based policies, it must operate with a scalpel[,]" "[a]nd its cuts must be informed by data that suggest intentional discrimination." 999 F.3d at 361. "'[B]road statistical disparities ... are not nearly enough.'" *Ultima*, 2023 WL 4633481 at *13 (quoting *Vitolo*, F.3d at 362). That is because "when it comes to general social disparities, there are simply too many variables to support inferences of intentional discrimination." *Vitolo*, 999 F.3d at 362 (citing cases).

In other words, the fact that the population of a certain geographic area is, say, 20% Hispanic, but significantly less than 20% of the workforce in a particular industry in that region is Hispanic, does not signify that *intentional* discrimination has occurred, highlighting a serious flaw with Defendants' reliance on disparity studies. Any number of non-discriminatory factors may account for the difference. A "dearth of minority participation" can be explained by factors ranging from past societal discrimination in education and economic opportunities to simple career choices

9

and preferences and other non-discriminatory business-related factors. *Croson*, 488 U.S. at 503; *e.g.*, *Eng'g Contractors Ass'n of S. Fla. Inc. v. Metro. Dade Cnty.*, 122 F.3d 895, 917, 922 (11th Cir. 1997) (describing the importance of accounting for known non-discriminatory factors, including "firm size," in proving intentional discrimination, but nevertheless rejecting the contention "that any significant disparities that exist after[wards] [] must [necessarily] be due to the ongoing effects of [] discrimination"); *Michigan Rd. Builders Ass'n, Inc. v. Milliken*, 834 F.2d 583, 592 (6th Cir. 1987), *aff'd*, 489 U.S. 1061 (1989) ("most MBEs, *as a result of their size*, were unable to effectively compete for state contracts.") (emphasis in original); *Ultima*, 2023 WL 4633481 at *13 (data that "cannot eliminate all variables that could account for the disparities" insufficient to support racial presumption).

Thus, numbers alone "don't cut it" when it comes to establishing intentional discrimination in contexts in which there may be multiple factors and "multiple decision makers 'behind the disparity.'" *Vitolo*, 999 F.3d at 361–62; *Ultima*, 2023 WL 4633481 at *12–13 (quoting *Vitolo*). Moreover, such "data does not establish that the rebuttable presumption itself remedies discrimination" over "the simple proposition that participation in a program designed to facilitate the award of federal contracts to [certain] [] businesses does, in fact, help those participating [] businesses win federal contracts." *Ultima*, 2023 WL 4633481 at *13. The broad disparities upon which the DBE Program relies do not point to any instances of intentional discrimination.

### iii. There is no evidence that the government had a hand in the discrimination it seeks to remedy.

The DBE Program also flunks the third and final prong of the three-part compelling interest test. To remedy discrimination, the government "must identify prior discrimination by the governmental unit involved or passive participation in a system of racial exclusion." *Vitolo*, 999 F.3d at 362 (quoting *Croson*, 488 U.S. at 492 (plurality)) (internal quotation marks and brackets

omitted). In other words, "the government must have had a hand in the past discrimination" it seeks to remedy. *Id.* at 361; *see, e.g.*, *Aiken v. City of Memphis*, 37 F.3d 1155, 1162 (6th Cir. 1994) ("the Supreme Court 'has insisted upon some showing of prior discrimination *by the governmental unit involved* before allowing limited use of racial classifications . . .'") (quoting *Wygant*, 476 U.S. at 274 (plurality)) (emphasis added).[3]

