IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY

MID-AMERICA MILLING COMPANY, LLC, et al.,

    Plaintiffs,

v.                                              Case No. 3:23-cv-72

UNITED STATES DEPARTMENT
OF TRANSPORTATION, et al.,

    Defendants.

## DECLARATION OF KRAMER KOETTER

Pursuant to 28 U.S.C. § 1746, I, Kramer Koetter, declare as follows:

1. I am the Assistant General Manager for Mid-America Milling Company, LLC ("MAMCO"), one of the Plaintiffs in the above lawsuit. I make this declaration based upon my personal knowledge.

2. MAMCO provides milling services for highway projects, including bridge rehabilitation. The company has been in business since 1981 and employs 32 across approximately two dozen states.

3. Milling is the process of removing some or all of the surface of a paved and/or concrete area, such as a road or bridge, to create an even base on which to repave.

4. Milling allows a road surface that may have incurred damage due to pavement damage, weather events, or years of wear and tear to be refreshed—thereby extending the life of the roadway or bridge. It can also redress problems such as uneven surfaces, drainage problems, and other issues that can develop over time.

5. Milling is environmentally friendly in that reclaimed asphalt pavement (produced from the milling process) can be recycled and used to make new asphalt.

6. Milling contractors like MAMCO employ heavy equipment operators and use specialized equipment to perform their work.

7. MAMCO regularly bids on roadbuilding contracts funded by the United States Department of Transportation and overseen by the Federal Highway Administration (FHWA) in dozens of states across the country, and successfully performs dozens of federal roadbuilding contracts each year.

8. Federal highway contracts make up approximately 65% of MAMCO's annual business, on average.

9. MAMCO's primary states for work include Indiana, Kentucky, Tennessee, Arkansas, and Ohio. The company also frequently successfully bids for work on toll roads in many other states.

10. Although MAMCO bids and works most frequently in the areas in the previous paragraph, it also bids and performs work in other states, including Mississippi, Delaware, Alabama, Louisiana, Virginia, Oklahoma, South Carolina, West Virginia, Missouri, Illinois, North Carolina, Georgia, Michigan, Iowa, Kansas, Minnesota, Texas, and portions of northern Florida.

11. I have personal knowledge of and experience with the bidding process for highway work funded with federal funds, including the impact of the disadvantaged business enterprise (DBE) program on MAMCO's business.

12. State departments of transportation that oversee spending of federal highway funds frequently engage in "letting," or the process of putting out major projects for bid, using an online

system. The departments set goals for the participation of DBEs on projects, as required by federal law.

13. According to federal and state agencies, MAMCO cannot qualify as a federal DBE. The majority of our owners are neither women nor minorities. Our business is owned by six individuals, two of which are women (including myself).

14. A prime contractor meeting the DBE goals for a particular state contract is an important consideration for subcontractors getting the work.

15. For example, Indiana's DBE certification provides, "I understand that neither my company nor I will be penalized for failure to achieve the dollar amounts listed *beyond the contract goal*." In other words, the DBE contract goal acts as a de facto set aside until that percentage quota is met. And if a prime contractor cannot meet the goals, they must complete a considerable amount of paperwork to prove their efforts, which is not only time-consuming but expensive.

16. For the purposes of determining whether a contractor has hit the DBE goal, not all DBEs are treated equally. As an example, a supplier manufacturer that is a DBE receives 100% credit, dollar for dollar, counted toward the DBE goal on a particular project, whereas a supplier regular dealer receives 60% credit, and a supplier broker receives credit for fees and commissions only.

17. To further illustrate this system of DBE credits, if a DBE produces and supplies its own concrete for a road project, 100% of the contract is counted toward the DBE goal. If, on the other hand, the DBE merely acts as a broker and sources the concrete from a non-DBE, only the fees and commissions paid to the DBE count toward the contract goal. A "regular dealer" is something in between. If a DBE regularly sells a product that is used for a road project and then

supplies that same type of product for a construction project, it may be considered a "regular dealer" entitled to 60% credit.

18. When bidding on a project, MAMCO must consider various factors when settling on a proposed price for the work. These factors include, but are not limited to, labor costs (including union area rates), material costs, fuel costs, the location of the project, hotels if applicable, the scope of the work, the personnel and equipment resources that MAMCO will need to deploy, and timing with other projects.

19. If MAMCO pursues a given project, our estimators will submit extensive documentation about our scope of work, our proposed price (including, but not limited to, the breakdown for materials and labor), and other information.

20. In many states, including Indiana and Kentucky, all prime contractors who submit bids are required to use the state's DBE Directory to find and verify DBE contractors before electronically uploading their bids.

21. On numerous occasions, MAMCO has bid on milling work but has lost out to a DBE with a higher bid.

22. In 2022 and the first eleven months of 2023 alone, MAMCO lost contracts in the amount of approximately $1,413,752 to DBEs with higher bids. This figure is just for federally funded jobs in the state of Indiana for those twenty-three months alone.

23. For example, for a job in Monroe County, IN, in April 2022, MAMCO bid $3,822.00 for milling and asphalt work, while a DBE bid $7,422.00. Despite bidding nearly twice as much, the DBE was awarded the work.

24. Likewise, in December 2022, MAMCO bid $23,244 for reconstruction work in Lake County, IN. The contract was awarded to a DBE for $32,370.

25. The year 2022 was not an outlier. The trend of losing contracts to less attractive bids by DBEs continued in 2023. For example, in March 2023, MAMCO bid $7,478.03 for transportation work for INDOT in Franklin County, IN, but lost the work to a DBE's bid of $13,580.28.

26. In a milling, asphalt, and patch job in Newton County, IN, also in March 2023, MAMCO bid $191,712.49. A DBE was once again awarded the work, despite the much higher bid of $245,805.00 for the same scope of work.

27. In May 2023, MAMCO bid $12,804.40 but lost to a DBE, which bid $16,000 for the same milling and asphalt work in Marshall and Fulton Counties, IN.

28. In September 2023, MAMCO bid $15,433.00 for milling and asphalt work in Greene County, IN, but lost to a DBE's higher bid of $18,934.00.

29. The examples I have listed above are far from the only instances of MAMCO losing out to DBEs (despite lower bids). Based on a review of MAMCO's records, I concluded that MAMCO lost at least 82 contracts to DBEs with higher bids since January 2022 in the state of Indiana alone.

30. MAMCO faces the same issues in Kentucky, as well as the other dozens of states listed above, when bidding projects funded with federal transportation dollars.

31. When MAMCO submits bids for milling, asphalt, and related work but is rejected in favor of a DBE with a higher bid, we are denied the opportunity to compete on an equal footing for these contracts. As noted above, these contracts have been, and continue to be, an essential part of our business.

32. When a contract is awarded to a company with a higher bid based upon its DBE status, MAMCO and its employees are not the only ones affected. Because these projects are

funded with federal transportation dollars, American taxpayers are paying more than is necessary for the work.

33. Moreover, absent discriminatory criteria mandating race and gender preferences for contractors, MAMCO would not be deterred from further competition for federal roadbuilding contracts and could place additional bids.

34. The DBE program's discriminatory preferences have placed, and continue to place, MAMCO at a disadvantage.

35. If discriminatory barriers did not exist in the DBE program, MAMCO would be able to compete for contracts on equal footing without regard to race or gender.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: December 11, 2023.

_____
Kramer Koetter