## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## CENTRAL DIVISION
## FRANKFORT

**MID-AMERICA MILLING COMPANY, LLC, *et al.*,**

**Plaintiffs,**

**v.**

**UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*,**

**Defendants.**

**Case No. 3:23-cv-00072-GFVT**

## DEFENDANTS' RESPONSE IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

The Court should deny Plaintiffs' Motion for Preliminary Injunction, ECF No. 27, because Plaintiffs have failed to establish that they are entitled to the extraordinary remedy of preliminary injunctive relief against the operation of the Department of Transportation's Disadvantaged Business Enterprise (DOT DBE) program. First, Plaintiffs cannot demonstrate a clear likelihood of success on the merits because Plaintiffs do not have standing to challenge the program, and even if they had standing, the DOT DBE program survives strict scrutiny and has been held constitutional by every court of appeals that has reviewed the program. Second, Plaintiffs have failed to show they are at imminent risk of suffering irreparable harm absent an injunction—notably, they do not identify any current transportation construction contract letting process that has race- or gender-based subcontracting goals due to the DOT DBE program. Finally, the balance of equities and the public interest weigh heavily in the government's favor. Any alleged burden on the constitutional rights of Plaintiffs' owners is far outweighed by the burden that would be created

by requiring the suspension of DOT's effort to remedy specified past and ongoing discrimination in the transportation industry. Finally, even if the Court awards injunctive relief, any injunction should be carefully tailored to remedy Plaintiffs' alleged injuries.

## I.      BACKGROUND

### A.      The DOT DBE Program

The DOT DBE program is designed to provide fair and efficient small business contracting, including by remedying ongoing discrimination and the continuing effects of past discrimination in federally assisted highway, transit, and airport contracting markets nationwide. *See* 49 C.F.R. § 26.1; *see also, e.g.*, *W. States Paving Co. v. Wash. State Dep't of Transp.*, 407 F.3d 983, 991–93 (9th Cir. 2005) (holding that the program serves the compelling interest of correcting and preventing discrimination in the "transportation contracting industry"). To that end, the DOT DBE program requires state and local recipients of federal transportation funds to set overall goals for the participation of "socially and economically disadvantaged" small business owners on public contracts, based on local market conditions. *See* Pub. L. No. 177-58, § 11101(e), 135 Stat. 429, 449 (Nov. 15, 2021) (Infrastructure Act); 49 C.F.R. § 26.45. "[S]ocially disadvantaged individuals" are "those who have been subjected to racial or ethnic prejudice or cultural bias within American society[.]" 49 C.F.R. Part 26 app. E. "Economically disadvantaged individuals are socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired . . . as compared to others in the same . . . line of business who are not socially disadvantaged." *Id.* Any person may qualify as socially and economically disadvantaged (a prerequisite for DBE status), regardless of their race or gender. 49 C.F.R. § 26.67(d) & app. E. The only race- or gender-based aspects of the DOT DBE program are the rebuttable presumptions of social and economic disadvantage afforded to applicants who are women or members of certain

racial and ethnic groups. 49 C.F.R. § 26.5.

The Infrastructure Act provides that, "[e]xcept to the extent the Secretary [of Transportation] determines otherwise," "not less than" 10 percent of federal funding for surface transportation and public transit projects "shall be expended" on contracts awarded to small business concerns "owned and controlled by socially and economically disadvantaged individuals." Pub. L. No. 117-58, § 11101(e)(3), 135 Stat. at 449. This national goal, however, is only "aspirational" and has no impact on the program's implementation. 49 C.F.R. § 26.41(b). Recipients are not required "to set overall or contract goals at the 10 percent level, or any other particular level, or to take any special administrative steps if their goals are above or below 10 percent." *Id.* § 26.41(c). Instead, each recipient must set an overall DBE goal "based on demonstrable evidence of the availability of ready, willing and able DBEs relative to all businesses ready, willing and able to participate on" contracts that the recipient oversees. *Id.* § 26.45(a)–(b). In determining the local DBE participation goal, recipients may "account for the continuing effects of past discrimination . . . or the effects of an ongoing DBE program" and may adjust the local goal "based on demonstrable evidence that is logically and directly related to the effect for which the adjustment is sought." *Id.* § 26.45(d).

A recipient of DOT funding "must meet the maximum feasible portion of [its] overall [DBE] goal by using race-neutral means." *Id.* § 26.51(a).[1] If race-neutral means are not sufficient, then the recipient sets goals for DBE subcontractor participation on specific contracts. *Id.* § 26.51(d). Even then, a recipient may only include contract goals to the extent necessary to meet

---

[1] "Race-neutral" refers to a "measure or program . . . that is, or can be, used to assist all small businesses [and] includes gender-neutrality," whereas "race-conscious" or "race-based" refers to a "measure or program . . . that is focused specifically on assisting only DBEs, including women-owned DBEs." 49 C.F.R. § 26.5.

any portion of its overall goal that it could not meet with race-neutral means. *Id.* § 26.51(d), (f)(2). Thus, a DOT funding recipient might never include DBE goals on contracts, and non-DBE subcontractors may compete against DBEs in an open market depending upon the contract.

Finally, a DBE participation goal does not operate as a quota or set-aside. *See* 49 C.F.R. § 26.43. Instead, the prime contractor must meet the goal by hiring DBE subcontractors or show that it could not do so despite using good-faith efforts. *Id.* § 26.53 & App. A. If the prime contractor used good-faith efforts, it may not be denied an award because of its failure to meet the goal. 49 C.F.R. § 26.53. A non-DBE subcontractor is free to bid on any subcontract, regardless of whether it includes a DBE participation goal.

### B.    Procedural History

On October 13, 2023, Plaintiffs filed a Complaint challenging the constitutionality of certain provisions of the DOT DBE program that apply to "socially and economically disadvantaged individuals." *See, e.g.*, Compl., ECF No. 1 (Complaint), ¶ 3 (quoting Pub. L. No. 117-58, § 11101(e), 135 Stat. at 449). Notably, the Complaint does not allege whether Plaintiffs' owners are socially or economically disadvantaged, or identify their race or gender. Nor does the Complaint identify the Plaintiff businesses' ownership structure or their small business status. And although Plaintiffs purport to "seek relief against Defendants alone," *id.* ¶ 42, they nevertheless seek injunctive and declaratory relief that would "end[] the DBE program once and for all," *id.* ¶ 10. On December 15, 2023, more than two months after they filed the Complaint and 40 years after Congress first authorized the DOT DBE program, Plaintiffs filed a motion for a preliminary injunction. *See* ECF No. 27. That motion seeks an injunction "prohibiting Defendants from implementing or enforcing the DBE Program's race and gender presumptions and DBE participation goal as set forth in P.L. 117-58, § 11101(e) and in 49 C.F.R. §§ 26.21, 26.41, 26.45,

26.47, 26.5, 26.51, 26.53, 26.67, 26.69, and 13 C.F.R. §§ 124.101, 124.103, 124.104, 124.105, and/or as otherwise applied to the DBE Program and other DBE programs and services" while this case proceeds. *Id.* at 1.

