UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

---

MID-AMERICA MILLING COMPANY,
LLC, *et al.*,

        Plaintiffs,

        v.                                                      Case No. 3:23-cv-00072-GFVT

UNITED STATES DEPARTMENT
OF TRANSPORTATION, *et al.*,

        Defendants.

---

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

---

## INTRODUCTION

Defendants seek to dismiss this lawsuit pursuant to Fed. R. Civ. P. 12(b)(1) for failure to state a claim; 12(b)(6) for lack of subject matter jurisdiction; and 12(b)(7) for failure to join an indispensable party. However, as set forth below, Plaintiffs, through their Verified Complaint, have alleged more than sufficient factual content, which readily satisfies the basic pleading standard under Fed. R. Civ. P. 8 and establishes Article III standing. In addition, Plaintiffs have joined precisely those named federal parties required for the Court to properly adjudicate this case and accord Plaintiffs the relief they seek. Defendants' motion should be denied.

## ARGUMENT

**I.     Plaintiffs state a claim for race and gender discrimination in violation of the United States Constitution.**

Defendants invoke Rule 12(b)(6) to dismiss this case according to their overly technical and narrow construction of Plaintiffs' Verified Complaint against the plausibility pleading standard set forth in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). However, "[the Sixth Circuit] has cautioned against reading '*Twombly* and *Iqbal* so narrowly as to be the death of notice pleading....'" *El-Hallani v. Huntington Nat. Bank*, 623 F. App'x. 730, 734 (6th Cir. 2015) (citing cases and other materials). Indeed, "the bar for pleading [] is still low" and does not "demand[] highly specific factual allegations to satisfy the plausibility requirement." *Id*. at 739 (case citations, quotation marks, and brackets omitted).

To survive a motion to dismiss for failure to state a claim, Plaintiffs "only need to allege sufficient factual content from which a court, informed by its judicial experience and common sense, could draw the reasonable inference" "that the defendant is liable for the misconduct alleged." *Id.* at 734 (first quoting *Keys v. Humana, Inc*., 684 F.3d 605, 610 (6th Cir. 2012), then quoting *Currier v. First Resolution Inv. Corp.*, 762 F.3d 529, 533 (6th Cir. 2014) (both citing *Iqbal*,

556 U.S. at 678) (quotation marks omitted). This plausibility standard also requires a court to "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Cagayat v. United Collection Bureau, Inc.*, 952 F.3d 749, 753 (6th Cir. 2020) (citation and quotation marks omitted). Plaintiffs' Verified Complaint easily passes this "low" pleading bar because Plaintiffs have properly alleged violations of the Fifth Amendment to the United States Constitution.

Far from Defendants' contention that Plaintiffs' complaint "is impossible to decipher," it is more than apparent as to "who Plaintiffs are, how they were injured, [and] by whom." *See* ECF 31:9. As Plaintiffs' Verified Complaint confirms, Plaintiffs are construction companies in the "milling" and truck "hauling" industries that have a "month after month and year after year" history of performing federally funded surface transportation projects "impacted by the federal DBE program" "in both Kentucky and Indiana." ECF 1: ¶¶ 8, 11–12. Connected to this "long history" is Plaintiffs' equally "long history of being discriminated against by the DBE program" since it uses race and gender to prioritize contract awards funded under the Infrastructure Act for DBE firms, but not for non-DBEs, like Plaintiffs. *E.g.*, ECF 1: ¶¶ 8, 25–30, 32. Unlike DBE firms, Plaintiffs are "not afford[ed] [] either a race or gender preference [under the DBE Program.]" ECF 1: ¶ 32. Plaintiffs further explain that in Kentucky and Indiana, "[m]ost contracts contain a 'DBE participation goal,' meaning that the states are implementing their federally mandated DBE goal, and DBE businesses will have an advantage when bidding for contracts or subcontracts." ECF 1:

¶¶ 35–36.[1] "Plaintiffs regularly bid on and compete for federally funded highway contracts that contain Kentucky's and Indiana's DBE participation goals" and "are qualified, willing, and able to bid on these contracts or subcontracts." ECF 1: ¶¶ 37, 40; *id.* at ¶¶ 8, 11–12. However, "because the federal DBE program treats individuals differently based on race and gender, Plaintiffs cannot compete for contracts on an equal footing." ECF 1: ¶ 51. Plaintiffs further explain that under this system, they have "lost out . . . to DBE firms based on race and gender" "despite being the lowest bidder," ECF 1: ¶¶ 8, 38, 40, and that "presently, and in the future" they remain on "[un]equal footing" and suffer harms to their dignity because of the DBE Program's race and gender discrimination. *E.g.*, ECF 1: ¶¶ 32, 39, 40, 42, 51.

Despite this factual content—which is more than sufficient to state Plaintiffs' equal protection claims—Defendants attempt to pick-apart and re-write Plaintiffs' allegations. Specifically, Defendants argue that "Plaintiffs have stated only that . . . *some* [federally funded state] contracts have DBE participation goals" but have not identified whether Plaintiffs bid contracts that "had DBE goals." ECF 31:9–10, 12. But Defendants' assertions are unfounded. Plaintiffs have attested that "[m]ost contracts" they "regularly bid" in Kentucky and Indiana contain DBE participation goals. *See* ECF 1: ¶¶ 34–40. Defendants' suggestion that this case *might* be about contract losses to DBE firms generally in the absence of contracts containing the DBE Program's DBE goals is rather absurd in the face of Plaintiffs' varied allegations, which (as highlighted briefly above), discuss the DBE Program's discriminatory goals for race- and gender-

---

[1] The inclusion of a DBE goal on a contract reflects a state recipient's implementation of federal requirements for DBE goals through race and gender conscious means. For example, the state of Kentucky applies a race- and gender-conscious DBE participation goal of 10.4% for the 2023–25 time frame. *See* Kentucky Transportation Cabinet, DBE Goal Methodology Federal Fiscal Year (FY) 2023–2025 at 1, 5–6, available at https://transportation.ky.gov/Civil-Rights-and-Small-Business-Development/Documents/FY%2023-25%20Goal%20Methodology%207.16.22.pdf; 49 C.F.R. § 26.51; ECF 1: ¶ 36; ECF 31:5 n. 5.

based selection preferences in the bidding process; the DBE goal as implemented for "most" federal contracts in Indiana and Kentucky; the impact that the DBE Program has had on Plaintiffs in the context of "regularly" bidding on such contracts in those particular states; and the past, present, and future competitive advantage that DBE firms have had, and continue to have, over Plaintiffs in obtaining these federally financed contracts.

