UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

---

MID-AMERICA MILLING COMPANY,
LLC, *et al.*,

       Plaintiffs,

    v.                                                                Case No. 3:23-cv-00072-GFVT

UNITED STATES DEPARTMENT
OF TRANSPORTATION, *et al.*,

       Defendants.

---

## PLAINTIFFS' REPLY BRIEF IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

---

## ARGUMENT IN REPLY

### I.    Plaintiffs have standing to bring their claims challenging the DBE Program.

Plaintiffs have standing to bring their equal protection claims under the Fifth Amendment and Administrative Procedure Act challenging the DBE Program, as Plaintiffs explained in their response brief to Defendants' motion to dismiss this case. *See* ECF 36:1–22, 26 n.12. Defendants' arguments to the contrary recycle the same arguments they made in their motion to dismiss brief, relying not only upon a narrow and hyper-technical construction of Plaintiffs' claims, but also a legal conception of standing that fundamentally overlooks the injury inflicted by a government-imposed barrier to equal treatment. *Compare* ECF 32:5–12, *with* ECF 31:12–20. Defendants' misconstructions of both fact and law should be rejected.

The Supreme Court has articulated a broad conception of standing for equal protection cases in which a plaintiff challenging a discriminatory government contracting program "need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666, (1993). This discriminatory denial of equal treatment is a "twofold" injury in fact, consisting of (1) the competitive harm sustained from "the inability to compete on an equal footing" and (2) "the dignitary harm inherent in racial discrimination." *See id.*; *Inner City Contracting, LLC v. Charter Twp. of Northville*, 87 F.4th 743, 751–52 (6th Cir. 2023) (concluding that a contracting business denied equal protection sustained a "twofold" injury); *see also Heckler v. Mathews*, 465 U.S. 728, 739–40 (1984) (recognizing the Court's "repeated[] emphasi[s]" on the stigmatiz[ation] caused by racial discrimination as "serious non-economic injur[y]"); *Moore v. U.S. Dep't of Agric. ex rel. Farmers Home Admin.*, 993 F.2d 1222, 1224 (5th Cir. 1993) ("The badge of inequality and stigmatization conferred by racial discrimination is a cognizable harm in and of itself providing grounds for standing."); *Smith v.*

*Howard Univ.*, 605 F. Supp. 3d 103, 108 (D.D.C. 2022) ("[I]f race discrimination is a fundamental injury[,] . . . [then] gender discrimination must be as well") (quoted source and quotation marks omitted).

The elements of "[c]ausation and redressability follow from this definition of injury." *Midwest Fence Corp. v. U.S. Dep't of Transp.*, 840 F.3d 932, 940 (7th Cir. 2016). The policy "is the 'cause' of [the] injury and [] a judicial decree directing the [government] to discontinue its program would 'redress' the injury." *City of Jacksonville*, 508 U.S. at 666 n.5; *see, e.g.*, *W.H. Scott Const. Co. v. City of Jackson, Miss.*, 199 F.3d 206, 215 & n.8 (5th Cir. 1999) (causation and redressability "collapsed" into definition of injury in fact). Thus, a plaintiff that shows an injury in this context also demonstrates standing. Here, Plaintiffs have made more than a sufficient showing to establish standing in their claims.

### A. Plaintiffs have suffered, and continue to suffer, competitive and dignitary injuries flowing from the government's denial of equal treatment.

Plaintiffs have established injury in fact because they are "able and ready to bid" on federally funded contracts impacted by the DBE Program, but "[the Program's] discriminatory policy prevents [them] from doing so on an equal basis," without regard to race and gender—inflicting also, "the dignitary harm inherent in racial [and gender] discrimination." *E.g.*, *City of Jacksonville*, 508 U.S. at 666; *Inner City Contracting*, 87 F.4th at 751–52; ECF 1: ¶¶ 8, 11–12, 19–30, 32, 34–40, 42, 51; 27-2; 27-3.

As Plaintiffs' Verified Complaint and declarations confirm, Plaintiffs have set forth their injuries in *plenty* of detail, including: (1) the "milling" and "hauling" Infrastructure Act construction contracts they are "qualified, willing, and able to bid on" in Kentucky, Indiana, and multiple other states; (2) a successful, decades-long history of fulfilling just such types of contracts, dating back to the early 1980s; and (3) an equally "long" and ongoing history of rejected

2

bids for "contracts impacted by the federal DBE Program," which "do[es] not afford Plaintiffs either a race or gender preference." ECF 1: ¶¶ 8, 11–12, 32, 34–40; 27-2: ¶¶ 2–30; 27-3: ¶¶ 2–20.

Defendants do not resist the fact of Plaintiffs' standing by continuing to split hairs over the semantics of Plaintiffs' statements in order to suggest that this case is about lost opportunities to DBE firms generally, in the absence of contracts containing the Program's race- and gender-based DBE goals for DBE firms. ECF 32:8–9 & n.2. In an unrelenting demand for Plaintiffs to "identify . . . specific contracts," ECF 32:9, Defendants completely ignore the rich factual content of Plaintiffs' verified statements, which specifically attest that "[m]ost contracts" Plaintiffs "regularly bid" contain DBE goals and further identify *multiple* contracting occasions in which Plaintiffs have lost out under this scheme.[1] *See* ECF 1: ¶¶ 35–40; ECF 27-3 (discussing Kentucky and Indiana); ECF 27-2: ¶¶ 9–30 (discussing multiple other states). Indeed, "the impact of the federal DBE [P]rogram" to Plaintiffs is anything but small, spanning multiple states and including ongoing lost revenues and "significant investment[s] of time."[2] ECF 27-3: ¶¶ 10, 14–16, 18–20 (estimating impacts for Plaintiff Bagshaw at $3 million annually); ECF 27-2: ¶¶ 9–30 (noting that Plaintiff "MAMCO faces the same [impacts]" across dozens of states and estimating over $1.4 million in losses between 2022 and 2023 in Indiana alone).

---

[1] Notably, while Plaintiffs have supported their equal protection claims by describing various examples in which they have lost out on these contracts despite being the lowest bidder, Plaintiffs are not required to show that they have "lost out" on any contracts. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995) (Because "[t]he injury in cases of this kind is that a 'discriminatory classification prevent[s] the plaintiff from competing on an equal footing,'" a plaintiff neither needs to allege "that it has been, or will be, the low bidder on a Government contract[,]" nor "'allege that [it] would have obtained the benefit but for the barrier to establish standing.'" (quoted source omitted).

