UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | | |
|---|---|---|
| MID-AMERICA MILLING COMPANY, LLC, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 3:23-cv-00072-GFVT |
| v. | ) ) ) | **OPINION** |
| UNITED STATES DEPARTMENT OF TRANSPORTATION*, et al.*, | ) ) ) | **&** |
| Defendants. | ) ) | **ORDER** |

**\*\*\*   \*\*\*   \*\*\*   \*\*\***

The noble aspirations of our founding documents represent the most successful experiment in representative democracy the world has even known.  But by no means has our American experiment been perfect.  No one could argue, for example, that our Nation has always treated men and women of all backgrounds in this country equally.

Attempting to cure this imperfect history, Congress enacted the Disadvantaged Business Enterprise program, which requires the Department of Transportation to ensure that a certain portion of federal funds authorized for the highway and transit projects be expended with disadvantaged business enterprises.  To execute this requirement, the Department of Transportation affords certain minority- and women-owned businesses a presumption of disadvantage—a rebuttable presumption—but a presumption, nonetheless.  These presumptions have been employed since the 1980s, but the Plaintiffs say enough is enough.  The Court agrees.  Because these race and gender classifications violate the Constitution's guarantee of equal protection, the pending request for a preliminary injunction will be **GRANTED**.

**I**

In 1983, the federal government enacted the Disadvantaged Enterprise ("DBE") Program. [R. 1 at 7.]  Since then, the law has required that ten percent of federal highway construction funds be paid to small businesses owned and controlled by "socially and economically disadvantaged individuals," as that term is defined in § 8(d) of the Small Business Act (15 U.S.C. § 637).  *Id.* at 7-8; *Sherbrooke Turf, Inc. v. Minn. DOT*, 345 F.3d 964, 967 (8th Cir. 2003).  "[S]ocially disadvantaged individuals" are "those who have been subjected to racial or ethnic prejudice or cultural bias within American society[.]"  49 C.F.R. Part 26 app. E.  "Economically disadvantaged individuals are socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired … as compared to others in the same … line of business who are not socially disadvantaged."  *Id.*

Any person may qualify as socially and economically disadvantaged regardless of their race or gender. 49 C.F.R. § 26.67(d) & app. E.  But under the law, certain racial groups and women are rebuttably presumed to be disadvantaged.  49 C.F.R. § 26.5.  All other applicants for DBE certification who are not presumed disadvantaged on the basis of their racial or female status must prove, by a preponderance of the evidence, that they are socially and economically disadvantaged.  49 C.F.R. § 26.67(a)(3)(i)-(d).

Under federal law, fund recipients, such as state departments of transportation, are required to have a DBE Program and must set a DBE participation goal "based on demonstrable evidence of the availability of ready, willing and able DBEs relative to all businesses ready, willing and able to participate on" federally funded contracts.  49 C.F.R. §§ 26.21, 26.45(a)–(b).  To the extent feasible, state-recipients of federal highway funds attempt to meet their overall goals through the use of race and gender-neutral means.  49 C.F.R. § 26.51(a).  But to the extent

2

they cannot meet their overall goals, the state must utilize "contract goals" to meet its overall goal. 49 C.F.R. § 26.51(d). On these particular contracts, the recipient sets goals for DBE subcontractor participation on specific contracts. *Id*. On contracts with goals, states must meet the goal for DBE participation or otherwise document that a bidder has made "good faith efforts" to meet the DBE goal. 49 C.F.R. § 26.53.

Plaintiffs Mid-America Milling, LLC and Bagshaw Trucking Inc. operate within Kentucky and Indiana. [R. 27-1 at 4.] Both Plaintiffs regularly bid on United States Department of Transportation ("DOT") funded contracts impacted by DBE goals. *Id*. But neither Plaintiff receives the rebuttable presumption of disadvantage. The Plaintiffs have previously lost out on federally funded contracts to DBE firms, even when Plaintiffs' bids were lower. Believing that they are denied the opportunity to compete for transportation contracts on equal footing, the Plaintiffs filed suit seeking a declaratory judgment and to permanently enjoin the Defendants from applying race- and gender-based classifications in the federal DBE program. *Id*. at 1. The Plaintiffs also seek a preliminary injunction pending the final resolution of this matter. [R. 27.] The Court turns now to that motion.

## II

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington—Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir. 2002) (citing *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (cleaned up) ("[A] preliminary injunction involv[es] the exercise of a very far-reaching power ….")). To issue a preliminary injunction, the Court must consider: (1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3)

whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction. *Overstreet*, 305 F.3d at 573 (citations omitted).

The Sixth Circuit has clarified that, "[w]hen a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor." *City of Pontiac Retired Employees Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012)). Even if, however, the plaintiff is unable "to show a strong or substantial probability of ultimate success on the merits" an injunction can be issued when the plaintiff "at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if an injunction is issued." *In re Delorean Motor Co*., 755 F.2d 1223, 1229 (6th Cir. 1985).

### A

### 1

Before considering the four preliminary injunction factors, the Court must examine whether the Plaintiffs have standing. The Government contends that the Plaintiffs are unlikely to succeed on their facial challenge to the DBE program because the Plaintiffs lack standing to bring their claims. Article III of the United States Constitution limits the judiciary to resolving "Cases" and "Controversies." U.S. Const. Art. III. § 2. Theoretical questions will not suffice to confer subject-matter jurisdiction to this Court. *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 860 (6th Cir. 2020). The standing doctrine ensures that a live dispute between adverse parties actually exists, "thereby preventing the federal courts from issuing advisory opinions." *Carney v. Adams*, 141 S. Ct. 493, 498 (2020).

