# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
## CENTRAL DIVISION AT FRANKFORT

|  |  |  |
|---|---|---|
| MID-AMERICA MILLING COMPANY, LLC, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **Case No. 3:23-cv-00072-GFVT-EBA** |
| UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

## <u>MOTION TO INTERVENE</u>

Brooke Menschel*
DC Bar No. 9000389
Adnan Perwez*
DC Bar No. 90027532
Jessica Anne Morton*
DC Bar No. 1032316
Audrey Wiggins*
DC Bar No. 482877
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090 Ext. 1011
bmenschel@democracyforward.org
aperwez@democracyforward.org
jmorton@democracyforward.org
awiggins@democracyforward.org

Douglas L. McSwain
KY Bar No. 46895
Wyatt, Tarrant & Combs LLP
250 West Main Street
Suite 1600
Lexington, KY 40507
(859) 288-7415
dmcswain@wyattfirm.com

Sarah von der Lippe*
DC Bar No. 454585
Minority Business Enterprise Legal Defense
and Education Fund, Inc.
1104 East Capitol St. NE
(202) 744-5415
Outsidecounsel1@mbeldefwatchdog.org

*Counsel for Proposed Intervenor DBEs*

*Pro Hac Vice Forthcoming*

This case concerns a challenge to the Department of Transportation's Disadvantaged Business Enterprise Program. Pursuant to Federal Rule of Civil Procedure 24, individual Disadvantaged Business Enterprises, and associations and organizations that represent such enterprises, respectfully move to intervene to ensure an adequate and thorough defense of that program. As detailed further below, Proposed Intervenors satisfy each of the requirements for intervention as of right under Rule 24(a). If the Court declines to grant intervention as of right, Proposed Intervenors alternatively request that the Court grant permissive intervention under Rule 24(b).

## INTRODUCTION

Proposed Intervenor Defendants National Association of Minority Contractors ("NAMC"); Women First National Legislative Committee; Airport Minority Advisory Council ("AMAC"); Women Construction Owners & Executives, Illinois Chapter ("WCOE"); Atlantic Meridian Contracting Corp. ("AMC-Civil"); and Upstate Steel, Inc. (collectively "Intervenor DBEs") move to intervene—either by right or by permission—to defend the Disadvantaged Business Enterprise program, a critical tool that Congress has repeatedly authorized to address past and present effects of discrimination. Plaintiffs Mid-America Milling Company, LLC, and Bagshaw Trucking Inc. seek to gut the DBE program, undermining Congress's efforts to ensure that federal contracts are available to socially and economically disadvantaged communities. They concede that they hope to "end[] the DBE program once and for all." Compl. ¶ 10.

The Department of Transportation initially defended the program against the Plaintiffs' Equal Protection challenges, asserting the program's legality and suggesting fatal flaws in the Plaintiffs' arguments. But recent action by the Executive Branch shows a dramatic shift in the Department's position. Rather than adequately representing the interests of Proposed Intervenor

1

DBEs and countless similar companies, as it has been doing for months, the Department is now poised to support Plaintiffs' efforts to end the DBE program altogether.

Where the federal government abdicates its responsibility to defend statutes that have been lawfully adopted, implemented, and reauthorized, intervention is appropriate. Moreso here, where the government's refusal to defend the DOT DBE program perpetuates the social and economic disadvantage that Intervenor DBEs and others like them suffer from the government's own longstanding discrimination against minority- and women-owned businesses. Reviewing the factors for intervention confirms this conclusion: Intervenor DBEs moved to intervene in a timely manner, just days after the President indicated that he would seek to eliminate all "diversity, equity, inclusion, and accessibility" programs, including "'equity-related' grants or contracts," from the federal government, Exec. Order, *Ending Radical and Wasteful Government DEI Programs and Preferencing* (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/ending-radical-and-wasteful-government-dei-programs-and-preferencing/ (hereinafter "Jan. 20 EO"), and then directed the Office of Federal Contract Compliance Programs to "immediately cease . . . [a]llowing or encouraging Federal contractors and subcontractors to engage in workforce balancing based on race, color, sex, sexual preference, religion, or national origin," Exec. Order, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity* (Jan. 21, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/ending-illegal-discrimination-and-restoring-merit-based-opportunity/ (hereinafter "Jan. 21 EO"). Under Plaintiffs' theory of the case, both EOs would reach the DOT DBE program. Intervenor DBEs have a unique legal interest that, absent successful intervention, may be significantly impaired if MAMCO and Bagshaw obtain the relief they seek; the Administration's Executive Orders show that Intervenor DBEs will not be adequately

represented by existing parties; and finally, because of the timely motion and early stage of discovery, Intervenor DBEs' involvement will not prejudice the current parties or delay the proceedings.

## FACTUAL BACKGROUND

Since its inception in 1983, the DOT DBE program has been reauthorized many times,[1] most recently in 2021 as part of the Infrastructure Investment and Jobs Act (more commonly known as the Infrastructure Act). Pub. L. No. 117-58 (2021). Each time Congress has considered the program, it has drawn broad bipartisan support. And just as Congress repeatedly found the DOT DBE program necessary, every federal court of appeals to consider the question has found the DOT DBE program constitutional. *See Midwest Fence Corp. v. U.S. Dep't of Transp.*, 840 F.3d 932 (7th Cir. 2016); *W. States Paving Co. v. Wash. State Dep't of Transp.*, 407 F.3d 983 (9th Cir. 2005); *Sherbrooke Turf, Inc. v. Minn. Dep't of Transp.*, 345 F.3d 964, 967-68 (8th Cir. 2003); *Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147 (10th Cir. 2000).

