# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT FRANKFORT

| | |
|---|---|
| MID-AMERICA MILLING COMPANY, LLC, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*, | ) ) ) ) |
| Defendants. | ) |

Case No. 3:23-cv-00072-GFVT-EBA

## DECLARATION OF EBONI WIMBUSH

I, Eboni Wimbush, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am the President & CEO of the Airport Minority Advisory Council (AMAC), one of the organizations seeking to intervene in this case.
2. AMAC is a 501(c)(6) trade membership organization. It was founded on November 8, 1998, to help provide a unified voice for DBEs and actively work to address economic disparities, discrimination and their negative consequences.
3. AMAC exists to advocate for the inclusion and advancement of minorities and women within the airport and transportation industries. The organization focuses on expanding opportunities in contracting, employment, and leadership by promoting diversity and economic equity. AMAC provides resources, advocacy, and support to DBEs, including minority-owned business enterprises, and women-owned business enterprises.
4. One of AMAC's functions is that AMAC, through its active engagement with the DBE program, seeks to utilize the program's platform to address and mitigate the ongoing discriminatory practices within federal contracting, particularly in airport and transportation operations.
5. AMAC serves as a bridge between minority- and women-owned businesses and the aviation industry, fostering long-term growth and success. AMAC's mission also includes education, outreach, and policy advocacy to create a more inclusive and equitable industry.

1

6. AMAC has a national presence, with approximately 900 members nationwide, including individuals and organizations. It also has seven chartered Chapters in Atlanta, Baltimore/Washington, Chicago, Detroit, Denver, Los Angeles, and Portland.
7. This declaration is based on my personal knowledge, gathered through my own research, observations, and collaboration and consultation with AMAC members.

*AMAC*

8. AMAC operates under the governance of a Board of Directors composed of representatives from its member organizations and stakeholders across the aviation sector.
9. The Board appoints the President & CEO, who serves as the executive leader responsible for the organization's operations. Additionally, the Board oversees several committees that drive AMAC's strategic initiatives, advocacy efforts, and program development.
10. AMAC categorizes its services into four groups: (1) advocacy, through championing policies that promote economic inclusion in airport and transportation contracting and leadership; (2) education, through offering workshops, conferences, and training on certification, compliance, and business growth; (3) networking: through creating platforms for members to connect with airports, transportation industry leaders, and other stakeholders to unlock business opportunities; and (4) support, through resources to help DBEs overcome industry challenges.
11. Historically, AMAC has been a key advocate for the DBE program since its inception. AMAC's early efforts focused on advocacy to ensure the enforcement of existing DBE regulations and to push for expanded policies that promoted equity in airport and transportation projects. Over the years, AMAC has partnered closely with the Federal Aviation Administration to refine and enforce regulations that provide opportunities for small minority- and women-owned businesses in airport and transportation construction. AMAC has played a vital role in advancing policy reforms to raise DBE participation thresholds and broaden certification criteria.
12. Currently, AMAC advocates for DBEs through (1) its annual Airport Business Diversity Conference & Economic Opportunity & Policy Forum which includes a lobbying day on the Hill, (2) working with Congress and federal agencies to strengthen the program and its enforcement, including through submitting public comments, (3) providing training to DBEs on certification process and competitive bidding, (4) addressing challenges such as limited access to financing and discrimination, (5) authoring studies to analyze the difference of including DBEs in federally authorized Airport Capital Improvement Plan (AIP) projects versus projects funded by Passenger Facility Charges (PFCs) which do not require participation by DBEs, and (6) conducting research to provide guidelines and tools for effective practices to help airports increase and maintain meaningful DBE participation in their business opportunities.

