# EXHIBIT G

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT FRANKFORT

| | |
|---|---|
| MID-AMERICA MILLING COMPANY, LLC, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*, | ) ) ) |
| Defendants. | ) |

Case No. **3:23-cv-00072-GFVT-EBA**

### DECLARATION OF KENNETH B. CANTY

I, Kenneth B. Canty, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am the President and CEO of American Meridian Contracting Corp., also known as AMC-Civil, one of the companies seeking to intervene in this case.
2. We are a full-service heavy civil construction company. We specialize in heavy civil, marine and industrial demolition.
3. I bought AMC-Civil in 2018.
4. I am the President and CEO of the company.
5. The company is 100% minority-owned by me. I am a Black man.
6. Our company currently has approximately 4 employees.
7. We are headquartered in Charleston, South Carolina.
8. AMC-Civil is a certified DBE certified in Alabama, Florida, Georgia, South Carolina, Maryland, Massachusetts, and Washington, DC. AMC-Civil is certified under the State minority business programs in Maryland and Massachusetts.
9. In the past I owned another heavy civil construction, marine and industrial demolition firm. That firm was called Freeland Construction Co. and I bought it in 2008.
10. I was the President and CEO of Freeland Construction Co.
11. Freeland was 100% minority-owned by me at the time it ceased operations in 2022.
12. During the time Freeland was operational, it averaged approximately 35 employees at any given time.

1

13. Freeland was a certified DBE and was certified in Florida, South Carolina, Kentucky, Maryland, and Massachusetts.
14. I also founded a materials company called Janus Materials, Inc. in 2020. It no longer operates independently and its functions have been taken over by AMC-Civil.

*The Importance of the DBE Program*

15. The DBE program has been an essential element of business development for me and for many other companies. The program is far from perfect and certainly does not get close to making up for the rampant race discrimination that exists in the U.S. construction industry, but it gives us a fighting chance to compete.
16. The bottom line is that most big primes would never work with small, minority-owned firms if it were not for the DBE program and other programs like it. They want to keep all the business for themselves and people they know. The problem is that the reason they have all business to begin with is due to past racial discrimination.
17. Many of the biggest construction companies, all white-owned, are multi-generational with ownership that stretches back to times when racial discrimination was legal. They started, grew and succeeded without minorities even having a chance to compete. And so, they accumulated enormous amounts of success and wealth.
18. Today, we still have pervasive race discrimination and we have the problem that the biggest firms are so enormous that they control just about everything.
19. The reality is that racism is just so pervasive. You can really see it in my industry. There are so few minority-owned firms in the heavy civil construction arena. The big primes are gigantic and they are dead set on keeping everyone out if they don't know them, especially DBEs.
20. Because the program is so important, I have advocated for it in many different ways. I've worked hard to make sure my congressional delegation knows how important this program is for South Carolina businesses like mine, and I have worked with the National Association of Minority Contractors (NAMC) to advocate for the DBE program at the federal, state and local levels of government.
21. NAMC is very important because they advocate for minority-owned businesses in a way that would be very difficult for each owner to do on their own. They work very hard to make sure the interests of minority businesses are presented on a national basis. I understand that NAMC is also seeking to intervene in this case and I support their effort to do so.

*My Experiences with Discrimination Before Starting My First Business*

22. I grew up in the Boston area and was the victim of several types of racism right from the beginning. My dad was a Black descendant of slaves and my mom is of Cape Verdean descent.  Both groups were on the receiving end of malicious racism in Boston.

