UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

MID-AMERICA MILLING COMPANY,
LLC, *et al.*,

      Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

      Defendants.

Case No. 3:23-cv-00072-GFVT-EBA

## BRIEF OF IDAHO, NORTH DAKOTA, ALABAMA, ARKANSAS, FLORIDA, INDIANA, IOWA, KANSAS, KENTUCKY, MISSISSIPPI, MISSOURI, MONTANA, NEBRASKA, OHIO, OKLAHOMA, SOUTH CAROLINA, SOUTH DAKOTA, TENNESSEE, TEXAS, WEST VIRGINIA, AND THE ARIZONA LEGISLATURE AS *AMICI CURIAE* IN SUPPORT OF JOINT MOTION FOR ENTRY OF CONSENT ORDER

"[E]very time the government places citizens on racial registers and makes race relevant to the provision of burdens or benefits, it demeans us all." *Grutter v. Bollinger*, 539 U.S. 306, 353 (2003) (Thomas, J., concurring). For decades now, the federal Disadvantaged Business Enterprise (DBE) program has required the States to discriminate against non-DBE contractors like Mid-America Milling, thereby demeaning both the States and their contractors and stealing thousands of contractors' economic opportunities based entirely on their race and sex.

This discrimination is expensive. It routinely requires States to reject the lowest bid on a project in favor of a less-efficient DBE-compliant bidder, and even when States can choose the lowest bid, the price is usually inflated because contractors have to use DBE-compliant subcontractors. The subcontractors, in turn, know they can get away with high prices, because the

1

DBE program leaves the contractors who hire them no alternative. It is difficult to estimate the DBE program's total cost to taxpayers, but one study suggests that it amounts to more than 5% of the total cost of the contracts it covers—potentially billions of dollars annually.

But more importantly, this discrimination is unjust. "[A]ny rule excluding a man on account of his color is an indignity, an insult, and a wrong." *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 600 U.S. 181, 243 (2023) (Thomas, J., concurring) (quoting Sen. Charles Sumner, Cong. Globe, 42d Cong., 2d. Sess., 242 (1871)). *Amici* States applaud the federal government for concluding that "[e]liminating racial discrimination means eliminating all of it," *id.* at 206 (majority), and they urge the Court to approve the consent decree as "fair, adequate, and reasonable, as well as consistent with the public interest." *United States v. Cnty. of Muskegon,* 298 F.3d 569, 580–81 (6th Cir. 2002) (cleaned up).

## ARGUMENT

### I.    The DBE Program Costs States Millions of Dollars.

The DBE program wastes money on purpose. When supposedly disadvantaged entities are the lowest bidders, the program has no effect—its whole point is to force States to hire disadvantaged entities when they are *not* the lowest bidders.

And it works. Idaho's Transportation Department recently had to reject a $2.2 million bid for a project submitted by a contractor who tried and failed to meet the DBE threshold, instead accepting a $2.7 million bid from a contractor who succeeded. Margaret Carmel, *ITD program meant to boost minority and women-owned businesses not meeting goal,* Idaho Press (Dec. 17, 2022), https://tinyurl.com/rzjkhr73 (the DBE program "forces prices up on projects because ITD will select any contractor who has met the [DBE] goals even if they're bidding hundreds of thousands higher than someone else"). North Dakota's Department of Transportation similarly had to reject a bid for inadequate DBE participation, then spent an extra $400,000 when it rebid the

project the following year. Testimony of Amber Schoenborn in favor of S.C.R. 4021, 69th Leg. 1st Reg. Sess. (N.D. 2025) (Mar. 5, 2025).[1]

These are not rare events but routine, recurring costs of the DBE program. Over a recent 44-month period, the DBE program required[2] the Idaho Transportation Department to reject the lowest bid on a project eight times, wasting a total of $15.2 million dollars that could have been spent on other projects. Decl. of Monica Crider (showing at least $1.1 million wasted from state and local matching funds). And Idaho is only a single State with less than 0.6% of the country's population—if Idaho's experience over that 44-month period was representative, then the total waste of state and federal tax dollars was about $2.6 billion.

But that figure understates the problem because, thanks to the DBE program, even the lowest bids that States receive tend to be inflated. The program forces the prime contractors who submit the bids to "pass over non-DBE subcontractors" in order "to employ DBEs that are either less qualified or more expensive," which "will often cost taxpayers more money than necessary." George R. La Noue, *Setting Goals in the Federal Disadvantaged Business Enterprise Programs*, 17 Geo. Mason U. Civ. Rts. L.J. 423, 428–29 (2007). One North Dakota prime contractor reported

---

[1] Admittedly, some of this cost is borne by the federal government. But the federal government covers only part of the cost of DBE-inflated projects. *Understanding Non-Federal Match Requirements*, U.S. Dep't of Transp, (last updated Mar. 20, 2025), https://tinyurl.com/26xmk2af (explaining DOT funding scheme); *Disadvantaged Business Enterprise Program Plan*, Idaho Transp. Dep't (Oct. 2017), https://tinyurl.com/8zbft5tf (explaining that the DBE requirements apply to all projects funded in any part by DOT dollars). And whether the DBE program wastes State taxpayer dollars or federal taxpayer dollars, it is still wasting taxpayer dollars.