Where the government has actively or passively participated in discrimination, it may act to undo its specific acts of intentional discrimination. *Croson*, 488 U.S. at 492; *Vitolo*, 999 F.3d at 361. But to be a "passive" participant, the government must be a participant, running afoul of far more than simply existing in a market in which there may be a racial disparity or even discrimination. Indeed, the government must show that it "allowed discrimination to occur in the industries relevant" to the classification, *Ultima*, 2023 WL 4633481 at *14, such that it "induce[d], encourage[d] or promote[d] private persons to accomplish what it is constitutionally forbidden to accomplish," *Croson*, 488 U.S. 469, 492–93 (plurality), and in so doing "knowingly perpetuated the discrimination" as "a kind of joint tortfeasor, coconspirator, or aider and abettor." *Builders Ass'n of Greater Chicago v. Cnty. of Cook*, 256 F.3d 642, 645 (7th Cir. 2001). Thus, the fact that "prior, race-neutral relief efforts failed to reach minorities is no evidence at all that the government enacted or administered those policies in a discriminatory way." *Vitolo*, 999 F.3d at 362.

The 2012 and 2015 reauthorizations of the DBE Program and the Infrastructure Act challenged here refer to "continuing barriers," "full and fair participation in surface transportation-related businesses," and "many aspects of surface transportation-related businesses in the public

---

[3] Given the central purpose of the Equal Protection Guarantee to prevent the government from purposefully discriminating between individuals on the basis of race, *Washington v. Davis*, 426 U.S. 229, 239 (1976), the requirements that the government may remedy only intentional discrimination that it "had a hand in" provide the appropriate scope of governmental redress. In this way, the government brings itself back into compliance with the Constitution and does not transgress the Equal Protection Guarantee anew.

and private markets" as a continuing justification for the DBE Program. However, nothing in any of the statutes authorizing the DBE Program indicates that the federal government has "had a hand" in discriminating against any of the racial groups presumed to be disadvantaged for purposes of the DBE Program. There are no findings indicating that the federal government erected barriers or conspired with private parties to bar access to roadbuilding opportunities for anyone in any of the preferred racial groups, much less that the government did so with such frequency as to require racial exclusion as a remedy. The DBE Program is not, for example, a response to "systemic[] discrimination" by the government "in the administration of farm loans and other benefits" combined with a government agency's "fail[ure] to investigate discrimination complaints." *Holman v. Vilsack*, 2021 WL 2877915 at *2 (W.D. Tenn. Jul 8, 2021) (discussing *Pigford v. Glickman*, 206 F.3d 1212 (D.C. Cir. 2000) and related cases alleging decades of documented racial discrimination by Department of Agriculture). Instead, the DBE Program relies on purported racial disparities in society—involving various actors, decisions, and factors—that may have any number of causes. But "a governmental agency's interest in remedying 'societal' discrimination, that is, discrimination not traceable to its own actions, cannot be deemed sufficiently compelling to pass constitutional muster." *Parents Involved*, 551 U.S. at 731–32 (plurality) (citation and internal brackets omitted). Because there is no indication that Defendants have prohibited, or discriminated against, any racial groups in accessing surface transportation opportunities, the DBE Program's racial preferences are unconstitutional and invalid.

### 2. The DBE Program is not narrowly tailored.

Because "racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification," to survive strict scrutiny, "a governmental classification based on race" must also "be specifically and narrowly framed to accomplish" its remedial purpose. *Aiken,* 37 F.3d at 1164 (quoting *Wygant*, 476 U.S. at 280 (plurality)) (internal

12

quotation marks and brackets omitted). In the Sixth Circuit, courts consider the following factors: "(1) the necessity for the relief; (2) the efficacy of alternative remedies; (3) the flexibility and duration of the relief; (4) the relationship of the numerical goals to the relevant labor market; and (5) the impact of the relief on the rights of third parties." *Middleton v. City of Flint, Mich.*, 92 F.3d 396, 409 (6th Cir. 1996) (citing *United States v. Paradise*, 480 U.S. 149, 171 (1987)). Even if this Court concludes there is a compelling interest in support of the DBE Program, the DBE Program falls short of these criteria for narrow tailoring.