## II.   LEGAL STANDARD

A preliminary injunction is an "extraordinary and drastic" remedy, "never awarded as of right." *Am. Civil Liberties Union Fund of Mich. v. Livingston Cty.*, 796 F.3d 636, 642 (6th Cir. 2015) (internal quotation marks and citation omitted). In determining whether to grant a preliminary injunction, the Court considers: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Am. Civil Liberties Union Fund of Mich.*, 796 F.3d at 642 (internal quotation marks and citation omitted). The plaintiff bears the burden of proving that an injunction is proper. *See Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). And "the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion." *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012) (quoting *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (internal quotation marks omitted).

## III.   ARGUMENT

### A.   Plaintiffs Cannot Show that They Are Likely to Succeed on Their Facial Challenge to the DOT DBE Program.

#### 1.   Plaintiffs Lack Standing.

Plaintiffs cannot show that they are likely to succeed on their facial challenge to the DOT DBE program because they lack standing to do so. A "party who fails to show a 'substantial likelihood' of standing is not entitled to a preliminary injunction." *Memphis A. Philip Randolph*

*Inst. v. Hargett*, 978 F.3d 378, 386 (6th Cir. 2020) (quoting *Waskul v. Washtenaw Cty. Cmty. Mental Health*, 900 F.3d 250, 256 n.4 (6th Cir. 2018)). This is because "an affirmative burden of showing a likelihood of success on the merits . . . necessarily includes a likelihood of the court's *reaching* the merits, which in turn depends on a likelihood that plaintiff has standing." *Waskul*, 900 F.3d at 256 n.4 (quoting *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 328 (D.C. Cir. 1987) (internal quotation marks omitted)) (emphasis in original).

Article III standing requires a plaintiff to establish: (1) a concrete and particularized, actual or imminent injury (2) that is traceable to the defendant, and (3) proof that a favorable outcome would redress the harm. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *Vonderhaar v. Vill. of Evendale*, 906 F.3d 397, 401 (6th Cir. 2018). Plaintiffs have not shown an injury in fact, nor have they shown that they have suffered a traceable and redressable injury.

> a.  *Plaintiffs Have Not Shown They Have Suffered an Injury in Fact Because They Do Not Show They Have Lost Out on Specific Contracts with DBE Participation Goals or that They Likely Will Do So in the Future.*

Plaintiffs lack standing because they have not shown they have suffered an injury in fact. In an equal protection challenge to racial or gender classifications, a plaintiff may show injury in fact where it adequately pleads that it is "able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.* (*Jacksonville*), 508 U.S. 656, 666 (1993). In *Jacksonville*, the Supreme Court held that an association of general contractors established an injury in fact where many of its members "regularly bid on and perform[ed] construction work for the City of Jacksonville," and "would have . . . bid on . . . designated set aside contracts but for the restrictions imposed" by a city ordinance that set aside funding for city projects for certain minority-owned businesses. *Id.* at 659 (internal quotation marks and citation omitted); *see also*

6

*Bruckner v. Project Mgmt. Corp.*, __ F. Supp. 3d __, 2023 WL 2744026, at *4 (M.D. Fla. Mar. 31, 2023) ("a plaintiff must 'clearly' 'allege facts demonstrating' that he is 'able and ready' to bid on contracts under a discriminatory scheme") (quoting *Spokeo*, 578 U.S. at 338; *Jacksonville*, 508 U.S. at 666).

Plaintiffs assert that they are "able and ready to bid" on transportation contracts "impacted by Defendants' implementation of the federal DBE program," and allege that the 10 percent goal is "not merely aspirational in practice" but "bars companies like Plaintiffs from competing on equal footing with DBE enterprises." Br. in Supp. of Pls.' Mot. for Prelim. Inj., ECF No. 27-1 (Brief) at 4-5; *see also* Decl. of Kramer Koetter, ECF No. 27-2 (Koetter Decl.), ¶ 35. These conclusory statements are not enough, however, to establish injury in fact. *See, e.g.*, *Bruckner*, 2023 WL 2744026, at * 4.

First, Plaintiffs mischaracterize the DOT DBE program, stating that DBE participation goals are essentially "quotas" that amount to a "gender- and race-based mandate" that "10% of all new surface transportation funding" shall be allocated to DBEs. *See* Br. at 2. This is incorrect. The DOT DBE program expressly prohibits recipients from using quotas to meet DBE goals. *See* 49 C.F.R. § 26.43(a). Second, the program does not *require* that 10 percent of surface transportation federal funding be allocated to DBEs. The authorizing statute calls for the expenditure of "not less than 10 percent" of funds with DBEs "except to the extent the Secretary determines otherwise." Pub. L. No. 117-58, § 11101(e)(3), 135 Stat. at 449. In exercising that discretion, the Secretary has decided to treat the 10 percent goal as only "an aspirational goal at the national level" that "does not authorize or require recipients to set overall or contract goals at the 10 percent level, or any other particular level." 49 C.F.R. § 26.41. Importantly, recipients—not Defendants—set their own goals, which must be based on "demonstrable evidence of the availability of ready,

willing and able DBEs relative to all businesses ready, willing and able to participate" in DOT-assisted contracts, and "must reflect [the recipient's] determination of the level of DBE participation [it] would expect absent the effects of discrimination." *Id*. § 26.45(b). And a recipient may not "simply rely on either the 10 percent national goal, [its] previous overall goal, or past DBE participation rates in [its] program without reference to the relative availability of DBEs in [its] market." *Id*.

Recipients are likewise prohibited from using set-aside contracts for DBEs, except for limited and extreme circumstances "when no other method could be reasonably expected to redress egregious instances of discrimination." *Id*. § 26.43(b). Notwithstanding the language regarding the use of set asides in "limited and extreme circumstances," there is no evidence that any recipient uses set asides in *any* circumstances, and Plaintiffs do not demonstrate otherwise. *See* Ex. 1, Decl. of Martha Kenley (Kenley Decl.), ¶ 3.

While some contracts do include DBE participation subcontracting goals, that fact alone does not establish standing because many contracts do *not* have DBE goals, and non-DBE subcontractors can participate on contracts with goals. Plaintiffs allege generally in their Complaint that they bid on contracts with DBE goals, *see* Compl. ¶ 37, but they do not show or even allege that their bids on these contracts have ever been unsuccessful.[2] Nor do Plaintiffs

---

[2] Plaintiffs state that they submitted low bids for DOT-funded contracts and that the contracts were awarded to DBEs, and they suggest that such information, standing alone, constitutes evidence that they were harmed by the DBE presumptions. *See* Compl. ¶¶ 8, 38; Koetter Decl., ¶¶ 21–30; Decl. of Gregory Bagshaw, ECF No. 27-3 (Bagshaw Decl.), ¶¶ 14–15. But not being selected for a contract does not mean that the contracts they cite necessarily had DBE participation goals. DBEs can and do bid on contracts without DBE goals, and prime contractors may choose not to award contracts to the low bidder for reasons unrelated to DBE status (for example, based on the quality of a bidder's work). *See* Ex. 1 (Kenley Decl.), ¶ 5 (explaining that numerous factors are considered in awarding a contract other than DBE status and that contracts are awarded to recipients who have not submitted the lowest bid regardless of DBE status).

identify any specific contracts with goals on which they intend to bid in the future. Although Plaintiffs allege generally that "Kentucky and Indiana have established DBE goals according to the federal regulations," Compl. ¶ 35, and that "[b]oth states use DBE goals on their projects," Bagshaw Decl., ¶ 13, they fail to allege whether they intend to bid on or pursue specific contracts with DBE participation goals.