Moreover, since "[m]ost contracts" in Kentucky and Indiana contain DBE goals, ECF 1: ¶¶ 35–36, and Plaintiffs "regularly bid on and compete for [these particular contracts,]" ECF 1: ¶ 37, it is, *at best*, highly improbable that Plaintiffs' references to past losses to DBE firms placing higher bids do not encompass *at least some* contracts having discriminatory DBE goals. *See Cagayat*, 952 F.3d at 753 ("T[he] [plausibility] standard does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal conduct.") (citation and quotation marks omitted). Nor can Defendants' narrow construction of Plaintiffs' claims be reconciled with Plaintiffs' allegation that "presently, and in the future, DBE-owned firms [] have an advantage over Plaintiffs" in obtaining these federally funded contracting projects. ECF 1: ¶¶ 37, 39–40. Contrary to Defendants' view, Plaintiffs' allegations set forth a "long history" of past and continuing unequal competition for federally financed road-construction contracts in a system that institutes race- and gender-based selection preferences for DBE firms, given Plaintiffs' equally long history of both performing such contracts and being "qualified, willing, and able" to bid them. ECF 1: ¶¶ 8, 11–12, 35–40, 51.

While Defendants may have preferred that Plaintiffs attach modifying phrases to each of their various factual allegations, describing a particular contract's DBE goal, this grammar lesson and expectation demands a level of specificity that is *not* required to satisfy the "low" pleading

4

bar. *See El-Hallani*, 623 F. App'x. at 739. Indeed, it would wholly defy the "liberal" pleading standard of Rule 8 to construe Plaintiffs' statements, as alleged, so narrowly and technically as referencing *all* contracts that are *not* subject to the DBE Program's discriminatory goals and *no* contracts that *are* subject to the DBE Program's goal. *See E.E.O.C. v. J.H. Routh Packing Co.*, 246 F.3d 850, 851 (6th Cir. 2001) (Rule 8 implements a liberal standard); *Archey v. Hyche*, 935 F.2d 269 (6th Cir. 1991) (the test of sufficiency is whether the facts "may *reasonably* be construed to state a claim") (emphasis added). Accordingly, Defendants' assertions that Plaintiffs have "indicate[d] nothing about the nature" of Plaintiffs' lost contracting opportunities—namely, "whether [the contracts] were in Plaintiffs' industries," "whether the contracts . . . had DBE goals," and whether Plaintiffs were "qualified for an award of those contracts"—are baseless and contrary to a reasonable construction of Plaintiffs' complaint. ECF 31:10.

Similarly, Defendants' contention that it is somehow unknown as to whether Plaintiffs are "complaining about the race-based presumptions, the sex-based presumption, or both" simply carries no water. ECF 31:11. Plaintiffs repeatedly explain and "complain[] about" the race and gender-based discrimination inflicted by the DBE program and its discriminatory goals that "[m]ost contracts" they bid are subject to, and which pit Plaintiffs in an unequal competition against DBE firms. ECF 1: ¶¶ 8, 32, 22–30, 35–40, 42, 51. Contrary to Defendants' criticisms, Plaintiffs' claims are *not* "fatally deficient" for "fail[ing] to identify the race or gender of [their] owners." ECF 31:3, 10. Plaintiffs do not need to specifically identify the race or gender of their owners to plausibly allege "being discriminated against by the DBE program" "based on gender and race," where they have attested that the DBE Program "do[es] not afford [them] either a race or gender preference." ECF 1: ¶¶ 8, 32. "[D]raw[ing] all reasonable inferences in favor of [] [P]laintiff[s]," these verified allegations, "accept[ed] [] as true," confirm that Plaintiffs' owners

are *not* of a race or gender that is singled out for preferential treatment under the DBE Program. *See Cagayat*, 952 F.3d at 753. Thus, these allegations state Plaintiffs' claims that the DBE Program has, and is, "discriminating against [them] on the basis of race and gender." *E.g.*, ECF 1: ¶ 32.

Defendants do not undercut the sufficiency of Plaintiffs' complaint by noting that Plaintiffs could have lost a particular bid "to a DBE that established its status without relying on the [race-and/or gender-based] presumptions." ECF 31:11. "[W]hether the contract was awarded based on the winning business owner's race or gender," *id.*, and any reasons surrounding *why* Plaintiffs might have lost a particular DBE contract to a DBE have nothing to do with the injury alleged—an *unequal opportunity to compete* for said contracts, spanning Plaintiffs' past, present, and future. ECF 1: ¶¶ 8, 32, 35–40, 42, 51. Indeed, as further explained *infra* Section II, a plaintiff need not even allege "that it has been, or will be, the low bidder on a Government contract" because "[t]he injury in cases of this kind is that a 'discriminatory classification prevent[s] the plaintiff from competing on an equal footing.'" *E.g.*, *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995) (citation omitted).[2]

In short, Defendants' efforts to revise Plaintiffs' complaint and split hairs over the semantics of Plaintiffs' allegations are unsupported by fact, reason, and law—requiring a construction in the light most *disfavorable* to Plaintiffs and drawing *no sensible* inferences in favor

---

[2] Defendants also briefly and vaguely criticize Plaintiffs for "plead[ing] no facts" regarding "Plaintiffs' own ability to establish DBE status." ECF 31:12. However, any additional allegations on this point are irrelevant to Plaintiffs' claims. Here, Plaintiffs have complained about the race and gender-based system in which federally funded contracts are awarded under the DBE Program. Plaintiffs do *not* assert a desire to be DBEs. Instead, Plaintiffs assert that the DBE Program "discriminat[es] against [them]" because it forces them into an unequal competition that is "based on race and gender," thus depriving them from "consider[ation] on equal footing without regard to race [and gender.]" *E.g.*, ECF 1: ¶¶ 8, 32, 40, 42, 51. As further explained *infra* Section II, Defendants' briefly noted expectation here only mischaracterizes Plaintiffs' injury, thus implicating a question of standing; and as explained, the answer is not one that depends on Plaintiffs' desire or ability to establish DBE status.

of Plaintiffs. *But see Cagayat*, 952 F.3d at 753 (the complaint is to be construed "in the light most *favorable* to the plaintiff," . . . draw[ing] all *reasonable* inferences in favor of the plaintiff.") (emphases added). Plaintiffs, through their Verified Complaint, more than satisfy the plausibility standard in alleging that they have been, and continue to be, denied equal access to federally financed road-construction contracts subject to the federal government's DBE Program and its discriminatory race- and gender-based selection biases for DBE firms. Likewise, Plaintiffs have alleged that Defendants have not satisfied the "high bar" the Constitution demands in interpreting and implementing the DBE Program's race- and gender-based classifications through the demonstration of a compelling governmental interest that is narrowly tailored to achieve that interest. ECF 1: ¶¶ 4–7, 31, 44–53. Plaintiffs explain that "[they] seek relief against Defendants alone, because it is [the federal government's] DBE program and regulations that are causing harm to Plaintiffs." ECF 1: ¶¶ 41–42, 49–50.