[2] Plaintiffs bid this work across numerous states, most of which implement the federal DBE goal through race- and gender- conscious means. *See* Ex. A to Decl. of Daniel Lennington.

Likewise, Defendants' legal misconstructions of Plaintiffs' injuries do not negate standing. A characterization of the federally-imposed DBE goal as "aspirational" and not "100 percent" absolute does not change the calculus here; and the reasons a "prime contractor[] may choose not to award" a DBE contract to a bidder are wholly irrelevant. *See* ECF 32:7–9 & n.2; *see also* ECF 36:13–16 & n.6. That is because Plaintiffs do not challenge the fact that DBE and non-DBE firms alike have an opportunity to bid on, and potentially receive, DBE contracts—indeed, Plaintiffs have a "long history" of bidding on such contracts. *E.g.*, ECF 1: ¶¶ 8, 11–12. What Plaintiffs challenge here is the race- and gender-based *inequality of that opportunity*. Plaintiffs have a "constitutional right to be *considered* for [these contracts] without the burden of invidiously discriminatory disqualifications," and "the inability to compete on equal footing for even one contract would constitute an injury." *City of Jacksonville*, 508 U.S. at 666 (quoted source omitted); *Midwest Fence Corp. v. U.S. Dep't of Transportation*, 84 F. Supp. 3d 705, 722 (N.D. Ill. 2015), (quoted source omitted), *aff'd*, 840 F.3d 932.

## B. Plaintiffs' injuries are traceable to the DBE Program and redressable.

Under the Supreme Court's definition of injury in this context, Plaintiffs have established standing because they have shown a "twofold" equal protection injury from which traceability and redressability must follow. "[T]he [DBE Program] is the 'cause' of [Plaintiffs' competitive and dignitary] injury" and "a judicial decree directing the [government] to discontinue its [race and gender discrimination] would 'redress' the injury." *City of Jacksonville*, 508 U.S. at 666, n.5; *Midwest Fence*, 840 F.3d at 940; *W.H. Scott Const. Co.*, 199 F.3d at 215 & n.8; *Contractors Ass'n of E. Penn., Inc. v. City of Philadelphia*, 6 F.3d 990, 995–96 (3d Cir.1993) (finding standing when an injury has been established under the *City of Jacksonville* framework); *Sherbrooke Turf, Inc. v. Minn. Dep't of Transp.*, 345 F.3d 964, 967 (8th Cir. 2003) (same).

Defendants do not advance any new arguments to attack Plaintiffs' satisfaction of the remaining standing elements. Instead, Defendants merely restate the same proposition argued in their motion to dismiss that Plaintiffs cannot show traceability and redressability because "Plaintiffs fail to make any showings that they meet [the race and gender-neutral] requirements" of the DBE Program. ECF 32:10–11. Defendants declare that if Plaintiffs cannot qualify as DBEs under these requirements, then they cannot show that their injuries are traceable to the race and gender-based preferences and "enjoining the presumptions would leave Plaintiffs in exactly the same position." *Id.* at 11. However, the same defects inherent in Defendants' mischaracterizations of Plaintiffs injury continue to infect Defendants' analysis as to traceability and redressability.

While a plaintiff desiring to be a DBE and stymied only by the DBE Program's race and gender barriers would certainly suffer one kind of injury, that is *not* the injury that Plaintiffs suffer here. Plaintiffs do not assert any desire to be DBEs. Nor must they, to establish an injury and secure their right to be free to compete for contracts equally without regard to race and gender. *See, e.g.*, *City of Jacksonville*, 508 U.S. at 666; *Dynalantic Corp. v. Dep't of Def.*, 115 F.3d 1012, 1013, 1015–16 (D.C. Cir. 1997) ("Appellant has no desire to participate in the [program for socially and economically disadvantaged businesses]" but has nevertheless alleged an equal protection injury).

Defendants look to the Tenth Circuit to assume it is "wholly speculative" "that invalidating the allegedly unconstitutional preferences would ameliorate [Plaintiffs'] ability to compete in any way." ECF 32:10 (quoting *Cache Valley Elec. Co. v. Utah Dep't of Transp.*, 149 F.3d 1119, 1123 (10th Cir. 1998)). But this reasoning itself is speculative and even unlikely, and further breaks step with the simple and controlling logic of standing in this context as set forth in *City of Jacksonville* and echoed by various circuit courts. As Judge Leinenweber pointed out, for Defendants' *Cache Valley* theory to work, it must be assumed that the race and gender-based presumptions of social

and economic disadvantage are doing *nothing at all*. *See Midwest Fence Corp. v. U.S. Dep't of Transp.*, No. 10 C 5627, 2011 WL 2551179, at 9–10 (N.D. Ill. June 27, 2011), confirmed in *Midwest Fence*, 84 F. Supp. 3d 705, *aff'd*, 840 F.3d 932. For the reasons Plaintiffs have already explained, that theory "assumes too much," giving far "too little consideration to the value of the [] presumptions in the DBE program[]." *Id.* Defendants cannot argue it both ways—that the continuation of the race- and gender-based presumptions in the DBE Program are essential and constitutionally-justified, ECF 32:12–24, and that, simultaneously, the presumptions do nothing to accord any benefit to DBEs over others in competing for DBE contracts. *See* ECF 36:19–21.

The standard is that an injury is "likely [to] be redressed by a favorable decision." *Bennett v. Spear*, 520 U.S. 154, 162 (1997). It is unimaginable that the DBE Program's favor for women and certain racial groups plays no role in certifying certain firms as DBEs and prioritizing them for DBE contracts over non-DBEs. Rather, the government "is conferring a significant benefit" through the presumptions. *See Milwaukee Cnty. Pavers Ass'n v. Fiedler*, 922 F.2d 419, 422 (7th Cir. 1991). In their absence, the "much higher hurdle" for a firm's owners to prove their separate claims of "social" and "economic" disadvantage to obtain DBE status would "likely" alter both the number and identity of DBE firms, changing, and even reducing, Plaintiffs' competition against DBEs for DBE contracts. *See Vitolo v. Guzman*, 999 F.3d 353, 363 (6th Cir. 2021); *Midwest Fence*, 2011 WL 2551179 at 9–10; ECF 36:21. Thus, Plaintiffs' injuries would be redressed because DBEs would be designated only by neutral terms. In turn, any DBE contract losses Plaintiffs may incur to DBEs would no longer be *undignified losses on the basis of race and gender*; and the competitive harm to Plaintiffs is reduced to zero because race and gender are no longer a basis for winning or losing a DBE contract.