4

Standing consists of three elements.  A plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Id*.  At the preliminary injunction stage, the Plaintiff must show "a substantial likelihood of standing." *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 255 n.3 (6th Cir. 2018).

## a

The Government first attacks the Plaintiffs' standing by alleging that the Plaintiffs have failed to show that they have suffered an injury in fact.  [R. 32 at 6.]  Generally, an injury for purposes of standing must be "concrete and particularized" and "actual or imminent." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  A "conjectural" or "hypothetical" injury will not do.  *Id*.  Moreover, mere allegations of possible future injury are insufficient to satisfy the first standing element.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (collecting cases).  Rather, the threatened injury must be certainly impending.  *Id*. (quotations omitted).

In an equal protection case, an injury in fact arises "[w]hen the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group." *Ne. Fla. Chapter, Associated Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 666 (1993).  The injury "is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Id*.; *see also Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007) ("[O]ne form of injury under the Equal Protection Clause is being forced to compete in a race-based system that may prejudice the plaintiff." (citations omitted)).  Thus, to satisfy the first standing

5

element, the Plaintiffs must demonstrate that they are "able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis." *Northeastern Florida*, 508 U.S. at 666.

The Plaintiffs aver that they have "a long history of participating in federally financed road-construction projects and a long history of being discriminated against by the DBE program." [R. 1 at ¶ 8.] According to their Complaint, Mid-America and Bagshaw Trucking routinely bid for federally funded surface transportation contracts in both Kentucky and Indiana, two states that have established DBE goals in accordance with federal regulations. *Id*. at ¶¶ 11-12, 35. Plaintiffs evince that they are "qualified, willing, and able" to bid on construction contracts impacted the federal DBE program. *Id*. at ¶ 40.

The Government argues that Plaintiffs' assertions that they are "able and ready" to bid on DOT contracts "impacted by [the Government's] implementation of the federal DBE program" is not enough to establish injury in fact. [R. 32 at 7 (quoting R. 27-1 at 4-5).] First, according to the Government, the Plaintiffs' characterization of DBE participation goals as being essentially race-based quotas is incorrect because the DOT's DBE program expressly prohibits recipients from using quotas to meet DBE goals. *Id*. (citing 49 C.F.R. § 26.43(a) ("You are not permitted to use quotas for DBEs on DOT-assisted contracts …."). Second, because the Secretary of Transportation has decided to treat the 10 percent goal as only "an aspirational goal at the national level," the program does not actually require that 10 percent of surface transportation federal funding be allocated to DBEs. *Id*. (citing 49 C.F.R. § 26.41). Rather, fund recipients—not the federal government—set their own goals based on the DOT's regulatory guidance. And while some contracts do have DBE goals, others do not. The Government argues that the Plaintiffs have neither shown nor alleged that their bids on DBE contracts have ever been

unsuccessful, and that the Plaintiffs fail to "identify any specific contracts with [DBE] goals on which they intend to bid in the future." *Id*. at 9. Thus, argues the Government, the Plaintiffs have not shown that the DBE program has caused them injury or will do so in the future.

Here, closely adhering to the Supreme Court's guidance in *Adarand Constructors, Inc. v. Pena*, 515 U.S. 20 (1995), the Court finds that the Plaintiffs have sufficiently alleged an injury in fact. As an initial matter, *Adarand* suggests that, in the context of lost contracts, the question is whether Plaintiffs "ha[ve] made an adequate showing that sometime in the relatively near future [they] will bid on another Government contract" that employs DBE goals. 515 U.S. at 211. The Court concludes that Plaintiffs have satisfied that requirement. Plaintiffs do not merely rely on a "bare statement of intent" to indicate that they are "able and ready" to bid. *See Carney v. Adams*, 141 S. Ct. 493, 502 (2020) ("a bare statement of intent alone against the context of a record that shows nothing more than an abstract generalized grievance" will not suffice to show imminent injury). Rather, the Plaintiffs aver that that they "regularly bid on and compete for federally funded highway contracts that contain Kentucky's and Indiana's DBE participation goals …." [R. 1 at ¶ 37.] Although the Plaintiffs do not state exactly how often they bid, they indicate that "[e]very month, both states advertise contracts open for bid." *Id*. at ¶ 35. Moreover, they allege that "[m]ost contracts contain a DBE participation goal . . . ." *Id*. (quotations omitted). Taken together, the Plaintiffs' allegations indicate that they have bid on contracts containing DBE goals in the past, that Kentucky and Indiana routinely advertise contracts open for bid, that many of the contracts contain DBE goals, and that, despite their disadvantage, that the Plaintiffs still bid on these federally funded contracts at regular intervals. These pleadings alone are sufficient to conclude that the Plaintiffs are likely to encounter a contract containing a DBE participation goal, even if not *every* contract that Kentucky and Indiana advertise contains such goals.

The Plaintiffs have also supplemented the record with declarations of Mid-America's and Bagshaw's owners, who provide further detail as to the regularity at which both companies bid on contracts funded by the DOT.  [*See* R. 27-2 and R. 27-3.]  For example, Mid-America indicates that federal highway contracts make up, on average, approximately 65% of Mid-America's annual business.  [ R. 27-2 at ¶ 8.]  Mid-America concludes that they have lost at least 82 contracts because of the DBE program in the state of Indiana alone since January 2022.  *Id*. at ¶ 29.  Likewise, Bagshaw represents that federal highway contracts equaled between $3 million and $4 million of Bagshaw's total revenue over a fourteen-month period beginning in late 2022. [R. 27-3 at ¶ 7.]  Plaintiffs' detailed accounts of their expertise, prior experience, and the types of contracts they would like to pursue indicate an ability and readiness to bid on DOT federal highway contracts.  *See Adams*, 141 S. Ct. at 502-03 (explaining that plaintiffs in other cases involving unequal treatment have "each introduced at least some evidence that, *e.g.*, they had applied in the past, there were regular opportunities available with relevant frequency, and they were 'able and ready' to apply for them.").