The DOT DBE program plays a critical, and well-recognized, role in "ensur[ing] nondiscrimination," "creat[ing] a level playing field," and "remov[ing] barriers to participation" for disadvantaged business enterprises seeking to compete for funds awarded through DOT contracts. 49 C.F.R. § 26.1. The program is a partnership between the federal government and DOT funding recipients to set participation goals for the number of "socially and economically disadvantaged" small businesses who receive federal contracting dollars. *See* 49 C.F.R. §§ 26.41, 26.5. By statute, recipients should aspire to ensure that "not less than 10 percent" of federal funds are directed towards DBEs. IIJA § 11101(e)(3); 49 C.F.R. § 26.41. The statutory and regulatory scheme defines DBEs as those small businesses that are 51 percent (or more) owned,

---

[1] *See, e.g.*, Infrastructure Investment and Jobs Act , Pub. L. 117–58, 135 Stat. 429 (2021).

and which are managed, by individuals who are both "socially and economically disadvantaged." 49 C.F.R. § 26.5; IIJA § 11101(e)(2)(b). Any otherwise qualified small business can be found to be socially and economically disadvantaged based on its owners' unique experiences and circumstances. 49 C.F.R. § 26.67(d). The program also provides that companies owned by members of certain demographic groups are "presumed" socially and economically disadvantaged. 49 C.F.R. § 26.67(a); IIJA § 11101(e)(2)(b).[2] This presumption is no guarantee: the regulation sets forth a process by which certifiers can investigate and rebut this presumption. 49 C.F.R. § 26.67(b)-(c).

The participation goals set through the DBE program are not created in a vacuum; the goals may consider the availability of DBE firms in a particular market, goals of a similar DOT recipient, and other customizable local market factors. *See* 49 C.F.R. § 26.45(c)–(d). Moreover, the DBE program's statutory 10% goal is merely aspirational, 49 C.F.R. § 26.41(b). Contract goals, as distinct from overall aspirational goals, must be set on a contract-by-contract basis, may not simply rely on the overall aspirational goal, must be based on the specifics of the contract and the local availability of DBEs, 49 C.F.R. §26.51(e), and a contract recipient cannot be penalized for failing to meet a stated participation goal unless it did not act in good faith. 49 C.F.R. § 26.47(a). The program bars the use of quotas, 49 C.F.R. § 26.43(a),[3] and requires funding recipients to pursue race-neutral means to reach DBE goals to the extent possible. 49 C.F.R. § 26.51(d). Further, the program includes a mechanism to ensure that overconcentration of DBE

---

[2] These groups include people who identify as women, Black American, Hispanic American, Native American, Asian Pacific American, Subcontinent Asian American, or other groups identified by the Small Business Administration.

[3] Likewise, contracts cannot be "set aside" for DBEs, except in "limited and extreme circumstances" where "no other method could be reasonably expected to redress egregious instances of discrimination." 49 C.F.R. § 26.43(b).

firms does not deny non-DBE businesses to participate in a particular sector or region. 49 C.F.R. § 26.33.

Congress has repeatedly recognized the need for the DOT DBE program as a means of remedying decades of consistent explicit and implicit discrimination against women and people who are members of particular racial or ethnic groups. Despite progress towards breaking down barriers, Congress reiterated the need for the DOT DBE program in 2021:

> [D]iscrimination and related barriers continue to pose significant obstacles for minority- and women-owned businesses seeking to do business in Federally assisted surface transportation markets across the United States; the continuing barriers . . . merit the continuation of the disadvantaged business enterprise program; Congress has received and reviewed testimony and documentation of race and gender discrimination from numerous sources, . . . which show that race- and gender-neutral efforts alone are insufficient to address the problem; the testimony and documentation . . . demonstrate that discrimination across the United States poses a barrier to full and fair participation in surface transportation-related businesses of women business owners and minority business owners and has impacted firm development and many aspects of surface transportation-related business in the public and private markets; and . . . provide a strong basis that there is a compelling need for the continuation of the disadvantaged business enterprise program to address race and gender discrimination in surface transportation-related business.

IIJA § 11101(e) (subdivisions omitted).

Intervenor DBEs have experienced the need for this program at a personal level.

NAMC is a nonprofit trade association with a mission to "train minority contractors on how to pursue government contracting and advocate for their access to these business opportunities." Stemley Decl. (Ex. A) ¶ 1. NAMC was founded in 1964, and currently has 22 chapters across the country and approximately 3,500 members nationwide. *Id.* ¶¶ 2, 5. NAMC members face explicit racism and discrimination "all the time," due in large part to a "pervasive" "good old boys network" that includes big companies, big prime contractors, banks, and the government itself. *Id.* ¶¶ 11, 16-17, 19. For example, there is a practice where bonding or

insurance companies rely on "Good Guy Letters" to vouch for a favored subcontractor, allowing them to have their bond requirements waived—a privilege generally not afforded to minority-owned subcontractors, including NAMC members. *Id.* ¶¶ 14, 16. NAMC's members have already felt the impact of this case through a slow-down in DBE contracts. *Id.* ¶ 43. And this slow-down is critical: the DBE program "helps firms get a foot in the door, which has not been possible because of the decades of discrimination from prime contractors, banks, businesses, and the government." *Id.* ¶ 40. "Even with the DBE Program, these forms of discrimination are still happening regularly. The DBE Program is just one small way that some minority- and women-owned firms can have access to the same contracting dollars that the white-owned firms can access." *Id.* That is still a "very small percentage of federal contracting dollars," as "[f]irms owned by white men still account for 90% of th[ose] dollars." *Id.* ¶ 39.

Women First is a nonpartisan grassroots organization advocating for women-owned DBEs; it has fifteen women serving as Trustee Board members who own DBE-certified businesses, as well as other members, which can be certified DBEs, associations, corporate sponsors, or other organizations. Payne Decl. (Ex. B) ¶¶ 2-4. Women First's "primary mission . . . is to protect the DBE Program and DBE status for thousands of women-owned businesses across the country." *Id.* ¶ 9. It effectuates this mission through sharing information with its members and the public, and by advocating in Congress and with the Executive Branch. *Id.* Women First has found that "[t]he DBE Program is a literal lifeline to countless women business owners": its leaders have repeatedly "heard women say that without this program, they would never get a chance and their business would fail" because "[t]he discrimination that women owned businesses face is that strong"—including from the DOT engineers themselves. *Id.* ¶¶ 16, 18. Women First has found that when there is no DBE goal on a project, women are explicitly

told not to submit a bid. *Id.* ¶ 19. And when a DBE loses its certification, they often lose half of their business in the next year, and go out of business entirely the year after. *Id.* ¶ 20. In Women First's experience, without the DOT DBE program, "women are completely locked out." *Id.* ¶ 26.