*Discrimination against minority- and women-owned businesses*

13. The DBE program is vital to AMAC members as it ensures access to contracting opportunities that would otherwise remain out of reach due to discriminatory barriers.
14. For AMAC members, the DBE program provides crucial support by beginning to level the playing field in contracting and creating opportunities to overcome entrenched discriminatory practices. AMAC actively assists its members in navigating the program's regulatory requirements, fostering an environment for success, and addressing the persistent challenges of discrimination in the industry.
15. In our experience, without a program like the DBE program, prime contractors, who are mostly white-owned companies, would not subcontract to minority companies — unless they are forced to make good faith efforts.
16. There are multiple studies that show that when these programs are not in place, women and minorities do not get contracts. Without these programs, minorities would simply not enjoy even the limited opportunities they currently have in the airport industry today.
17. A clear way to see the difference, backed by hard numbers, is the difference between the Airport Capital Improvement Program (AIP) versus the Passenger Facilities Charge (PFC) Program, as demonstrated in the 2015 study commissioned by AMAC.[1] AIP has DBE program requirements; PCF has none. You can see the clear disparity between the number of minorities that get actual contracts between projects funded under the AIP and projects funded with PFCs.[2] AMAC worked with a research firm to refresh this study in 2023, and it still had the same outcome. It shows very tangibly why there is a need for these programs. The AIP and PFC disparity is a perfect example of how the "good old boys" network works, and continues to be the default when programs like DBE don't exist.
18. Minority participation results in high-quality work. There is history to back this up. In 1980, Maynard Jackson required a 25% minority-owned business participation goal throughout the construction of the new domestic terminal of Hartsfield-Jackson Atlanta International Airport (ATL). That included architecture, concessions, design, construction; everything. It was a tough thing to push through. And there was a lot riding on it: if it had failed, it would have been a big blow to minority contractors and programs. In the end, the construction—done by at least 25% minority-owned firms—was 4 months ahead of schedule, under budget, and has never been cited for poor workmanship. Maynard Jackson's support for minority participation gave strength to the case that when you encourage minority-owned business participation, you get excellent, high-quality results.

*Discrimination faced by AMAC members*

19. Discrimination in the private sector mirrors many of the challenges faced in public contracting. Minority- and women-owned businesses frequently encounter exclusionary

---

[1] https://www.amac-org.com/wp-content/uploads/2025/01/AIP-and-PFC-Report-2015-FINAL.pdf.
[2] https://www.amac-org.com/wp-content/uploads/2025/01/AIP-and-PFC-Report-2023-FINAL.pdf

3

practices, such as restrictive procurement processes, biased subcontracting decisions, and a lack of transparency in bidding. These practices perpetuate a lack of participation of minority- and women-owned businesses and stifle equitable opportunity in private-sector projects.

20. Private-sector disparities are often less visible due to the absence of mandated reporting requirements, making it more challenging to address discrimination. However, disparity studies consistently show significant underrepresentation of DBEs, MBEs, and WBEs in private contracting opportunities, even in industries with a diverse client base and areas with significant availability of minority- and women-owned businesses.

21. I learn about the experiences of members who face so much discrimination in this space through our members. It's what motivated the DBE program to be created in the first place. Basically, white people have been playing monopoly for 400 years. When minority-owned firms try to enter the game, they are generally relegated to the least advantageous positions.

22. Discrimination exists pre-award, pre-solicitation, post-solicitation: all throughout every contract. The whole process is rife with discrimination. Here are some tangible examples of how this discrimination occurs.

23. There are many artificial impediments blocking access to contracts from the beginning. Our members experience it all the time: for example, requirements to have 10+ years of airport experience. This automatically excludes many minority- and women-owned businesses who often do not have the network or connections to get that experience in the first place. It prevents any entry into the marketplace.

24. Then there are informal networks in which large businesses hear about opportunities months before minority-owned businesses do. There are many ways that this works, but basically there is a lot of word of mouth involved. People hear about opportunities through their connections, so that excludes a lot of minority-owned businesses. It's the good old boys network. AMAC is trying to create its own ecosystem on how to notify people, because minority firms just do not have access to that good old boys network.

25. Even if DBEs somehow hear about opportunities, there are multiple other obstacles in the way. You have to be in the right meetings to make the connections with the primes who might want to hire you. And then you have to wait for the prime contractor to invite you to be part of their bid – which usually only happens if a particular contract has DBE goals.