23. People think that Boston is a bastion of tolerance, but it really isn't. In terms of racism, in some ways it's better than the South. In some ways it's worse than the South.
24. Still, I had strong role models in my family and my church, and I had a strong will to succeed.
25. My dad had a big impact on me. He was a World War II veteran. He has seen and been through a lot. When times were difficult, he would say that we need to "work right through it." He was tough, and he raised me to be tough and to not let little things get to me. He was also a business owner and founded a successful dry-cleaning business in Boston in the mid-1950s that is still operating today.
26. I have been fascinated by bridges since I was a small boy. I learned everything I could about them and I wanted to build them. Eventually I went to school to be an engineer so I could do exactly that.
27. While I was in college, I took a job at the Hasbro Toy Company in Pawtucket, RI. One of the senior engineers at Hasbro learned that I was in college to become a civil engineer, he said, "What's the longest bridge in the world?" I answered that it was the Lake Pontchartrain Bridge in Louisiana. He said, "No. It's the Braga Bridge. It goes all the way from Fall River, Massachusetts to Portugal." I understood him to be making a racist and ethnically derogatory comment about the Portuguese and Cape Verdean communities that had settled in large numbers in Fall River, were subject to virulent racial and ethnic bias and were largely economically disadvantaged. My mother is of Cape Verdean descent, which was a colony of Portugal.
28. I graduated with an engineering degree from UMass, Amherst in 1997.
29. My first job in construction started in 1999 on the massive bridge and tunnel project in Boston known as the "Big Dig." I worked for the Modern Continental Construction Company as the scheduling and cost engineer for their contract. One day, I walked into our bullpen where the superintendents got ready for the day's work. I overheard General Foreman say that he was getting ready to go to a "Jig Joint" to party. As soon as he saw that I had just walked into the room, he apologized. He and I both knew that what he said was a racial slur. This was not the first time I had heard such language and would not be the last.
30. One other example is seeing caricatures of our Project Manager, who was of Iranian descent, drawn in port potties with the slur "Sand Nigger" written below them.
31. That job involved a lot of racism but I was determined to succeed. I knew that the white guys I worked with expected me to be late and incompetent – the soft bigotry of low expectations. So, I would get to work earlier than anyone else and work harder than everyone else. It didn't necessarily change their minds but they couldn't find fault with my work.
32. Despite this, there were always not-so-subtle signs that they just didn't see me the same way they saw the white engineers. Just to give one example, there was one other senior

3

      Black man working on the job and my white colleagues would often call us by each other's names and confuse us. We did not look alike.

33. Part of the reason they did that was because there were just so few Black people working in heavy construction. They had a hard enough time believing there was one of us on the job, but two? That was just impossible.

34. But the other part was just to constantly, subtly remind us that we were different and we didn't belong there. Let's be clear: There were lots of white guys on that job and they didn't seem to have any trouble calling them by their names. Just us. It was purposeful and, in my experience, it was in part intended to put us in our places and keep us there.

*Discrimination as a Business Owner*

35. I bought Freeland in 2008. I didn't know about the Small Business Administration's 8(a) program and the DBE programs, but given the racism I had encountered on the job, once I heard about them, I knew they could be helpful. By 2009 I had become certified as a DBE and soon thereafter I became certified as an 8(a) company with the Small Business Administration.

36. I knew there would be discrimination against me as a business owner, but one of the surprisingly demoralizing things was to experience it in the process of becoming a DBE. There was just a sense of disbelief among some of the officials I encountered that a Black man could own a heavy construction company. I remember that even the South Carolina DOT official who worked on certification – and who was Black himself – put me through extra scrutiny. That's the problem with discrimination in the heavy construction field, it's so widespread and deep that even Black people themselves have been conditioned to think that what I was working to build was impossible.

37. Of course, one of the first areas where I encountered discrimination was in access to capital. I had to get a loan for my initial investment to buy the company. It wasn't much, only $5,000 down and a very long mortgage, but it still wasn't easy to find a loan.

38. Basically, the banks make you pledge your house and your future receivables to get any sort of significant loan. I talked to lots of white engineer friends who made clear they did not have to put up so much collateral.

39. The problem of historical discrimination plays a role here too – many large primes had families that had been in the country stretching back to before emancipation and so they had all that extra time to accumulate wealth. In my case, as a Black man, we really didn't have legal rights until the Civil Rights Acts and even after that, discrimination continued.

40. I and my businesses have been discriminated against more times than I can count.  I will just provide a few more examples here.