[2] Nominally, the DBE program's target of spending 10% of all project dollars is "aspirational," 49 C.F.R. § 26.41, but it acts much like a quota in practice. *Cf. Students for Fair Admissions*, 600 U.S. at 222 (illustrating the quota-like nature of Harvard's professed "holistic approach" to student admissions); *id.* at 222 n.7 ("For all the talk of holistic and contextual judgments, the racial preferences at issue here in fact operate like clockwork."). States who fail to meet the target on a project generally face varying degrees of reprimand from the DOT—ranging from verbal censure to threatened (or actual) enforcement action.

that the DBE subcontractors it is required to use are upwards of 65% more expensive than other sub-contractors. Testimony of Amber Schoenborn, *supra*.

And why wouldn't they be? DBE subcontractors know they can charge higher rates and still be selected. Testimony of Carey Burke in favor of S.C.R. 4021, 69th Leg. 1st Reg. Sess. (N.D. 2025) (Mar. 5, 2025). "On bid night, a non-DBE [] supplier quotes the prime contractors," and then the DBE supplier "gets the same quote, . . . puts it on DBE supplier letterhead, marks it up, and quotes the same prime contractors. The contractors have to use the marked-up quote if they want to be awarded the project." *Id.*

Some of these inflated DBE sub-contractor rates are simple opportunism, but others are outright fraud. DBE fraud often takes one of two forms: (1) a "front-company" scheme, where a non-DBE firm creates a DBE company as a front to bid on projects and charge higher rates; or (2) a "pass-through company" scheme, where a DBE company is formally designated as performing the work, but its role is actually limited to taking a cut off the top and then passing payment along to the non-DBE company that actually does the job. Evan A. Blaker & Joseph L. Sine, *Passing on the Pass-Through: How to Avoid DBE Fraud Through Due Diligence*, Constr. in Brief at 5 (2020), https://tinyurl.com/zzsbwdvv. The latter sort of scheme is prevalent enough that it even reached the Supreme Court recently. *See Kousisis v. United States*, 145 S. Ct. 1382, 1389 (2025) (describing an example of a pass-through scheme in the DBE program). Precise numbers are not available, but there have been "many" instances of both types of fraud, resulting in higher costs for States than they would have paid without the DBE program. Hongtao Dang & Jennifer S. Shane, *Fraud and Abuse Schemes in the Disadvantaged Business Enterprise Program*, 12(3) J. of Legal Affs. & Disp. Resol. in Eng'g & Constr. (Aug. 2020), https://tinyurl.com/4k7w2nbu.

4

Because of these hidden costs, it is impossible for States to know just how much of their money the DBE program wastes. But one hint is that when California's Proposition 209 ended racial preferences in State contracts, "the cost of state-funded contracts [in California] fell 5.6% relative to federally funded projects" that were still subject to DBE. *Goodbye to Racial Quotas in Federal Contracts*, Wall St. J. (May 29, 2025), https://tinyurl.com/n6pn4x5p (summarizing the MIT study); Justin Marion, *How Costly is Affirmative Action? Government Contracting and California's Proposition 209*, 91(3) Rev. of Econ. and Stats. 503 (2009); *see also* Varun Kishore & Dulcy M. Abraham, *Construction Costs—Using Federal Vs. Local Funds: Identifying Factors Affecting Highway Construction Costs When Sources of Funding Vary*, 26–27, 49–50 (2009), https://tinyurl.com/rxfyfyrh (concluding that DBE requirements increase contract costs and recommending program be re-examined).

To put that 5.6% figure in perspective: in 2022, state and federal governments together spent nearly $420 billion on transportation. USDOT Bureau of Transp. Stats., *Transportation Public Finance Statistics (TPFS)*, https://tinyurl.com/3ad2e4vs. For the years 2022 through 2026, the federal Infrastructure Investments and Jobs Act committed a total of $673.8 billion to transportation on top of what was already being spent. It is impossible to determine from published sources how much of that spending is subject to DBE requirements, but the orders of magnitude seem clear: the state and federal governments spend hundreds of billions of dollars on transportation, and state and federal DBE programs waste billions or tens of billions.