Looking to the first two factors, the "necessity" and "efficacy" of the remedy, the government must demonstrate "serious, good faith consideration of workable race-neutral alternatives" before resorting to race-conscious policies. *Grutter v. Bollinger*, 539 U.S. 306, 339 (2003). As the Supreme Court has explained, many operational or regulatory barriers "may be the product of bureaucratic inertia more than actual necessity, and may have a disproportionate effect on the opportunities open to new minority firms." *Croson*, 488 U.S. at 510. Indeed, the Sixth Circuit has found that "[s]mall businesses, as a result of their size, were unable to effectively compete for state contracts," and consequently MBEs suffered the same fate too. *Michigan Rd. Builders*, 834 F.2d at 592, *aff'd*, 489 U.S. 1061. Yet here, the DBE Program's race-based mission has remained static for *four decades*.[4] This stagnancy reflects neither necessity nor effectiveness to addressing any purported problem. As opposed to careful consideration of underlying issues and a tailored response, the DBE Program continually operates to broadly target race, channeling the old adage of insanity—doing the same thing repeatedly and expecting a different result.

---

[4] Indeed, the 10% statutory DBE target has not moved, and the "findings" on which Congress has relied for reauthorization have also remained the same, word for word, for the three most recent authorizations. *See* P.L. 112-141, § 1101 (2012); P.L. 114-94 § 1101 (2015); P.L. 117-58 § 1101 (2021).

Nor do Defendants explain why existing remedies—like the various longstanding strata of criminal and civil laws prohibiting racial discrimination as well as private legal and administrative remedies—do not suffice to address racial discrimination in roadbuilding and surface transportation contexts. *See Croson*, 488 U.S. at 509–10. Defendants could simply step up their enforcement efforts against race discrimination in such contexts, which is a logical alternative to explicit governmental race discrimination in the DBE Program. *Id.* ("Nor is [ ] government powerless" to take appropriate measures against those who discriminate on the basis of race or other illegitimate criteria). No obvious reasons for Defendants' inaction on this front present themselves. It is Defendants' burden to provide this explanation, not Plaintiffs'.

Moreover, a policy is not "necessary" or efficient if it is "either overbroad or underinclusive in its use of racial classifications." *Vitolo*, 999 F.3d at 362–63 (citations omitted). However, here the DBE Program is underinclusive because it arbitrarily excludes various racial groups. For example, individuals with ancestors from the "Asian Pacific" and "Subcontinent Asian" regions are deemed Asians worthy of assistance, while Middle Eastern and Mediterranean regions are excluded without any justification. *See* 13 C.F.R. § 124.103; 49 C.F.R. § 26.5. Similarly, given Defendants' preference for "Black Americans," which opaquely "includes persons having origins in any of the Black racial groups of Africa," 49 C.F.R. § 26.5, individuals with ancestors in Africa may be divided up without explanation: north Africans (Egypt, Libya, Tunisia, Algeria, and Morocco) may not count, while sub-Saharan populations are included. *See, e.g.*, 32 C.F.R. § 191.3 ("A [white] person [has] origins in any of the original peoples of . . . North Africa."). In addition, the DBE Program is underinclusive because it excludes every contractor who owns less than 51% of his/her business. The Program is also overinclusive because it helps individuals who may have never been discriminated against. *See Croson*, 488 U.S. at 506 (overinclusiveness of racial groups

"strongly impugns" any remedial motivation). Because the DBE Program's racial classifications are "imprecise," "arbitrary," "undefined," "overbroad," and "underinclusive," they do not pass for narrowly tailored. *SFFA*, 600 U.S. 181, 216–17.

The DBE Program also fails narrow tailoring under the third factor, "flexibility and duration." Defendants will likely argue that the DBE Program is flexible because it does not impose a quota and the racial presumption of disadvantage is rebuttable, but these features do not overcome the DBE Program's unyielding objective. Funding recipients must use "active" and "aggressive" efforts to utilize DBEs in roadbuilding contracts, 49 C.F.R. pt. 26, App. A at II, imposing a qualification that Plaintiffs and others similarly situated cannot meet through no fault of their own. As *Ultima* pointed out when assessing the same presumptions of disadvantage, the presumption "is dispositive" and "individuals who do not receive the presumption must put forth double the effort to qualify." 2023 WL 4633481 at *15 (citing *Vitolo*, 999 F.3d at 363).