For instance, Plaintiff Bagshaw Trucking's vice president states only that "Indiana and Kentucky continuously post new opportunities to bid, and these upcoming projects continue to require DBE goals, just as they have for decades," and "it is certain that each month that goes by, Bagshaw [Trucking] will continue to be negatively impacted by the race and gender preferences imposed by the DBE program." Bagshaw Decl., ¶ 17. But under the program, even contracts with DBE goals do not require 100 percent DBE participation and require prime contractors only to make good faith efforts to meet those goals. *See* 49 C.F.R. §§ 26.51(d)–(e), 26.53. And Plaintiff MAMCO does not even state that it intends to bid on upcoming contracts that contain DBE goals, and instead states only that absent the race- and gender-based provisions in the DBE program, "MAMCO would not be deterred from further competition for federal roadbuilding contracts and could place additional bids." Koetter Decl., ¶ 33. Plaintiffs have thus not shown that the DBE program has caused them any injury or will do so in the future.

> b.    *Plaintiffs Fail to Demonstrate Traceability or Redressability Because They Do Not Show that Enjoining Application of the DOT DBE Program's Rebuttable Presumptions Would Redress Their Alleged Injuries.*

Plaintiffs' failures to show an injury that is either fairly traceable to Defendants' allegedly unconstitutional conduct or redressable by a court order are independent bases for denying Plaintiffs' motion. To establish standing, "plaintiffs must not only trace an injury in fact to the defendant's conduct, but they also must establish that their requested relief will redress the injury."

*Mann Constr., Inc. v. United States*, 86 F.4th 1159, 1162 (6th Cir. 2023) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998)). "If that relief does nothing to redress the alleged injury, a court could do nothing more than issue a jurisdiction-less 'advisory opinion.'" *Id.* (quoting *California v. Texas*, 141 S. Ct. 2104, 2116 (2021)).

As discussed above, the only part of the DOT DBE program that is race- or gender-based— and therefore even potentially susceptible to Plaintiffs' equal protection challenge—is its inclusion of rebuttable presumptions of disadvantage. The "practice of setting goals for DBE participation on some projects . . . is facially neutral because the DBE program requires only that qualifying firms be certified as disadvantaged, not that they be owned and run by individuals of a particular race or gender." *Klaver Const. Co. v. Kan. Dep't of Transp.*, 211 F. Supp. 2d 1296, 1302 (D. Kan. 2022). "What renders these facially neutral practices potentially race- or gender-conscious is the fact that [the program] accords a rebuttable presumption of disadvantaged status to individuals who belong to certain groups that historically have been subjected to social and economic disadvantage." *Id.* In order to establish standing, therefore, Plaintiffs must show that their injuries are caused by the presumptions and would be remedied by enjoining those presumptions. And they must do more than merely speculate "that invalidating the allegedly unconstitutional preferences would ameliorate [Plaintiffs'] ability to compete in any way." *Cache Valley Elec. Co. v. Utah Dep't of Transp.*, 149 F.3d 1119, 1123 (10th Cir. 1998). In *Cache Valley*, the Tenth Circuit held that the plaintiff's alleged injury from the DOT DBE program was not redressable because "any anticipated redress from a favorable decision is wholly speculative" and that the plaintiff "adduced no evidence that the elimination of the preferences would result in any meaningful reduction in the number of qualifying DBEs." *Id.*

The same is true here. Plaintiffs fail to show that they would qualify for DOT DBE funding

under the race- and gender-neutral requirements of the program if the rebuttable presumptions were enjoined. Even if the DOT DBE program's presumptions were enjoined, the program would still continue to operate with its race- and gender-neutral requirements—including social and economic disadvantage, business size and structure, ownership, and wealth limits—intact. In that case, Plaintiffs would still only qualify as DBEs if they could show: (1) they are owned and controlled by socially- and economically-disadvantaged individuals; (2) their owners meet the personal wealth requirements; (3) they are small businesses; (4) their business structures comply with DOT DBE program requirements; and (5) their businesses are independent. *See* 49 C.F.R. § 26.67.

Plaintiffs fail to make any showings that they meet these requirements. And if Plaintiffs do not meet these race- and gender-neutral requirements—for example, if they are owned by individuals with a personal net worth exceeding $1.32 million, *see* 49 C.F.R. § 26.67(b), or if their average annual gross receipts exceed the cap, *see id.* § 26.65(b)—then enjoining the presumptions would leave Plaintiffs in exactly the same position and would certainly not redress their stated injury. *See Klaver Constr. Co.*, 211 F. Supp. 2d at 1304–05 (holding that plaintiff lacked standing because "even if the Court were to declare rebuttable presumptions unconstitutional and enjoin their use, [plaintiff's] alleged diminished competitiveness would not be materially altered because [plaintiff] would still be ineligible to participate in the DBE program for race- and gender-neutral reasons"); *see also Interstate Traffic Control v. Beverage*, 101 F. Supp. 2d 445, 453 (S.D. W. Va. 2000) ("Absent fraud, removing the complained-of conduct, the allegedly unconstitutional rebuttable presumption, from the application process would not alter the number or identity of socially and economically disadvantaged individuals eligible to participate in DBE."); *Rothe Dev., Inc. v. U.S. Dep't of Def.*, 836 F.3d 57, 61–64 (D.C. Cir. 2016) (holding that when a program

limited access to "socially and economically disadvantaged" individuals, but contained no presumptions about which groups met those definitions, it did not make race-based classifications and was subject to rational basis review).

## 2. The DOT DBE Program Survives Strict Scrutiny.

Even if the Court were to find that Plaintiffs have standing to seek preliminary relief, Plaintiffs are unlikely to succeed on their challenge to the DOT DBE program because it is constitutional. *See Midwest Fence Corp. v. U.S. Dep't of Transp.*, 840 F.3d 932, 935–36, 941 (7th Cir. 2016); *W. States Paving Co. v. Wash. State Dep't of Transp.*, 407 F.3d 983, 995 (9th Cir. 2005); *Sherbrooke Turf, Inc. v. Minn. Dep't of Transp.*, 345 F.3d 964, 967–68 (8th Cir. 2003); *Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147, 1155 (10th Cir. 2000).[3] This is so because

---

[3] Because Defendants can establish that both the race-based and gender-based classifications in the DOT DBE program satisfy strict scrutiny, Defendants focus on that level of constitutional analysis in this response. *See Clark v. Jeter,* 486 U.S. 456, 461 (1988) ("Classifications based on race or national origin . . . are given the most exacting scrutiny," while "intermediate scrutiny . . . generally has been applied to discriminatory classifications based on sex[.]") (internal citations omitted). In any case, the program's gender-based presumptions are equally constitutional and survive intermediate scrutiny because they are "substantially and directly related to the government's objectives." *Vitolo v. Guzman*, 999 F.3d 353, 364 (6th Cir. 2021) (internal quotation marks and citation omitted). Other courts reviewing the DOT DBE program, its predecessors, or similar state programs under intermediate scrutiny have reached the same conclusion for the same substantive reasons. *See Assoc. Gen. Contractors of Am., San Diego Chapter, Inc. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1195 (9th Cir. 2013) (concluding that because the state's affirmative action program "passes strict scrutiny," it "is therefore unnecessary to undertake a separate analysis under intermediate scrutiny"); *W. States Paving Co. v. Wash. State Dep't of Transp.*, 407 F.3d 983, 990 n.6 (9th Cir. 2005) ("[I]n this case, intermediate scrutiny would not yield a different result than that obtained under strict scrutiny's more stringent standard."); *Geyer Signal, Inc. v. Minn. Dep't of Transp.*, 2014 WL 1309092, at *12 n.4 (D. Minn. Mar. 31, 2014) (concluding that "[b]ecause race is also used by the DBE Program . . . the Program must ultimately meet strict scrutiny, and the Court therefore analyzes the entire Program for its compliance with strict scrutiny," and holding that it does); *N. Contracting Inc. v. Illinois*, 2004 WL 422704, at *24 n.34 (N.D. Ill. Mar. 3, 2004) ("Nevertheless, because the court concludes that the race-conscious provisions of the federal and state DBE programs survive strict scrutiny, it follows that the program's gender-conscious provisions survive the lesser 'intermediate scrutiny' standard.") (citation omitted).

the program is remedial, it is supported by a strong basis in evidence, and it is narrowly tailored.