Accordingly, Plaintiffs state plausible claims of Fifth Amendment race and gender discrimination in satisfaction of the "low" pleading threshold because there is "sufficient factual content from which a court, informed by its judicial experience and common sense, [can] draw the reasonable inference" that "[D]efendant[s] [are] liable for the [equal protection violations] alleged." *El-Hallani*, 623 F. App'x. at 734, 739 (citations and quotation marks omitted).

## II. The Court has subject matter jurisdiction over Plaintiffs' Equal Protection claims because Plaintiffs have sufficiently alleged standing.

Likewise, Defendants' Rule 12(b)(1) challenge to Plaintiffs' standing continues to rely upon, not only a narrow and hyper-technical construction of Plaintiffs' claims, but also a legal conception of standing that fundamentally overlooks the injury inflicted by a government-imposed barrier to equal treatment. Defendants' misconstructions of both fact and law should be rejected.

Article III restricts the jurisdiction of federal courts to "cases and controversies," requiring that a plaintiff establish standing or a "personal interest" in the lawsuit." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 732 (2008). To establish standing, there must be (1) an injury in fact that is (2) fairly traceable to the challenged conduct of the defendant, and that (3) is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

Under the "first and foremost" requirement of standing's three elements, a plaintiff establishes an injury in fact by showing that he "suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent." *Id.* at 338–39 (citations and quotation marks omitted). This burden is low, requiring nothing more than "an identifiable trifle" of harm. *Norton v. Beasley*, No. 21-6053, 2022 WL 17348385 at 7 (6th Cir. Dec. 1, 2022) (citing *United States v. Students Challenging Regul. Agency Procs. (SCRAP)*, 412 U.S. 669, 689 n. 14 (1973) ("an identifiable trifle is enough for standing to fight out a question of principle; the trifle is the basis for standing and the principle supplies the motivation.").

In an equal protection case, "[w]hen the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group," "the 'injury in fact' is the inability to compete on an equal footing." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666, (1993). This "denial of equal treatment" recognizes that while "plaintiffs have no right to be appointed [a government benefit,]" "they do have a federal constitutional right to be *considered* for [the benefit] without the burden of invidiously discriminatory disqualifications." *Id.* (citing *Turner v. Fouche*, 396 U.S. 346, 362 (1970)) (emphasis in original) (quotation marks and brackets omitted); *e.g.*, *Vitolo v. Guzman*, 999 F.3d 353, 359 (6th Cir. 2021) (citing *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No.*

8

*I*, 551 U.S. 701, 719 (2007) ("[O]ne form of injury under the Equal Protection Clause is being forced to compete in a race-based system that may prejudice the plaintiff").

Moreover, the discriminatory denial of equal treatment is a "twofold" injury: (1) the competitive harm sustained from the "inability to compete on an equal footing" and (2) "the dignitary harm inherent in racial discrimination." *See Inner City Contracting, LLC v. Charter Twp. of Northville, Michigan*, 87 F.4th 743, 751–52 (6th Cir. 2023) (finding contracting business denied equal protection sustained a "twofold" injury); *Moore v. U.S. Dep't of Agric. on Behalf of Farmers Home Admin.*, 993 F.2d 1222, 1224 (5th Cir. 1993) ("The badge of inequality and stigmatization conferred by racial discrimination is a cognizable harm in and of itself providing grounds for standing."); *Smith v. Howard Univ.*, 605 F. Supp. 3d 103, 108 (D.D.C. 2022) ("if race discrimination is a fundamental injury . . . [then] gender discrimination must be as well); *Heckler v. Mathews*, 465 U.S. 728, 739–40 (1984) (recognizing the Court's "repeated[] emphasi[s]" on the stigmatiz[ation] caused by racial discrimination as "serious non-economic injur[y]"); *see also, e.g.*, *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. (SFFA)*, 600 U.S. 181, 208, 217 (recognizing the "odious" and "pernicious" nature of racial classifications); *United States v. Virginia*, 518 U.S. 515, 534 (1996) (recognizing the stigma inherent to gender discrimination).

Given the definition of injury in fact, the Supreme Court has found that causation and redressability necessarily flow from the denial of equal treatment injury: A plaintiff who alleges a governmental denial of equal treatment also "allege[s] both that the [government's discriminatory policy] is the 'cause' of [the] injury and that a judicial decree directing [the government] to discontinue its [discriminatory policy] would 'redress' the injury." *E.g.*, *City of Jacksonville*, 508 U.S. at 666, n. 5.

"To establish standing, therefore," in the context of a discriminatory government contracting program, involving race- or gender-based preferences, a plaintiff "need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis." *Id.* at 666. Here, Plaintiffs have suffered both competitive and dignitary harms caused by Defendants' DBE Program and have made more than a sufficient showing to allege standing in this equal protection case.

A.    **Plaintiffs have alleged injuries in fact.**

1.    **Plaintiffs sufficiently allege competitive and dignitary injuries flowing from the government's denial of equal treatment.**

Defendants again contend that Plaintiffs "do not allege that the DBE program is causing them any injury" because "they do not plausibly allege that the contracts they lost out on, or are likely to lose out on in the future, are contracts with *DBE goals*." *See* ECF 31:15 (cleaned up) (emphasis added). But this plausibility argument, asserting that Plaintiffs' allegations are "conclusory," ECF 31:14, merely recycles Defendants' narrow and over-particular construction of Plaintiffs' claims. *See supra* Section I.