Plaintiffs do not need to speculate on the degree of change or reduced competition for DBE contracts that would inure in the absence of the presumptions. Rather, because "the inability to compete on equal footing for *even one contract*" establishes injury," *Midwest Fence*, 84 F. Supp. 3d at 722, (emphasis added) (quoted source omitted), a remedy "likely" increasing Plaintiffs' contracting opportunities by "even one" DBE contract establishes redressability.

## II.    Plaintiffs are likely to succeed on the merits of their equal protection claims because the DBE Program cannot survive strict scrutiny.

As the Supreme Court has emphasized, "racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007) (quoted source omitted). Here, Defendants have not meet their "burden of proving that [the DBE Program's] racial classifications are narrowly tailored measures that further compelling governmental interests." *Johnson v. California*, 543 U.S. 499, 505 (2005) (quoted source and quotation marks omitted).

### A.    The DBE Program is not supported by a compelling interest.

To support a compelling interest, Defendants must show that the DBE Program targets a "specific episode" of "intentional discrimination" that the government "participated in." *E.g.*, *Vitolo*, 999 F.3d at 361. As the Supreme Court has repeatedly explained, a governmental "interest in remedying 'societal' discrimination, that is, discrimination not traceable to its own actions, cannot be deemed sufficiently compelling to pass constitutional muster." *E.g.*, *Parents Involved*, 551 U.S. at 731–32 (plurality) (quoted source omitted). Such an interest presents an "amorphous" concept of injury that may be "ageless in [its] reach into the past," permitting a court to uphold remedies that are "timeless in their ability to affect the future." *E.g.*, *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 276 (1986) (plurality). Thus, "[a] generalized assertion of past discrimination in a particular industry or region is not adequate." *Shaw v. Hunt*, 517 U.S. 899, 909 (1996).

Defendants must present evidence that is "approaching a prima facie case of a constitutional or statutory violation." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 500 (1989); *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 207 (2023). Defendants fail to show any of the three *Vitolo* elements as required to establish a compelling interest for the DBE Program.

Defendants submit three exhibits, marked 2 through 4, which are collectively hundreds of pages, but they do not explain how these exhibits satisfy their burden.[3] This litany of papers does not document a single discriminator—that is, a person who intentionally discriminated and whose conduct must now be remedied by the DBE Program—let alone explain Defendants' role in fostering this discriminator's discrimination. Instead, these exhibits purport to document broad statistical disparities, constituting societal discrimination.

Start with "Exhibit 2," Defendants' "Compelling Interest Report," identifying "over 200 disparity studies." Referenced on a single page of Defendants' response brief, what precisely Defendants are relying on is unclear. ECF 32:15. The report is 60 pages, with only roughly 20 pages discussing supposed disparities. ECF 32-2:17–37. Contrary to the "compelling interest" the report is named for, the term "intentional discrimination" is used a single time—and only to summarize the *Vitolo* decision. *Id.* at 15. Likewise, the report is filled with conclusory hearsay, purporting that "instances of outright discrimination permeate[]" government contracting. ECF 32-2:22. These instances are never discussed with any specificity. At most, several quotes show that some minorities and women think they may have faced discrimination. For example,

---

[3] Defendants must "point to the evidence with specificity and particularity in the[ir] . . . [response] brief," not "just drop[] a pile of papers on . . . [the Court's] desk and expect[] it to sort it out." *See Wimbush v. Wyeth*, 619 F.3d 632, 638 n.4 (6th Cir. 2010). Accordingly, at least for the purpose of deciding Plaintiffs' motion, Defendants should be deemed to have forfeited any argument that the DBE Program's classifications are constitutional. *See Gafurova v. Whitaker*, 911 F.3d 321, 328 (6th Cir. 2018).

according to the report, one Asian-American woman said that she heard another woman "believes she lost the bid on an environmental project in her county to an out-of-state contractor because she was a woman-owned business." ECF 32-2:23. Such isolated "anecdotal evidence" and feelings are "not the sort of 'identified discrimination' contemplated by *Croson*," nor do they demonstrate intentional government participation. *See Eng'g Contractors Ass'n of S. Fla., Inc. v. Metro. Dade Cnty.*, 943 F. Supp. 1546, 1580 (S.D. Fla. 1996), *aff'd*, 122 F.3d 895 (11th Cir. 1997). If Defendants are correct that isolated, unverified stories of possible discrimination prove intentional, governmental discrimination, then strict scrutiny has been transformed into *no scrutiny*.

Likewise, Defendants' inclusion of two expert reports ("Exhibit 3" and "Exhibit 4")—previously submitted in another case—fare no better. These exhibits suffer from many of the same defects as Exhibit 2; and Defendants, again, fail to specify what they expect this Court to take away from these documents relevant to specifically identified instances of government-endorsed discrimination. For example, Defendants direct the Court to pages 17 through 19 of Exhibit 3. ECF 32:16–17. But those pages merely explain what a disparity study is; they do not purport to discuss specific findings, much less specified events of discrimination, identifying any discriminator who engaged in intentional discrimination. *See* ECF 32-3:19.

In *Ultima Services Corp. v. U.S. Dep't of Agric.*, the district court considered each of the exhibits Defendants submit now, and properly rejected them all. ___ Fed. Supp. 3d ___, 2023 WL 4633481, at *12–14 (E.D. Tenn. July 19, 2023) ("Defendants' expert reports do not show specific instances of intentional discrimination" "that the federal government allowed [] to occur" "but only statistical disparities that are insufficient to show a compelling governmental interest").[4] That

---

[4] Given the court's rejection of this evidence in *Ultima*, Defendants are collaterally estopped from relying on these exhibits. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979).

is because "[s]tatistical disparities don't cut it" for supporting inferences of intentional discrimination in contexts involving numerous factors and parties. *See Vitolo*, 999 F.3d at 361–62. Here, (like in *Ultima* and *Vitolo*) there are numerous decision-makers and actors (both government and private) and countless decisions involved in a business's opportunities and success—not the least of which implicate diverse individual interests, market and industry conditions, legitimate stakeholder needs and preferences, and various other factors that could account for disparities in a business's relative success or failure.