And contrary to the Government's contention, the Plaintiffs need not necessarily identify *specific* contracts that they plan to bid on in the near future, so long as the Plaintiffs have made "an adequate showing that sometime in the relatively near future it will bid on another government contract that offers financial incentives to a prime contractor for hiring disadvantaged subcontractors."  *Adarand Contructors, Inc.*, 515 U.S. at 211.  Mid-America and Bagshaw have made an adequate showing by identifying past contracts they have lost because of the DBE program and alleging their intention to continue bidding in regular intervals on federal highway contracts.  *See, e.g., Cache Valley Elec. v. State of Ut. Dept. of Transp.*, 149 F.3d 1119, 1122 (10th Cir. 1998) (plaintiff's injury was imminent where plaintiff "point[ed] to the two

8

contracts that it lost as a result of the DBE program" and represented that "it will continue to apply for UDOT electrical subcontracts in the relatively near future"). Thus, because the Plaintiffs have shown that they are "able and ready" to bid on DOT funded contracts, their injury is imminent. The first element of standing is sufficiently met.

**b**

The more difficult issue is the Government's challenge to standing on the bases of traceability and redressability. The Government argues that the Plaintiffs' injuries are not traceable to the race- or gender-based rebuttable presumption because the entirety of the DBE program is not based on race or gender. [R. 32 at 9-10.] The "practice of setting goals for DBE participation on some projects . . . is facially neutral because the DBE program requires only that qualifying firms be certified as disadvantaged, not that they be owned and run by individuals of a particular race or gender." *Id*. at 10 (quoting *Klaver Const. Co. v. Kan. Dep't of Transp.*, 211 F. Supp. 2d 1296, 1302 (D. Kan. 2022)). In other words, not *every* DOT contract, even those that have DBE goals, employ the race- or gender-based rebuttable presumption. Thus, even if the DBE program's presumptions were enjoined, the program would still continue to operate with its race- and gender-neutral requirements—including social and economic disadvantage, business size and structure, ownership, and wealth limits—intact. *Id*. at 11. And because the Plaintiffs fail to make any showings that they would qualify for the DBE program under its race- and gender-neutral requirements, "enjoining the presumptions would leave Plaintiffs in exactly the same position and would certainly not redress their stated injury." *Id*.

There is a clear split of authority on the causation and redressability requirements for standing in a disadvantaged enterprise case like this one. One line of cases, which the Government relies on, stems from *Cache Valley Electrical Co. v. Utah Department of*

9

*Transportation*, 149 F.3d 1119, 1120 (10th Cir. 1998).  In *Cache Valley*, an electrical subcontractor seeking contracts with the DOT sought to enjoin a predecessor of the DBE program presently at issue.  The Tenth Circuit found that the subcontractor had adequately established an injury in fact because the subcontractor was able to point to the two contracts that it lost as a result of the DBE program and showed that it would continue to apply for UDOT electrical subcontracts in the relatively near future.  *Id*. at 1122.  But, reasoned the court, even assuming that the subcontractor's injury was fairly traceable to the DBE program's rebuttable presumptions, "it would be pure speculation to conclude that invalidating the allegedly unconstitutional preferences would ameliorate plaintiff's ability to compete in any way."  *Id*. at 1123.

*Cache Valley*'s reasoning rested on two determinations.  First, that the race- and gender-based preferences are severable from the rest of the DBE program and that the DBE program would remain viable even without those preferences.  In other words, the race- and gender-neutral aspects of the DBE program would still exist in order to foster development in small businesses whose owners have had to overcome social and economic hardship.  *Id*.  Thus, "the DBE program would continue even absent the disputed presumption, so that small businesses whose owners could prove they were disadvantaged—and thereby qualify as DBEs—would continue to have an advantage over businesses like [plaintiff] that are too large to qualify as DBEs."  *Id*. at 1124.

The second determination bolstering the court's declination of redressability was that the subcontractor had "adduced no evidence that the elimination of the preferences would result in any meaningful reduction in the number of qualifying DBEs."  *Id*.  Because those who would have initially gained the race- or gender-based presumption in their favor might still qualify for

the DBE program under the race- and gender-neutral criteria, the pool of DBE contractors might still be the same—meaning that the non-DBE plaintiff is still at a disadvantage.  *See id*. at 1125 ("In fact, there is no evidence that any other subcontractors against whom CVE competes would lose their DBE status as a result of eliminating the presumption.").  Thus, the subcontractor was unable to establish that a favorable judicial decision striking down the rebuttable presumption would likely improve the terms of competition it faced.

The Government also cites two district court decisions that follow *Cache Valley*'s reasoning.  In *Klaver Constr. Co. v. Kansas Dep't of Transp.*, 211 F. Supp. 2d 1296, 1302 (D. Kan. 2002), the court considered a challenge to the DOT's DBE program by a construction company that did not qualify as a DBE.  The *Klaver* court found that the plaintiff's injury was not traceable to the DBE program because the construction company could not show that the program's race- and gender-conscious elements caused its alleged injuries.  *Id*. at 1302.  Rather, the direct cause of any injury that the construction company had suffered was the fact that it did not qualify as a disadvantaged small business because Klaver and its affiliate were too large and Klaver itself was owned and controlled by an individual who was too wealthy to qualify as economically disadvantaged.  *Id*.  Furthermore, any traceable injury would not be redressable because, even if the rebuttable presumption was declared unconstitutional and enjoined, the DBE program would still continue with its race- and gender-neutral elements.  *Id*. at 1305.  Because the construction company did not qualify for the DBE program for race- and gender-neutral reasons, the company's alleged diminished competitiveness would not be materially altered by a favorable judicial decision.  *Id*. at 1304.  Likewise, the court in *Interstate Traffic Control v. Beverage* held that, absent fraud, removing the rebuttable presumption from the contract application process would not alter the number or identity of socially and economically

disadvantaged individuals eligible to participate in DBE. 101 F. Supp. 2d 445, 453 (S.D. W. Va. 2000) ("[i]n the absence of allegations and proof of fraud by DBE program applicants subject to the disadvantage presumption, it would be pure speculation for the Court to conclude that judicial removal of the presumption would diminish the number of DBE program eligible participants.").