AMAC is a 501(c)(6) trade membership organization of approximately 900 members. Wimbush Decl. (Ex. C) ¶¶ 2, 6. The organization was founded in 1998 "to help provide a unified voice for DBEs and actively work to address economic disparities, discrimination and their negative consequences," particularly within the airport and transportation industries. *Id.*. ¶¶ 2-3. AMAC has found that the DBE program is "vital" to its members because it "ensures access to contracting opportunities that would otherwise remain out of reach due to discriminatory barriers." *Id.* ¶ 13. In AMAC's experience, "without a program like the DBE program, prime contractors, who are mostly white-owned companies, would not subcontract to minority companies-—unless they are forced to make good faith efforts." *Id.* ¶ 15. As one of AMAC's members explained, "where there are no DBE goals, there is no participation." Daniels (Ex. D) Decl. ¶ 10. In part, this is because "[t]ypically, minority-owned businesses don't start with strong business relationships, which might go back through families for generations, so they don't get the contracts"—because "[b]y definition, minority- and women-owned firms are newcomers." *Id.* ¶ 12. In other words, "[m]inority firms are constantly playing catch up." Ex. C ¶ 30. "AMAC members have witnessed contractors admit publicly that without the DBE program, they wouldn't include minority contractors because they had already established relationships with their own team." *Id.* ¶ 32. When AMAC members are offered opportunities, they often face "artificial impediments," including not hearing about opportunities as early as white-owned firms (and thus having less time to prepare a bid), and if a bid is accepted, having the scope of work

"suddenly change[]," knowing that "[i]f they report, they risk not being paid." *Id.* ¶¶ 23-33. As a result, "[t]he preliminary injunction in this case has created a dire situation for DBEs operating in the affected states," including "a loss of competitive edge, financial instability, [and] discouragement of investment." *Id.* ¶ 40.

WCOE is a 501(c)(6) trade association that has advocated for women-owned construction companies since 1983. Minaghan Decl. (Ex. E) ¶ 2. Their leaders have experienced "bully[ing] and intimidat[ion]" as women-owned DBEs, *id.* ¶ 11, including payment delays, *id.* ¶ 10; Kern Decl. (Ex. F) ¶ 10, obvious discrimination, Ex. E ¶¶ 12-13, and lack of access to credit, *id.* ¶¶ 18-23; Ex. F ¶ 8. WCOE has noted that if a job doesn't have a DBE goal, the "big primes just don't call you at all." Ex. E ¶ 27. As one Women First and WCOE member explained, "[i]t's well-known that minority and women-owned businesses get no opportunities in the private contractor space, where there are no DBE goals." Ex. F ¶ 13. When that member tried to give quotes for two different jobs, the person receiving quotes told her that she only needed them on the contract with DBE goals, and not the other. *Id.* WCOE believes that "[w]ithout the DBE program and other programs like it, women-owned businesses will be crushed out of existence." Ex. E ¶ 29. Indeed, the preliminary injunction in place in this case has led DBEs to lose $11,000,000 of opportunity in Illinois, in December alone. *Id.* ¶ 30.

AMC-Civil is a minority-owned full-service heavy civil construction company that specializes in heavy civil, marine, and industrial demolition. Canty Decl. (Ex. G) ¶¶ 2-5. It is 100% owned by a Black man, and is DBE-certified in six states and the District of Columbia. *Id.* ¶¶ 5, 8. AMC-Civil's owner has found that the DBE program "has been an essential element of business development" that, despite its flaws, "gives us a fighting chance to compete." *Id.* ¶ 15. In his experience, many of the largest construction companies are multi-generational, and were

8

started and grew at a time when minorities did not even have a chance to compete: now, they are "so enormous that they control just about everything." *Id.* ¶¶16-18. In AMC-Civil's experience, "most big primes would never work with small, minority-owned firms if it were not for the DBE program and other programs like it." *Id.* ¶ 16. AMC-Civil's owner has experienced significant racial discrimination over the course of his career. *Id.* ¶¶ 22-62. For example, "[t]here was just a sense of disbelief among some of the officials I encountered that a Black man could own a heavy construction company." *Id.* ¶ 36, "[E]ven the South Carolina DOT official who worked on certification—and who was Black himself—put [the owner] through extra scrutiny." *Id.*

Upstate Steel is a woman-owned business that sells and distributes steel and fabricates metal for structural application, such as in roads and bridges. Chmielowiec Decl. (Ex. H) ¶¶ 4-6. Upstate Steel is DBE-certified in five states. *Id.* ¶ 6. As a woman, Upstate Steel's president and primary owner "often face[s] the impossible choice between accepting the sexism and harassment to maintain business relationships and standing up for [her]self but having [her] business suffer as a result." *Id.* ¶ 10. For example, she is "regularly harassed or facing unwanted sexual advances" from suppliers and customers. *Id.* ¶¶ 13-20. And the "doubt and discrimination" she faces comes not only from private companies, but also "from the government directly too." *Id.* ¶ 23. For example, New York denied Upstate Steel's women-owned business designation based on an assumption that the owner was not truly running the business—and only reinstated that designation after the owner brought her story to the news media. *Id.* Losing its certification cost Upstate Steel more than $3,000,000 per year. *Id.*

But on its first day in office, the new Presidential administration started the process of ceasing to defend the program on which Intervenor DBEs rely. On January 20, 2025, the President issued an executive order describing diversity, equity, and inclusion programs as

9

"illegal and immoral discrimination programs." Jan. 20 EO Sec. 1. The EO directs the Attorney

General to assist in "coordinat[ing] the termination of all discriminatory programs, including

illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies,

programs, preferences, and activities in the Federal Government *under whatever name they*

*appear*." Jan. 20 EO Sec. 2(a) (emphasis added). The EO further orders "[e]ach agency,

department, or commission head, in consultation with the Attorney General" and others" to,

within sixty days, "terminate, to the maximum extent allowed by law, . . . all 'equity-related'

grants or contracts" as well as "all DEI or DEIA performance requirements for employees,

contractors, or grantees." Jan. 20 EO Sec. 2(b)(i). And the EO orders deputy agency and

department heads to "recommend actions, such as Congressional notifications under 28 U.S.C.