26. One thing that happens to our DBE members is that primes will realize at the last minute they haven't made sufficient good faith efforts to attract DBEs for a particular project. Then, they begin calling people off a list, trying to meet the goals. But doing that puts DBEs at a disadvantage – either DBEs have to forgo the work altogether, or rush to put together a bid that may be too low. The turnarounds are just too tight. Primes will call you on a 2 PM Wednesday to submit for a project due on Thursday at 3 PM. While non-

4

DBEs who the prime was planning to use had weeks to prep their bids, the DBEs only have 24 hours. That means the DBEs' bids are often not competitive. It can't be.

27. Even if a DBE somehow manages to assemble a bid on such a tight turnaround, they are at a disadvantage from the moment they submit the bid. It's great to get business, of course, but if a DBE gets that contract, they're still at a disadvantage because of the tight turnaround. It limits how much research they could do, compared with the other firms who have weeks. It means there are more obstacles for them.

28. There are two scenarios here, and both of them are bad. One is that DBEs somehow hear about the contract, somehow get invited, somehow turn around a bid on an unreasonably tight deadline, often without enough time to research, and somehow get accepted. That's the best case scenario. Even in the best case scenario, there are a ton of obstacles. And the worst case scenario is that you just never hear about the bid in the first place. It's a limiting ecosystem.

29. Because this compressed timeline is commonplace for DBEs, we support prime contractors using a checklist. For example, we might ask: did you give the business at least 14 days notice? Did you follow up with them? We know contractors might say they *tried* to reach out, but they would only call once and would never follow up. We also have heard from our members about contractors that sometimes only say they tried to reach out, but never even call once.

30. The difference between minority businesses and white-owned businesses learning about these opportunities is stark. Big primes, which are mostly white-owned, know that a big 10-15 year contract is coming. Larger, white-owned firms are able to network with the agency directly. They begin lining up subcontractors long before the actual contract document ever hits the street. They go to the subs they know through their personal networks. Minority firms are constantly playing catch up.

31. Airports sensitive to these problems make contract info available well in advance. But not all airports do that. There are practices like these that help limit the effects of discrimination. That's why AMAC has taken all the best practices done throughout different locations and shares them through conferences and trainings.

32. People readily admit that the only reason they use minority-owned businesses is because of the DBE goals. AMAC members have witnessed contractors admit publicly that without the DBE program, they wouldn't include minority contractors because they had already established relationships with their own team.

33. It doesn't stop once you win a bid either. AMAC members themselves regularly hear how, once a bid is accepted, the scope of the work suddenly changes. The dollar amount changes. It happens quietly and quickly. Minority- and women-owned businesses know that this is wrong. But they don't report it to the airports, because they fear retaliation from their prime. If they report, they risk not being paid. This is discrimination, because it puts an added pressure on minority- and women-owned businesses. This practice is common.

34. Minority-owned businesses are coming in as JV players in the professional league. AMAC works to ensure that diverse businesses learn how to play the game. AMAC is an ingredient to help these DBEs be in the game. Without programs and organizations supporting them, DBEs don't have a way into the networks, communities, and business. The odds are stacked against them.
35. If we want to become a better society economically, we have to make all businesses more competitive. That includes DBEs. The DBE program helps us make businesses more competitive, as a country.

*Broad Societal Impacts*

36. Widespread discrimination erodes trust in the fairness of contracting processes, discouraging small minority- and women-owned businesses from competing at all, and certainly not on equal footing.
37. This narrowing of service provider pools stifles innovation and competition while limiting economic mobility in minority communities, perpetuating cycles of poverty.
38. Minority women also specifically struggle in the construction industry. There are challenges in professional services, but not like the way there are for minority women in the construction industry. Minority women also sometimes are expected to bring their husbands in to co-sign for loans or even just to be seen as a legitimate business.
39. Discrimination has profound macro-level impacts on DBEs and the communities where they live and work. These effects include economic marginalization, community underdevelopment, stifled innovation and competition, and creating a generational wealth gap.
40. The preliminary injunction in this case has created a dire situation for DBEs operating in the affected states. For many DBEs, it has led to a loss of competitive edge, financial instability, discouragement of investment, and threatens to exacerbate existing economic inequalities and their ability to contribute to their local economies.
41. Rolling back the DBE program has sweeping, long-term implications. It threatens to reverse decades of progress achieved under the program.

Alexandria, Virginia
Dated:  1/22/25

_____
Eboni Wimbush

6