*Army Corps Fort Jackson Contract*

4

41. In 2014, Freeland won a contract with the Army Corps of Engineers at Fort Jackson, Charleston, SC. In the course of accomplishing that work, we encountered differing site conditions on the project that significantly increased the cost of the project.
42. Our employees and subcontractors were also subject to a hostile work environment, including being belittled on a regular basis in a manner that was racially biased. One of my white construction managers from Massachusetts, who had worked with the Corps of Engineers there, came down to help us on the project and couldn't believe how bad the mistreatment was.
43. Despite providing ample documentation of our claims, the Army Corps refused to reimburse us for the additional costs imposed by their intentional misrepresentation of the site conditions.
44. In late August, 2017, I was arrested for failing to respond to a court summons regarding the nonpayment of union dues in relation to a different contract. The use of force in my arrest was so disproportionate that I believe that something else was going on beyond the fact that I missed the summons in the mail the only time it had been sent.
45. When the federal agents came to my office to arrest me, they brought 6 members of the Fugitive Task Force. They arrived with rifles at the ready. I was put in handcuffs and leg irons. When I was put in the car, they put me in the front seat and positioned armed agents behind me. I was terrified and I thought that they might kill me.
46. They brought me to the federal court house in Charleston. I knew a lot of people there because I had done work on the court house itself. It was humiliating to be paraded through the courthouse in cuffs and leg irons and held in a cell in the basement for more than three hours. All because I missed one piece of mail.
47. The judge himself seemed surprised to see me there and by the restraints. He just told me that he highly recommended that I pay the union dues and he released me.
48. Some time later I ran into one of the federal court security personnel at the grocery store who approached me very briefly and said, "You were being sent a message," and walked away.
49. As I tried to figure out what that might mean, I realized that the union dues issue had arisen from a contract in which the Army Corps was also involved. I have come to believe that they had some hand in having me arrested in retaliation for my efforts to pursue what I was owed on the Fort Jackson project.
50. In the course of my work on this project and others, I have learned about the ways that government agencies and big prime contractors try to use minority-owned companies to cover their own mistakes and incompetence to drive us out of business. Since they know that there is a general sense that minority firms are not competent, and since we are genuinely willing to do very hard work under difficult conditions in order to try to get ahead, we often land on projects where there are hidden, pre-existing problems. I believe this situation is intentional and based in racial bias.

51. Minority firms are profoundly less likely to have the resources to vigorously defend themselves against powerful federal and state government agencies and big, powerful prime contractors. And these powerful actors know that minority-owned firms do not have those resources.

*Pee Dee River Contract*

52. Very similar events occurred on a different contract we won not long after winning the Fort Jackson project. This project involved demolishing a bridge across the Pee Dee River in South Carolina. This was another case in which a large white-owned construction company used its power to pin the blame for problems on a smaller minority-owned firm that they knew didn't have the resources to fight back.
53. After a series of events, including Hurricane Florence, the prime contractor was behind schedule and then tried to blame us for their delay so that they could have us removed from the contract and self-perform the parts of the contract that they had contracted to us.
54. That would have been bad enough, but unfortunately the South Carolina Department of Transportation compounded the problem by allowing the prime contractor to terminate our contract contrary to the DBE rules.
55. In the background of all this were many racially discriminatory comments and micro-aggressions. My competence and accomplishments were constantly questioned as were those of my employees, and there was an acceptance of racially hostile conditions on site including Ku Klux Klan graffiti on the very bridge where we were working.
56. Ultimately, this contract dispute dragged on for so long that it destroyed Freeland.

*Recent Discrimination*

57. After all the problems on the Pee Dee River project, Freeland sued South Carolina DOT and a prime contractor in federal court for violations of Section 1981 and Title VI of the Civil Rights Act and other claims. Our case was dismissed on procedural and technical grounds in 2023.
58. In 2024, I, in my new role as the owner of AMC-Civil, was asked to participate in a SC DOT contract for workforce development via a company called Stantec, a prime contractor that was working on environmental justice initiatives.
59. We did not get the job and we had a debrief on the contract on January 17, 2025, and during that debrief we were told that one of the reasons that SCDOT had told Stantec not to hire AMC because I was "just some demo guy." This was a clear attempt to belittle me and insult my reputation.
60. I'm a prominent business owner and successful heavy construction company owner in Charleston, not "some demo guy."
61. I believe that SCDOT urged Stantec not to use us for the contract in retaliation for filing the civil rights action against them.

62. The bottom line is that they just don't think minority business owners can fight back. And when we try to, they hit us with everything they have.

*Importance of the DBE Program*

63. Basically, across the board, historical intentional discrimination and current discrimination combine to create barriers that are nearly impossible to surmount. That combination of problems exists at every stage of a business owner's life and thus has an enormous negative influence over the ability of a minority-owned business to start up, grow and succeed.
64. The DBE program cannot possibly correct for all of that, but it can provide at least an opening to begin to correct the substantial harm that racism and discrimination have done to minority business owners and minority people in general.
65. For me personally, the DBE program has been a very targeted means to address pervasive discrimination. Without the program, there would be very few minority construction companies involved in the building of America's infrastructure.
66. Given the harm we have suffered, this program should address discrimination far more aggressively than it does, but it provides at least some narrow pathway to success in a very dark environment.
67. What we need is to strengthen the DBE Program and give it more tools to level the playing field – not abolish it.

Charleston, SC  
Dated: 1-22-2025

Kenneth B. Canty

7