Finally, adding insult to injury, there are the compliance costs—money the states have to waste on bureaucracy for the privilege of wasting even more money on inefficient DBE contractors. DBE regulations require the States to create a DBE policy statement, hire a DBE liaison officer with direct access to the head of their transportation agency, implement mechanisms

5

to monitor DBE compliance by all participants, maintain a DBE business directory, and establish a business development program to help DBE firms succeed when DBE requirements do not apply. 49 C.F.R §§ 26.23, 26.25, 26.31, 26.33, 26.37, 26.53, 26.81.

All that busywork isn't free. According to a survey published in 2001 by the Government Accountability Office (and now twenty-four years out of date), the States and transit authorities who responded to the survey reported annual spending between $10,000 and $4.5 million apiece to administer the DBE program, totaling $44 million—$80 million, when adjusted for inflation. U.S. Gov't Accountability Off., GAO-01-586, *Disadvantaged Business Enterprises, Critical Information Is Needed to Understand Program Impact* 36 (2001), https://www.gao.gov/assets/gao-01-586.pdf. Those figures don't include non-monetary costs, such as the cost of delaying projects to ensure DBE compliance. Testimony of Amber Schoenborn, *supra* (when a DBE sub-contractor must be replaced, "that requires a minimum five (5) day notice to the DBE, then the prime to contact all the other DBE's that do the same type of work to see if they are available which delays the work even further"). And while $80 million is only a tiny fraction of the States' combined transportation budgets, it is still $80 million per year completely wasted—spent on nothing but compliance with a discriminatory federal program, with no benefit to States.

*    *    *

The extra money States spend on the DBE program could be used elsewhere. States could fund other priorities with that money—schools, public health, law enforcement, etc.—or build other transportation projects. Instead, the money is funneled from taxpayers to uncompetitive contractors based on those contractors' sex or the color of their skin. Purely from an economic perspective, the program entails massive waste of the States' taxpayers' dollars.

## II.    The DBE Program Requires States to Discriminate Unjustly.

But as the Court is well aware, the true public cost of the DBE program cannot be measured in dollars and cents. Behind each bid that's rejected for insufficient DBE participation are real-life people who are "excluded" from a commercial opportunity at the hand of their government "solely because of [their] race" or sex. *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 759 (2007) (Thomas, J. concurring). Such exclusion "demeans the dignity and worth" of these citizens, *Rice v. Cayetano*, 528 U.S. 495, 517 (2000)—indeed, "any rule excluding a man on account of his color is an indignity, an insult, and a wrong." *Students for Fair Admissions*, 600 U.S. at 243 (Thomas, J., concurring) (quoting Sen. Charles Sumner, Cong. Globe, 42d Cong., 2d. Sess., 242 (1871)).

Our Constitution promises better. The Equal Protection Clause contains a "simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class." *Miller v. Johnson*, 515 U.S. 900, 911 (1995) (cleaned up). The central premise of the "second founding" that wrought the Fourteenth Amendment was "that we are all equal, and should be treated equally before the law without regard to our race." *Students for Fair Admissions*, 600 U.S. at 277 (Thomas, J., concurring). "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Rice*, 528 U.S. at 517 (cleaned up).

The DBE program begets not only disrespect, but also division. In a zero-sum situation like government contracting, "it is not even theoretically possible to 'help' a certain racial group without causing harm to members of other racial groups." *Students for Fair Admissions*, 600 U.S. at 271 (Thomas, J., concurring); *id.* at 218–19 (majority) (because "[c]ollege admissions are zero-sum," "[a] benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter"). And when such discrimination occurs, those who were slighted

7

"may resent members of what they perceive to be favored races, believing that the successes of those individuals are unearned." *Id.* at 275–76 (Thomas, J., concurring); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 241 (1995) (Thomas, J., concurring) ("Inevitably, such programs engender attitudes of superiority or, alternatively, provoke resentment among those who believe that they have been wronged by the government's use of race.").

    *Amici* States want no further role in perpetrating these wrongs on their own citizens, and they should not have to engage in racial or sexual discrimination as a condition for receiving federal funds. Instead, *Amici* States wish to afford respect to every contractor who bids on transportation-related projects by judging the bid on its "own merit" rather than "by [the] ancestry" of the bidder. *Rice*, 528 U.S. at 517; *accord* S.C.R. 4021 (N.D. 2025) (joint resolution urging the end of the DBE program because "government construction contracts should be awarded based on the lowest responsible bid, not based on the color of someone's skin, race, [or] sex").