As for the duration, the DBE Program is one of the longest-running affirmative action programs in the United States. Indeed, the DBE Program (and its never-wavering 10% set-aside) have seen six different U.S. presidents—including four who served for two terms—since its start in the 1980s. The Supreme Court recently reconfirmed the importance of durational limitations on race-conscious relief: it is "critical" that such programs "'have a termination point' . . . 'sunset provisions' . . . 'a logical end point'; their 'deviation from the norm of equal treatment'" must be 'a temporary matter.'" *SFFA*, 600 U.S. at 212 (quoting *Grutter*, 539 U.S. at 342); *see also Ultima*, 2023 WL 4633481 at *16 (race-based program has "no temporal limit on the use of the rebuttable presumption" and so "there is no reason to believe that [Defendants] will—even acting in good faith—comply with the Equal Protection Clause any time soon.") (quoting *SFFA*, 600 U.S. at 225). Given Congress's 43-year old habit of reflexively reauthorizing the DBE Program on the same

terms and based upon identical findings, it would defy all logic to contend that the DBE Program is in any way "temporary" or limited.

Under the fourth factor, the DBE Program fails to account for the relevant labor market in relation to the statutory numerical goal. The DBE Program has devoted federal highway and transit contracting to race-based spending since 1980, and its national 10% figure has remained unchanged since 1983. Congress's fixation on this perpetual target fails to account for any progress accomplished. Defendants will undoubtedly point to the disparity studies upon which Congress purportedly relied, but as noted above, the presence of purported national societal discrimination, or the simple fact that there are variations in society, does not justify a sweeping and timeless race-based remedy. Quite simply, the relationship of the numerical goal to the contracting industry is nothing more than a continued effort to effectuate patently unconstitutional racial balancing.

Finally, under factor five considering the "impact" to others, the DBE Program's race-based mission necessarily harms innocent third parties. Indeed, "it is not even theoretically possible to 'help' a certain racial group without causing harm to members of other racial groups." *SFFA*, 600 U.S. at 271 (Thomas, J., concurring). Plaintiffs' experiences demonstrate the obvious harms of the DBE Program's unequal treatment and the dignitary and financial impacts that result: Plaintiffs' owners are members of non-preferred racial groups and face an unequal disadvantage when competing against preferred DBEs for the same opportunities. Plaintiffs have been deterred from bidding for contracts that they are able and ready to bid for, and offer various examples of contracts they have lost to DBEs, despite providing lower bids for the same work. *See* Decl. K. Koetter ¶¶ 21–35; Decl. G. Bagshaw ¶¶ 14–21. Moreover, Plaintiffs are just two of thousands of similarly situated contractors nationwide who similarly are denied the opportunity to compete on equal footing for such work. In addition to the contractors themselves, there is also a negative

third-party impact on hundreds of millions of others: American taxpayers. Because the DBE Program explicitly urges participants to accept bids from companies that did not submit the lowest bid if they are DBEs, 49 C.F.R. pt. 26, App. A at IV.D.(2), E.(1), Americans pay more for their road projects than they would if the bids were simply submitted without regard for race and gender preferences.

For these reasons, the DBE Program is not narrowly tailored and fails both prongs of strict scrutiny. These failures mean that the DBE Program does not enact legitimate uses of race but is instead the product of "illegitimate notions of racial inferiority," "illegitimate racial prejudice or stereotype," and even "racial politics." *E.g., Adarand*, 515 U.S. at 226 (citation omitted).

### 3. The DBE Program violates the "twin commands" of the Equal Protection Guarantee.

As if all that were not enough, the DBE Program is unconstitutional for yet another independently sufficient reason: the DBE Program violates the "twin commands" of equal protection because it uses race as a "negative" and a "stereotype." *SFFA*, 600 U.S. at 218.