Because the program's presumption of social and economic disadvantage includes a racial classification, it is subject to strict scrutiny. *See Adarand Constructors Inc. v. Peña*, 515 U.S. 200, 227 (1995). Under strict scrutiny, the government may employ race-based measures in "remedial settings" when necessary to dispel the effects of invidious discrimination. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989). The government "bears the initial burden of demonstrating" that the program is constitutional. *Rutherford v. City of Cleveland*, 179 F. App'x 366, 373 (6th Cir. 2006) (quoting *Associated Gen. Contractors of Ohio v. Drabik*, 214 F.3d 730, 735 (6th Cir. 2000)). Once the government has satisfied that burden by presenting evidence, the burden shifts to the plaintiff to prove its unconstitutionality. *See id.*; *Aiken v. City of Memphis*, 37 F.3d 1155, 1162 (6th Cir. 1994) ("The party challenging the [race-based affirmative action] plan, however, retains the ultimate burden of proving its unconstitutionality.").

> a.    The DOT DBE Program Serves a Compelling Governmental Interest.

> i.    There Is a Strong Basis in Evidence that the DOT DBE Program Is a Necessary Remedial Measure.

To employ race-based measures in "remedial settings," *Croson*, 488 U.S. at 493, the government must have "a strong basis in evidence for its conclusion that such action was necessary" to further its compelling interests. *Id.* at 500; *see Students for Fair Admission v. President & Fellows of Harvard Coll.* (*SFFA*), 600 U.S. 181, 207 (2023) (noting that "our precedents have identified only two compelling interests that permit resort to race-based government action," including "remediating specific, identified instances of past discrimination that violated the Constitution or a statute") (citations omitted). The Sixth Circuit has held that the strict scrutiny analysis for race-based government measures has three distinct elements. *See Vitolo*

*v. Guzman*, 999 F.3d 353, 361 (6th Cir. 2021). First, the policy cannot rest on a generalized assertion that there has been past discrimination, but instead must target a "specific episode of past discrimination." *Id.* (citing *Croson*, 488 U.S. at 498). Second, there must be evidence that supports an inference of intentional discrimination. *Id.* (citing *Croson*, 488 U.S. at 503). And third, the government must have had either an active or passive hand in the discrimination. If "the government show[s] that it had essentially become a passive participant in a system of racial exclusion . . . then the government can act to undo the discrimination." *Id.* (citing *Croson*, 488 U.S. at 492). In that case, the Sixth Circuit concluded that the Small Business Administration's (SBA) distribution of grants from the Restaurant Revitalization Fund (RRF), which was intended to aid small, privately owned restaurants affected by the pandemic, did not satisfy these requirements because the government relied on "the effects of societal discrimination," did not identify past intentional discrimination, and had not shown it participated in the discrimination it sought to remedy. *Id.* at 361–62. However, none of these defects is present in the DOT DBE program, which is materially different from the RRF. Further, although strict scrutiny involves a single, well-settled standard, the Supreme Court has explained that courts must take into account "relevant differences" between programs, such as those between the DOT DBE program and the program at issue in *Vitolo*. *Adarand*, 515 U.S. at 228 (explaining that "strict scrutiny *does* take 'relevant differences' into account") (emphasis in original).[4] As explained further below, the

---

[4] In *Vitolo*, the Sixth Circuit considered the Small Business Administration's (SBA) distribution of grants from the RRF, which was intended to aid small, privately owned restaurants affected by the pandemic. *Id.* at 353. Notably, the program in *Vitolo* differed in significant ways from the DOT DBE program. The RRF program established an initial 21-day period during which SBA gave priority access to a pool of limited funds to restaurants that were at least 51 percent owned and controlled by women, veterans, or socially and economically disadvantaged individuals. *Id.* at 356; *see also id.* at 360 (enjoining the RRF program because it was available only to disadvantaged businesses for the first 21 days, and thus "[t]here is a real risk that the funds will run out"). Here,

program targets and seeks to remedy past, intentional discrimination in the transportation industry—discrimination that the government has had a hand in.

First, there is a strong basis in evidence that the DOT DBE program targets specific episodes of past, intentional discrimination in which the government participated and now seeks to remedy. *See* Pub. L. No. 117-58, § 11101(e)(1)(C), 135 Stat. at 449; *Remote Hearing Before the Committee on Transportation and Infrastructure*, 116th Cong. 64 (Sept. 23, 2020).[5] Since 2010, over 200 disparity studies, other reports and studies, and congressional testimony have documented the discrimination and its lingering effects that continue to affect the ability of DBEs to compete equally for government contracts. *See* Ex. 2 (Compelling Interest Report).[6] Of particular consequence are the hundreds of disparity studies that were submitted to Congress in advance of the reauthorization of the DOT DBE program. *See* Pub. L. No. 117-58, § 11101(e)(1)(C), 135 Stat. at 449; *Remote Hearing Before the Committee on Transportation and Infrastructure*, 116th Cong. 64 (Sept. 23, 2020).

---

by contrast, all subcontractors may bid on all DOT-funded contracts, and only state recipients set DBE goals on certain projects. And even where contracts have DBE goals, recipients can meet them using race-neutral means. *See* 49 C.F.R. § 26.51; *cf. Ultima Servs. Corp. v. U.S. Dep't of Agric.*, 2023 WL 4633481; at *17 (E.D. Tenn. July 19, 2023) (concluding that the Small Business Administration's Section 8(a) program did not include race-neutral alternatives to its rebuttable presumptions).

[5] This hearing includes the statements and testimony of Evalynn Williams, Geri E. Boyer, Mary T. Lerdahl, and Jon S. Wainwright detailing recent instances and evidence of discrimination in industries that DOT regulates and the need for the DOT DBE program to remediate such discrimination. Available here: https://www.govinfo.gov/content/pkg/CHRG-116hhrg43413/pdf/CHRG-116hhrg43413.pdf.

[6] The Compelling Interest Report has been introduced in Congress. *See* 168 Cong. Rec. E619-20 (daily ed. June 14, 2022) (statement of Rep. Carolyn Maloney). The 2022 report updated and expanded upon a 2010 Department of Justice Report on the same topic, which also was considered by Congress and cited in federal court as evidence of a compelling governmental interest in "continued remedial action through USDOT's DBE program." *Midwest Fence Corp. v. U.S. Dep't of Transp.*, 2011 WL 2551179, at *12 (N.D. Ill. June 27, 2011) (internal quotation marks and citation omitted).