As already explained, contrary to law, reason, and the facts alleged, Defendants ignore and discount most of the factual content supporting Plaintiffs' claims while attempting to nit-pick and construe Plaintiffs' Verified Complaint "so narrowly as to be the death of notice pleading." *See El-Hallani*, 623 F. App'x. at 734; *supra* pp. 2–6. However, Plaintiffs have attested that they are "qualified, willing, and able to bid on [milling and hauling] contracts impacted by the federal DBE program," ECF 1: ¶¶ 11–12, 40, 51, and that "[m]ost contracts" they "regularly bid" in Kentucky and Indiana "contain . . . DBE participation goals." ECF 1: ¶¶ 34–37. Moreover, given Plaintiffs' "long history" of performing, and bidding on, these contracts in a system that imposes race- and gender-based selection preferences for DBE firms, but not for Plaintiffs, Plaintiffs have

10

experienced an equally "long history" of past and continuing unequal competition. ECF 1: ¶¶ 8, 11–12, 32, 38–40. In addition to Plaintiffs' past experiences competing "at a disadvantage because of their race and gender," Plaintiffs' have complained that the DBE Program continues to place them on "[un]equal footing" "on the basis of race and gender" and causes them dignitary harm. ECF 1: ¶¶ 8, 32, 37–40, 42, 51.[3]

These allegations, "accept[ed] [] as true," establish standing because Plaintiffs have alleged that they are "able and ready to bid" on federally funded contracts impacted by the DBE Program "and that [the Program's] discriminatory policy prevents them from doing so on an equal basis." *E.g.*, *Cagayat*, 952 F.3d at 753; *City of Jacksonville*, 508 U.S. at 666.[4] Moreover, this race and gender discrimination causes Plaintiffs dignitary harm, conferring standing.[5] And because Plaintiffs "regularly" experience this unequal treatment, ECF 1: ¶¶ 34–37, they point to far more

---

[3] This case is *not* "therefore closely similar to another one in which a district court recently determined that a plaintiff lacked standing to challenge the DOT DBE program." ECF 31:14 (citing *Bruckner v. Biden*, No. 8:22-CV-1582-KKM-SPF, 2023 WL 2744026 (M.D. Fla. Mar. 31, 2023)). To the contrary, Plaintiffs have alleged plenty of "detail regarding the kinds of contracts that the Plaintiffs would like to pursue under the Infrastructure Act" alongside a longstanding career of fulfilling just such types of contracts, and an ongoing history of rejected bids for contracts subject to the DBE Program's discriminatory race- and gender-based goals. *See Bruckner*, 2023 WL 2744026 at *5; *see also supra* pp. 2–6.

[4] Although Plaintiffs do allege that they have "lost out . . . to DBE firms based on race and gender" "[d]espite being the "lowest bidder" on these contracts, *e.g.*, ECF 1: ¶¶ 8, 35–40, a plaintiff *neither* needs to allege "that it has been, or will be, the low bidder on a Government contract[,]" *nor* "'allege that [it] would have obtained the benefit but for the barrier to establish standing.'"*Adarand*, 515 U.S. at 211 (quoting *City of Jacksonville*, 508 U.S. at 666).

[5] The Sixth Circuit has explicitly recognized that discrimination can cause an entity to suffer both "dignitary harm" and competitive harm conferring constitutional standing. *See Inner City Contracting*, 87 F.4th at 751–53 (discussing the issue in both constitutional and statutory contexts); *e.g.*, *Triad Assocs., Inc. v. Chicago Hous. Auth.*, 892 F.2d 583, 590–91 (7th Cir. 1989), (reversing and remanding for proper consideration of corporation's standing to bring equal protection racial discrimination claims), *abrogated on other grounds by Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668 (1996). Indeed, [i]t has long been clear" that entities are "persons" protected by the Equal Protection Guarantees of the Constitution. *See, e.g.*, *Marshall v. Kleppe*, 637 F.2d 1217, 1220 (9th Cir. 1980); *Grosjean v. Am. Press Co.*, 297 U.S. 233, 244 (1936); *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 535 (1925).

than the "identifiable trifle" of harm sufficient for standing. *SCRAP*, 412 U.S. at 689 n. 14. Indeed, "the inability to compete on equal footing for *even one* contract would constitute an injury." *Midwest Fence Corp. v. United States Dep't of Transportation*, 84 F. Supp. 3d 705, 722 (N.D. Ill. 2015), *aff'd*, 840 F.3d 932 (7th Cir. 2016) (emphasis added); *SFFA*, 600 U.S. 181, 255, (2023) (Thomas, J. concurring) ("tremendous harm" is inflicted by a racial classification).

### 2. Defendants' concept of injury ignores the essence of what a denial of equal treatment is.

Aside from Defendants' quibble about the sufficiency of Plaintiffs' grammar, Defendants' also advance a conception of standing that wholly mischaracterizes the injury inflicted by a government denial of equal treatment. Hoping to distinguish this case, Defendants briefly assert that the DBE Program is "[u]nlike the program in *Jacksonville*" because it "does not set aside contracts for DBEs[,]" allowing "any firm [to] bid on and be awarded any contract." ECF 31:14. But that argument turns a blind eye to the injury at hand. In finding an equal protection injury, the Court in *City of Jacksonville* does not make any material distinction between the government's method of prioritizing contracts on the basis of race and gender—whether such contracts be subject to a traditional set-aside or otherwise prioritized for participants. Indeed, the Court confirms that the at issue Minority Business Enterprise (MBE) ordinance was *not* "sufficiently altered" following the repeal of an initial ordinance "requir[ing] that 10% of the amount spent on city contracts be set aside each fiscal year for so-called [MBEs]" and replacement with a new ordinance establishing "participation goals" and various methods to achieve them. *City of Jacksonville*, 508 U.S. at 658, 661–62, n. 3. Instead, the Court explains that the "fundamental" problem of a contracting scheme that "accords [race- and gender-based] preferential treatment" to some is that it likewise imposes a race and gender-based "disadvantage" upon others. *Id.* at 662. As the Court notes:

> The gravamen of petitioner's complaint is that its members are disadvantaged in their efforts to obtain city contracts. The new ordinance may disadvantage them to a lesser degree than the old one, but insofar as it accords preferential treatment to [certain racial minorities] and female-owned contractors[,] . . . it disadvantages them in the same fundamental way.

*Id.*; *see also id.* at 666 (describing this race- and gender-based disadvantage as "the inability to compete on an equal footing [establishing injury in fact]"). Further, because a denial of equal treatment is a "twofold" injury, the disadvantage of a race- and gender-based preference goes far beyond competitive harm and further inflicts dignitary harm. *E.g.*, *Inner City Contracting*, 87 F.4th at 751–52; *Moore*, 993 F.2d at 1224; *Smith*, 605 F. Supp. 3d at 108.