While appropriate statistical evidence may be used to establish an inference of discrimination when the disparity falls at the feet of a single decision-maker, "when it comes to general social disparities, there are simply too many variables to support inferences of intentional discrimination." *Id.* at 362. Indeed, many courts have raised concerns regarding relevant factor control. *See e.g.*, *Morgan v. United Parcel Serv. of Am., Inc.*, 380 F.3d 459, 466 (8th Cir. 2004) (explaining "even the best regression equation cannot . . . prove causation"); *Eng'g Contractors Ass'n*, 122 F.3d at 917, 922 (describing the importance of accounting for known non-discriminatory factors in proving intentional discrimination, but nevertheless rejecting the contention "that any significant disparities that exist after[wards] . . . must [necessarily] be due to the ongoing effects of . . . discrimination"); *Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1045 (7th Cir. 1988) (explaining disparity studies are "essentially worthless" if they do not control for all relevant variables); *McNamara v. City of Chicago*, 138 F.3d 1219, 1223 (7th Cir. 1998) ("[S]tatistical disparities prove little; they certainly do not prove intentional discrimination."). Nor do isolated and unverified anecdotes lend persuasive support for intentional discrimination when it cannot be determined to what conduct and to whom these accounts and perceptions specifically relate.

*Croson*—the case Defendants claim "governs" over all other equal protection precedent—does not hold otherwise. *See* ECF 32:18–20. *Croson* did, indeed, discuss the use of statistical comparisons, but only in "a proper case"; the Court specifically referenced Title VII employment discrimination cases—a context confined by limited players, decisions and decision-makers. *See* 488 U.S. at 501–02. When the Court discussed this framework in the context of a city's contracting program set-aside for minorities, it found that "low minority membership" was an insufficient interest and that the government lacked potentially "relevant" facts about the low participation it claimed to remedy. *Id.* at 503. *Croson* does not hold that just any demonstration of disparity and isolated anecdotes rise to an "inference of discrimination," let alone a constitutional justification for a race-based remedy. Nor does it suggest against the multitudes of factors that may be "relevant" to a disparity study. Critically, whatever *Croson* began to articulate in its limited discussion on statistical studies, it did not blunt all equal protection precedent, requiring a showing of intentional discrimination "by the governmental unit involved."[5] *E.g.*, *Wygant*, 476 U.S. at 274.

Similarly, Defendants take precedent on "passive participation" out of context to propose an alarming theory of "government participation" in which the government discriminates simply by existing in the federal contracting industry. ECF 32:19. However, for the government "to be a passive participant, it must be a participant." *Nuziard v. Minority Bus. Dev. Agency*, ___ F. Supp. 3d ___, 2023 WL 3869323, at *6 (N.D. Tex. June 5, 2023). Defendants' notion amounts only to

---

[5] Defendants also cite *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) for the proposition that "invidious discriminatory purpose may often be inferred from the totality of the relevant facts." ECF 32:17. To be sure, the use of circumstantial evidence to create an inference of discrimination is *not* the problem. The problem is that Defendants' assertions do not contain *any* totality of "relevant facts." Indeed, Defendants' broad assertions, lack all the essential elements of a claim of intentional government discrimination: there is no indication of what specified discriminatory violations occurred; government involvement is unspecified; and given the broad and unverified assertions conferred by Defendants' anecdotal evidence, victims cannot be distinguished either.

another "amorphous" concept with no boundaries or limitations for the government's imposition of a race-based remedy. To the contrary, the government must prove that it "knowingly perpetuated the discrimination," and therefore became "a kind of joint tortfeasor, coconspirator, or aider and abettor." *Builders Ass'n of Greater Chicago v. County of Cook*, 256 F.3d 642, 645 (7th Cir. 2001); *Croson*, 488 U.S. at 492–93 (plurality) (government "may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish") (quoted source omitted). Defendants produce no evidence of such impermissible government participation.

**B.    The DBE Program is not narrowly tailored.**

Even if Defendants had shown a compelling interest in remedying some specific episode of intentional, governmental discrimination, the DBE Program is not narrowly tailored to further that interest, for multiple independent reasons. *See* ECF 27-1:13–18. First, Defendants have not shown that women and favored minorities "have actually suffered discrimination"—Defendants cannot address this by lumping various groups together in broad categories. *See W. States Paving Co. v. Wash. State Dep't of Transp.*, 407 F.3d 983, 998 (9th Cir. 2005); *Builders Ass'n*, 256 F.3d at 646. Defendants do not explain why each specifically identified group called out for preferential treatment is entitled to the presumption.

Second, even if Defendants had addressed each specifically identified group, the DBE Program's numerous classifications remain "arbitrary," "imprecise," "overbroad," and "underinclusive." *SFFA*, 600 U.S. at 216; *Vitolo*, 999 F.3d at 362 ("[A] policy is not narrowly tailored if it is either overbroad or underinclusive."). For example, a man from Pakistan is presumed "disadvantaged," but a man who grew up just a few miles away in Afghanistan is not. 49 C.F.R. § 26.5. The classifications are also overinclusive because they extend to individuals who may have never been discriminated against. Contrary to Defendants' suggestions, the rebuttable nature of the presumption does not solve the problems of arbitrary imprecision. *See* ECF 32:22–

23. The fact is that certain groups and individuals are left out, and included, when they should not be. Defendants do not even attempt to justify their incoherent line drawing.

Third, the DBE Program lacks a "logical end point," a *requirement* the Supreme Court has said is "critical." *SFFA*, 600 U.S. at 212. Defendants do not address this aspect of narrow tailoring because there is no acceptable answer for it: the DBE Program has operated for *four decades*.

Moreover, Defendants do not defeat narrow tailoring requirements by characterizing the Program as "aspirational" and therefore "flexible," "tether[ed]" to local markets, and harmless. *See* ECF 32:21–22. Plaintiffs have specifically challenged the race- and gender-conscious aspects of the national DBE Program. And as Defendants submit, these provisions are "on" in *all parts of the country*, save eight states. ECF 32-1: ¶ 4. Additionally, the so-called race- and gender-neutral component of the overall DBE goal do not render the Program neutral since recipients of federal funding must, nonetheless, remain focused on sorting individuals by race and gender to ensure compliant DBE participation. Indeed, funding recipients of *every state* must strive to meet their overall DBE goal under the threat of penalty. *E.g.*, 49 C.F.R. §§ 26.45, 26.101–.109, 26.47, 26.53, App. A. At bottom, this federally-required setting and maintenance of an overall DBE goal is an effort "amount[ing] to outright racial balancing, which is patently unconstitutional." *E.g.*, *Grutter v. Bollinger*, 539 U.S. 306, 329–30 (2003). And, this discrimination has a considerable "impact" to Plaintiffs and others. *See, e.g.*, *supra* p. 3. Indeed, in applying a racial classification, "it is not even theoretically possible to 'help' a certain racial group without causing harm to members of other racial groups." *E.g.*, *SFFA*, 600 U.S. at 271 (Thomas, J., concurring).