Another line of cases lends more favorably to Plaintiffs.  The Seventh Circuit, relying on *Northeastern Florida*, follows a less stringent approach than the one established in *Cache Valley*. In *Midwest Fence Corp. v. United States Dep't of Transp.*, the district court determined that once an injury is properly alleged, causation and redressability flow from that injury.  No. 10 C 5627, 2011 U.S. Dist. LEXIS 68784 at *26-27 (N.D. Ill. June 27, 2011) (citing *Ne. Fla. Gen. Contractors*, 508 U.S. at 666) confirmed in *Midwest Fence*, 84 F. Supp. 3d 705, aff'd, 840 F.3d 932.  Put another way, it follows that the barrier to entry is the cause of the injury and that a judicial decree removing that barrier redresses the injury.  The *Midwest Fence* court provided a thorough explanation of the division in case law stemming from differences in interpretation of *Northeastern Florida*.  In ultimately concluding that *Cache Valley*'s analysis of standing is far too stringent, the *Midwest Fence* court reasoned that the DBE program's rebuttable presumptions are a material component of the DBE program.  *See Midwest Fence Corp.*, No. 10 C 5627, 2011 U.S. Dist. LEXIS 68784 at *26-31.  Thus, the district court "[could] not agree with the *Cache Valley* analysis that is 'pure speculation' to conclude that eliminating the presumptions would have no impact on the number of businesses qualifying for the DBE program."  *Id*. at *31.

In the present case, the Court finds the Seventh Circuit's approach more persuasive, and agrees that the Tenth Circuit's severability test is too stringent.  As the district court in *Midwest Fence* explained, *Cache Valley* and those cases following it rely on the idea that the

12

presumptions of disadvantage given to racial minorities and women are severable from the program as a whole and that the program would have just as much participation if the presumptions were eliminated.  *Id*. at *27.  This notion, however, is a fallacy.

The Government's own arguments are contradictory.  On the one hand, they contend that enjoining the presumptions would leave the Plaintiffs in exactly the same position as with the presumptions and would not redress the Plaintiffs' injury.  [R. 32 at 11.]  This argument relies on *Cache Valley*'s assumption that the absence of the race- and gender-based presumptions from the DBE program would not alter the number or identity of socially and economically disadvantaged individuals eligible to participate in DBE.  Practically speaking, this assumption would mean that the race- and gender-based presumptions have no effect on the number of DBEs in the DBE program—in other words, the presumptions really do nothing at all.  On the other hand, the Government contends that the race- and gender-based elements are a necessary remedial measure that serve a compelling interest—that is to say, the rebuttable presumptions really move the ball. *Id*. at 13.  By this logic, the race- and gender-based measures do both nothing and something. The Government is trying to have its cake and eat it too.

*Cache Valley* held that non-DBE plaintiffs lacked standing because any anticipated redress from a favorable decision would be wholly speculative.  149 F.3d at 1123.  According to the Tenth Circuit, the lack of evidence showing a meaningful reduction in the number of DBEs is "merely hypothesizing that elimination of the presumption would improve its terms of competition."  *Id.* at 1124.  But this line of reasoning itself rests on its own hypothesis that the elimination of the rebuttal presumptions has no effect on the number of DBEs.  Again, that hypothesis is counter to the Government's own position, which elucidates the necessity of the race- and gender-based elements as a means of remedying past discrimination.  The DBE

13

program itself calls for the use of race-conscious measures if using purely race-neutral means does not allow a recipient to achieve their contract goals for the year.  *See* 49 C.F.R. § 26.51. Thus, the race- and gender-based presumption must have *some* impact on the number of competitors who qualify as DBEs.  If the presumption had no effect, then what would be its point and purpose?

The presumptions must have an impact on the number of qualifying DBEs—that is why Congress has previously rejected any amendment to the DBE program that would eliminate the presumption of social and economic disadvantage for certain minority groups and women.  *See* 144 Cong. Rec. 40, 1998.  In all practicality, there exists a finite pool of DOT contracts open for bidding.  A certain percentage of these contracts must go to DBEs.  Businesses owned by particular racial minorities and women are given a presumption as qualifying as DBEs. Eliminating that presumption would require those minority and women owned businesses to qualify as DBEs through race- and gender-neutral means.  They may or may not qualify as DBEs without the presumption, and it would be quite the stretch to hypothesize that *every* minority- or woman-owned business would otherwise qualify as a DBE under the program's neutral criteria. Thus, it is not "wholly speculative" to conclude that the number of DBEs would be reduced. And with less DBEs jockeying for the finite number of contracts available to bid on, the terms of competition for non-DBEs, like the Plaintiffs here, inherently improves.  Accordingly, eliminating the race- and gender-based presumptions would redress the injury harming Plaintiffs. Because the Plaintiffs have established an injury resulting from the denial of equal treatment that is traceable to the DBE's race- and gender-based presumption and redressable by a favorable decision by this Court, the Plaintiffs have shown a likelihood of success on standing.  The Court now turns to the four preliminary injunction factors.