530D, to align agency or department programs, activities, contracts (including set-asides), grants,

consent orders, and litigating positions with the policy of equal dignity and respect" identified in

the EO–in other words, to complete the necessary predicate to changing the government's

litigating position in this very lawsuit. Jan. 20 EO Sec. 2(b)(iii)(B); *see also id.* Sec. 2(c)(i)

(requiring the Assistant to the President for Domestic Policy to convene a monthly meeting to

"hear reports on the prevalence and the economic and social costs of DEI, DEIA, and

'environmental justice' in agency or department programs, activities, policies, regulations,

guidance, employment practices, enforcement activities, contracts (including set-asides), grants,

consent orders, and litigating positions").

The very next day, the new administration doubled down: on January 21, 2025, the

President issued another executive order describing "diversity, equity, and inclusion" or

"diversity, equity, inclusion, and accessibility" policies as "an unlawful, corrosive, and

pernicious identity-based spoils system." Jan. 21 EO Sec. 1. The President "therefore order[ed]

all executive departments and agencies (agencies) to terminate all discriminatory and illegal preferences, mandates, policies, programs, activities, guidance, regulations, enforcement actions, consent orders, and requirements." *Id.* Sec. 2.[4] As to federal contracting specifically, the President ordered that the Office of Federal Contract Compliance Programs "shall immediately cease . . . [a]llowing or encouraging Federal contractors and subcontractors to engage in workforce balancing based on race, color, sex, sexual preference, religion, or national origin." *Id.* Sec. 3(b)(ii)(C). And the President further ordered that "the employment, procurement, and contracting practices of Federal contractors and subcontractors shall not consider race, color, sex, sexual preference, religion, or national origin in ways that violate the Nation's civil rights laws." *Id.* Sec. 3(b)(iii). Thus, every Federal contract or award must include "[a] term requiring such counterparty or recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." *Id.* Sec. 3(b)(iv)(B). Further, the Attorney General is directed to assist the Office of Management and Budget, as requested, in "[t]erminat[ing] all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate." *Id.* Sec. 3(c)(iii).

## PROCEDURAL BACKGROUND

On October 26, 2023, Plaintiffs Mid-America Milling, LLC & Bagshaw Trucking Inc. brought this challenge, seeking to end the Department of Transportation's Disadvantaged Business Enterprise program. Compl., ECF No. 1. Plaintiffs allege that the program violates equal protection and fails to meet the requisite level of scrutiny. In particular, Plaintiffs object to

---

[4] Although Intervenor DBEs strongly contest the notion that the DOT DBE program is illegal or discriminatory in any way, the Executive Orders' statements concerning equity are consistent with Plaintiffs' theory of the case here.

the framework for identifying socially and economically disadvantaged individuals as set forth in Sections 11101(e)(2) and (3) of the Infrastructure Act, and specifically take issue with Congress's mandate that women and people who are members of certain racial minorities are presumed to be socially and economically disadvantaged. Compl. ¶ 52. Plaintiffs also argue that DOT, through its regulatory scheme implementing the DBE program, violates the Administrative Procedure Act ("APA"). Compl. ¶¶ 54-58.

Plaintiffs filed a motion for preliminary injunction on December 15, 2023, seeking to completely halt the DBE Program's participation goals, as well as the framework for identifying socially and economically disadvantaged businesses. Pls.' Mot. Prelim. Inj. 1, ECF No. 27. On January 16, 2024, the Department of Transportation moved to dismiss the case, citing a failure to state a claim, a lack of standing, failure to join an indispensable party (state and local agencies that apply the framework), and that the APA claim failed by being derivative of the equal protection claim and untimely. Defs.' Mot. to Dismiss, ECF No. 31. DOT opposed the motion for preliminary injunction on January 26, 2024. Resp. Opp'n Pls.' Mot. Prelim. Inj., ECF No. 32. In their opposition, the Department noted that, even were this Court to grant an injunction, it should decline to enter the sweeping nationwide injunction that Plaintiffs sought. *Id*. at 25.

On September 23, 2024, this Court granted the motion for preliminary injunction and denied the motion to dismiss, enjoining the Department of Transportation from "mandating the use of race- and-gender-based rebuttable presumptions" in certain DOT contracts. Op. & Order 27, ECF No. 44. The Court rejected MAMCO and Bagshaw's request for a nationwide injunction, instead carefully limiting the scope of the injunction to only those contracts impacted by DBE goals where the Plaintiffs had submitted a bid. *Id.* at 25, 27. Following a motion by the Plaintiffs, Pls.' Mot. Clarify Scope, ECF No. 46, and opposition by DOT, Defs.' Opp'n Pls.'

Mot. Clarify Scope, ECF No. 48, the Court clarified that its injunction barred DOT from mandating the use of the rebuttable presumptions for contracts impacted by DBE goals where the Plaintiffs bid, "to be effective in any state in which Plaintiffs operate or bid on such contracts." Op. & Order 8 ECF No. 50. The Court once again reiterated that it would limit relief to the Plaintiffs so as not to "short-circuit the judicial process." *Id.* at 5.

DOT answered the complaint on October 7, 2024. Answer, ECF No. 45. The parties filed their Rule 26(f) plan on December 6, 2024, Joint Proposed Disc. Plan, ECF No. 51, and on December 12, 2024, the Court adopted that plan and issued a scheduling order. Scheduling Order, ECF No. 52. Under the terms of that scheduling order, discovery remains in early stages: months remain in fact discovery, and even the initial deadline for written discovery has not yet passed. *See id.*

On January 1, 2025, Central Seal Company and Charbon Contracting, LLC moved to intervene as plaintiffs, seeking to expand the preliminary injunction. Mot. to Intervene 14, ECF No. 53. That motion remains pending.

## ARGUMENT

Intervenor DBEs meet all four requirements for mandatory intervention under Federal Rule of Civil Procedure 24(a) and should be allowed to intervene as a matter of right. In the alternative, permissive intervention is appropriate here under Federal Rule of Civil Procedure 24(b) given common questions of law and fact, and because intervention is timely and not prejudicial.