    "Eliminating racial discrimination means eliminating all of it." *Students for Fair Admissions*, 600 U.S. at 206. Whatever the original intent of the DBE program, it has become clear that "[r]acialism simply cannot be undone by different or more racialism." *Id.* at 277 (Thomas, J., concurring); *accord Parents Involved in Cmty. Sch.*, 551 U.S. at 748 (plurality) ("The way to stop discrimination on the basis of race is to stop discriminating on the basis of race."). Programs employing race-based preferences will never foster "racial harmony, integration, or equality under the law." *Students for Fair Admissions*, 600 U.S. at 276 (Thomas, J., concurring). The only way forward is to return to a "Constitution [that] is color-blind, and neither knows nor tolerates classes among citizens." *Plessy v. Ferguson*, 163 U.S. 537, 559 (Harlan, J., dissenting).

## CONCLUSION

The proposed consent decree would take America one step closer to its ideal of equality before the law. *Amici* States respectfully ask the Court to approve it.

DATED: June 12, 2025

RAÚL R. LABRADOR
Attorney General
State of Idaho

*/s/ Alan M. Hurst*
Alan M. Hurst
Solicitor General
Office of the Idaho Attorney General
700 W. Jefferson St. Ste. 210
Boise, ID 83720
(208) 334-2400
*Pro Hac Vice* application filed with this motion
*Attorney for Amici State of Idaho, et al.*

9

### ADDITIONAL SIGNATORIES AND COUNSEL

DREW H. WRIGLEY
Attorney General
State of North Dakota

STEVE MARSHALL
Attorney General
State of Alabama

TIM GRIFFIN
Attorney General
State of Arkansas

JAMES UTHMEIER
Attorney General
State of Florida

THEODORE E. ROKITA
Attorney General
State of Indiana

BRENNA BIRD
Attorney General
State of Iowa

KRIS KOBACH
Attorney General
State of Kansas

RUSSEL COLEMAN
Attorney General
State of Kentucky

LYNN FITCH
Attorney General
State of Mississippi

ANDREW BAILEY
Attorney General
State of Missouri

AUSTIN KNUDSEN
Attorney General
State of Montana

MIKE HILGERS
Attorney General
State of Nebraska

DAVE YOST
Attorney General
State of Ohio

GENTNER DRUMMOND
Attorney General
State of Oklahoma

ALAN WILSON
Attorney General
State of South Carolina

MARTY JACKLEY
Attorney General
State of South Dakota

JONATHAN SKRMETTI
Attorney General
State of Tennessee

KEN PAXTON
Attorney General
State of Texas

JOHN B. MCCUSKEY
Attorney General
State of West Virginia

WARREN PETERSON
President of the Senate
*State of Arizona*

*By counsel:*
Rusty D. Crandell
Majority General Counsel
Arizona State Senate
1700 W. Washington St.
Phoenix, Arizona 85007
rcrandell@azleg.gov
(602) 926-3137

STEVE MONTENEGRO
Speaker of the House of Representatives
*State of Arizona*

*By counsel:*
Linley Wilson
Majority General Counsel
Arizona House of Representatives
1700 W. Washington St.
Phoenix, Arizona 85007
lwilson@azleg.gov
(602) 926-5418

10

CERTIFICATE OF SERVICE

I certify that on June 12, 2025, the foregoing was mailed for physical filing with the Clerk

of the Court via USPS.

Pursuant to Fed. R. Civ. P. 5(b), I also certify that paper copies were mailed via USPS to

the following counsel representing the parties in this case:

**Plaintiffs' Counsel**
Cara Tolliver
Wisconsin Institute for Law & Liberty, Inc
330 E. Kilbourn Avenue
Suite 725
Milwaukee, WI 53202

Gregory Austin Healey
Lynch, Cox, Gilman & Goodman PSC
500 W. Jefferson Street
Suite 2100
Louisville, KY 40202

Jason Michael Nemes
Commonwealth Counsel Group, PLLC
10343 Linn Station Road
Louisville, KY 40223

**Defendants' Counsel**
Andrew Braniff
U.S. Department of Justice - Civil Rights
Housing and Civil Enforcement Section
950 Pennsylvania Ave, NW; 4-CON
Washington, DC 20530

Charles Ethan Enloe, GOV
U.S. Department of Transportation
1200 New Jersey Avenue SE
Washington, DC 20590

**Intervenor-Defendants' Counsel**
Brooke Menschel
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043

Sarah C. Von Der Lippe
Law Office of Sarah C. Von Der Lippe
1104 E. Capital Street NE
Washington, DC 20002

Douglas L. McSwain
Wyatt, Tarrant & Combs LLP - Lexington
250 W. Main Street
Suite 1600
Lexington, KY 40507

**Movants' Counsel**
David Bryan Owsley, II
Stites & Harbison, PLLC - Louisville
400 W. Market Street
Suite 1800
Louisville, KY 40202

/s/ *Alan M. Hurst*
Alan M. Hurst

11