### i. The DBE Program uses race as a "negative."

As to the first command, the Supreme Court has long explained that racial classifications like those used by the DBE Program violate the Constitution when race is used "against" an applicant. *SFFA*, 600 U.S. at 218, 211–12 (citing *Grutter* 539 U.S. 306). At the heart of this prohibition are policies that consider race in a manner that reduces participation by certain racial groups—such as, "reserv[ing] a specified number of seats," or providing "a prescribed number of seats set aside for each identifiable category of applicants," or assuring "some specified percentage of a particular group merely because of its race." *See Bakke*, 438 U.S. at 307, 315. These actions remove proportions of available opportunities for which applicants can all "compete on equal footing" in contravention of the Equal Protection Guarantee. *Ne. Fla. Ch. of Assoc. Gen.*

*Contractors*, 508 U.S. at 666; *SFFA*, 600 U.S. at 219 ("How else but 'negative' can race be described if, in its absence, members of some racial groups would [receive the benefit] in greater numbers than they otherwise would have [] ?").

The DBE Program, at its core, sets aside a percentage of contracts for which only applicants of certain races may compete. It is no answer to say that the 10% DBE threshold is merely a goal. The Infrastructure Act and implementing regulations at 49 C.F.R. pt. 26 and 13 C.F.R. pt. 124 ensure that DBE participation is an integral part of contracting, and the efforts of general contractors to meet that goal are heavily scrutinized. And regardless, "goal" or not, the DBE Program exists purely to target specified racial groups. Using race as a negative for certain applicants in this way disregards "the clear and central purpose" of the Equal Protection Guarantee to ensure that the government does not engage in or promote invidious discrimination, enshrining instead, the pernicious classifications by ancestry into federal law. *SFFA*, 600 U.S. at 206, 217. Government must treat applicants "as individuals, not as simply components of a racial, . . . sexual, or national class." *Id.* at 223 (quoting *Miller v. Johnson*, 515 U.S. 900, 911 (1995)). The race-based mission of the DBE Program has "turn[ed] that principle on its head[,]" "effectively assur[ing] that race will always be relevant." *Id.* at 223–24 (citation omitted). Because the DBE Program uses race as a negative, excluding a wide variety of applicants that are otherwise qualified to bid on projects funded with federal funds, the program violates the Constitution.

### ii.   The DBE Program operates upon illegal racial stereotyping.

The DBE Program also runs afoul of the second of the "twin commands" that race "may not operate as a stereotype." *SFFA*, 600 U.S. at 218. The Supreme Court has long cautioned against assuming that an individual's abilities or worldview are derivative of that person's skin color. *See Gratz v. Bollinger*, 539 U.S. 244, 271 (2003) ("impermissibl[e]" to rate an applicant on the "presumption that 'persons think in a manner associated with their race'") (quoting *Metro*

*Broadcasting, Inc. v. FCC*, 497 U.S. 547, 618 (1990) (O'Connor, J., dissenting)). When the government makes decisions on the basis of race, "it engages in [an] offensive [] assumption" that "demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities." *SFFA*, 600 U.S. at 220 (quoting *Miller*, 515 U.S. at 911–12; *Rice v. Cayetano*, 528 U.S. 495, 517 (2000)). Such "stereotypes that treat individuals as the product of their race, evaluating their [] efforts—their very worth as citizens" are "barred to the Government by history and the Constitution." *Id.* at 221 (citation and internal quotation marks omitted).

Unfortunately, this is precisely what the DBE Program does. It assumes, based on nothing more than demographic considerations beyond an applicant's control, that members of certain groups should be defined based upon those characteristics rather than upon their individual abilities. In other words, the DBE Program affords preferred status to certain groups based upon the presumption that they "always (or even consistently)" require help to succeed, while erecting barriers to others who supposedly "always (or even consistently)" have a track record of success based on their own demographic characteristics. *Id.* at 211 (citing *Grutter*, 539 U.S. at 333).