In 2020, the House Committee on Transportation and Infrastructure "amassed an enormous amount of evidence providing an exceedingly strong basis for the conclusion that discrimination against minority- and women-owned businesses continues to affect the construction, architecture and engineering, and related surface transportation contracting markets nationwide." H.R. Rep. No. 116-437, at 331 (2020). In June 2021, Congress received over 100 disparity studies published from 2015 to 2021 as evidence of discrimination and its lingering effect based on both race and gender in support of the reauthorization of the DOT DBE program. 167 Cong. Rec. H3505-07 (daily ed. June 30, 2021) (statement of Rep. DeFazio) (listing disparity studies); 167 Cong. Rec. S5898-99 (daily ed. August 5, 2021) (statement of Sen. Tom Carper) (same). Also in June 2021, Congress made specific findings as to the value of such studies: "[D]isparity studies contain myriad analyses aimed at answering the question: 'Does business discrimination based on race or gender continue to exist?' Even a cursory review of the studies reveals that the answer is resoundingly 'yes.'" H.R. Rep. No. 117-70, at 392–95 (2021). Congress also reviewed studies that showed significant underutilization of DBEs in government-funded contracts and the positive impact of the DOT DBE program. *See* 167 Cong. Rec. S5898 (2021).[7]

These disparity studies include additional evidence and statistical methods that tie the disparities to discrimination, including regression analyses, statistical significance—which eliminates the possibility that the disparities could be due to random chance (rather than intentional discrimination)—and surveys, interviews, and other qualitative evidence that document the personal accounts of business owners and identify the discriminatory barriers that contribute to

---

[7] The House Committee on Transportation and Infrastructure reviewed these studies, many of which found that disparities between DBEs and non-minority male businesses are "far greater than the disparities that persist in the public sector where remedial programs are more routine." H.R. Rep. 117-70, at 393 (2021).

many of the disparities. *See* Ex. 3 (Wainwright Report) at 17–19. Given the rich body of quantitative and qualitative evidence they provide, it is unsurprising that courts consistently find that disparity studies can provide persuasive evidence of specific instances of discrimination and its continuing effects. *See, e.g.*, *Assoc. Gen. Contractors of Am., San Diego Chapter, Inc. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1196 (9th Cir. 2013); *H.B. Rowe Co. v. Tippett*, 615 F.3d 233, 257 (4th Cir. 2010); *Adarand Constructors, Inc. v. Slater*, 228 F.3d at 1174; *Midwest Fence*, 84 F. Supp. 3d 705, 727 (N.D. Ill. 2015); *Rothe Dev. Corp. v. U.S. Dep't of Def.*, 107 F. Supp. 3d 183, 209–10 (D.D.C. 2015). Thus, the DOT DBE program is supported by a strong basis in evidence that identifies "specific instances of past discrimination." *Vitolo*, 999 F.3d at 361.[8]

Second, and as required by the Supreme Court in *Croson*, statistical disparity evidence and anecdotal evidence demonstrating the persistence of discrimination and its lingering effects in the transportation construction industry, both at a nationwide and local level, provide a strong basis in evidence for the constitutionality of the DOT DBE program. "Where there is a significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors, an inference of discriminatory exclusion could arise." *Croson*, 488 U.S. at 509 (citation omitted); *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) ("[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the [practice] bears more heavily on one race than another."). Under *Vitolo*, this type of discriminatory exclusion provides "evidence of *intentional* discrimination in the past." *Vitolo*, 999 F.3d at 361 (citing *Croson*, 488 U.S. at 503)

---

[8] As explained further *infra* at 23–24, the DOT DBE program is also distinguishable from the Small Business Administration's Section 8(a) program in multiple respects—contrary to Plaintiffs' implication otherwise. *See* Br. at 8 (citing *Ultima Servs. Corp.*, 2023 WL 4633481).

(emphasis in original).

Moreover, the Sixth Circuit in *Vitolo* specifically reaffirmed that "statistical disparities . . . may be used as evidence to establish intentional discrimination." *Id.* at 361. Although the *Vitolo* court stated that "broad statistical disparities" alone are insufficient, it did not dispute that statistical disparities may support an inference of discrimination when combined with evidence of past discrimination in which the government has actively *or* passively participated. *Id.* Other circuits concur. *See H.B. Rowe Co., Inc.*, 615 F.3d at 241; *Midwest Fence Corp.*, 840 F.3d at 945; *Concrete Works of Colo., Inc. v. Denver*, 321 F.3d 950, 958 (10th Cir. 1994). And as the Supreme Court has made clear, a "strong basis in evidence" is that "approaching a prima facie case of a constitutional or statutory violation." *Croson,* 488 U.S. at 500; *see also H.B. Rowe Co.*, 615 F.3d. at 241 (holding that a state actor need not "conclusively prove the existence of past or present racial discrimination to establish a strong basis in evidence"); *Cotter v. City of Boston*, 323 F.3d 160, 169 (1st Cir. 2003); *Brunet v. City of Columbus*, 1 F.3d 390, 406 (6th Cir. 1993) ("[A] prima facie case of intentional discrimination is sufficient to support a public employer's affirmative action plan."). Unlike the RRF program at issue in *Vitolo*, the DOT DBE program is supported by "evidence of past intentional discrimination against the . . . groups to whom it grants preferences," and it does not rely on "general social disparities." *Vitolo*, 999 F.3d at 361–62.

Plaintiffs acknowledge that, under *Croson*, race-based remedial measures are permissible when they are "clearly identified and unquestionably legitimate." Br. at 9 (quoting *Croson*, 488 U.S. at 505) (internal quotation marks omitted). But Plaintiffs err in characterizing Congress's reauthorization of the DOT DBE program as resting on "broad observations," *id.* at 7, and disparity studies that they assert provide only "general observations about race in society," *id.* at 9. These assertions are refuted by the public record.

18

Third, government contracting has historically suffered from past discrimination in which the government had a hand. *See Vitolo*, 999 F.3d at 361. Plaintiffs concede that "[w]here the government has actively or passively participated in discrimination, it may act to undo its specific acts of intentional discrimination." Br. at 11 (citing *Croson*, 488 U.S. at 492; *Vitolo*, 999 F.3d at 361). Here, expert reports submitted to Congress have identified substantial disparities in direct federal government contracting and conducted regression analyses that eliminate potentially non-discriminatory reasons for the disparities. *See* Ex. 4 (Chow Report).[9] For example, using federal contracting data from April 2019 to August 2020, Chow utilized regression analyses to determine that small disadvantaged businesses (SDBs) were much less likely to win federal contracts relative to non-SDBs with similar size, age, receipts and other characteristics. *Id.* at 2.

ii.     *Croson*, Not *SFFA*, Governs this Case.

The government may employ race-based measures in "remedial settings" when necessary to dispel the effects of invidious discrimination. *Croson*, 488 U.S. at 493 (1989). *Croson* controls here, and Plaintiffs' assertions that the DOT DBE program uses race as an impermissible "negative" and a "stereotype" are unavailing. *See* Br. at 17 (quoting *SFFA*, 600 U.S. at 218). In *SFFA*, the Supreme Court held that two universities' use of racial classifications in university admissions to promote the educational benefits of a diverse student body in the classroom could not be "reconciled with the guarantees of the Equal Protection Clause." 600 U.S. at 230.[10] At the same time, *SFFA* affirmed that "remediating specific, identified instances of past discrimination that violated the Constitution or a statute" is a compelling interest. *Id.* at 207 (citing *Parents*

---

[9]  The Chow Report was reviewed by Congress. *See* "Are Governmentwide Contracts Helping or Hurting Small Contractors?": Hearing before H. Comm. On Small Business, 117th Cong. (2022) 63–84.