The same "fundamental" problem of a race- and gender-based inequality exists here: The DBE Program injects an unequal race- and gender-based bias into the system of awarding federal contracts for road-construction projects. It is wholly beside the point that "any firm can bid on" "any contract," or that "the low bidder [may not be selected for a contract] for reasons unrelated to DBE status." ECF 31:14, 15 n. 9.[6] Plaintiffs do not challenge the fact that DBE and non-DBE firms alike have an opportunity to bid on, or potentially receive, contracts—indeed, Plaintiffs have a "long history" of bidding on federally funded surface transportation contracts impacted by the DBE Program's discriminatory goals. *E.g.*, ECF 1: ¶¶ 8, 11–12. What Plaintiffs take issue with here is the race- and gender-based *inequality* of that opportunity. Plaintiffs have a "constitutional right to be *considered* for [these contracts] without the burden of invidiously discriminatory

---

[6] Despite Defendants' insistence that the DBE Program is "*not* [a] set-aside" because the regulations say so, *see* ECF 31:15 n. 8, the reality is that compliance with the DBE Program, including the race- and gender-based DBE goal, is enforced through a series of regulations imposing various expectations under the threat of penalty. *See* 49 C.F.R. §§ 26.101–.109, 26.47, 26.53, App. A; *see also* ECF 27-1:3–4. Given this scheme mandating the consideration of race and gender in contract awards, the particular characterization of the DBE Program matters little. *See Midwest Fence*, 84 F. Supp. 3d at 722, *aff'd*, 840 F.3d 932 (7th Cir. 2016) ("Although the challenged DBE programs are not mandatory set-asides, the Court continues to find [*City of Jacksonville*] to provide the better analytic approach.") (quotation marks omitted).

disqualifications." *City of Jacksonville*, 508 U.S. at 666 (citing *Turner*, 396 U.S. at 362). However, Plaintiffs, who are not DBEs, are "being forced to compete" against an unequal system that imposes race- and gender-based contracting goals prioritizing DBE firms. *Vitolo*, 999 F.3d at 359 (citing *Parents Involved*, 551 U.S. at 719).

Contrary to Defendants' contention, Plaintiffs do *not* need to allege "that they could qualify for DBE status by making the race-neutral factual showing" to be entitled to the freedom to compete for contracts without regard to race and gender. *See* ECF 31:14. Defendants' "argument is premised on a mischaracterization of [Plaintiffs'] alleged injury." *See Dynalantic Corp. v. Dep't of Def.*, 115 F.3d 1012, 1013, 1015–16 (D.C. Cir. 1997) (discussing the contracting goal for socially and economically disadvantaged businesses under the SBA's 8(a) Program and noting that "Appellant has no desire to participate in the program" but has nevertheless alleged a cognizable injury—"'the inability to compete on an equal footing in the bidding process.'") (citing cases)). Defendants discount that fact that DBE status is *not* a neutral concept; it is set forth on the basis of race and gender through a presumption of eligibility. Likewise Defendants ignore that the DBE Program creates a system of awarding federal contracts that is divided into *two separate programs* on the basis of race and gender—one in which *everyone* is considered equally without regard to race and gender, and the other in which *only* racial minorities and women are prioritized for preferential treatment. Plaintiffs challenge this unequal governmental prioritization of race and gender in the awarding of federal contracts. "It does not matter that the plaintiffs might not otherwise qualify for priority consideration" as a DBE firm because it is the government's consideration of race and gender as a factor for awarding contracts that is causing the equal protection injuries. *See, e.g.*, *Vitolo*, 999 F.3d at 359.

In sum, a system of awarding contracts that considers race and gender cannot be equal, and Plaintiffs have challenged the unequal treatment imposed against them under the DBE Program. As explained *supra* Section II.A.1., Plaintiffs have established standing because they have alleged that they are "able and ready to bid" on federally funded contracts impacted by the DBE Program "and that [the Program's] discriminatory policy prevents them from doing so on an equal basis." *E.g.*, *City of Jacksonville*, 508 U.S. at 666. Likewise, this denial of equal treatment also inflicts dignitary harm, conferring Plaintiffs standing. *E.g.*, *Inner City Contracting*, 87 F.4th at 751–52; *Moore*, 993 F.2d at 1224; *see also supra* n. 5.[7]

**B.    Plaintiffs' injuries are traceable to Defendants and redressable by this Court.**

**1.    Plaintiffs have sufficiently alleged traceability and redressability, which follow from Plaintiffs' twofold equal protection injuries.**

Standing also requires that the injury be "fairly traceable" to the challenged conduct—though not definitively so—and "likely [to] be redressed by a favorable decision." *Bennett v. Spear*, 520 U.S. 154, 162 (1997); *Changizi v. Dep't of Health & Hum. Servs.*, 82 F.4th 492, 497 (6th Cir. 2023). As previously noted, the Supreme Court has articulated a broad conception of

---

[7] Defendants also claim, incorrectly, that "Plaintiffs[] Attempt to Manufacture Injury in Fact Based on [the Supreme Court's decision in] *Students for Fair Admissions*." *See* ECF 31:16–17. Defendants go on to assert a theory of "per se" injury under *SFFA*—a notion that Plaintiffs have not argued or indicated—providing arguments seemingly going to the merits of the case (the constitutionality of race- and gender-based classifications). To be sure, the Supreme Court has repeatedly emphasized that racial and gender classifications *do* inflict harm to plaintiffs that have been injured by them; and as Plaintiffs have alleged here, the DBE Program's race- and gender-based preferences have injured Plaintiffs. However, Plaintiffs have *not* asserted any "per se" theory of injury in fact under *SFFA* and maintain that the "able and ready" standard set forth in *City of Jacksonville* applies here. To the extent Defendants endeavor to defend the DBE Program's race- and gender-based classifications as constitutionally-justified, *see, e.g.*, ECF 31:16–17 (discussing *SFFA*), such arguments, while appropriate at preliminary or summary judgment, are *not* appropriate at this stage (and not appropriate under the standing inquiry). *See Daugherty Speedway, Inc. v. Freeland*, 520 F. Supp. 3d 1070, 1074–75 (N.D. Ind. 2021) ("The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits.") (quoting *Triad*, 892 F.2d at 586); *Primus Grp., LLC v. Smith & Wesson Corp.*, 844 F. App'x. 824, 826 (6th Cir. 2021) ("[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.").