* * *

In sum, Defendants' document dumping justifies nothing. For multiple, independently sufficient reasons, the DBE racial classifications fail both prongs of strict scrutiny. These failures

mean that the DBE Program does not enact legitimate uses of race but is instead the product of "illegitimate notions of racial inferiority," "illegitimate racial prejudice or stereotype," and "racial politics" in violation of the "twin commands." *E.g., Adarand*, 515 U.S. at 226; *SFFA*, 600 U.S. at 218 (explaining that under the twin commands, "race may never be used as a 'negative' and . . . it may not operate as a stereotype."). Indeed, the DBE Program employs race as a "negative" because some people, by virtue of their race, cannot compete for contracts on equal footing. Likewise, Defendants rely broadly on "stereotypes," assuming that business owners entitled to the racial presumption "always (or even consistently)" require it for success; and that business owners of other races "always (or even consistently)" do not require such assistance for success. *See SFFA*, 600 U.S. at 219. These classifications do not "treat citizens as individuals" but rather "components of a racial . . . [and] sexual . . . class." *Id.* at 223. Defendants do not explain how the classifications can be conceptualized as anything but negatives and stereotypes, declaring only that any argument to the contrary is "unavailing." *See* ECF 32:19. Because Defendants have failed to meet their burden under strict scrutiny, Plaintiffs have a high likelihood of success on their claims.[6]

### III.    The DBE Program inflicts irreparable harms contrary to the public interest, weighing the balance in favor of an injunction.

Plaintiffs' high likelihood of success on the merits also directs the other preliminary injunction factors in Plaintiffs' favor. *E.g.*, *Vitolo*, 999 F.3d at 360 (noting that a likelihood of success is "typically dispositive" in constitutional cases). Defendants do not dispute that a

---

[6] Defendants do not attempt to separately analyze the Program's gender classification under intermediate scrutiny. ECF 32:12–13 & n.3. However, in addition to failing strict scrutiny, the gender classification fails intermediate scrutiny because the government has not provided an "exceedingly persuasive justification" for according a broad preference to 50% percent of the population based on nothing more than gender. *See* ECF 27-1:21–23. Moreover, because any constitutional violation would result in a finding that Defendants are in violation of 5 U.S.C. § 706(2)(B), Plaintiffs are also likely to succeed on their Administrative Procedure Act claim. There is no statute of limitations issue because Plaintiffs' APA claim is timely following recent clarifications to equal protection precedent. *See infra* p. 16–17 & n.7.

constitutional denial of equal treatment and dignitary harm constitute irreparable harms as a matter of law. *See* ECF 32:24. Instead, Defendants merely restate their arguments that Plaintiffs have not established injury under the standing inquiry, citing to *Mitchell v. City of Cincinnati*, No. 21-4061, 2022 WL 4546852 (6th Cir. Sept. 29, 2022), an unpublished opinion involving an equal protection challenge that Defendants mischaracterize. There, the Sixth Circuit did not analyze "whether plaintiffs had standing" but simply confirmed that "the district court did not abuse its discretion by denying the preliminary injunction" because the plaintiffs "have not yet been injured" and "a speculative chain of events must occur before they are injured in the future." *Mitchell*, 2022 WL 4546852, *at 2–4. Thus, that case stands for the unremarkable and obvious proposition that a plaintiff who does not have a present or future injury—that is, an injury that is "actual or imminent," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)—also fails to establish irreparable harm, dooming the plaintiff's entitlement to prospective relief.

However, here—as previously explained—the DBE Program has denied Plaintiffs equal treatment under the law, not only in the past, but also in the present and future, resulting in *current* and *ongoing* competitive and dignitary harms. *See supra* Part I; ECF 36:1–22; 1; 27-2; 27-3. Unless this Court acts to put an end to Defendants' constitutional violations, the DBE Program will continue to deny Plaintiffs of their fundamental right to equality. And, as *Mitchell* reemphasized, once "constitutional rights are threatened or impaired, irreparable injury is presumed." 2022 WL 4546852, at *4 (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *see also Vitolo*, 999 F.3d at 365 ("When reviewing a motion for a preliminary injunction, if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated.") (quoted source and internal brackets omitted). Thus, absent injunctive relief, Plaintiffs will continue to suffer irreparable harm as a result of Defendants' continued unconstitutional Program.

Defendants' do not explain their brief assertion that Plaintiffs have "unreasonabl[y] delay[ed]" "in moving for preliminary relief." ECF 32:24. Defendants only cite to an unpublished decision in *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg.*, Inc., 511 F. App'x. 398, 405 (6th Cir. 2013), which cites another unpublished decision from a state appellate court. *See Aero Fulfillment Servs., Inc. v. Tartar*, No. C-060071, 2007 WL 120695, at *5 (Ohio Ct. App. 2007). Neither decision had anything to do with a constitutional injury—one was about trade secrets and the other about a noncompete agreement.

Regardless, Plaintiffs have *not* so delayed. A plaintiff must have a "likelihood of success on the merits" to warrant preliminary relief in the first place. *E.g.*, *Nat'l Credit Union Admin. Bd. v. Jurcevic*, 867 F.3d 616, 622 (6th Cir. 2017). However, despite strong constitutional protections against government-imposed racial and gender discrimination, the DBE Program has sustained certain challenges in the past, as Defendants point out. ECF 32:12. While these decisions purport to seriously erode equal protection, recently, it has been forcefully re-confirmed that affirmative action programs have specific limits and cannot remain forever. Indeed, over the last couple of years up until the time just preceding this action, various equal protection claims have been vindicated in federal courts at every level. *See, e.g.*, *Vitolo*, 999 F.3d 353; *Nuziard*, 2023 WL 3869323; *SFFA*, 600 U.S. 181; *Ultima*, WL 4633481. Thus, following the long history of the DBE Program and recent confirmations to equal protection precedent, on October 26, 2023, Plaintiffs filed suit in pursuit of their constitutional rights. ECF 1. And weeks later, after Plaintiffs continued to collect and assess the impact of the DBE Program, Plaintiffs moved for a preliminary injunction with supporting declarations. ECF 27-1; 27-2; 27-3. Defendants do not offer any explanation on their brief accusation; however, against this context, Plaintiffs' timing is reasonable. Moreover, given the unique temporal issue inherent to constitutional claims challenging affirmative action

programs, the DBE Program's age indicates that it should be preliminarily enjoined—not ignored. Unlike trade secrets, equal protection claims of this nature only get stronger over time because "at some point[,] [an affirmative action program] must end."[7] *SFFA*, 600 U.S. at 213.