**B**

Have the Plaintiffs shown there to be a strong likelihood of success on the merits?  The Court first considers the DBE program's race-based presumption.  The Fourteenth Amendment's equal protection guarantee applies "to all persons … without regard to any differences of race, of color, or of nationality …."  *Yick Wo v. Hopkins*, 118 U. S. 356, 369 (1886).  Thus, "[g]overnment policies that classify people by race are presumptively invalid."  *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021) (citing U.S. Const. amend. XIV; *Adarand Contructors, Inc.*, 515 U.S. at 234-35).  Any exception to the Constitution's demand for equal protection must survive strict scrutiny.  *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 206 (2023).  In order for a discriminatory classification to survive this "daunting" two-step examination, the Government must first show that the racial classification is being employed to further a compelling government interest.  *Id.* at 206-07.  If there is a compelling government interest, the Government must then prove that its use of race is narrowly tailored—in other words, "necessary to achieve that interest."  *Id.* at 207 (internal quotation omitted).

**1**

The Supreme Court has identified "only two compelling interests that permit resort to race-based government action."  *Id.*  The first is "remediating specific, identified instance of past discrimination that violated the constitution or a statute."  *Id.* (citing cases).  The other is "avoiding imminent and serious risks to human safety in prisons, such as a race riot."  *Id.*

Here, the Government contends it has a compelling interest because the DBE program "targets and seeks to remedy past, intentional discrimination in the transportation industry—discrimination that the government has had a hand in."  [R. 32 at 15.]  But remedial policies do

*not always* justify preferential treatment based on race. *Vitolo*, 999 F.3d at 361 ("The Supreme Court has told us that remedial policies can *sometimes* justify preferential treatment based on race." (emphasis in original) (citing *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493-94 (1989) (plurality opinion); *Adarand*, 515 U.S. at 237). "[T]he bar is a high one." *Id*.

Three criteria must be met for the Government to have a compelling interest in remedying past discrimination. *Id*. "First, the policy must target a specific episode of past discrimination. It cannot rest on a 'generalized assertion that there has been past discrimination in an entire industry.'" *Id*. (quoting *J.A. Croson Co.*, 488 U.S. at 498); *see also Aiken v. City of Memphis*, 37 F.3d 1155, 1162-63 (6th Cir. 1994) (en banc) ("there must be 'strong' or 'convincing' evidence of past discrimination by that governmental unit.") (citations omitted). "Second, there must be evidence of *intentional* discrimination in the past." *Vitolo*, 999 F.3d at 361 (emphasis in original). Statistical disparities by themselves are not enough, although they may be used as evidence to establish intentional discrimination. *Id*. "Third, the government must have had a hand in the past discrimination it now seeks to remedy." *Id*. In other words, the Government must show that it actively or passively participated in the past discrimination. *Id*.

In this case, the Government argues that "there is a strong basis in evidence that the DOT DBE program targets specific episodes of past, intentional discrimination in which the government participated and now seeks to remedy." [R. 32 at 15.] In support, the Government cites a compelling interest report (which collected over 200 disparity studies, other reports and studies, and congressional testimony) that purports to document the past discrimination and its lingering effects on the ability of DBE's to equally compete for government contracts. *Id*.; [*see also* R. 32-2.] The Government also provides statistical disparity evidence and anecdotal evidence, along with expert reports, which Congress reviewed before renewing the DBE

Program, that conducted regression analyses that eliminate potentially non-discriminatory reasons for the disparities.  [*See* R. 32-3; R. 32-4.]

In previous challenges to DBE programs, other circuits have weighed this type of evidence and concluded that it sufficiently provides persuasive evidence of specific instances of discrimination and its continuing effects.  [*See* R. 32 at 17 (citing *Assoc. Gen. Contractors of Am., San Diego Chapter, Inc. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1196 (9th Cir. 2013); *H.B. Rowe Co. v. Tippett*, 615 F.3d 233, 257 (4th Cir. 2010); *Adarand Constructors, Inc. v. Slater*, 228 F.3d at 1174; *Midwest Fence*, 84 F. Supp. 3d 705, 727 (N.D. Ill. 2015); *Rothe Dev. Corp. v. U.S. Dep't of Def.*, 107 F. Supp. 3d 183, 209–10 (D.D.C. 2015))].  The Sixth Circuit, however, appears skeptical of the broad "societal discrimination" type of evidence that the Government provides.  *See Vitolo*, 999 F. 3d at 361-62.

In *Vitolo*, the Sixth Circuit explained that the Government's compelling interest did not meet any of the three requirements required to jump the first hurdle of strict scrutiny.  The panel found that the Government's evidence pointed "generally to societal discrimination against minority business owners[]" but did not "identify specific incidents of past discrimination."  *Id.* at 361.  Nor did the Government provide much evidence of past intentional discrimination against the many groups to whom it grants preferences.  *Id.*  And lastly, the Government did not show that it participated in the discrimination is sought to remedy.  *Id.*

Even more recently, a sister court within the Sixth Circuit considering the Small Business Association's Section 8(a) program examined the same exhibits that the Government presents here.  *See Ultima Servs. Corp. v. United States Dep't of Agric.*, 683 F. Supp. 3d 745 (E.D. Tn. 2023).  Applying *Vitolo*, the district court concluded that the Government's evidence failed to show a compelling interest for the use of a race-based rebuttable presumption.  *Id.* at 769.