### I.    Intervenor DBEs Are Entitled to Intervention as of Right

Federal Rule of Civil Procedure 24(a) requires a district court to allow intervention where the party seeking to intervene "claims an interest relating to the property or transaction that is the

subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2). Proposed intervenors are entitled to mandatory intervention under Rule 24(a) where they meet each of four factors: (1) the application to intervene is timely; (2) the proposed intervenor has a "substantial legal interest" in the case; (3) absent intervention, the outcome of the case may impair the proposed intervenor's ability to protect that interest; and (4) the proposed intervenor's interest will not be adequately represented by the existing parties. *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1245 (6th Cir. 1997) (citation omitted).

Each of the four factors for mandatory intervention are met here.

### A. Intervenor DBEs' motion is timely

Whether a motion to intervene is timely is determined based on "all the circumstances" of a case. *Nat'l Ass'n for the Advancement of Colored People v. New York*, 413 U.S. 345, 366 (1973). In the Sixth Circuit, courts evaluating timeliness consider:

> (1) the point to which the suit has progressed; (2) the purpose for which intervention is sought; (3) the length of time preceding the application during which the proposed intervenors knew or should have known of their interest in the case; (4) the prejudice to the original parties due to the proposed intervenors' failure to promptly intervene after they knew or reasonably should have known of their interest in the case; and (5) the existence of unusual circumstances militating against or in favor of intervention.

*Jansen v. City of Cincinnati*, 904 F.2d 336, 340 (6th Cir. 1990) (citation omitted); *see also NAACP*, 413 U.S. at 365-66 ("Although the point to which the suit has progressed is one factor in the determination of timeliness, it is not solely dispositive."). Each of the factors here weighs in favor of timeliness.

First, the litigation is still in its early stages: the written discovery deadline has not yet

14

passed, months remain in fact and expert discovery, and a trial on the merits remains more than a year away. ECF No. 52. Finding timeliness here, where the suit has barely waded into fact discovery, is consistent with the approach of other courts in this circuit. *See, e.g. Equal Emp. Opportunity Comm'n v. SFI of Tenn.*, No. 14-cv-02740, 2016 WL 8312159, at *2 (W.D. Tenn. Mar. 9, 2016) (finding that the "early stage of litigation counsels in favor of timeliness" where more than 17 months had passed from the filing of the case but deadlines for written discovery and depositions had not yet passed); *Equal Emp. Opportunity Comm'n v. Spitzer Mgmt., Inc.*, No. 6-cv-02337, 2009 WL 10690282, at *2 (N.D. Ohio Feb. 24, 2009) (finding a motion timely where it had "not progressed significantly, as discovery is not complete, no dispos[i]tive motions have been filed, and trial is not scheduled for eight more months"); *cf. Jansen*, 904 F.2d at 340-41 (finding an intervention motion timely where "only half of the 12 month discovery period had elapsed"). Indeed, this case is far afield from the "limited circumstances" in which the Sixth Circuit has affirmed orders denying intervention. *Davis v. Lifetime Cap., Inc.*, 560 F. App'x 477, 490 (6th Cir. 2014); *see also, e.g.*, *Stupak-Thrall v. Glickman*, 226 F.3d 467, 475 (6th Cir. 2000) (finding intervention untimely nearly five months after the court entered a scheduling order expediting the case, more than two months after the close of discovery, more than a month after disclosure of experts and other witnesses, where the dispositive motion deadline was merely a month away, and where the "finish line" was fast approaching).

Regarding the second factor, courts "evaluate the purpose of intervention in terms of the importance of the legal interests asserted." *Davis*, 560 F. App'x at 491 (internal quotation marks and citation omitted). For example, "[i]f a third party seeks merely an opportunity to present an argument or expertise, participation as an *amicus curiae* may adequately protect its interests." *Id.* (citation omitted). But here, Intervenor DBEs do not merely seek to share their perspective: they

"seek[] to protect [their] existence." *Blount-Hill v. Zelman*, 636 F.3d 278, 285 (6th Cir. 2011). As set forth more fully in the discussion of Intervenor DBEs' substantial interest below, Intervenor DBEs have a strong interest in preserving the DOT DBE program in order to mitigate the pervasive discrimination that they and the members they represent confront in seeking to access federal transportation contracts. *See* Ex. A ¶¶ 11-19, 36-45; Ex. B ¶¶ 16-26; Ex. C ¶¶ 13-41; Ex. E ¶¶ 7-24; Ex. G ¶¶ 35-67; Ex. H ¶¶ 9-23, 26-27; Ex. F ¶¶ 13-17, 23; Ex. D ¶¶ 8-12, 29-38, 42. Should Plaintiffs prevail, Intervenor DBEs will lose that opportunity, resulting in significant financial harm, dignitary harm, and harm to their missions. And because the federal government has demonstrated that it may not defend this lawsuit going forward, Intervenor DBEs will not merely add a voice to the chorus of defense, but will fill a critical role by providing an adequate defense of a program that has been understood to be constitutional for 42 years.

Third, the duration between the time Intervenor DBEs learned of the need to intervene and this motion also weighs in their favor. "Until recently, [Intervenor DBEs] had no reason to question whether the [federal government] would continue to adequately represent [their] interests." *Equal Emp. Opportunity Comm'n v. R.G. & G.R. Harris Funeral Homes, Inc.*, No. 16-2424, 2017 WL 10350992, at *1 (6th Cir. Mar. 27, 2017). And "it was not until there was reason to believe their interests were not being adequately represented . . . that they would have been alerted to the need to seek intervention." *Midwest Realty Mgmt. Co. v. City of Beavercreek*, 93 F. App'x 782, 787-88 (6th Cir. 2004) (citing *Jansen*, 904 F.2d at 341). Indeed, prior to the issuance of the executive order, DOT, represented by the Department of Justice, put forth a robust defense of the program.