This stereotyping is antithetical to the principles of equality, justice, and basic human dignity. In fact, the only aspect of equality the DBE Program embraces is that it imposes some form of dignitary harm on everyone involved. Applicants in the favored groups under the DBE Program are the subjects of pernicious stereotyping: they are accorded the status of "disadvantaged" based on their race or gender based solely on an immutable characteristic. Meanwhile, Plaintiffs and others similarly situated are denied the opportunity to compete on equal footing for the same work based on those same characteristics under an assumption of "privilege," whether they come from generations of family wealth or have only a few dollars to their name.

Stereotyping hurts everyone and helps no one. The DBE Program fuels misperceptions and division by promoting the false dichotomy that a white male is automatically privileged while a black female is inherently a helpless victim. In any individual case, that might be true—or it might just as easily be false. The DBE Program's policy of placing a thumb on the scale for certain groups on the basis of pernicious stereotyping violates the Equal Protection Guarantee.

**B.   The DBE Program discriminates based on sex in violation of the Constitution.**

The DBE Program also provides preferential treatment to certain individuals based on sex. While the standard that government must meet to satisfy differential treatment based on sex is lower than that required to differentiate on the basis of race, such differential treatment is nevertheless also "presumptively invalid." *Vitolo*, 999 F.3d at 364 (citing *United States v. Virginia*, 518 U.S. 515, 531 (1996)). An "exceedingly persuasive justification" is required. *Virginia*, 518 U.S. at 531. If a government initiative that provides preferential treatment based on sex is to survive, it must serve an important objective, and the classification must be "substantially and directly related" to that objective. *Vitolo*, 999 F.3d at 364 (quoting citation omitted).

**1.   The DBE Program does not serve an "important" governmental objective.**

"[P]roving broad sociological propositions by statistics is a dubious business, and one that inevitably is in tension with the normative philosophy which underlies the Equal Protection Clause." *Craig v. Boren*, 429 U.S. 190, 204 (1976). Prioritizing women-owned businesses for its own sake is not an important governmental interest. The "mere recitation of a benign, compensatory purpose is not an automatic shield which protects against any inquiry into the actual purposes underlying a statutory scheme." *Weinberger v. Wiesenfeld*, 420 U.S. 636, 648 (1975). In other words, simply stating that the DBE Program is intended to help women does not, in and of itself, satisfy the "important governmental objective" prong. To satisfy an important objective in

20

the context of remediating sex discrimination, "the government first needs proof that the discrimination occurred," and "must show that the sex being favored 'actually suffer[ed] a disadvantage' as a result of discrimination *in a specific area or field*." *Vitolo*, 999 F.3d at 364 (quoting *Miss Univ. for Women v. Hogan*, 458 U.S. 718, 728 (1982)) (emphasis added). As in the racial context, statistical disparities "do nothing to support an inference of intentional discrimination." *Vitolo*, 999 F.3d at 365. Absent proof of intentional discrimination, "a policy that discriminates on the basis of sex cannot serve a valid governmental objective." *Id.*

Here, as was the case with the race-based classifications, the DBE Program is not supported by evidence of specific instances of sex discrimination requiring remediation—much less intentional, governmental discrimination in specific geographical areas and industries within the roadbuilding/surface transportation context. Once again, "general claims of societal discrimination are not enough": it is not enough to allege that there is a lower percentage of women involved in construction nationwide than there are women generally. *Id.* at 364 (citing *Hogan*, 458 U.S. at 727–29). If the aim of "racial balancing" for its own sake is "patently unconstitutional," the aim of "gender balancing" necessarily is as well. *See Grutter*, 539 U.S. at 330. And the statute's formulaic recitation of "findings" first incorporated in 2012 that Congress reviewed "testimony and documentation" that "provide a strong basis that there is a compelling need for the continuation of the disadvantaged business enterprise program" does not make it so. *See* P.L. 117-58, § 11101(e)(1)(E). A preference for 50% of the population narrowed only by a career choice "cannot in any realistic sense be tied to any injury suffered by anyone." *See Croson*, 488 U.S. at 499.