[10] The Court also held that these admissions policies violated Title VI of the Civil Rights Act. *See* 600 U.S. at 198 n.2.

*Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007); *Shaw v. Hunt*, 517

U.S. 899, 909–10 (1996)); *see also id.* at 215 (noting the permissibility of "a race-based benefit"

in employment discrimination cases when necessary to make "members of the discriminated class

'whole for [the] injuries [they] suffered'") (quoting *Franks v. Bowman Transp. Co.*, 424 U.S. 747,

763 (1976)) (alterations in original). Nothing in *SFFA* affects *Croson*'s conclusion that "evidence

of a pattern of individual discriminatory acts can, if supported by appropriate statistical proof, lend

support to a local government's determination that broader remedial relief is justified." *Croson*,

488 U.S. at 509 (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 338 (1977)).

b.     *The DOT DBE Program Is Narrowly Tailored.*

The narrow tailoring inquiry requires a court to consider: (1) "the necessity for the relief

and the efficacy of alternative remedies"; (2) "the flexibility and duration of the relief, including

the availability of waiver provisions"; (3) "the relationship of the numerical goals to the relevant

labor market"; and (4) "the impact of the relief on the rights of third parties." *Rutherford*, 179 F.

App'x at 377–78 (quoting *United States v. Paradise*, 480 U.S. 149, 171 (1987)). Additionally, "a

policy is not narrowly tailored if it is either overbroad or underinclusive in its use of racial

classifications." *Vitolo*, 999 F.3d at 362. However, "[t]hese are not elements of a test," and a

government affirmative action program "need not satisfy each and every item to survive strict

scrutiny." *Rutherford*, 179 F. App'x at 378 (citation omitted). And "[t]here is no single 'best'

remedy—courts and other government bodies enjoy some discretion in remedying racial

discrimination." *Id.* at 377 (*citing Paradise*, 480 U.S. at 185).

Application of the *Paradise* factors to the DOT DBE program demonstrates that it is

narrowly tailored on its face. Its implementing regulations expressly require DOT-funded

recipients to meet DBE goals through race-neutral means, and they expressly provide for

20

flexibility, a nexus between DBE goals and local market conditions, and the minimization of impact on third parties. First, the program's implementing regulations expressly provide for the consideration of race-neutral alternatives. DOT-fund recipients must have a DBE program of their own, 49 C.F.R. § 26.21, with each recipient establishing its own annual goal for DBE participation in federally funded projects based on local market conditions and upcoming projects in its location. *Id.* § 26.45. Significantly, those recipients must always attempt to meet the goal by using race- and gender-neutral means to the maximum extent possible. *Id.* § 26.51(a).

Second, the DOT DBE program is flexible. The 10 percent goal that Plaintiffs assert "has not moved," Br. at 13 n.4, has always been not a quota but "an aspirational goal at the national level, which [DOT] uses as a tool in evaluating and monitoring DBEs' opportunities to participate in DOT–assisted contracts." 49 C.F.R. § 26.41(b).[11]

Third, the DOT DBE program closely tethers its numerical goals for DBE participation to the relevant local labor markets. *See id.* § 26.45(b) (requiring that a recipient's "overall goal must be based on demonstrable evidence of the availability of ready, willing and able DBEs relative to all businesses ready, willing and able to participate on your DOT-assisted contracts"). Indeed, DBE goals "must reflect [the recipient's] determination of the level of DBE participation [it] would

---

[11] Plaintiffs' Brief later mischaracterizes the 10 percent goal as a "never-wavering 10% set-aside," which is false. Br. at 15. As explained above, recipients are prohibited from using set-aside contracts for DBEs except under extremely limited circumstances. *See* 49 C.F.R. § 26.43(b). Moreover, Plaintiffs' Brief inaccurately describes the program as having remained "static for *four decades*." Br. at 13 (emphasis in original). This is also false. A recipient's overall DBE goals, as well as the portion of those goals met through race- and gender-based means, are not static and change over time. For example, in Indiana (where Plaintiffs are based), the percentage of DOT funds awarded to DBE firms through race- and gender-based means decreased from 7.55% in 2017 to 5.26% in 2023, while the percentage of funds awarded to DBE firms through race- and gender-neutral means increased during the same time period from 3.19% to 6.36%. Some recipients have even shifted to the use of *exclusively* race-neutral means; eight states currently administer their programs in this manner. *See* Ex. 1 (Kenley Decl.), ¶ 4.

expect absent the effects of discrimination," and recipients may not "simply rely on either the 10 percent national goal, [its] previous overall goal, or past DBE participation rates in [its] program without reference to the relative availability of DBEs in [their] market." *Id.*

Fourth, the DOT DBE program attempts to minimize the impact of any race- or gender-based classifications on the rights of non-minority third parties. Significantly, as noted, recipients "must meet the maximum feasible portion of [their] overall goal by using race-neutral means of facilitating race-neutral DBE participation." *Id.* § 26.51(a). And the presumption of economic disadvantage for both minority and women applicants does not apply to all minority- or women-owned businesses because it may be rebutted if the business owner has a personal net worth in excess of $1.32 million or is able to accumulate substantial wealth. *See id.* § 26.67(b).

Finally, the DOT DBE program is neither overbroad nor underinclusive. The program is not overbroad because its presumptions do not invariably apply to all minority- or women-owned businesses.[12] *See Midwest Fence*, 840 F.3d at 945–46 ("Though the minority groups in question are given presumptive DBE status across the board, the federal regulations ultimately require individualized determinations. Each presumptively disadvantaged firm owner must certify that he or she 'is, in fact, socially and economically disadvantaged,' 49 C.F.R. § 26.67(a)(1), and that presumption can be rebutted."); *see also* 49 C.F.R. § 26.5 (providing that "a DBE must be 'at least 51 percent owned by one or more individuals who are both socially and economically disadvantaged'"). And the applicable regulations contain only presumptions, which are rebuttable

---

[12] Specifically, DBE applicants must "submit a signed, notarized certification that each presumptively disadvantaged owner is, in fact, socially and economically disadvantaged," 49 C.F.R. § 26.67(a)(1), "certify that he or she has a personal net worth that does not exceed $1.32 million," *id.* § 26.67(a)(2)(i), "support [the certification] with a signed, notarized statement of personal net worth, with appropriate supporting documentation," and, on a case-by-case basis, provide additional financial information, *id.* § 26.67(a)(2)(ii).

by recipients. *See* 49 C.F.R. § 26.67(b). As explained, recipients may rebut the presumption of economic disadvantage when an owner submits a statement that either shows a personal net worth in excess of $1.32 million or demonstrates the owner's ability to accumulate substantial wealth. *Id.* § 26.67(b).