standing for equal protection cases in which a plaintiff challenging a discriminatory government contracting program "need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis." *City of Jacksonville*, 508 U.S. at 666. The elements of causation and redressability follow from this equal protection injury: "causation, because the theory is that the policy prevents equal competition; redressability, because invalidating the policy will again place the plaintiff on equal footing." *Midwest Fence Corp. v. United States Dep't of Transportation*, 840 F.3d 932, 940 (7th Cir. 2016) (citing *City of Jacksonville*, 508 U.S. at 666 n. 5); *W.H. Scott Const. Co. v. City of Jackson, Miss.*, 199 F.3d 206, 215, n. 8 (5th Cir. 1999) (causation and redressability collapsed into definition of injury in fact); *Contractors Association of Eastern Pennsylvania, Inc. v. City of Philadelphia*, 6 F.3d 990, 995–96 (3d Cir.1993) (finding that construction contractors have standing to challenge a minority preference ordinance upon a showing they are "able and ready to bid on contracts subject to the ordinance and that a discriminatory policy prevents them from doing so on an equal basis."); *Sherbrooke Turf, Inc. v. Minnesota Dep't of Transp.*, 345 F.3d 964, 967 (8th Cir. 2003) (same). Similarly, "[t]he badge of inequality and stigmatization conferred by [] discrimination is a cognizable harm in and of itself providing grounds for standing." *Moore*, 993 F.2d at 1224; *e.g.*, *Inner City Contracting*, 87 F.4th at 751–52 (competitive and dignitary harms resulting from racial discrimination traceable to local government and redressable by a favorable court decision).

Here, Plaintiffs have established standing because they have sufficiently alleged a "twofold" injury from which traceability and redressability readily follow. Plaintiffs are "able and ready to bid" on federally funded contracts impacted by the DBE Program but "[the Program's] discriminatory policy prevents them from doing so on an equal basis," inflicting also, "the dignitary harm inherent in racial [and gender] discrimination." *See, e.g.*, *City of Jacksonville*,

16

508 U.S. at 666; *Inner City Contracting*, 87 F.4th at 751–52; *Moore*, 993 F.2d at 1224; *Smith*, 605 F. Supp. 3d at 108; ECF 1: ¶¶ 8, 11–12, 32, 35–40, 42, 51.

Because Plaintiffs have sufficiently alleged these competitive and dignitary harms flowing from the government's denial of equal treatment, Plaintiffs have also sufficiently alleged both the second and third requirements of standing. Indeed, "the [DBE Program] is the 'cause' of [Plaintiffs' competitive and dignitary] injury" and "a judicial decree directing the [government] to discontinue its [race and gender discrimination] would 'redress' the injury." *City of Jacksonville*, 508 U.S. at 666, n. 5; *e.g.*, *Midwest Fence*, 840 F.3d at 940; *City of Jackson*, 199 F.3d at 215.

### 2. Defendants' arguments against Plaintiffs' satisfaction of the traceability and redressability again mischaracterize Plaintiffs' injuries and further devolve into unlikely speculation.

Despite Plaintiffs' sufficiently alleged injuries and the simple logic set forth in *City of Jacksonville* and echoed by various Circuit Courts, Defendants insist that Plaintiffs fail the traceability and redressability prongs of standing because "they do not allege that they would qualify under the race- and gender-neutral requirements of the [DBE] [P]rogram." ECF 31:18. "[I]f Plaintiffs do not meet the[] race- and gender-neutral requirements," Defendants argue, "then enjoining the presumptions would leave Plaintiffs in exactly the same position, and they would remain at a competitive disadvantage relative to other DBEs." ECF 31:19. But Defendants' argument here is, like Defendants' injury argument, based on the same miscalculation of Plaintiffs' injuries and further invokes a series of unwarranted assumptions.

In the first place, Plaintiffs have *not* alleged any desire to be DBEs. Nor must they to secure their right to be free to compete for contracts without regard to race and gender. *See, e.g.*, *City of Jacksonville*, 508 U.S. at 666; *Adarand*, 515 U.S. at 211; *Midwest Fence*, 840 F.3d at 940. Contrary to Defendants' characterizations of Plaintiffs' injuries, Plaintiffs do not complain of just *any* old "competitive disadvantage" to DBEs. Plaintiffs allege that the DBE Program prevents them from

being "considered on equal footing *without regard to race* [*and gender*] *and* … [causes] harms to [their] dignity." *E.g.*, ECF 1: ¶ 42 (emphasis added). Defendants completely ignore the fundamental injury inflicted by all race and gender discrimination, which is "the dignitary harm inherent in [] discrimination." *E.g.*, *Inner City Contracting*, 87 F.4th at 751–52; *Smith*, 605 F. Supp. 3d at 108. It is exactly this demeaning essence of discrimination that has earned "[r]acial and ethnic distinctions of any sort" their characterization as "odious" and "pernicious." *E.g.*, *SFFA*, 600 U.S. at 208–09, 217; *see also* Virginia, 518 U.S. at 534 (regarding gender classifications).

Accordingly, striking the presumptions would *not* "leave Plaintiffs in exactly the same position." ECF 31:19. Absent the race- and gender-based presumptions, the DBE Program would cease to discriminate against Plaintiffs on the basis of race and gender. Thus, the harms caused to Plaintiffs would be remedied because the "badge of inequality" would be removed, and Plaintiffs would no longer be "forced to compete" for contracts subject to "invidiously discriminatory disqualifiers." *City of Jacksonville*, 508 U.S. at 666; *Parents Involved*, 551 U.S. at 719; *Inner City Contracting*, 87 F.4th at 751–52; *Moore*, 993 F.2d at 1224.

Defendants assume far too much in asserting that "removing the . . . presumption . . . would not alter the number or identity of socially and economically disadvantaged individuals" participating in the DBE Program. ECF 31:19 (citing *Interstate Traffic Control v. Beverage*, 101 F. Supp. 2d 445, 453 (S.D. W. Va. 2000)). Under this hypothesis, Defendants "presum[e] [that Plaintiffs would thus] continue to compete against DBEs and still face the same [] disadvantages in competing against them." *Id*. But Defendants' theory makes little practical sense and pays no consideration to the value of the DBE Program's presumptions. *See Midwest Fence Corp. v. U.S. Dep't of Transp.*, No. 10 C 5627, 2011 WL 2551179 at *10 (N.D. Ill. June 27, 2011), confirmed in *Midwest Fence*, 84 F. Supp. 3d 705 (N.D. Ill. 2015), *aff'd*, 840 F.3d 932, 940 (7th Cir. 2016).