Defendants also assert that the "merged" factors—harms to others and the public interest—favor them because they will be unable to continue their unconstitutional Program if they are enjoined. *See* ECF 32:25. Specifically, Defendants argue that, even if this Court finds the DBE Program to be unconstitutional, "the government and the public always have a strong interest in the implementation of the laws enacted by their elected representatives" and there are benefits to be derived from the Program's unconstitutional provisions. *See id.* But these arguments simply carry no water. The balance of harms and public interest *never* weigh in favor of allowing a constitutional violation to continue. Indeed, beneficiaries of unconstitutional conduct lack any "cognizable" interest in its continuance, so "stopping unconstitutional conduct" does not harm them. *Vitolo*, 999 F.3d at 360. Consequently, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Id*. (quoted source omitted); *see also* ECF 27-1:25.

Defendants' assertion that the injunction sought would burden either "other parties" or any interest in representative government is further unwarranted because Defendants exaggerate the scope of the injunctive relief that Plaintiffs seek. *See* ECF 32:25. Plaintiffs do not, necessarily, seek to enjoin Defendants implementation of the DBE Program in general. Rather, Plaintiffs seek an end to the unconstitutional race and gender discrimination that Defendants impose under the

---

[7] For similar reasons, Plaintiffs' APA claim remains viable against the six year statute of limitations imposed under 28 U.S.C. § 2401(a). Moreover, the Supreme Court may soon provide further instruction on the APA's statute of limitations that may have some bearing on this case, and accordingly, the Court's authority under the APA to "hold unlawful and set aside agency action" found to be "contrary to a constitutional right." *See Corner Post, Inc. v. Bd. of Governors, FRS*, 216 L. Ed. 2d 1312 (Sept. 29, 2023) (granting certiorari) (argument set for Feb. 20, 2024); 5 U.S.C. § 706(2)(B); *see also* ECF 36:26 n.12.

Program.[8] *E.g.*, ECF 1: ¶¶ 16–17. Regardless of the scope of relief, there is no public or governmental interest in allowing Defendants to continue implementing an unconstitutional program. Thus, the balancing of harms and public interest considerations, coupled with the irreparable harms to Plaintiffs, weigh in favor of granting an injunction.

**IV.    The DBE Program is unconstitutional on its face, and the principles of equitable relief empower this Court to grant Plaintiffs complete relief.**

A district court's vesting with the "[t]he judicial Power of the United States" extends throughout the country, authorizing this Court to apply the principles of equitable relief to redress the irreparable harms that the DBE Program has inflicted, and continues to inflict, upon Plaintiffs. U.S. Const. art. III §§ 1–2; *Steele v. Bulova Watch Co.*, 344 U.S. 280, 289 (1952).

"[O]nce a violation of the Constitution has been found," "the scope of an equity court's power is broad and flexible" in consideration of "what is necessary, what is fair, and what is workable." *Geier v. Univ. of Tenn.*, 597 F.2d 1056, 1060–61 (6th Cir. 1979); *Lemon v. Kurtzman*, 411 U.S. 192, 200 (1973) (plurality opinion) ("In shaping equity decrees, the trial court is vested with broad discretionary power; appellate review is correspondingly narrow.").

"[T]o repair the denial of a constitutional right," "[t]he task is to correct, by a balancing of the individual and collective interests, the *condition* that offends the Constitution." *E.g.*, *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15–16 (1971) (emphasis added). "[T]he scope of the remedy is determined by the nature and extent of the constitutional violation," "not by the

---

[8] Notably, Congress reauthorized DBE Program funding using language specifically directed at "presumed" "socially and economically disadvantaged individuals." P.L. 117-58 §§ 11101(e)(2) (B), (3). Thus, the DBE Program may be characterized as more of "a minority enrollment program with a secondary disadvantage element." *Cf. Dynalantic*, 115 F.3d at 1017 (quoted source omitted). Given this unjustified interest, if Congress wants any benefit to continue, it must re-tool the law to comport with the Constitution.

geographical extent of the plaintiff class." *Milliken v. Bradley*, 418 U.S. 717, 744 (1974); *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (injunction must "provide complete relief to the plaintiffs").

**A.    Because Defendants' policy of discrimination is extensive, Plaintiffs injuries are extensive, requiring a correspondingly broad remedy.**

Here, the scope of relief must necessarily be broad "to cure the condition that offends the Constitution"—Defendants' de jure discrimination. *Milliken v. Bradley*, 433 U.S. 267, 282 (1977) (quoted source and quotation marks omitted). Indeed, the Infrastructure Act and the SBA and DOT regulatory frameworks create and maintain a nationwide policy, directing Defendants to implement the DBE Program on the basis of race and gender. *See, e.g.*, P.L. 117–58 §§ 11101(e)(2)–(3) (adopting Small Business Act provisions); 49 C.F.R. pt. 26. The "extent" of Defendants' constitutional violations have been established *in toto*: the Program's use of race and gender is unconstitutional on its face—failing the standards of strict scrutiny, employing race and gender as a "negative" to exclude individuals of disfavored groups, and engaging in a host of pernicious stereotyping against favored and disfavored groups alike.[9] *See supra* Part II. Moreover, by Defendants' own admission, there are only *eight* states in the entire country "that administer their DBE programs without the use of [DBE] contract goals." ECF 32-1: ¶ 4. And, in any event, the so-called race- and gender-neutral components of the overall DBE are not truly "neutral," as funding recipients of *every state* must nonetheless strive for racial balance in efforts to meet their

---

[9] Plaintiffs' as-applied challenge is premised entirely upon the unconstitutionality of the federal DBE Program's race and gender classifications; and it is necessary for the Court to address that issue in order to determine Plaintiffs' case. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331–33 (2010) (analyzing a law's facial validity because the plaintiff's challenge as-applied could not be addressed "without assuming a premise—the constitutionality of [the challenged law]—that is itself in doubt."). Here, the DBE Program's race and gender classifications are invalid in every application because they are without constitutional justification for various, independently sufficient reasons. *See supra* Part II; *United States v. Salerno*, 481 U.S. 739 (1987) (explaining that under a facial challenge, a litigant "must establish that no set of circumstances exists under which the [challenged regulation] would be valid.").

overall DBE goal under the threat of penalty. *See supra* p. 13. Plaintiff MAMCO "regularly" bids on milling "contracts impacted by the federal DBE program" not only in the states of Kentucky and Indiana (which impose race- and gender-conscious DBE goals), but also in at least 21 other states, many of which also employ race- and gender-conscious DBE goals. ECF 1: ¶¶ 8, 11, 35–40; 27-2: ¶¶ 9–10, 30; Ex. A, Decl. Daniel Lennington.