Essentially, the *Ultima* court reasoned that the Government's evidence did not pass muster because the examples of discrimination contained within the exhibit related too broadly to the federal government's actions in different areas of the national economy. *Id*. at 768. "Because the Court must determine whether the use of racial classifications is supported with *precise* evidence, examples of the federal government's passive participation in areas other than the relevant industries do not support [the federal government's] use of the rebuttable presumption here." *Id*. at 769 (citing *Vitolo*, 999 F.3d at 361) (emphasis added).

The Court is compelled to follow this line of reasoning. While the Court is aware that its decision goes down the road less travelled, its compass is controlled by the Sixth Circuit. *Vitolo* elucidates that "[w]hen the government promulgates race-based policies, it must operate with a scalpel. And its cuts must be informed by data that suggest intentional discrimination." *Vitolo*, 999 F.3d at 361. Although other courts have found that the Government's imprecise evidence has supported a compelling interest, this Court finds, like its sister court in *Ultima*, that the Government's proffered proof is too dull of a scalpel.

The Court in no way doubts that racial barriers still persist when it comes to the success of minority-owned businesses. But the Government's evidence here is too broad. It points to societal discrimination against minority-owned businesses generally, but does not offer much evidence of past discrimination against the many groups to whom it grants a preference via the DOT's DBE program. As *Vitolo* explains, the preferences "for Pakistanis but not Afghans; Japanese but not Iraqis; Hispanics but not Middle Easterners—is not supported by any record evidence at all." *Id*. The same is true here. Simply compiling an extensive portfolio of studies that show disparities exist for minority-owned businesses generally speaking does not support a government imposed racial preference for only *some* of those groups. The Government's

imprecision is its fatal flaw.  If it wants to grant preferences to certain groups, it must specifically show how the Department of Transportation has previously discriminated against *those* groups. It cannot group all minority owned businesses into one gumbo pot but then try to scoop out only the sausage and not the okra.

## 2

Even if the Government could establish a compelling interest, the race-based rebuttable presumption is not narrowly tailored.  "Narrow tailoring requires courts to examine, among other things, whether a racial classification is 'necessary'—in other words, whether race-neutral alternatives could adequately achieve the governmental interest." *Students for Fair Admissions*, 600 U.S. at 311 (citing *Grutter v. Bollinger*, 539 U.S. 306, 327, 339-40 (2003)).  The government must "engage in a genuine effort to determine whether alternative policies could address the alleged harm." *Vitolo*, 999 F.3d at 362.  Thus, "in turn, a court must not uphold a race-conscious policy unless it is 'satisfied that no workable race-neutral alternative' would achieve the compelling interest." *Id*. (quoting *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 312 (2013)).  Further, "a policy is not narrowly tailored if it is either overbroad or underinclusive in its use of racial classifications." *Id*.

Here, the DOT's DBE Program is not as narrowly tailored as the Government proclaims. The Government points out that the DBE program's implementing regulations expressly provide for the consideration of race-neutral alternatives because DOT-funds recipients must always attempt to meet its annual DBE participation goal by using race- and gender-neutral means to the maximum extent possible.  [R. 32 at 21]; *see also* 49 C.F.R. § 26.51(a).  The Government also contends that the DBE program is "flexible"—the 10 percent participation goal has never been a quota, but rather "an aspirational goal at the national level, which [DOT] uses as a tool in

19

evaluating and monitoring DBEs' opportunities to participate in DOT–assisted contracts."  [R. 32 at 21 (citing 49 C.F.R. § 26.41(b)).  The Court takes these points.  But the Government's additional arguments are unconvincing.

First, as explained above, the Government has not shown how each of its favored groups suffered discrimination.  Instead, it assesses past discrimination against minority-owned businesses broadly, but then carves out preferences for only *some* minority groups.  A contract business owned by man from Pakistan receives the rebuttable presumption, but the business owned a man from Afghanistan does not.  Why?  The Government contends that this preference for only some minority groups prevents the DBE program from being overbroad.  [R. 32 at 21 ("The program is not overbroad because its presumptions do not invariably apply to all minority- or women-owned businesses.").]  But these preferences for specific minorities, without clear support, "fail[s] to articulate a meaningful connection between the means … employ[ed] and the goals … pursue[d]."  *Students for Fair Admissions*, 600 U.S. at 186.  This "unclear connection" amounts to a "scattershot approach" that "does not conform to the narrow tailoring strict scrutiny requires."  *Id*. at 187; *Vitolo*, 399 F.3d at 364.  The Government's argument is akin to saying that all bourbons are made up of at least 51% corn, but that only certain bourbons should actually be called "bourbon."  The Government also contends that the DBE program is not underinclusive because non-minority-owned firms may apply for DBE certification on a case-by-case basis.  But this application process is a high hurdle.  *See* 49 C.F.R. § 26.67(d).  The fact of the matter is that some minority groups receive a presumption, albeit rebuttable, while others do not.

The DBE program also fails the narrow tailoring prong because it lacks a "logical end point."  *Students for Fair Admissions*, 600 U.S. at 221 (citing *Grutter*, 539 U. S. at 342).  In *Students for Fair Admissions*, the Supreme Court took *Grutter* at its word when striking down

the use of race-based admissions policies at our nation's universities.   The *Grutter* court, in its willingness to temporarily suspend the Constitution's equal protection guarantee, emphasized that "all race-conscious admissions programs have a termination point"; they "must have reasonable durational limits"; they "must be limited in time"; they must have "sunset provisions"; they "must have a logical end point"; their "deviation from the norm of equal treatment" must be "a temporary matter." *Grutter*, 539 U.S. at 342.