Upon learning that they may not be adequately represented in this litigation, Intervenor DBEs moved promptly to defend their rights. The first clear indication that the incoming

administration would limit its defense of the DOT DBE program came on January 20, 2025, when the President issued an executive order ordering all agencies and departments to recommend actions—including Congressional notifications under 28 U.S.C. § 530D—to align litigating positions with the order's policy of ending federal initiatives, grants, and programs that promote equity. Jan. 20 EO Sec. 1, 2(b)(iii)(B). This order specifically encompasses "all 'equity-related' grants or contracts." *Id.* Sec. 2(b)(i). The intention of this order was further clarified when, on January 21, 2025, the new administration issued another executive order requiring the Attorney General to assist in "[t]erminat[ing] all programs and activities "'advancing equity'" and prohibiting federal contractors and subcontractors from "engag[ing] in workforce balancing based on race, color, sex, sexual preference, religion, or national origin." Jan. 21 EO Sec. 3(b)(ii)(C), (c)(3). Intervenor DBEs filed this motion the very same week. *See Jansen*, 904 F.2d at 340-41 (finding a motion timely where "[a]pproximately two weeks elapsed between the time in which the proposed intervenors learned of their need to intervene and when they filed their motion to intervene"). "Certainly, this short period does not support a finding of undue delay." *Id*. at 341; *see also R.G. & G.R. Harris Funeral Homes*, 2017 WL 10350992, at *1 (finding motion to intervene timely, "if not premature," based on the actions of an incoming administration that "impl[ied] that the new administration" may take a different position in the litigation). Rather Intervenor DBEs have "proceeded with haste from the time that they became aware that the [government's] interest differed from their interest." *Jansen*, 904 F.2d at 341.[5]

---

[5] Intervention before the issuance of the executive orders would have been premature. Intervention based on an administration change requires both a change in administration *and* a substantive change in position. *See, e.g.*, *Carpenters Indus. Council v. Zinke*, 2018 WL 11424768 at *3 (D.D.C. Mar. 28, 2018) (denying as not "necessary at this point" intervention based on administration change without indication of change in policy position). And, in any event, intervention before the inauguration was unnecessary because the government would not be expected to act upon this changed policy position until after the change in administration. *See*

The fourth factor, prejudice to the existing parties, likewise weighs in favor of timeliness. "For the purpose of determining whether an application for intervention is timely, the relevant issue is not how much prejudice would result from allowing intervention, but rather how much prejudice would result from the would-be intervenor's failure to request intervention as soon as he knew or should have known of his interest in the case." *Stallworth v. Monsanto Co.*, 558 F.2d 257, 267 (5th Cir. 1977); *see also United States v. Detroit*, 712 F.3d 925, 933 (6th Cir. 2013) ("[T]he analysis [on prejudice as an element of timeliness] must be limited to the prejudice caused by the *untimeliness*, not the intervention itself.") (citing *Stallworth*, 558 F.2d at 267) (emphasis in original). Here, there is no prejudice caused by delay because Intervenor DBEs did not delay at all. Rather, they "filed their motion to intervene as soon as they realized that their interest was not protected." *See Jansen*, 904 F.2d at 341.

Moreover, Intervenor DBEs moved swiftly in a specific effort to avoid prejudicing the parties by seeking to preserve the existing discovery schedule. *See* ECF No. 52[6]; *see also Jansen*, 904 F.2d at 341 (finding no prejudice to original parties where the intervening party sought to file opposition to summary judgment within the existing schedule, which prevented delay). If allowed to intervene, Intervenor DBEs "would address the same issues Defendant must confront," are "not attempting to inject wholly unseen, unnecessary, or irrelevant issues into this litigation," and "attempt[] no more than to become a defendant and litigate the claims Plaintiffs have currently presented." *Priorities USA v. Benson*, 448 F. Supp. 3d 755, 765 (E.D. Mich.

---

*also, e.g.*, *Davis*, 560 F. App'x at 493 ("A court cannot squeeze a proposed intervenor from both ends by first ruling a motion to intervene premature and then ruling a second motion to intervene too late.") (citing *Grubbs v. Norris*, 870 F. 2d 343, 346 (6th Cir. 1989)).

[6] Intervenor DBEs are aware of the deadlines in the Scheduling Order and will make every effort to serve written discovery requests by the existing deadline, should the Court grant their motion. Recognizing that the deadline for Rule 26 initial disclosures has passed, Intervenor DBEs will make every effort to serve such disclosures within two weeks of the Court granting intervention.

2020). Thus, no prejudice will result to the existing parties if Intervenor DBEs are allowed to participate as a party in this case.

The final timeliness factor, the existence of unusual circumstances counseling for or against intervention, also weighs heavily in favor of timeliness here. This Circuit "does not have an established list of additional factors that it considers in every timeliness analysis." *Davis*, 560 F. App'x at 494. Nonetheless, "it is important for the court to hear" from an intervening party that has a unique and relevant perspective, particularly where the outcome of the case may have a far-reaching impact. *See Priorities USA*, 448 F. Supp. at 766 (finding "other relevant factors" weigh in favor of intervention where the proposed intervenor argued that the original defendant would not "fully and adequately defend" the challenged law and may even "abandon her role as an adversarial party" (citation omitted)). Moreover, "[i]t is not error for a court to consider the total balance of the timeliness factors under this prong." *Davis*, 560 F. App'x at 494. Here, as each of the other factors weighs in favor of timeliness, the overall balance favors intervention.