### 2. The DBE Program is not "substantially and directly related" to its objective.

Even if Congress had documented instances of past discrimination against women in roadbuilding industries, the DBE Program would still violate the Equal Protection Guarantee because its generic targeting of women business owners based on sex is not substantially and directly related to remedying past discrimination. Like narrow tailoring in the racial context, this inquiry tests how closely linked the proposed remedy is to its purpose. The "burden of justification is demanding and it rests entirely on the [government]." *Virginia*, 518 U.S. at 533.

In *Vitolo*, the government contended that women "'struggled to receive pandemic aid from the Federal government' from prior aid programs." 999 F.3d at 365. But the court there pointed out a "ready alternative" to simply using sex as a proxy—"[g]ive priority to restaurant owners who did not receive prior aid. There is no need to use sex as a proxy when the government seeks to remedy a problem that is purely economic." *Id.* Where there is "no effort to tailor" a system that uses sex as a qualification, the policy "cannot serve a valid governmental objective." *Id.*

So too here. The DBE Program uses sex as a proxy, presuming that every woman is disadvantaged whether she's breaking into the construction industry or is a forty-year veteran of it. Meanwhile, men who are not part of the DBE's system of racial preferences are unable to compete on a level playing field. Because of the inherent inequality of the DBE Program, Plaintiffs lose out to DBEs, including women-owned enterprises. *See* Decl. K. Koetter ¶¶ 21–35; Decl. G. Bagshaw ¶¶ 14–21. This Court should not continue to allow the DBE Program to create these artificial divisions in perpetuity. Because the DBE Program does not offer an "exceedingly persuasive justification" for its gender preference, it is unconstitutional.

**C.     The DBE Program violates the Administrative Procedure Act because it operates in a manner contrary to a constitutional right.**

The DBE Program also violates the Administrative Procedure Act (APA). Under the APA, courts must "hold unlawful and set aside" final "agency action," including "an agency rule," "found to be contrary to constitutional right." 5 U.S.C. §§ 706(2)(B), 704, 551(13). As described above, the DBE Program does not satisfy the constitutional criteria for treating applicants differently based on either race or sex. The DBE Program's regulations at 49 C.F.R. pt. 26 and 13 C.F.R. pt. 124, implementing the race- and sex-based presumptions violate the Fifth Amendment's Equal Protection Guarantee and, by extension, the APA.

**III.     The remaining preliminary injunction factors are also satisfied.**

Because the DBE Program does not even come close to meeting the "daunting" demands of constitutional scrutiny, Plaintiffs have a high likelihood of success on the merits, and it is "unnecessary to dwell on the remaining three [preliminary injunction] factors," which are readily satisfied in a constitutional case like this one. *Roberts v. Neace*, 958 F.3d 409, 416 (6th Cir. 2020).

**A.     Absent an injunction, Plaintiffs will suffer irreparable harm.**

When "a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001); *Husted*, 697 F.3d at 436 (constitutional harms cannot be fully compensated by money damages; "irreparable injury is presumed"). Indeed, "equal protection rights are 'so fundamental to our legal system and to our society that any violation thereof will cause irreparable harm irrespective of the financial impact.'" *M. C. W., Inc. v. Lewis*, 522 F. Supp. 338, 341 (M.D. Tenn. 1981) (citation omitted).