Conversely, the program is not underinclusive. Plaintiffs mischaracterize the program as categorically "exclud[ing] every contractor who owns less than 51% of his/her business," Br. at 14, when, in fact, a small business can be certified as a DBE as long as it is majority-owned by *one or more* socially and economically disadvantaged individuals, *see* 49 C.F.R. § 26.5. And even if a firm's owners are not presumed to be socially and economically disadvantaged, it may also qualify for DBE status, as noted above—regardless of its owners' race or gender. *See id.* § 26.67(d) (providing that "[f]irms owned and controlled by individuals who are not presumed to be socially and economically disadvantaged . . . may apply for DBE certification" on a case-by-case basis).

Material differences between the DOT DBE program and SBA's Section 8(a) program mean that nothing in *Ultima Services Corporation v. U.S. Department of Agriculture*, 2023 WL 4633481 (E.D. Tenn. July 19, 2023), calls these conclusions into question. In *Ultima*, a district court reviewed the regulatory presumptions of social disadvantage in SBA's Section 8(a) program and found that they could not withstand strict scrutiny. *Id.* at *18 (holding that "Defendants' use of the rebuttable presumption violates Ultima's Fifth Amendment right to equal protection of the law"). But the narrow tailoring considerations applicable to the Section 8(a) program materially differ from those for the DOT DBE program. The Section 8(a) program involves the set-aside and direct award of contracts to small and disadvantaged businesses from the federal government, *see* 15 U.S.C. § 637(a), while the DOT DBE program does not. The DOT DBE program requires the use of race-neutral means to the maximum extent possible, has measurable and locally set

contracting goals, and uses set-asides only in very limited circumstances. All of these differences limit the impact of the program on non-DBEs, encourage race-neutral options, and serve to narrowly tailor the program to remedy discrimination and its lingering effects.

     **B.**    **Plaintiffs Cannot Show Irreparable Harm.**

To demonstrate irreparable harm, Plaintiffs must show that, in the absence of the relief they seek, "they will suffer 'actual and imminent' harm rather than harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006) (quoting *Monsanto Co. v. Manning*, 841 F.2d 1126, 1988 WL 19169, at *6 (6th Cir. Mar. 8, 1988); citing *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003)). "Additionally, an unreasonable delay in filing for injunctive relief will weigh against a finding of irreparable harm." *Allied Erecting and Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 511 F. App'x 398, 405 (6th Cir. 2013) (citation omitted).

It is true, as Plaintiffs emphasize, that constitutional harms are generally presumed to be irreparable—i.e., incapable of being remedied after the fact. *See* Br. at 23–24. "That presumption of *irreparability*, however, does not change the fact that the plaintiff must still demonstrate *imminence*." *Mitchell v. City of Cincinnati*, 2022 WL 4546852, at *4 (6th Cir. 2022) (citing *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 391 (6th Cir. 2020)) (emphases added). As discussed *supra* at 5–12, Plaintiffs have failed to demonstrate that they face an "actual, concrete, particularized, and imminent threat of harm." *Memphis A. Philip Randolph Inst.*, 978 F.3d at 388. Plaintiffs have not identified any contracts with DBE goals in Kentucky or Indiana that are currently being let, nor have they identified whether those contracts contain subcontracting opportunities in their industry. Absent these facts, and in light of Plaintiffs' lengthy delay in moving for preliminary relief, Plaintiffs cannot establish that any potential harm caused by the

DOT DBE program is imminent so as to warrant a preliminary injunction.

### C.      The Balance of Harms and Public Interest Favor Defendants.

On the third and fourth factors, the balance of harms overwhelmingly favors Defendants, and the injunction Plaintiffs seek is manifestly contrary to the public interest. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting that "[t]hese factors merge when the Government is the opposing party"). As Plaintiffs concede, *see* Br. at 24, the government and the public always have a strong interest in the implementation of the laws enacted by their elected representatives. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) ("Any time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."). This is particularly true when Congress has continually reenacted a statute over more than 40 years. *See* Defs.' Mot. to Dismiss Pls.' Compl., ECF No. 31, at 4 n.2.

Plaintiffs nevertheless contend that a preliminary injunction is necessarily in the public interest because they allege the violation of a constitutional right. *See* Br. at 24. But Plaintiffs fail to explain why the sweeping injunction they seek would be necessary, appropriate, or in the public interest to remedy the DOT DBE program's alleged constitutional flaw, which concerns solely the use of race-based presumptions. Rather, such a sweeping injunction would be contrary to the public interest because it would be particularly harmful to other parties—all other contractors, regardless of their race, would not be able to take advantage of the DOT DBE program. Such an injunction would, in turn, harm other small businesses.

### D.      Even if the Court Determines that Injunctive Relief Is Appropriate, It Should Strictly Limit Its Scope.

Even if the Court determines that Plaintiffs' legal claims have merit and preliminary injunctive relief is appropriate, the Court should decline to enter the sweeping injunction Plaintiffs seek. "District courts 'should not issue relief that extends further than necessary to remedy the

plaintiff's injury.'" *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 490 (6th Cir. 2023), *petitions for cert. pending*, No. 23-477. (filed Nov. 6, 2023), No. 23-492 (filed Nov. 9, 2023) (quoting *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023)); *see also Gill v. Whitford*, 138 S. Ct. 1916, 1933 (2018) ("The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it."); *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J. concurring) (explaining that nationwide injunctions "take a toll on the federal court system— preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch"). Thus, the "plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill*, 138 S. Ct. at 1934.

### 1.   Any Injunction Should Be Limited to Extending the Program's Presumption of Disadvantage to Plaintiffs, or Alternatively, to Eliminating DBE Goals from Contracts on Which Plaintiffs Bid.

The Sixth Circuit has made clear that "[d]istrict courts 'should not issue relief that extends further than necessary to remedy the plaintiff's injury.'" *Skrmetti*, 83 F.4th at 490) (quoting *Kentucky v. Biden*, 57 F.4th at 556). Thus, while "district courts are not categorically prohibited from granting injunctive relief benefitting an entire class in an *individual suit*, such broad relief is rarely justified because injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Sharpe v. Cureton*, 319 F.3d 259, 273 (6th Cir. 2003) (emphasis in original) (citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *Aluminum Workers Int'l Union Local Union No. 215 v. Consol. Aluminum Corp.*, 696 F.2d 437, 446 (6th Cir. 1982)).[13] The Sixth Circuit's long-standing rule is consistent with skepticism about

---

[13] Accordingly, the Sixth Circuit has repeatedly reversed or narrowed injunctions that imposed relief extending beyond the plaintiff or plaintiffs. *See, e.g.*, *Kentucky v. Biden*, 57 F.4th at 557

"universal injunctions" recently expressed by certain Supreme Court justices. *See, e.g.*, *United States v. Texas*, 599 U.S. 670, 693–94 (2023) (Gorsuch, J., concurring in the judgment); *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600–01 (2020) (Gorsuch, J., concurring in grant of stay); *Trump v. Hawaii*, 585 U.S. ___, 138 S. Ct. 2392, 2426–29 (2018) (Thomas, J., concurring). Indeed, the Chief Judge of the Sixth Circuit has expressed similar skepticism. *See Arizona v. Biden*, 40 F.4th 375, 395–96 (6th Cir. 2022) (Sutton, C.J., concurring).