18

On the one hand, Defendants maintain that a compelling interest supports the use of the race- and gender-conscious provisions in their DBE program and that the continuation of these race- and gender-based classifications are essential and constitutionally-justified. *See id.*; ECF 31:2, 6–7, 16–17. On the other hand, Defendants argue that the race and gender presumptions carry little weight—as if the Program would continue unchanged as to the numbers and identities of participating DBE firms if the race- and gender-based presumptions were struck down, and as if Congress would have adopted, and repeatedly authorized, the DBE Program without the race- and gender-conscious provisions.[8] *See Midwest Fence*, No. 10 C 5627, 2011 WL 2551179 at 10. "These [two] premises are incompatible." *Id.*

The most plausible reasoning is that the race- and gender-based presumptions *are* in fact according DBEs a competitive advantage over non-DBEs for contracts requiring DBE goals. As the Seventh Circuit recognized, the government "is conferring a *significant* benefit—access to a presumption of social and economic disadvantage that is the key to valuable entitlements." *Milwaukee Cnty. Pavers Ass'n v. Fiedler*, 922 F.2d 419, 422 (7th Cir. 1991) (emphasis added) (discussing a state highway set-aside program that utilized a similar rebuttable presumption of disadvantage). Without the advantage of the race and gender-based presumptions, each firm's business owners would be required to set forth *proof* of their social and economic disadvantage to demonstrate DBE status—"a much higher hurdle" than simple reliance on a race- or gender-based presumption. *Vitolo*, 999 F.3d at 363 (discussing the SBA's presumptions of disadvantage).

---

[8] To the contrary, Congress reauthorized funding supporting the DBE Program using language specifically directed at "presumed" "socially and economically disadvantaged individuals." P.L. 117-58 §§ 11101(e)(2)(B), (3). Thus, the DBE Program might be characterized as more of "a minority enrollment program with a secondary disadvantage element." *Cf. Dynalantic*, 115 F.3d at 1017 (quoting *Regents of Univ. of California v. Bakke*, 438 U.S. 265, 281 n. 14 (1978) (Opinion of Powell, J.)).

Comparing the burdens between processes for those who are entitled to the presumption, and those who are not, is illustrative.[9] In order to qualify for the presumption of social and economic disadvantage, an individual must certify that he or she is a women or member of an included racial group and show that he or she meets the personal net worth limitation. 49 C.F.R. §§ 26.67(a), 26.5.

Meanwhile, individuals who are *not* entitled to the presumption must demonstrate "by a preponderance of the evidence, that they are socially and economically disadvantaged." 49 C.F.R. 26.61(d); 26.67(d). Proof of social disadvantage requires a showing of each of the following: (1) "at least one objective distinguishing feature that has contributed to social disadvantage, such as race, ethnic origin, disability, long-term residence in an environment isolated from the mainstream of American society"; (2) "personal experiences of substantial and chronic social disadvantage in American society"; and (3) "negative impact on entry into or advancement in the business world because of the disadvantage." 49 C.F.R. pt. 26, App. E. To prove economic disadvantage, the individual must be socially disadvantaged and submit a "narrative" and personal financial information to demonstrate that his/her "ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same or similar line of business who are not socially disadvantaged." *Id.*, § 26.67(d).

Consequently, in the absence of the presumption, "individuals . . . must put forth double the effort to qualify" and be willing and able to prove their separate claims of "social" and "economic" disadvantage. *See Ultima Servs. Corp. v. U.S. Dep't of Agric.*, No.

---

[9] Under either DOT or SBA frameworks, socially disadvantaged individuals "are those who have been subjected to racial or ethnic prejudice or cultural bias within American society because of their identities as members of groups." *E.g.*, 49 C.F.R. pt. 26, App. E. Economically disadvantaged individuals "are socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired . . . as compared to others . . . who are not socially disadvantaged." *Id.*; *see also* ECF 1: ¶¶ 29–30.

220CV00041DCLCCRW, 2023 WL 4633481 at *15 (E.D. Tenn. July 19, 2023) (declaring SBA's racial presumption unconstitutional and issuing nationwide injunction against its use). It is unreasonable for Defendants to assume that every person who can honestly sign the certification for the presumption could and would be able to prove disadvantage "as compared to others" by a preponderance of the evidence. *Midwest Fence*, No. 10 C 5627, 2011 WL 2551179 at 10. Thus, without the "significant benefit" of the DBE Program's race- and gender-based presumptions, the "much higher hurdle" for a firm's owners, would *likely* alter both the number and identity of DBE firms, changing and even reducing Plaintiffs' competition against DBEs for DBE contracts.[10]

It is simply inconceivable that the DBE Program's favor for women and certain racial groups plays *no appreciable role* in certifying certain firms as DBEs and prioritizing them for DBE contracts over non-DBEs. In the absence of the presumptions, Plaintiffs' injuries would be redressed because DBEs would be designated only by race- and gender-neutral terms. Thus, any DBE contract losses Plaintiffs may incur to DBEs would no longer be *undignified losses on the basis of race and gender.* In such case, the competitive harm to Plaintiffs is also reduced to zero because race and gender are no longer a basis for winning or losing a DBE contract. Accordingly, Plaintiffs' Verified Complaint, accepted as true, sufficiently alleges that the dignitary and competitive harms Plaintiffs have sustained, and continue to sustain, is traceable to Defendants' DBE Program and that these harms are "likely" redressed by a favorable ruling for Plaintiffs. *E.g.*, ECF 1: ¶¶ 8, 32, 42.

---

[10] Plaintiffs do not suggest merely a negligible reduction to competition for DBE contracts in the absence of the presumptions. However, if "the inability to compete on equal footing for *even one* contract" establishes injury," *Midwest Fence*, 84 F. Supp. 3d at 722, *aff'd*, 840 F.3d 932 (emphasis added), then a remedy "likely" increasing Plaintiffs' contracting opportunities by "even one" DBE contract establishes redressability.

**III.    There is no failure to name an indispensable party.**

Defendants also raise Rule 12(b)(7) to assert that "one or more state or local agencies" must be joined to this suit pursuant to Rule 19. ECF 31:20. However, Plaintiffs properly challenge, and seek relief from, exactly those named federal Defendants; and no party beyond those named Defendants is indispensable or appropriate in this case.