The span of Defendants' discrimination is *extensive*, and in turn, Plaintiffs' injuries are *extensive*. Consequently, appropriate injunctive relief must be correspondingly as broad, extending to, at least, the 23 states in which Plaintiffs regularly bid DBE contracts. Moreover, Defendants' national policy of discrimination should *not* be permitted to continue its imposition as a deterrent to Plaintiffs' success and growth. *See* ECF 27-2: ¶ 9–10, 33; 27-3: ¶¶ 19–20. A broad injunction, removing the obstacle of Defendants' deterring policy would enable Plaintiffs to place additional bids on federally funded contracts *anywhere* in the country, without regard to race or gender.

### B. Defendants' proposals on remedy fail to meet the standards of necessity, fairness, and workability, and would not afford Plaintiffs complete relief.

In response to the DBE Program's extensive and patently unconstitutional use of race and gender, Defendants argue that if this Court grants a preliminary injunction, it must "Strictly Limit Its Scope." ECF 32:25. Defendants first propose to limit Plaintiffs relief to "an order directing" for Plaintiffs to be presumed socially- and economically-disadvantaged "if" they apply for DBE certification. ECF 32:27. But Defendants' continued misunderstanding of Plaintiffs' injuries leads them to similarly misunderstand the proper scope of the remedy. As already explained, Plaintiffs do not desire to become DBEs; they simply want to compete on equal footing without regard to race and gender. *See supra* Part I; ECF 36:1–22.

Likewise, Defendants' alternative proposal—that DBE goals should be removed from any contracts on which Plaintiffs bid—fares no better. ECF 32:28. Defendants do not explain, even at

a high level, how such a remedy could ever be either "workable" or "fair." Removing the DBE goals from specific contracts could only cause untold confusion and disorder. Contractors must be able to evaluate the pros and cons of making a particular bid—a time and resource-consuming task in a fast-moving industry, where lead time is not always an afforded luxury. *See* ECF 27-2: ¶¶ 18–19; 27-3: ¶ 19. Defendants propose an atypical and separate process that would be onerous to every party it touched—Plaintiffs, other bidders, and numerous states. Plaintiffs would be left with the new burden of coordinating multiple exception processes across dozens of states, which already follow structured compliance with Defendants' unconstitutional Program. Defendants' proposed process may even allow DBE bidders to miscalculate their odds, preparing themselves to bid on a DBE contract, only to later find the contract's DBE goal removed.

Moreover, Defendants would require Plaintiffs to utilize this separate, multi-state process to obtain equal treatment, while DBEs need not avail themselves of any separate process to afford themselves the same opportunity. Not only does this scenario shift the burden of maintaining Defendants' discriminatory program to Plaintiffs, but also, the very fact of this separate process for Plaintiffs only continues to compound the very inequality problem at issue: "[s]eparate after all is inherently unequal." *L. W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 482 (6th Cir. 2023), (citing *Brown v. Bd. of Educ.*, 347 U.S. 483, 495 (1954)). Plaintiffs should not have to shoulder added burden or continued inequality owing to Defendants' discriminatory Program.

In addition, Defendants do not propose to adjust the states' DBE goals to account for the removal of certain contracts from the goal. But if the DBE goal is not lowered proportionally to account for the contracts on which Plaintiffs bid, and another contract (on which Plaintiffs do not bid) simply takes the place of the removed contract, the burden of race and gender discrimination is effectively transferred from Plaintiffs to other innocent third parties, who would not have

otherwise incurred the burden. Equitable principles forbid a remedy that would invite such burden shifting of an injury from one innocent victim to others.

As if that all were not enough, removing the goals also go beyond what is necessary—*not* because such a remedy may "extend to individuals or entities not before the Court," as Defendants suggest. ECF 32:28. Rather, as Defendants have repeatedly pointed out, the DBE goals reflect a blend of DBE certification requirements, including both race- and gender-conscious criteria and neutral criteria. *See* ECF 32:11, 29. Thus, a remedy that excises the DBE goal from contracts upon which Plaintiffs bids, goes beyond the necessity because it removes race- and gender-conscious criteria and neutral criteria alike, extinguishing the goal entirely. In contrast, for Plaintiffs to be treated equally without regard to race and gender, all the Court need do, is cure the single condition that offends the Constitution: Defendants' implementation of DBE Program's race and gender classifications. *See Milliken*, 433 U.S. at 282 ("[T]he remedy does not 'exceed' the violation if the remedy is tailored to cure the 'condition that offends the Constitution.'") (quoted source omitted). If Defendants' implementation of the race and gender classifications is halted, the classifications cannot be used to presume disadvantage for DBE certification, enabling Plaintiffs to compete for contracts without regard to race or gender. *See supra* Section I.B.

In a third proposal, Defendants advise this Court to limit any broader injunction, enjoining Defendants' implementation of the DBE Program's race and gender classifications "to Kentucky and Indiana" only. ECF 32:30. However, Defendants' do not limit their discrimination to Kentucky and Indiana; they impose an extensive, nationwide policy of discrimination, which, in turn, affects Plaintiffs' work across *numerous* states. *See* ECF 27-2: ¶¶ 9–10, 13, 30; 1: ¶¶ 8, 11–12, 32, 35–40; Ex. A, Decl. Daniel Lennington. Thus, Plaintiffs have asked the Court to end this unlawful and extensive discrimination. *See, e.g.*, ECF 1: ¶¶ 16–17; *supra* Part II. Although Defendants *again*

exaggerate the scope of the injunctive relief that Plaintiffs seek (and *again* rehash their argument that Plaintiffs have not established injury), contrary to these mischaracterizations, Plaintiffs have *not* asked the Court to "dismantl[e] the entire program" by enjoining Defendants' implementation of "the DBE program as a whole." ECF 32:28–30. Plaintiffs' hopes for relief remain focused on Defendants' unconstitutional implementation of the Program's race and gender classifications.[10] *See* ECF 27. In contrast, Defendants hope to awkwardly compartmentalize the operation of the DBE Program in order to preserve its unconstitutional discrimination. But there is no justification for denying Plaintiffs the complete relief they seek (equal treatment) or shifting the burdens of maintaining Defendants' discriminatory Program to other parties.