There is no reason to believe that *Grutter*'s reasoning, adopted by a majority of the Supreme Court in *Students for Fair Admissions*, does not extend to all race-conscious programs. Indeed, the Supreme Court has explained that "[a] core purpose of the Fourteenth Amendment was to do away with all governmentally imposed discrimination based on race." *Palmore v. Sidoti*, 466 U.S. 429, 432 (1984); *see also Students for Fair Admissions*, 600 U.S. at 311 ("Importantly, even if a racial classification is otherwise narrowly tailored to further a compelling governmental interest, a deviation from the norm of equal treatment of all racial and ethnic groups must be a temporary matter—or stated otherwise, must be limited in time." (internal quotations omitted) (Kavanaugh, J. concurring)).   "All 'race-based governmental action' should 'remai[n] subject to continuing oversight to assure that it will work the least harm possible to other innocent persons competing for the benefit.'" *Students for Fair Admissions*, 600 U.S. at 212 (quoting *Grutter*, 539 U.S. at 341).   "[T]he deviation from the norm of equal treatment of all racial and ethnic groups is a temporary matter, a measure taken in the service of the goal of equality itself." *J.A. Croson Co.*, 488 U.S. at 510.

The DOT's DBE program has been around since the Cold War.   It was implemented during the same year that the Space Shuttle *Challenger* launched its maiden voyage.

Star Wars:  Episode VI—Return of the Jedi was the top grossing domestic movie, and Kenny Rogers's and Dolly Parton's "Islands in the Stream" topped the country music charts for two straight weeks.  Is there actually a "logical end point" for the DBE's racial presumptions?  Repeated Congressional approval is no cure.  *Students for Fair Admissions* makes clear that periodic review does not make unconstitutional conduct constitutional.  *See* 600 U.S. at 225 ("*Grutter* never suggested that periodic review could make unconstitutional conduct constitutional.").  Because the DBE program's racial preferences are not tethered to a foreseeable conclusion, the race-based presumption fails to be narrowly tailored.

C

The Court now considers the Plaintiffs' challenge to the gender-based presumption.  Sex-based discrimination, like racial classifications, is presumptively invalid.  *Vitolo*, 999 F.3d at 364 (citing U.S. Const. amend. XIV; *United States v. Virginia*, 518 U.S. 515, 531 (1996)).  The Government must provide an "exceedingly persuasive justification" for its discriminatory policy to stand.  *Virginia*, 518 U.S. at 531.  The Government meets this burden by proving that "(1) a sex-based classification serves 'important governmental objectives,' and (2) the classification is 'substantially and directly related' to the government's objectives."  *Vitolo*, 999 F.3d at 364 (quoting *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724, 730 (1982)).  "[R]emedying specific instances of past sex discrimination can serve as a valid governmental objective, [but] general claims of societal discrimination are not enough."  *Id*.

Here, the Government's proffered interest for its sex-based presumption is the same as for its race-based presumption:  to remedy past discrimination.  The Government also relies on the same disparity studies and statistical surveys as it did for race to show that women-owned businesses suffered and continue to suffer a disadvantage.  But "proving broad sociological

22

propositions by statistics is a dubious business, and one that inevitably is in tension with the normative philosophy that underlies the Equal Protection Clause." *Craig v. Boren*, 429 U.S. 190, 204 (1976).

For similar reasons as stated above, the Court is skeptical of the Government's evidence. On the one hand, the Government's studies point out disparities between male-owned businesses and female-owned businesses. [*See* R. 32-3; R. 32-4.] For example, female owned businesses obtain loans that are smaller and less favorable than loans obtained by their male counterparts. [*See* 32-2 at 34-35.] But, like the survey examined in *Vitolo*, evidence of this nature does "nothing to support an inference of *intentional* discrimination." 399 F.3d at 365 (emphasis added).

And on the other hand, the quantitative evidence, including the regression analyses, does not explain the extent to which women-owned DOT contractors have lost out on jobs because of blatant discrimination. Also, while the Court is sympathetic to the anecdotal evidence evinced by some women who feel as though they are disadvantaged, the evidence does not provide a clear record that women-owned contractors regularly bid for DOT funded contracts but fail to receive them because of blatant discrimination. *Cf. Coral Constr. Co. v. King County*, 941 F.2d 910, 921 (9th Cir. 1991) (relying on lengthy affidavits from multiple women complaining in varying degree of specificity about discrimination within the local construction industry).

Without evidence that it participated in intentional discrimination within the context of DOT funded contracts, the Government fails to meet its burden of proving that the DOT's rebuttable presumption serves an important government interest. And without this specific evidence, the Government is unlikely to show that the DOT's sex-based classification is appropriately tailored to the Government's objectives. Because the Government is unlikely to

provide an exceedingly persuasive justification for its sex-based presumption, the classification cannot stand.

C

Because the Government failed to justify its discriminatory policies, the Plaintiffs will likely win on the merits of their constitutional claims.[1]  In most constitutional cases, that is dispositive.  *See Vitolo*, 999 F. 3d at 365 (quoting *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) ("[W]hen reviewing a motion for a preliminary injunction, if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is *mandated*.") (emphasis added)).  Nevertheless, the Court will briefly address the remaining factors.

Will the Plaintiffs suffer irreparable harm if a preliminary injunction is not issued?  The Government says no.  It argues that, because the Plaintiffs have not identified any contracts with DBE goals that are currently being let, and because of the Plaintiffs' "lengthy delay" in moving from preliminary relief, there is no imminent harm.  [R. 32 at 24.]  Indeed, "[t]o merit a preliminary injunction, an injury must be both certain and immediate, not speculative or theoretical."  *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 391 (6th Cir. 2020) (quotations omitted) (cleaned up).  But as the Court previously determined, the Plaintiffs have provided evidence that they regularly bid on DOT contracts.  The Plaintiffs do not have a crystal ball to know precisely when contracts with DBE goals will be available to let.  But it is not speculative to conclude that those types of contracts will become available.  And when they do, the Plaintiffs will be at an automatic disadvantage to certain types of competitors.