### B. Intervenor DBEs have substantial interests in the DOT DBE program's rebuttable presumption

Intervenor DBEs meet Rule 24(a)'s interest requirement because they have "a direct and substantial interest in the litigation" that is "significantly protectable." *Grubbs*, 870 F.2d at 346. In this Circuit, courts analyze this prong with "a rather expansive notion of the interest sufficient to invoke intervention of right." *Michigan State AFL-CIO*, 103 F.3d at 1245 (citations omitted). Thus, the substantial interest requirement is less stringent than the test for Article III standing. *Providence Baptist Church v. Hillandale Comm., Ltd*, 425 F.3d 309, 315 (6th Cir. 2005), and the inquiry is "necessarily fact-specific," *Michigan State AFL-CIO*, 103 F.3d at 1245. Here, the Intervenor DBEs—DBEs that currently bid for contracts under and benefit from the DOT DBE program, and the organizations that represent them—have a strong interest in preserving that

program in order to mitigate the pervasive discrimination that they confront in seeking to access federal transportation contracts. *See* Ex. A ¶¶ 11-19, 36-45; Ex. B ¶¶ 16-26; Ex. C ¶¶ 13-41; Ex. E ¶¶ 24-29; Ex. G ¶¶ 35-67; Ex. H ¶¶ 9-23, 26-27; Ex. F ¶¶ 13-17, 23; Ex. D ¶¶ 8-12, 29-38, 42. Their livelihoods are at stake. *See* Ex. A ¶¶ 38-40, 43-44; Ex. B ¶¶ 16, 20-30; Ex. C ¶ 40; Ex. E ¶¶ 24, 29, 31; Ex. G ¶¶ 15-16, 19, 64-67; Ex. H ¶ 23-24; Ex. F ¶ 23; Ex. D ¶ 9. These are precisely the type of direct, substantial, and legally protectable interests contemplated by Rule 24(a). *See, e.g.*, *Jansen*, 904 F.2d at 341 (finding Black firefighters had a substantial interest to intervene in litigation targeting their city's hiring and promotion practices); *Bradley v. Milliken*, 828 F.2d 1186, 1192 (6th Cir. 1987) (recognizing that it "has generally been accepted" that "preserving particular remedial components" of desegregation efforts will implicate a "sufficient interest" for parents of schoolchildren); *Grutter v. Bollinger*, 188 F.3d 394, 398 (6th Cir. 1999) (finding "a substantial legal interest in educational opportunity, which requires preserving access to the University for African-American and Latino/a students and preventing a decline in [their] enrollment").[7] And this litigation directly threatens those interests. *See, e.g.*, Compl. ¶ 10 (seeking to "end[] the DBE program once and for all"); Mot. Prelim. Inj. at 1 (moving for "a preliminary injunction prohibiting Defendants from implementing or enforcing the DBE Program's race and gender presumptions and DBE participation goal").

Moreover, Intervenor DBEs and their members were actively involved in advocating for the creation and continuance of the DOT DBE program. *See, e.g.*, Ex. A ¶¶ 5, 41; Ex. B ¶¶ 8-10,

---

[7] Although Intervenor DBEs need not meet the test for Article III standing at this stage, they plainly do. Intervenor DBEs NAMC, WCOE, and AMAC assert standing on behalf of their members. *See Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 540 (6th Cir. 2004) (describing representational standing). Women First argues that it suffers an injury itself. *See id.* at 544. And AMC-Civil and Upstate Steel meet the traditional injury-in-fact, causation, and redressability requirements for Article III standing in their own right.

13-14; Ex. C ¶¶ 11-12; Ex. F ¶¶ 18, 20; Ex. G ¶ 20; Ex. D ¶ 13. Their history of legislative, administrative, and policy advocacy gives rise to a separate cognizable direct and substantial interest in advancing their advocacy goals. *See, e.g.*, *Michigan State AFL-CIO*, 103 F.3d at 1245-47. For instance, in *Michigan State AFL-CIO,* this Circuit held that the Chamber of Commerce had a substantial legal interest in litigation that challenged provisions of Michigan's Campaign Finance Act. The Act had long been a legislative and litigation focus for the Chamber. Analogizing to out-of-Circuit cases, the Sixth Circuit found that the Chamber's past advocacy on a statutory scheme that regulated its rights gave rise to a legal interest sufficient to support intervention. Like the intervenor Chamber of Commerce in *Michigan State AFL-CIO*, the group of Intervenor DBEs (or the members they represent) are "a vital participant in the political process that resulted in legislative adoption of the [DOT DBE program] in the first place," *Michigan State AFL-CIO*, 103 F.3d at 1247; *see also* Ex. A ¶ 5; Ex. B ¶ 8, "a significant party which is adverse to the [plaintiffs] in the political process surrounding [the DOT DBE program]," 103 F.3d at 1247; *see also* Ex. A ¶¶ 5, 41; Ex. B ¶¶ 9-10; Ex. C ¶¶ 11-12; Ex. G ¶ 20; Ex. F ¶¶ 18, 20,  and "an entity also regulated by [the] statutory provisions challenged by the plaintiffs," 103 F.3d at 1247; *see also* Ex. G ¶ 8; Ex. H ¶ 6; Ex. A ¶ 25; Ex. F ¶ 5; Ex. D ¶ 7; moreover, like the Chamber, at least one member represented by an Intervenor DBE has previously participated in litigation related to DBE programs, *see* Ex. A ¶ 34; *see also* 103 F.3d at 1247.

Finally, although Intervenor DBEs' interests are clear, even "close cases should be resolved in favor of recognizing an interest under Rule 24(a)." 103 F.3d at 1247.

### C.  The outcome of this case may impair and impede Intervenor DBEs' ability to protect their interests

"To satisfy this element of the intervention test, [Intervenor DBEs] must show only that

impairment of [their] substantial legal interest is possible if intervention is denied." *Michigan AFL-CIO*, 103 F.3d at 1247. In other words, Intervenor DBEs need not demonstrate that "substantial impairment of their interest" will result from an unfavorable disposition, nor that impairment is inevitable—simply that it "may" occur. *Purnell*, 925 F.2d at 948. "This burden is minimal," and Intervenors readily clear it. *Michigan AFL-CIO*, 103 F.3d at 1247.

Intervenor DBEs are themselves (or represent as members) the very entities that are the victims of discrimination intended to be addressed by the statute and regulations being challenged here. Disposition of this case in favor of the plaintiffs would impair Intervenor DBEs' interest in preserving their opportunity to mitigate the discrimination that inhibits their ability to access funds made available through federal contracts. *See Bradley*, 828 F.2d at 1192 (recognizing that disposition of a school desegregation case may impair the rights of parents of schoolchildren). If the Court grants the relief that plaintiffs seek, declaring unconstitutional the DOT DBE program's presumptions, Intervenor DBEs and the members they represent will no longer be able to access contracts within the transportation sector. *See, e.g.*, Ex. A ¶¶ 38, 40; Ex. E ¶¶ 24, 26; Ex. B ¶¶ 16, 26; Ex. C ¶ 40; Ex. F ¶ 23; Ex. G ¶ 65; Ex. D ¶¶ 9-12.