Here, Plaintiffs satisfy the burden of proving irreparable injury. Their primary complaint is that the DBE Program deprives them of the constitutional right to equality under the law—the opportunity to be considered and either accepted or rejected for government contracts on equal

footing with those of all races and both sexes. *E.g.*, ECF 1 ¶¶ 8, 40–42, 51. Likewise, Plaintiffs'

claim seeks to remedy a dignitary harm that can never be fully rectified by money damages. *E.g.*,

*Caspar v. Snyder*, 77 F. Supp. 3d 616, 635–36 (2015) (unequal treatment produces "severe

emotional harm through the assault on Plaintiffs' dignity"); *Heckler v. Mathews*, 465 U.S. 728,

739–40 (1984) (recognizing the Court's "repeated[] emphasi[s]" on the stigmatiz[ation] caused by

racial discrimination as "serious non-economic injur[y]").

      **B.**      **The balance of harms and public interest favor an injunction.**

     "The third and fourth factors of the preliminary injunction analysis—harm to others and

the public interest—'merge when the Government is the opposing party.'" *Does #1-9 v. Lee*, 574

F. Supp. 3d 558, 563 (M.D. Tenn. 2021) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). That

is because when a statute is enjoined, the government necessarily suffers the irreparable harm of

denying the public the enforcement of its laws, causing the government's interest to merge with

that of the public. *See Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers).

     When, as here, a "plaintiff shows a substantial likelihood that the challenged law is

unconstitutional, no substantial harm to others can be said to inhere in its enjoinment" because "it

is always in the public interest to prevent violation of a party's constitutional rights." *Deja Vu of

Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty., Tennessee*, 274 F.3d 377, 400 (6th

Cir. 2001) (citation and internal quotation marks omitted). Indeed, "[t]he public interest is

promoted by the robust enforcement of constitutional rights." *Am. Freedom Def. Initiative v.

Suburban Mobility Authority for Reg'l Transp.*, 698 F.3d 885, 896 (6th Cir. 2012), *abrogated on

other grounds by Am. Freedom Def. Initiative v. Suburban Mobility Authority for Reg'l Transp.*,

978 F.3d 481 (6th Cir. 2020).

     Plaintiffs seek only the guarantee of equal treatment under law required by the

Constitution—a fundamental right afforded to *every* individual across America. Defendants, by

contrast, do not have a protectible interest in perpetuating a federal program that has not moved the needle on its own stated goal, despite a four-plus decade experiment costing untold billions of public dollars. The balance of harms strongly favors Plaintiffs and those similarly situated.[5]

## CONCLUSION

For the foregoing reasons, Plaintiffs request that this Court grant its motion and enter a preliminary injunction in the form of the proposed order, pending the outcome of this litigation on the merits.

Dated December 15, 2023.

WISCONSIN INSTITUTE FOR
LAW & LIBERTY, INC.

*s/ Daniel P. Lennington*

Richard M. Esenberg (WI Bar No. 1005622)
Daniel P. Lennington (WI Bar No. 1088694)
Cara M. Tolliver (WI Bar No. 1112818)
330 East Kilbourn Avenue, Suite 725
Milwaukee, WI 53202
Telephone: (414) 727-9455
Facsimile: (414) 727-6385
Rick@will-law.org
Dan@will-law.org
Cara@will-law.org

*Attorneys for Plaintiffs*

---

[5] Plaintiffs should not be required to post a bond. Although Fed. R. Civ. P. 65(c) appears to be mandatory because it provides that a court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security," the rule in this Circuit "has long been that the district court possesses discretion over whether to require the posting of security." *Moltan Co. v. Eagle-Picher Indus.*, Inc., 55 F.3d 1171, 1176 (6th Cir. 1995). This Court should exercise its discretion not to require a bond. Plaintiffs are seeking to vindicate their constitutional rights and those of thousands of other business owners; they are not seeking damages or other monetary relief that would need to be repaid in the event a preliminary injunction is later vacated. Further, Plaintiffs are represented by pro bono counsel. The amount of any bond, were one required, would surely exceed the financial resources of Plaintiffs many times over due to the national scope of the DBE Program. Courts have declined to require a bond where such a requirement would "strain [a party's] limited financial resources." *Planned Parenthood Great Nw. v. Cameron*, 599 F. Supp. 3d 497, 513 (W.D. Ky. 2022).