Here, because Plaintiffs have brought this lawsuit only on their own behalf and on the basis that they alone are "qualified, willing, and able" to bid on contracts affected by the DOT DBE program, *see* Compl. ¶¶ 11, 12, 40, 51, the Court should, if it determines that preliminary injunctive relief is appropriate, limit that relief to the named Plaintiffs. The alleged injury described by Plaintiffs would be remedied by an order directing that Plaintiffs should be presumed to be socially- and economically-disadvantaged if and when they apply for DBE certification. Such relief would eliminate the only race- or gender-related barrier Plaintiffs might possibly currently face, which is that their owners might not be presumed to be disadvantaged and would have to

---

(affirming the district court's preliminary injunction against a federal contractor vaccine mandate but modifying "its scope to prohibit the federal government from enforcing the contractor mandate against the parties only"); *Skrmetti*, 83 F.4th at 490 (holding that district court abused its discretion in preliminarily enjoining Tennessee and Kentucky laws banning certain medical treatments as applied to every individual in those states, when the individual plaintiffs could not show that "statewide relief is necessary to remedy their injuries"); *Warshak v. United States*, 532 F.3d 521, 531 (6th Cir. 2008) (holding that it was not appropriate for the district court to grant a preliminary injunction that applied to every individual in the judicial district, when the plaintiff made no showing "why the injunction needed to run in favor of other individuals in order to protect him"); *Sharpe*, 319 F.3d at 273 ("The injunction issued by the district court is overly broad in that the class wide focus is completely unnecessary to provide the named plaintiffs the relief to which they are entitled as prevailing parties."); *see also Ohio v. Becerra*, ___ F.4th ___, 2023 WL 8270957, at *15 (6th Cir. Nov. 30, 2023) (upholding preliminary injunction against Health and Human Services rule but limiting the applicability of the injunction to the single plaintiff that had demonstrated irreparable harm). *Cf. Washington v. Reno*, 35 F.3d 1093, 1104 (6th Cir. 1994) (explaining why, under the particular circumstances of the case, injunction would only remedy the individual plaintiff inmates' harm if it extended to all inmates).

make individual showings of disadvantage. *See* 49 C.F.R. § 26.5 (indicating that individuals can be evaluated as a DBE on a case-by-case basis, regardless of the presumptions).[14]

Alternatively, the Court could order that DBE goals be removed from any contracts on which Plaintiffs bid. This broader relief would go further than necessary, as it would extend a benefit to all non-DBEs—not just Plaintiffs—with respect to contracts on which Plaintiffs bid, and would thus extend to individuals or entities not before the Court. *See Gill*, 138 S. Ct. at 1933 (2018) ("The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it."). But such an injunction would at least be far more tailored to the actual alleged injury of the Plaintiffs themselves than the sweeping relief they seek.

### 2.   Plaintiffs Are Not Entitled to the Broad Nationwide Injunction They Seek.

Plaintiffs seek an injunction that sweeps far beyond the scope of any potential injury that they have alleged, one that would enjoin regulations implementing the DBE program as a whole, including parts of the program that do not use race- or gender-conscious presumptions. *See* ECF No. 27-4.[15] This broad relief is inappropriate for several reasons.

First, Plaintiffs' conclusory and unspecific assertions are insufficient to warrant prospective relief anywhere, let alone on a nationwide basis. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983) (holding that a plaintiff seeking prospective relief to remedy a constitutional violation "must show that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury

---

[14] However, as pled in their Complaint, Plaintiffs fail to allege that they would qualify for DOT DBE funding under the race- and gender-neutral requirements of the program. *See supra* at 9–12; *see also* Defs.' Mot. to Dismiss Pls.' Compl., ECF No. 31, at 18–20.

[15] Specifically, Plaintiffs seek to enjoin 49 C.F.R. §§ 26.21, 26.41, 26.45, 26.47, 26.5, 26.51, 26.53, 26.67, and 26.69. None of these provisions implicates the DOT DBE program's race- or gender-based presumptions.

must be both real and immediate, not conjectural or hypothetical'") (internal quotation marks and citations omitted). But Plaintiffs assert merely that they "regularly" bid on milling (as to MAMCO) or hauling (as to Bagshaw) contracts in Indiana and Kentucky, Br. at 4, that "[b]oth Indiana and Kentucky continuously post new opportunities to bid, and these upcoming projects continue to require DBE goals," making it "certain that each month that goes by, Bagshaw will continue to be negatively impacted by the race and gender preferences imposed by the DBE program," Bagshaw Decl., ¶ 17, and that "absent discriminatory criteria mandating race and gender preferences for contractors, MAMCO would not be deterred from further competition for federal roadbuilding contracts and could place additional bids," Koetter Decl., ¶¶ 33–34, putting MAMCO at a disadvantage.

Second, enjoining *all* of these provisions targeted by Plaintiffs would effectively enjoin the whole DOT DBE program, even its race- and gender-neutral components, impacting and harming even those DBEs that have been so certified without the benefit of any race- or gender-based presumptions contained in the regulations. Plaintiffs state that they wish only to "compete on equal footing," Br. at 6, but they have not explained why dismantling the entire program is necessary to do so, since many parts of the program do not use race- or gender-based presumptions at all. *See* 49 C.F.R. §§ 26.21, 26.41, 26.45, 26.47, 26.5 (listing definitions other than the definition of socially and economically disadvantaged that includes reference to particular races or genders), 26.51, 26.53; 13 C.F.R §§ 124.101, 124.104, 124.105. Thus, enjoining those provisions that do not refer or make use of race- or gender-based provisions would create a "remedy" that is not "tailored" to redress Plaintiffs' specific individual injuries. *See Gill*, 138 S. Ct. at 1934. Indeed, Plaintiffs ask the Court to enjoin certain provisions of 13 C.F.R. Part 124 that govern an entirely separate program—the Small Business Administration's Section 8(A) program—without ever explaining

why that would be appropriate. Finally, if the Court were inclined to sweepingly enjoin the DOT DBE program's presumptions and participation goals, it should choose to do so only with respect to Kentucky and Indiana, since Plaintiffs have not shown any potential injury to them in any other jurisdiction. And again, Defendants likely could not force the states from continuing to apply these elements of the program, but it could tell the states that DOT will no longer require them to apply the elements.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for Preliminary Injunction.


Dated: January 26, 2024                              Respectfully submitted,

SUBASH IYER                                          KRISTEN CLARKE
 *Acting General Counsel*                            Assistant Attorney General
PAUL M. GEIER                                        Civil Rights Division
 *Acting Assistant General Counsel*
 *for Litigation and Enforcement*                    KAREN D. WOODARD
PETER J. PLOCKI                                      Chief
 *Deputy Assistant General Counsel*                  Employment Litigation Section
 *for Litigation and Enforcement*                    Civil Rights Division
CHARLES E. ENLOE
 *Senior Trial Attorney*                             /s/ Robert Rich
*U.S. Department of Transportation*                  ANDREW BRANIFF
                                                     (IN Bar No. 23430-71)
                                                     Deputy Chief
                                                     ROBERT RICH
                                                     (DC Bar No. 1016908)
                                                     JILLIAN MOO-YOUNG
                                                     (DC Bar No. 1045088)
                                                     DAVID REESE
                                                     (AL Bar No. ASB-0887-167R)
                                                     Trial Attorneys
                                                     Employment Litigation Section
                                                     Civil Rights Division
                                                     United States Department of Justice
                                                     950 Pennsylvania Avenue NW

Washington, DC 20530
(202) 598-9898
Robert.Rich@usdoj.gov

*Counsel for Defendants*