Resolving the question of joinder under Rule 19—and thus of dismissal for failure to join an indispensable party under Rule 12(b)(7)—involves a series of three questions, each one conditioned upon the last. *Keweenaw Bay Indian Cmty. v. State*, 11 F.3d 1341, 1345 (6th Cir. 1993). First, the court must determine whether the in-question party is necessary. *Id.* Included in this consideration is whether the court can accord "complete relief among existing parties" and whether resolving the case would impair the absent party from protecting its interest relating to the subject of the action. Rule 19(a)(1). Then, only if the party is necessary, does the court proceed to questions two and three—respectively, whether joinder of the necessary party is feasible or will instead deprive the court of subject matter jurisdiction; and whether, if joinder is not feasible, the necessary party is nonetheless indispensable and the case should be dismissed. *See Glancy v. Taubman Centers, Inc.*, 373 F.3d 656, 666 (6th Cir. 2004); Rule 19(b). Thus, a party "is only indispensable, within the meaning of Rule 19, if (1) it is necessary, (2) its joinder cannot be effected, and (3) the court determines that it will dismiss the pending case rather than proceed in the case without the absentee." *Id.*

Here, the inquiry begins and ends with the first question of necessity. Defendants argue that Kentucky and Indiana are necessary parties because "the Infrastructure Act and the DOT DBE program's implementing regulations require recipients of DOT funds to have [and administer] a state DBE program of their own" and "[t]he Court 'cannot accord complete relief among existing parties' in their absence." ECF 31:20–21. However, Defendants' acknowledgements of federal

requirements only confirm that Plaintiffs' challenge is properly limited to the named federal Defendants. Indeed, it is *federal law* that creates and sets forth the DBE Program according to racial and gender-based classifications: state and local agencies that receive Infrastructure Act funding must administer their own programs for disadvantaged small businesses in accordance with *federal law*. *E.g.*, P.L. 117-58 § 11101(e)(3); 49 C.F.R. §§ 26.3, 26.21. Likewise, it is *federal Defendants* who "are responsible for interpreting and implementing the federal DBE program and Sections 11101(e)(2)–(3) of the Infrastructure Act, including the race and gender presumptions," that harm Plaintiffs. *E.g.*, ECF 1: ¶ 50. Thus, Plaintiffs challenge and seek relief from federal law and Defendants' interpretations and implementations thereof, "*not* [from] those state, local, or private entities or actors that merely operate under the rules of Defendants' discriminatory program." *E.g.*, ECF 1:¶ 42.

Local or state entities do not become indispensable parties merely because they must comply with innumerable federal laws each day. And while state or local action may often be taken independent of federal law, Plaintiffs do not challenge this characteristic of federalism here. Rather, since Plaintiffs' challenges squarely concern federal Defendants' violations of the United States Constitution, this case concerns only the existing parties; no state or local agency recipient of funds under the Infrastructure Act is either implicated or indispensable for disposing this action.[11]

---

[11] Defendants' argument ignores that the "complete relief" standard applies "among existing parties." *See Intercept Sec. Corp. v. Code-Alarm, Inc.*, 164 F.R.D. 215, 218 (E.D. Mich. 1995). "It is irrelevant to this analysis that [a] plaintiff may or may not be foregoing opportunities to sue other defendants for other wrongs." *Id.* To the extent that a state or local agency may subsequently seek to enforce an unconstitutional and invalid federal law or regulation, then Plaintiffs may have a new cause of action in separate case addressing this arbitrary enforcement.

Moreover, the inclinations of previous litigants to name a state or local entity in certain challenges relating to the DBE Program would not necessarily compel a conclusion that such additional parties were in fact indispensable in those cases, nor does it compel such a conclusion here. *See* ECF 31:21. The indispensability inquiry is case-specific, depending upon a litigant's specific claims and requests. For example, Defendants cite *Midwest Fence Corp. v. United States Dep't of Transportation*, 840 F.3d 932 (7th Cir. 2016) to support the proposition that local entities must be joined to this lawsuit. ECF 31:21. But that case would be *expected* to involve local fund recipients as it involved challenges related *not only* to the federal DBE Program *but also* the Illinois State Toll Highway Authority, which "adopted its own DBE program" with "no federal funding." 840 F.3d at 938. Defendants also cite *Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147 (10th Cir. 2000), which *does* involve a challenge related to the federal DBE Program but does *not* appear to include state or local entities, naming only *federal* Defendants—just as Plaintiffs do here. *See also M.B. Guran Company, Inc. v. City of Akron*, 546 F.2d 201, 204 n. 3 (6th Cir.1976) (no need to determine whether HUD was an indispensable party where plaintiff alleged that defendant was violating a HUD rule, not that HUD was violating its own rule); *Fla. Panthers v. Collier Cnty., Fla.*, No. 213CV612FTM29DNF, 2016 WL 1394328 at *16 (M.D. Fla. Apr. 8, 2016) ("Plaintiffs do not seek any relief from the State of Florida or the [Fish and Wildlife Service] . . . this portion of the motion to dismiss is denied.").

To the extent this Court grants the requested declaratory and injunctive relief addressing the unconstitutional race- and gender-based classifications under the Infrastructure Act and

24

implementing DBE Program regulations, and prohibits Defendants from imposing the discriminatory provisions outlined in federal law, Plaintiffs would receive complete relief.[12]

## CONCLUSION

For the foregoing reasons, this Court should deny Defendants' motion to dismiss Plaintiffs' Verified Complaint.

Dated: February 6, 2023.

<div style="margin-left: 40%;">

WISCONSIN INSTITUTE FOR
LAW & LIBERTY, INC.

*s/ Cara Tolliver*

Richard M. Esenberg (WI Bar No. 1005622)
Daniel P. Lennington (WI Bar No. 1088694)
Cara M. Tolliver (WI Bar No. 1112818)
330 East Kilbourn Avenue, Suite 725
Milwaukee, WI 53202
Telephone: (414) 727-9455
Rick@will-law.org
Dan@will-law.org
Cara@will-law.org

COMMONWEALTH COUNSEL GROUP, PLLC
Jason M. Nemes (KBA# 90546)
Greg Healey (KBA# 99546)
10343 Linn Station Road, Suite 100
Louisville, KY 40223
jason@ccgattorneys.com
greg@ccgattorneys.com

*Attorneys for Plaintiffs*

</div>

---

[12] Defendants assert no additional grounds for dismissal of Plaintiffs' Administrative Procedure Act claim, other than their statute of limitations defense. *See* ECF 31:23. Plaintiffs do not dispute that a statute of limitations applies to an APA claim. Rather, the question of *when* an APA claim begins to accrue is currently pending before the Supreme Court and set for argument February 20, 2024. *See Corner Post, Inc. v. Bd. of Governors, FRS*, 216 L. Ed. 2d 1312 (Sept. 29, 2023) (granting certiorari); *see also* https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/22-1008.html. Thus, a decision in *Corner Post* may affect the disposition of Plaintiffs' APA claim, and accordingly, the Court's authority under the APA to "hold unlawful and set aside agency action" found to be "contrary to a constitutional right." *E.g.*, 5 U.S.C. § 706(2)(B). In any event, this Court is vested with plenary powers outside of the APA to address unconstitutional actions by the federal government.