Defendants appear to characterize any broader injunction as "more burdensome to the defendant than necessary." ECF 32:26 (citing *Sharpe v. Cureton*, 319 F.3d 259, 273 (6th Cir. 2003)). But "an injunction . . . is not a burdensome thing" when "it simply requires the [defendant] to obey the law." *E.g.*, *Hodgson v. First Fed. Sav. & Loan Ass'n of Broward Cnty., Fla.*, 455 F.2d 818, 826 (5th Cir. 1972); *Usery v. Casto*, No. 74-522, 1976 WL 1601, at *4 (S.D. Ohio Aug. 17, 1976). Plaintiffs ask only that Defendants comply with "the supreme Law of the Land," *Kelley v. Bd. of Ed. of City of Nashville*, 270 F.2d 209, 231 (6th Cir. 1959) (quoted source omitted), through a complete remedy that will not further compound the inequality at issue or impose new burdens to others as a result of the federal government's discrimination. To the contrary, Defendants

---

[10] Defendants' express some confusion as to Plaintiffs' inclusion of the regulatory framework under the Small Business Act—including, for example, 15 U.S.C. §§ 632, 637(d) and 13 C.F.R. pt. 124. *See* ECF 32:29–30. But this should come as no surprise. As Defendants are aware, the Infrastructure Act explicitly adopts SBA regulatory provisions, which Defendants have chosen to duplicate in a similar regulatory scheme at 49 C.F.R. pt. 26. *See* ECF 1: ¶¶ 19–30 (explaining the history of this "patchwork quilt" of regulation). Plaintiffs have requested relief to the extent Defendants must rely on either regulatory framework to implement the DBE Program's race and gender classifications. *See, e.g.*, ECF 27.

suggest incomplete patchwork, burdening everyone *except themselves*, while *they* are the parties responsible for causing a discriminatory two-tiered system of federal contracting in the first place.

At bottom, Defendants do not explain how any of their proposals would truly confront Plaintiffs' injuries while issuing "fair" and "workable" relief, capable of "cur[ing] the condition that offends the Constitution." *Lemon*, 411 U.S. at 200; *Milliken*, 433 U.S. at 282. Instead of addressing the relevant aspects of *this* case, Defendants point to other cases drawing no commonality to this one. *See* ECF 32:26–27 n.13.[11] Such focus does not avoid the necessity for broader injunctive relief in this case. *See Trump v. Hawaii*, 585 U.S. 667, 713 n.1 (2018) (Thomas, J., concurring). ("An injunction that [i]s properly limited to the plaintiffs . . . would not be invalid simply because it govern[s] the defendant's conduct nationwide.").

Defendants cannot escape the relevant remedy inquiry—considering necessity, fairness, and workability—or the responsive solution. A federal policy permeating the nation and causing widespread injury to Plaintiffs cannot be redressed through awkward attempts to cabin relief or measures that would shift the burden of maintaining Defendants' discriminatory policy to everyone *except* Defendants. Plaintiffs' injuries are extensive, spanning multiple states and owing

---

[11] Defendants cited cases bear no resemblance to this one. *See Skrmetti*, 83 F.4th at 490 (broad preliminary injunctions resting on facial invalidation of a state law prohibiting certain gender-affirming medical treatment not appropriate where plaintiffs were unlikely to succeed on their claims, had "not tried to meet th[e] standard" of facially invalidity, and did not explain why broader relief was necessary to afford plaintiffs gender-affirming medical treatment); *Warshak v. United States*, 532 F.3d 521, 526, 530–31 (6th Cir. 2008) (broad injunctive relief assuming facial invalidation of the federal Stored Communications Act not appropriate since case was not ripe for adjudication and involved "not just the risk of guessing about other fact patterns in which a statute might be applied but the risk of guessing how the statute will be applied even to this individual" and there was "no showing—below or here—why the injunction needed to run in favor of other individuals in order to protect [plaintiff]" from the government's compelled disclosures of plaintiff's emails); *Sharpe v. Cureton*, 319 F.3d 259, 272, 274 (6th Cir. 2003) (broader relief extending an injunction preventing the mayor from "taking any adverse employment actions" against plaintiff firefighters to all city firefighters "completely unnecessary" to remedy plaintiffs' adverse employment claims); *Ohio v. Becerra*, 87 F.4th 759 (6th Cir. 2023) (a non-constitutional case, confirming that an injury must be irreparable to warrant injunctive relief).

to Defendants' national policy of race and gender discrimination. Only a correspondingly broad remedy that would completely "cure the condition that offends the Constitution" is tailored to address Plaintiffs' irreparable harms. Accordingly, this preliminary relief should issue. *See Tabernacle Baptist Church, Inc. of Nicholasville v. Beshear*, 459 F. Supp. 3d 847, 856 (E.D. Ky. 2020) ("A preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally.") (quoted source omitted).

## CONCLUSION

For the foregoing reasons, and for those reasons stated in Plaintiffs' opening brief and response to Defendants' motion to dismiss, Plaintiffs respectfully request this Court to grant Plaintiffs' motion for preliminary injunction.

Dated: February 23, 2024.

WISCONSIN INSTITUTE FOR
LAW & LIBERTY, INC.

*Cara Tolliver*
Richard M. Esenberg (WI Bar No. 1005622)
Daniel P. Lennington (WI Bar No. 1088694)
Cara M. Tolliver (WI Bar No. 1112818)
330 East Kilbourn Avenue, Suite 725
Milwaukee, WI 53202
Telephone: (414) 727-9455
Rick@will-law.org
Dan@will-law.org
Cara@will-law.org

COMMONWEALTH COUNSEL GROUP, PLLC
Jason M. Nemes (KBA# 90546)
Greg Healey (KBA# 99546)
10343 Linn Station Road, Suite 100
Louisville, KY 40223
jason@ccgattorneys.com
greg@ccgattorneys.com

*Attorneys for Plaintiffs*