---

[1] This likelihood of success also encapsulates a likelihood of success on the Plaintiffs' challenge to the DOT's regulatory scheme.  *See* 5 U.S.C. §§ 551(13), 702, 704, 706(2)(B) ("A reviewing court shall …hold unlawful and set aside agency action … found to be … contrary to constitutional right ….").

As to the remaining two factors, they too weigh in favor of temporary relief.  "The two remaining preliminary injunction factors—whether issuing the injunction would harm others and where the public interest lies—merge when the government is the defendant."  *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023).  The Government contends that the Plaintiffs concede that "the government and the public always have a strong interest in the implementation of the laws enacted by their elected representatives."  [R. 32 at 25 (citing *Maryland v. King*, 567 U.S. 1301, 1303 (2012) ("Any time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.")).]  The Court cannot see, however, that the Government's violation of a constitutional right ever serves the public's interest.  *See Vitolo*, 999 F.3d at 360 ("[N]o cognizable harm results from stopping unconstitutional conduct, so 'it is always in the public interest to prevent violation of a party's constitutional rights.'") (quoting *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001)).  "And at bottom, the public interest lies in a correct application of the law."  *Biden*, 57 F.4th at 557 (internal quotations and citation omitted).  Temporary relief would not cause substantial harm to others and would serve the public's interest.

## D

The Plaintiffs are entitled to a preliminary injunction.  But how far should that injunction reach?  The Plaintiffs request a broad remedy—essentially an Order enjoining the Defendants from implementing or enforcing the DBE Program's race and gender presumptions and DBE participation goal nationwide.  The Court finds that granting such broad relief would be unwise.

The Sixth Circuit has held that a "district court should limit the scope of [an] injunction to the conduct 'which has been found to have been pursued or is related to the proven unlawful

conduct.'" *Howe v. City of Akron*, 801 F.3d 718, 753 (6th Cir. 2015) (quoting *E.E.O.C. v. Wilson Metal Casket Co.*, 24 F.3d 836, 842 (6th Cir. 1994)).  And this Court has previously written about the ongoing debate within the judiciary about the scope of injunctive relief.  *See Commonwealth v. Biden*, 571 F. Supp. 3d 715, 734-35 (E.D. Ky. 2021).  In finding that redressability "is properly limited to the parties before the Court[,]" the Court explained Justice Thomas's skepticism of "nationwide injunctions."  *Id*. at 734 (citing *Trump v. Hawaii*, 138 S. Ct. 2392, 2425-29 (2018) (Thomas, J., concurring) ("[In the past, as] a general rule, American courts of equity did not provide relief beyond the parties to the case.")).  In Justice Thomas's view, the sweeping relief brought by nationwide injunctions encourages "forum shopping" and makes "every case a national emergency for the courts and the Executive Branch."  *Trump*, 138 S. Ct. at 2425.

Likewise, Justice Gorsuch has noted that nationwide injunctions "raise serious questions about the scope of courts' equitable powers under Article III."  *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring).  Such injunctions are impracticable and "force judges into making rushed, high-stakes, low-information decisions."  *Id*.  "District courts should allow legal questions to percolate through the federal court system."  *Biden*, 571 F. Supp. 3d at 734 (citing *Trump*, 138 S. Ct. at 2425 (Thomas, J. concurring)).  "Careful review by multiple district and circuit courts … allows the Supreme Court the benefit of thoughtful and, at times, competing outcomes."  *Id*.

Perhaps most compelling, however, is the Sixth Circuit's review of this Court's injunction in *Commonwealth v. Biden*.  After granting the Plaintiffs' motion for a preliminary injunction, the Court enjoined the federal government from enforcing a vaccine mandate for federal contractors and subcontractors in Kentucky, Ohio, and Tennessee—the plaintiff states.

*Biden*, 571 F. Supp. 3d at 735.  In reviewing the Court's injunction, the Sixth Circuit held that the Court "abused its discretion in extending the preliminary injunction's protection to non-party contractors in the plaintiff States."  *Biden*, 57 F.4th at 557.  The Sixth Circuit found that "an injunction limited to the parties can adequately protect the plaintiffs' interests while the case is pending disposition on the merits" and, consequently, modified the scope of the injunction to prohibit the federal government from enforcing the contractor mandate against the parties only. *Id*.

Given this discussion, the Court finds that redressability in the present case is properly limited to the parties before the Court.  Thus, the scope of the preliminary injunction shall apply to the Plaintiffs in the states within which they operate, Kentucky and Indiana.

### III

The Court is keenly aware of the past discrimination that certain groups of people have faced in this country.  And the Court is sure that the federal government has nothing but good intentions in trying to remedy past wrongs.  But remedying those wrongs must still pass constitutional muster.  The federal government cannot classify people in such a manner that violates the principles of equal protection.  Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

1. The Plaintiffs' Motion for a Preliminary Injunction [**R. 27**] is **GRANTED**;

2. The United States Department of Transportation, Peter Buttigieg, Shailen Bhatt, Todd Jeter, and any successors in office, are **ENJOINED** from mandating the use of race- and gender-based rebuttable presumptions for United States Department of Transportation contracts impacted by DBE goals upon which the Plaintiffs bid.

3.  The pending Motion to Dismiss [**R. 31**] will be **DENIED without prejudice** pending the resolution of any interlocutory appeal of this Order.  The Defendants are granted leave of the Court to refile their motion, if necessary.

This the 23rd day of September 2024.

Gregory F. Van Tatenhove
United States District Judge