### D.  The existing parties cannot adequately protect Intervenor DBEs' interests

President Trump's recent executive orders demonstrate that Defendants may not sufficiently defend Intervenor DBEs' interest in this litigation. Indeed, Plaintiffs have already admitted it. *See* Pls.' Br. Opp'n Mot. Intervene, ECF No. 55, at 2 n.2 (opposing the intervention efforts of additional proposed plaintiffs).

Intervenor DBEs carry only a "minimal" burden to show that their interests "may" not be adequately represented by the existing parties to this litigation; they are "not required to show that the representation will in fact be inadequate." *Michigan State AFL-CIO*, 103 F.3d at 1247

(internal quotation marks and citations omitted); *Grutter*, 188 F.3d at 400-01 ("The proposed intervenors need show only that there is a *potential* for inadequate representation." (emphasis in original)).[8] Although there is a presumption of adequate representation where proposed intervenors have "the same ultimate objective" as an existing party, *Jansen*, 904 F.2d at 343, that presumption may be overcome. "For example, it may be enough to show that the existing party who purports to seek the same outcome will not make all of the prospective intervenor's arguments." *Michigan AFL-CIO*, 103 F.3d at 1247. Similarly, evidence of inadequacy has been found to exist where "the defendant has an incentive to disregard possible defenses that the applicant would like to present." *Blount-Hill v. Bd. of Educ. of Ohio*, 195 Fed. App'x 482, at 489 (Clay, J., concurring) (citing *Grutter*, 188 F.3d at 400). Likewise, where a putative intervenor's interests "potentially diverge" from the interests of the party who seemingly seek the same outcome, the Circuit has found sufficient evidence of inadequacy because they do not in fact have "the same ultimate objective." *See, e.g.*, *Northeast Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell*, 467 F.3d 999, 1008 (6th Cir. 2006) (contrasting an intervenor's "primary interest" in "ensuring the smooth administration" of a government function with the defendant's "independent interest in defending the validity of [] law and ensuring that those laws are enforced"); *see also, e.g.*, *Ctr. for Biological Diversity v. Rural Util. Srv.*, No. 5:08-292-JMH, 2008 WL 4186891 (E.D. Ky. Sept. 10, 2008) (finding inadequacy where the federal agency's "obligation is to uphold the administration of [a legally authorized] program, [but proposed intervenor]'s obligation is to provide" a consumer service).

Here, as discussed above, recent statements from the Executive Branch suggest that it

---

[8] That the government is a party has no bearing: this Circuit "has declined to endorse a higher standard for inadequacy when a governmental entity is involved." *Grutter,* 188 F.3d at 400.

may not continue to defend the DOT DBE program—which would necessarily be an inadequate representation. *See* Jan. 20 EO Sec. 2(b)(iii)(B), (c)(1) (requiring agencies to recommend changing litigating positions to comply with the order to cease using equity initiatives in contracts, grants, and other government initiatives). Moreover, Intervenor DBEs expect to put forward evidence of discrimination by the government itself. Defendants are unlikely to highlight this evidence. *See, e.g.*, *Grutter*, 188 F.3d at 401 ("find[ing] persuasive" proposed intervenors' argument that the public university was "unlikely to present evidence of past discrimination by the University itself . . . , and that these may be important and relevant factors" in evaluating the constitutionality of the case).

## II.    Alternatively, This Court Should Grant Permissive Intervention

Should the Court conclude that Intervenor DBEs may not intervene as of right, Intervenor DBEs should nevertheless be permitted to intervene under Federal Rule of Civil Procedure 24(b). Permissive intervention requires proposed intervenors to "establish that the motion for intervention is timely and alleges at least one common question of law or fact." *United States v. Michigan*, 424 F.3d 438, 445 (6th Cir. 2005) (citing *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1248 (6th Cir. 1997)). After these two requirements are met, a court must balance any undue delay and prejudice to the original parties (along with any other relevant factors). *Id.*

Permissive intervention is appropriate here. As discussed above, this motion is timely. Intervenors share common questions of law *and* fact with the existing action, as they seek to defend against the very claims that gave rise to this case challenging the DBE program's constitutionality. And—again, as discussed above—Intervenor DBEs' involvement in this case would not cause undue delay or prejudice to the original parties, as they moved to intervene "as soon as they realized that their interest was not protected," when the case was still in early

24

discovery. *See Jansen*, 904 F.2d at 341.

## CONCLUSION

For the foregoing reasons, Proposed Intervenor DBEs respectfully request that this Court

grant their Motion to Intervene and permit them to file the attached Answer.

Dated: January 24, 2025                    Respectfully submitted,

                                           */s/ Douglas L. McSwain*

Brooke Menschel*                           Douglas L. McSwain
DC Bar No. 9000389                         KY Bar No. 46895
Adnan Perwez*                              Wyatt, Tarrant & Combs LLP
DC Bar No. 90027532                        250 West Main Street
Jessica Anne Morton*                       Suite 1600
DC Bar No. 1032316                         Lexington, KY 40507
Audrey Wiggins*                            (859) 288-7415
DC Bar No. 482877                          dmcswain@wyattfirm.com
Democracy Forward Foundation
P.O. Box 34553                             Sarah von der Lippe*
Washington, DC 20043                       DC Bar No. 454585
(202) 448-9090 Ext. 1011                   Minority Business Enterprise Legal Defense
bmenschel@democracyforward.org             and Education Fund, Inc.
aperwez@democracyforward.org               1104 East Capitol St. NE
jmorton@democracyforward.org               (202) 744-5415
awiggins@democracyforward.org              Outsidecounsel1@mbeldefwatchdog.org

                                           *Counsel for Proposed Intervenor DBEs*

                                           **Pro Hac Vice Forthcoming*

Pursuant to Federal Rule of Civil Procedure 5(d)(1)(B), service of the foregoing, attached declarations, proposed answer, and proposed order is made on all parties of record through the Court's electronic service system.

Dated: January 24, 2025

_/s/ Douglas L. McSwain_____
Douglas L. McSwain