# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
## CENTRAL DIVISION AT FRANKFORT

|  |  |  |
|---|---|---|
| MID-AMERICA MILLING COMPANY, LLC, et al., | ) | |
| | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | **Case No. 3:23-cv-00072-GFVT-EBA** |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF TRANSPORTATION, et al., | ) | |
| | ) | |
| | ) | |
| *Defendants.* | ) | |

## INTERVENOR DBEs' OPPOSITION
## TO JOINT MOTION FOR ENTRY OF CONSENT ORDER

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................. ii

BACKGROUND ............................................................................................................... 2

LEGAL STANDARD.......................................................................................................... 5

ARGUMENT .................................................................................................................... 6

    I.    The Proposed Consent Order Should be Rejected Because It Would
Resolve Intervenor DBEs' Interests Without Their Consent...................................... 6

        A.    The PCO Aims to Circumvent Intervenor DBEs and Usurp Court
Authority .................................................................................................6

        B.    The PCO would Impose the Very Harm Intervenor DBEs Seek to
Avoid........................................................................................................8

        C.    The PCO Undermines Federal Rule of Civil Procedure 24 ............................9

    II.    PCO Should be Rejected Because it is Tainted with Collusion................................ 10

    III.    The Proposed Consent Order Should be Rejected Because it is
Inconsistent with Federal Law ................................................................................ 13

        A.    The PCO is Inconsistent with the Law on the Merits of the DBE
Program..................................................................................................13

        B.    The PCO Violates 28 U.S.C. § 530D............................................................15

        C.    The PCO Violates the Separation of Powers ..................................................16

        D.    The PCO is Inconsistent with Jurisdictional Law and is Not
Administrable..........................................................................................18

        E.    The PCO is Inconsistent with Remedies Law.................................................19

    IV.    The Proposed Consent Order Should Be Rejected because it would Not Be
a Fair, Adequate, or Reasonable Resolution of the Dispute ...................................... 20

CONCLUSION................................................................................................................. 25

## TABLE OF AUTHORITIES

Page(s)

### CASES

*326 Land Co. v. City of Traverse City*, No. 22-cv-45, 2023 WL 3033175
(W.D. Mich. Apr. 21, 2023) .................................................................. 10, 12

*Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147 (10th Cir. 2000) ................................... 4, 13

*Adarand v. Pena*, 515 U.S. 200 (1995) .................................................................. 2, 14

*Bronson v. Bd. of Educ. of City Sch. Dist. of Cincinnati*, 604 F. Supp. 68
(S.D. Ohio 1984) .................................................................................. 6, 24

*CFPB v. Fifth Third Bank, N.A.*, No. 21-cv-262, 2024 WL 3451080
(S.D. Ohio Jul. 18, 2024) ........................................................................ 19

*City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) ............................................. 14

*Cochran v. Zeon D.P., LLC*, 638 F. Supp. 2d 759 (W.D. Ky. 2009) ...................................... 6

*Conservation Nw. v. Sherman*, 715 F.3d 1181 (9th Cir. 2013) .......................................... 15

*Cotton v. Hinton*, 559 F.2d 1326 (5th Cir. 1977) ...................................................... 6

*Cruz v. JKS Ventures, Inc.*, No. 23-cv-8311, 2024 WL 814563 (S.D.N.Y. Feb. 26, 2024) ........ 12

*Dunn v. Carey*, 808 F.2d 555 (7th Cir. 1986) ......................................................... 17

*Evoqua Water Techs., LLC v. M.W. Watermark, LLC*, 940 F.3d 222 (6th Cir. 2019) ................ 19

*Flinn v. FMC Corp.*, 528 F.2d 1169 (4th Cir. 1975) ................................................... 23

*Frew ex rel. Frew v. Hawkins*, 540 U.S. 431 (2004) ................................................... 17

*Horne v. Flores*, 557 U.S. 433 (2009) ................................................................. 17

*Janus v. Miller*, 801 F.2d 578 (2d Cir. 1986) ......................................................... 6

*Kasper v. Bd. of Election Comm'rs of Chi.*, 814 F.2d 332 (7th Cir. 1987) .......................... 17

*Lewis v. Casey*, 518 U.S. 343 (1996) .................................................................. 19

*Loc. No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*,
478 U.S. 501 (1986) .......................................................................... 2, 7, 15, 18

*Macklin v. Kaiser Co.*, 69 F. Supp. 137 (D. Or. 1946) ................................................ 8

*Midwest Fence Corp. v. DOT*, 840 F.3d 932 (7th Cir. 2016) ......................................... 4, 13

ii

*Moore v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 47 (1971)............................................. 12

*Moses v. City of Perry*, 90 F.4th 501 (6th Cir. 2024) ..................................................................... 8

*Pedreira v. Sunrise Children's Servs., Inc.*, 802 F.3d 865 (6th Cir. 2015)........................... passim

*Ragsdale v. Turnock*, 941 F.2d 501 (7th Cir. 1991) ..................................................................... 17

*Sherbrooke Turf, Inc. v. Minn. DOT*, 345 F.3d 964 (8th Cir. 2003)........................................ 4, 13

*Stallworth v. Monsanto Co.*, 558 F.2d 257 (5th Cir. 1977) ........................................................... 9

*Strickland v. USDA*, 736 F. Supp. 3d 469 (N.D. Tex. 2024) ....................................................... 19

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*,
600 U.S. 181 (2023)............................................................................................................. 14

*True Gun-All Equip. Corp. v. Bishop Int'l Eng'g Co.*, 26 F.R.D. 150 (E.D. Ky. 1960) ............... 9

*Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571 (2017)................................................ 20

*United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409 (6th Cir. 1991) ......................... 8, 12

*United States v. BASF-Inmont Corp.*, 819 F. Supp. 601 (E.D. Mich. 1993) ................................ 5

*United States v. Brown*, No. 11-13640, 2011 WL 5508922 (E.D. Mich. Oct. 28, 2011) ............ 23

*United States v. Cannons Eng'g Corp.*, 899 F.2d 79 (1st Cir. 1990) .......................................... 23

*United States v. Dayton Indus. Drum, Inc.*, No. 16-cv-232, 2021 WL 1248136
(S.D. Ohio Apr. 5, 2021)................................................................................................. 21, 23

*United States v. Johnson*, 319 U.S. 302 (1943) .......................................................................... 10

*United States v. Louisville Jefferson Cnty. Metro Gov't*, No. 24-cv-722,
2025 WL 238010 (W.D. Ky. Jan. 18, 2025)................................................................. passim

*United States v. Ward Baking Co.*, 376 U.S. 327 (1964).............................................................. 10

*United States v. Windsor*, 570 U.S. 744 (2013) ..................................................................... 15, 17

*W. States Paving Co. v. Wash. DOT*, 407 F.3d 983 (9th Cir. 2005)......................................... 4, 13

*Williams v. Vukovich*, 720 F.2d 909 (6th Cir. 1983).............................................................. passim

**STATUTES**

5 U.S.C. § 706................................................................................................................................ 14

28 U.S.C. § 530D..............................................................................................................................15

FAA Reauthorization Act of 2024, Pub. L. No. 118–63, 138 Stat. 1025 (2024) ........................ 18

Infrastructure Investment and Jobs Act, Pub. L. No. 117–58, 135 Stat. 429 (2021) ............. passim

## RULES AND REGULATIONS

49 C.F.R. § 26.1 ..................................................................................................... 2, 22

49 C.F.R. § 26.29 ....................................................................................................... 22

49 C.F.R. § 26.39 ....................................................................................................... 22

49 C.F.R. § 26.41 ......................................................................................................... 3

49 C.F.R. § 26.45 ......................................................................................................... 3

49 C.F.R. § 26.47 ..................................................................................................... 2, 3

49 C.F.R. § 26.5 ...................................................................................................... 4, 23

49 C.F.R. § 26.51 ..................................................................................................... 2, 3

49 C.F.R. § 26.67 ................................................................................................... 4, 22

Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 29, 2025) ........................................ 11

Federal Rule of Civil Procedure 24 ............................................................................... 8

## OTHER AUTHORITIES

DOJ, *Letters Submitted to Congress Pursuant to 28 U.S.C. § 530D: 2009 to Present*,
https://perma.cc/QFH3-8X99 (updated June 12, 2025) .................................................... 16

DOT, *History of the DOT DBE Program*, https://perma.cc/Z7H3-6HCD
(updated Jan. 5, 2015) ...................................................................................................... 2

*Driving Equity: The U.S. Department of Transportation's Disadvantaged Business
Enterprise Program Before the H. Comm. on Transp. & Infrastructure*, 116th Cong.
(Sep. 23, 2020), https://perma.cc/2MSM-T8YN (written testimony of Jon S.
Wainwright). ................................................................................................................ 25

Elaine S. Chao, *Remarks Delivered by U.S. Secretary of Transportation Elaine L. Chao For
DOT Women's History Month Celebration* (Mar. 13, 2018), https://perma.cc/55JU-
73C4 ............................................................................................................................... 3

Harold Butler et al., *Closing the Racial Wealth Gap*, Citi GPS: Glob. Persps. & Sols. (2024),
https://perma.cc/9Y2L-6GWM ...................................................................................... 21

Jacob Bogage & Faiz Siddiqui, *Musk's DOGE Weighs Recommendations to Cut Federal
Diversity Programs*, Wash. Post (Jan. 16, 2025), https://perma.cc/XV3F-HJGA ............ 11

Katherine Shaw, *Constitutional Nondefense in the States*, 114 Colum. L. Rev. 213 (2014) ....... 16

Memorandum from Acting Assistant Att'y Gen. Randolph D. Moss to Assoc. Att'y Gen. Raymond C. Fisher (June 15, 1999) ............................... 15

Michael T. Morley, *Consent of the Governed or Consent of the Government? The Problems with Consent Decrees in Government-Defendant Cases*, 16 U. Pa. J. Const. L. 637 (2014) ................................................................... 17

Order Denying Mot. to Expedite Appeal, *Texas v. United States*, No. 19-10011 (5th Cir. Feb. 14, 2019), Dkt. 106 ................................................ 16

Press Release, DOT, *President Trump's Transportation Secretary Sean P. Duffy Announces Availability of $5.4 Billion in Bridge Funding to Get America Building Again* (June 2, 2025), https://perma.cc/786H-FH4N ........................... 4

Press Release, WILL, *WILL Applauds Trump Executive Orders Ending Unconstitutional "DEI" Practices* (Jan. 21, 2025), https://perma.cc/8MBK-DGHP ................. 11

Ryan Mac et al., *Meet Elon Musk's Top Lieutenant Who Oversees DOGE*, N.Y. Times (Mar. 21, 2025), https://perma.cc/GCQ3-5X8G ........................... 11

WILL, *Roadmap to Equality*, https://perma.cc/37G5-BKKX (captured June 17, 2025) ............ 11

WILL, *Roadmap to Equality*, https://perma.cc/VG9R-UKHX (captured June 9, 2025).............. 11

Wis. Inst. for L. & Liberty, *Roadmap to Equality—Terminate, Settle, Investigate: Dismantling the "Equity Agenda"* (Feb. 7, 2025), https://perma.cc/8QBN-6YUY, updated March 2025, https://perma.cc/Z5A2-2XZN ................................ 11, 17

After forty-plus years, regular congressional reviews, and approval of every federal circuit court to consider it, the Department of Transportation's Disadvantaged Business Enterprise program is the subject of an extraordinary request now before the Court. The original parties ask the Court to use its awesome power to rubber stamp their newly shared constitutional interpretation and dramatically, and permanently, impair the program. They do so knowing that the weight of the case law contradicts their position, and that a coalition representing tens of thousands of small businesses is prepared to defend if the government throws in the towel on a program that has been a critical lifeline. And they aim to accomplish this by circumventing Intervenor DBEs and without allowing the Court to hear their evidence, benefit from expert testimony, or consider the full history, continuing today, of discrimination that the DBE program helps redress. Essentially, the original parties ask this Court to take their word for it. The Court should decline to do so.

The original parties' incredible request comes at a pivotal moment. Since this case's inception, the federal government, as it has before, defended the DBE program. But for the first time in decades, the administration indicated it may break from that position on President Trump's first day in office. Intervenor DBEs moved briskly to defend the program and assert their legal interests, a move this Court blessed merely weeks ago. Intervenor DBEs have had no opportunity to develop evidence, and this Court has had no opportunity to adjudicate their defenses. And Intervenors have not agreed to settle the matter. If the original parties want to settle, that is their right. But they should not be permitted to waive Intervenor DBEs' defenses and arguments. Doing so would conflict with both the letter and the spirit of the Supreme Court's leading intervention case. "[P]arties who choose to resolve litigation through settlement may not dispose of the claims of a third party, and *a fortiori* may not impose duties or obligations on a third party, without the

party's agreement." *Loc. No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 529 (1986). But that is precisely what the original parties seek to do here.

Approving the original parties' effort to make a private agreement a court-ordered decree, with constitutionally significant edicts, would deny Intervenor DBEs the opportunity to present their case and undermine the purpose of Federal Rule of Civil Procedure 24. By its terms, the proposal conflicts with decades of precedent upholding the program, violates foundational doctrine, and imposes a framework that is fundamentally unfair, inadequate, and unreasonable. Each reason is alone sufficient to reject the proposal motion. Collectively, they are insurmountable. Intervenor DBEs respectfully request that this Court deny the proposed consent order.

## BACKGROUND

For more than four decades, the Department of Transportation's Disadvantaged Business Enterprise ("DBE") program has helped remedy discrimination,[1] while enjoying broad bipartisan support in both Congress and the Executive Branch. The program, including regulations carefully crafted to meet constitutional scrutiny,[2] strikes a delicate balance between helping remedy discrimination for countless women and minority small business owners, while ensuring that funding recipients and contractors need only make good faith efforts to pursue nondiscrimination and a level playing field in transportation contracting. 49 C.F.R. §§ 26.1, 26.47, 26.51.

For the first 14 months of this litigation, the Defendants ("Administration") defended the program, just like their predecessors. Nonetheless, during his first two days in office, President Trump issued Executive Orders that implied his administration might break from decades of

---

[1] *See, e.g.*, DOT, *History of the DOT DBE Program*, https://perma.cc/Z7H3-6HCD (updated Jan. 5, 2015) (explaining the DBE program helps effectuate DOT's policy of "helping small businesses owned and controlled by socially and economically disadvantaged individuals, including minorities and women, in participating in contracting opportunities").
[2] The program's regulations were rewritten in the aftermath of *Adarand v. Pena*, 515 U.S. 200 (1995), for this very purpose.

bipartisan support and target elements of the longstanding DBE program for elimination. This change marked a stark departure from President Trump's own first administration,[3] and eleven other Secretaries of Transportation of varied political persuasions.

In light of the Administration's marked shift, a coalition of DBEs and organizations that represent them—National Association of Minority Contractors; Women First National Legislative Committee; Airport Minority Advisory Council; Women Construction Owners & Executives, Illinois Chapter; Atlantic Meridian Contracting Corp.; and Upstate Steel, Inc. (together "Intervenor DBEs")—recognized the need and moved to intervene to defend the program, their rights, and the rights of their members. Just four months later, one week after the Court granted Intervenor DBEs' motion and before they had any opportunity to seek discovery, the Administration announced it had changed its position. Proposed Consent Order ("PCO") ¶ 5, Dkt. 82-1. The Administration and the two plaintiff companies (together "Original Parties") asked this Court to enter a sweeping order that seeks to tie the hands of future administrations, not to mention state and local governments, and declare central elements of the DBE program unconstitutional. *See generally id*.

Two components of the DBE program are at the heart of this litigation and the PCO. First, Congress set a nonbinding, aspirational, nationwide goal that "not less than 10 percent" of surface transportation projects be expended with DBEs. Infrastructure Investment and Jobs Act ("IIJA"), Pub. L. No. 117–58, § 11101(e)(3), 135 Stat. 429, 449 (2021). The Secretary of Transportation may adjust the goal. 49 C.F.R. § 26.41(a). On the state and local level, each jurisdiction sets its own aspirational, data-based goal, untethered from the national goal, which must first be pursued through race-neutral means. *Id.* §§ 26.45, 26.51(a). Funding recipients who administer the program in good faith may not be penalized for failing to meet their goal. *Id.* § 26.47(a).

---

[3] *See, e.g.*, Elaine S. Chao, *Remarks Delivered by U.S. Secretary of Transportation Elaine L. Chao For DOT Women's History Month Celebration* (Mar. 13, 2018), https://perma.cc/55JU-73C4.

Second, DBEs are defined expansively, by statute and regulation, as firms that are majority owned by individuals who are both "socially and economically disadvantaged." *Id.* § 26.5; IIJA § 11101(e)(2)(b). All small businesses, regardless of the race or gender of their majority owners, may be certified as DBEs so long as they meet the definition of socially and economically disadvantaged. 49 C.F.R. § 26.67(d). Owners who belong to certain demographic groups[4] are "rebuttably presumed" socially and economically disadvantaged, *id.* § 26.67(a); IIJA § 11101(e)(2)(b), which can be overcome through a regulatory challenge, 49 C.F.R. § 26.67(b)-(c).

This flexible framework has been reauthorized by Congress numerous times and upheld by every federal circuit to consider it. *See Midwest Fence Corp. v. DOT*, 840 F.3d 932 (7th Cir. 2016); *W. States Paving Co. v. Wash. DOT*, 407 F.3d 983 (9th Cir. 2005); *Sherbrooke Turf, Inc. v. Minn. DOT*, 345 F.3d 964 (8th Cir. 2003); *Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147 (10th Cir. 2000). Nonetheless, the Original Parties now suggest that central components of the DBE program are unconstitutional, implying that those previous appellate cases were wrongly decided.

Rather than the Administration exercising administrative or regulatory power to achieve its policy goals,[5] or the Original Parties entering a private settlement, the Original Parties now ask the Court to sanction their novel constitutional theories in a court order and deprive Intervenor DBEs the opportunity to develop an evidentiary record. *See generally* PCO.

Beyond the legal declaration, the PCO seeks to:

- Ban the use of "DBE contract goals," *id.* ¶¶ 11-12;
- Impose that ban on jurisdictions based on the presence of any DBE who was certified on a "race- or sex-based presumption," *id.*, including those set forth in congressional enactments, *e.g.* 49 C.F.R. § 26.67(a); IIJA § 11101(e)(2)(b);

---

[4] These groups include women, Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, Subcontinent Asian Americans, or others identified by the Small Business Administration.

[5] But the Administration *is* taking steps to undermine the program. *See, e.g.*, Press Release, DOT, *President Trump's Transportation Secretary Sean P. Duffy Announces Availability of $5.4 Billion in Bridge Funding to Get America Building Again* (June 2, 2025), https://perma.cc/786H-FH4N.

- Bind the Federal Aviation Administration, *id.* ¶¶ 1-2, not a party to this litigation;
- Bind future administrations in perpetuity; and
- Coerce state and local governments into eliminating their own efforts to address discrimination faced by minority- and women-owned small businesses. *Id.* ¶ 12.

Meanwhile, the PCO completely fails to:

- Provide a basis to distinguish its legal conclusions from Supreme Court precedent supporting the constitutionality of remedial minority contracting programs;
- Address the record of evidence of intentional discrimination that the former administration previously put forward in this case;
- Define relevant terms, including "DBE contract goals," *see id.* ¶¶ 11-12;
- Provide details about enforcement;
- Impose any durational limit on its terms; or
- Explain why Intervenor DBEs should not be able to develop their case.

On May 29, 2025, Intervenor DBEs notified the Court of their intent to oppose the proposed consent order. *See* Notice of Intent to File Opp'n, Dkt. 83.

## LEGAL STANDARD

Courts evaluating consent decrees typically consider a range of factors. Consent decrees must not be illegal or "tainted with collusion." *Williams v. Vukovich*, 720 F.2d 909, 921 (6th Cir. 1983). Courts must ensure they are "fair, adequate, and reasonable, as well as consistent with the public interest," *Pedreira v. Sunrise Children's Servs., Inc.*, 802 F.3d 865, 872 (6th Cir. 2015), and that any agreement is "fair and reasonable to those it affects." *Vukovich*, 720 F.2d at 921. Any affected parties must be "afforded a full and fair opportunity to consider the proposed [agreement] and develop a response," and courts provide a "forum for all interested parties to comment." *Id.* Absent demonstrating that each of those factors has been fulfilled, an agreement should not be approved. *See generally id.*, 720 F.2d at 909; *Pedreira*, 802 F.3d at 865.

Importantly, the Court may not "rewrite" a proposed agreement to cure flaws. *See, e.g.*, *United States v. BASF-Inmont Corp.*, 819 F. Supp. 601, 608 (E.D. Mich. 1993).

This Court does *not* have the power to order specific changes or modifications to be made in the agreement. Only the parties … have the power to agree upon

> changes. The Court's power, should it not approve the agreement as written, is therefore limited to either rejecting the agreement, without comment, or, in the alternative, to rejecting the agreement with suggestions and recommendations.

*Bronson v. Bd. of Educ. of City Sch. Dist. of Cincinnati*, 604 F. Supp. 68, 73 (S.D. Ohio 1984) (emphasis original); *see also Cochran v. Zeon D.P., LLC*, 638 F. Supp. 2d 759, 761 (W.D. Ky. 2009) ("[T]he Court may not fashion its own settlement" and so the "'settlement must stand or fall as a whole.'" (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1332 (5th Cir. 1977)).

## ARGUMENT

### I. The Proposed Consent Order Should be Rejected Because It Would Resolve Intervenor DBEs' Interests Without Their Consent

There are only two ways any lawsuit can be resolved: by adjudication or by agreement of the parties. *See, e.g.*, *Janus v. Miller*, 801 F.2d 578, 581 (2d Cir. 1986). Here, the PCO is neither. In this procedural posture, there should be no question that the PCO is not the result of an adjudication on the merits. But "agreement of the parties" is likewise lacking, as Intervenor DBEs, who are parties to this case, have not consented. A consent decree is an "'extraordinary'" step that is unwarranted and inappropriate at this stage. *See United States v. Louisville Jefferson Cnty. Metro Gov't*, No. 24-cv-722, 2025 WL 238010, at \*1-2 (W.D. Ky. Jan. 18, 2025) (citation omitted).

#### A. The PCO Aims to Circumvent Intervenor DBEs and Usurp Court Authority

The Original Parties *could* resolve plaintiffs' claims by entering into a "bilateral agreement" with "their own timeframe, benchmarks, outside reviewer, and enforcement mechanisms," but "without the need for judicial approval and ongoing involvement." *Louisville Jefferson*, 2025 WL 238010, at \*2. And depending on the terms, Intervenor DBEs could conceivably agree to resolve the matter in its entirety under Federal Rule of Civil Procedure 41(a)(1)(A)(ii). Alternatively, the parties, including Intervenor DBEs, may "publicly offer[] evidence and air[] their competing positions at a trial." *Id.* But the Original Parties should not be

permitted to extinguish Intervenor DBEs' interests here without so much as asking for their position.[6] While the original parties may "choose to resolve litigation through settlement[, they] may not dispose of the claims of a third party." *See Firefighters*, 478 U.S. at 529.[7] Intervenor DBEs have a right to litigate their own interests in this case. Yet here, the Original Parties seek a "consent order" but without the "consent" of Intervenor DBEs.

The Original Parties ask the Court to convert their private settlement into a judgment, which adds judicial credibility, heft, and "power and prestige" otherwise absent. *See Vukovich*, 720 F.2d at 920; *see also Louisville Jefferson*, 2025 WL 238010, at *1 (explaining a "judge's direct involvement in … policymaking [by virtue of approving consent decrees] represents a further encroachment on the democratic process"). Troublingly, the PCO asks the Court to blindly agree that in "its independent analysis, the Court … holds and declares" that the DBE program violates equal protection. *See* PCO ¶ 11. Yet simultaneously, the Original Parties ask the Court to forgo findings of fact and conclusions of law; in other words, to forgo the Court's own independent analysis the PCO proclaims has occurred. *See* Joint Mot. for Entry of Consent Order 1, Dkt. 82. The Court "is more than 'a recorder of contracts' from whom parties can purchase injunctions; it is an organ of government constituted to make judicial decisions." *Firefighters*, 478 U.S. at 525 (citation modified). This Court should not enter a consent judgment where the parties' stipulations

---

[6] *See* Ex. 1, Decl. of Sarah von der Lippe ¶¶ 2-3.

[7] The Supreme Court has clarified that an intervenor "does not have power to block the decree merely by withholding its consent" where the decree relates only to a dispute of the settling parties. *See Firefighters*, 478 U.S. at 528-29 ("It has never been supposed that one party—whether an original party, a party that was joined later, or an intervenor—could preclude other parties from settling their own disputes and thereby withdrawing from litigation."). Here, the Original Parties seek not only to resolve *their* dispute, but also to preclude Intervenor DBEs from litigating their interests. That result would contravene *Firefighters*'s holding. Moreover, Intervenor DBEs cannot withhold consent they were never asked to provide. *See* Ex. 1 ¶¶ 2-3. Finally, Intervenor DBEs have done much more than "merely" oppose the PCO: They have explained how it would cut off their opportunity to defend the DBE program, condone collusion, and memorialize by decree an unfair, unreasonable, and inadequate private agreement.

"would determine questions of fact which are highly controversial and establish as principles of law theories highly debatable." *Macklin v. Kaiser Co.*, 69 F. Supp. 137, 140 (D. Or. 1946).[8] With respect to constitutional or jurisdictional questions—like those the PCO would purport to resolve, *see* PCO ¶¶ 11-12—the "[c]onsent of the parties can establish neither the one or the other." *Macklin*, 69 F. Supp. at 140. The Sixth Circuit has confirmed that courts must undertake an "'independent evaluation'" and avoid "'rubber stamp approval'" of proposed consent judgments. *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1435 (6th Cir. 1991) (citation omitted).

Binding precedent, Federal Rule of Civil Procedure 24, and the PCO's effort to usurp the Court's role and exclude a duly recognized party[9] are alone sufficient reasons to reject it.

   B.   *The PCO would Impose the Very Harm Intervenor DBEs Seek to Avoid*

The Sixth Circuit's treatment of appeals of consent decrees demonstrates the importance of ensuring Intervenor DBEs have a chance to develop their case. The Circuit has emphasized that any "party to the case can appeal any final judgment—including a consent decree—that imposes some detriment on the party." *Pedreira*, 802 F.3d at 869 (citation modified). In *Pedreira*, the plaintiffs and one defendant reached an agreement and, like here, asked the court to exercise continuing jurisdiction over its terms. The other defendant, Sunrise Children's Services, opposed the agreement. The Circuit remanded for the district court to evaluate the proposed settlement under the proper framework, including considering whether it was fair, adequate, reasonable, and consistent with the public interest. *Id.* at 872. In doing so, the Circuit highlighted that the agreement

---

[8] Historically, the questions at issue here have not been "highly controversial" or "highly debatable," as evidenced by bipartisan support and line of cases upholding the DBE program. The "highly controversial" or "highly debatable" nature of the PCO is a product of the Original Parties' own making, and is evidenced by the strong opposition of the Intervenor DBEs alone.

[9] This Court has recognized Intervenor DBEs as parties in this case. *E.g.*, Order 1 n.1, Dkt. No. 85 (noting that Intervenor DBEs are "parties" whose position must be taken into account); *see also generally* Op. & Order, Dkt. No. 78 (granting Intervenor DBEs' Mot. to Intervene); *cf. Moses v. City of Perry*, 90 F.4th 501 (6th Cir. 2024) (explaining a nonparty becomes a party when its motion to intervene is granted).

imposed the very type of harm that Sunrise had sought to avoid throughout the litigation as a sign that it may fail that standard. So too here. If approved, the PCO would impose the very harm— loss of a crucial tool to help fight discrimination in access to federally funded transportation contracts—that Intervenor DBEs sought to avoid by intervening in this litigation. *Compare* Order Granting Mot. to Intervene, at 11-12, Dkt. 78 (acknowledging that Intervenor DBEs' businesses "rely heavily on the DBE program to obtain contracts," that "the upshot of any unfavorable ruling on the DBE program would result in them no longer having access to contracts for their respective transportation businesses," and that the goal of the litigation is "to end the DBE program once and for all" (citation modified)), *with Pedreira*, 802 F.3d at 872 (noting that throughout the litigation, Sunrise had "sought a merits adjudication" and the decree would impose the "very[] harm that Sunrise sought to avoid by means of 15 years of litigation").

C.      *The PCO Undermines Federal Rule of Civil Procedure 24*

Moreover, allowing the Original Parties to resolve these claims without the consent or even participation of Intervenor DBEs would thwart the goals of Rule 24. Intervention serves to "put [the intervenor] in position to assert in [an existing] suit a right which it has in respect to something in dispute between the original parties." *True Gun-All Equip. Corp. v. Bishop Int'l Eng'g Co.*, 26 F.R.D. 150, 151 (E.D. Ky. 1960). Courts have long recognized that a key purpose of Rule 24 is "to protect non-parties from having their interests adversely affected by litigation conducted without their participation." *E.g.*, *Stallworth v. Monsanto Co.*, 558 F.2d 257, 265 (5th Cir. 1977).

That purpose is frustrated if Intervenor DBEs are granted party status in name only. Rule 24 would be meaningless if the Original Parties, upon learning that the Court granted Intervenor DBEs' right to participate because of potential adverse effects, could nonetheless deprive them of any opportunity to litigate their legal interests. *See* Order Granting Mot. to Intervene 12 (noting

that Intervenor DBEs "easily clear" the threshold for showing that their ability to protect their own legal interest could be impaired by resolution of the case without their participation). But that is exactly what the Original Parties seek to do through the PCO. Allowing the Original Parties to bar Intervenor DBEs from asserting their position is particularly inappropriate where, as here, discovery is in the nascent stages and Intervenor DBEs intend to present a robust defense of the statute.[10] *Cf. also United States v. Ward Baking Co.*, 376 U.S. 327, 769 (1964) (vacating a district court's "consent judgment" in an antitrust matter because the objecting party had not consented and could have adduced evidence at trial that would have justified the requested relief).

## II.     PCO Should be Rejected Because it is Tainted with Collusion

The PCO bears indications of a product of egregious collusion that should be rejected. *See Vukovich*, 720 F.2d at 920 (explaining courts may not approve consent decrees that are "a product of collusion"). Concerns about collusion should prompt "reservations" about the fairness of the PCO. *See 326 Land Co. v. City of Traverse City*, No. 22-cv-45, 2023 WL 3033175, at *13 (W.D. Mich. Apr. 21, 2023). Litigation infected with collusion lacks the "honest and actual antagonistic assertion of rights to be adjudicated—a safeguard essential to the integrity of the judicial process, and one which [the Supreme Court has] held to be indispensable to adjudication of constitutional questions." *United States v. Johnson*, 319 U.S. 302, 305 (1943) (citation modified).

In the days leading up to the presidential transition, Plaintiffs' counsel Wisconsin Institute for Law & Liberty prepared a report that "categorized programs across 13 federal departments and offices in three buckets: terminate, settle and investigate," identifying potential cuts that Plaintiffs'

---

[10] Plaintiffs seem to agree, opposing Intervenor DBEs' motion to intervene, in part because Intervenor DBEs "would *not* be precluded from …putting forward evidence of discrimination" at a later stage of the case. Pls.' Opp'n to Intervenor DBEs' Mot. to Intervene 4 n.6, Dkt. 67 (citation modified); *cf. also* Intervenor DBEs' Reply in Supp. Mot. to Intervene 4 n.2, Dkt. 70 ("Intervenor DBEs' do not oppose staying the pending discovery deadlines but respectfully request that this Court refrain from entering any settlement agreement or other resolution of this case absent participation by Intervenor DBEs.").

counsel termed (incorrectly, to Intervenor DBEs') as "diversity, equity and inclusion" spending.[11] The DBE program was in the crosshairs of this report. *Id.* An incoming leader of the "Department of Government Efficiency" reportedly requested a copy of Plaintiffs' counsel's report before President Trump's inauguration. *Id.*[12] In the publicly available published report, Plaintiffs' counsel baldly urged the Administration to settle this very case, characterized the targeted initiatives as "indefensible," and urged the Administration "to root out DEI from the federal bureaucracy."[13]

After President Trump signed a January 20 Executive Order requiring agencies to recommend actions "to align agency or department … consent orders, and litigating positions with the policy" outlined therein,[14] *see* Intervenor DBEs' Mot. to Intervene 9-11, Dkt. 57, Plaintiffs' counsel characterized that order as having "answered our call to action."[15] The next day, Plaintiffs represented to this Court that they "anticipate[d] this lawsuit to be among the litigating positions that are re-assessed" under the January 20 order. Pls.' Opp'n to Mot. to Intervene 2 n.2, Dkt. 55. And indeed, only three weeks later, the Administration indicated that it was considering a change

---

[11] Jacob Bogage & Faiz Siddiqui, *Musk's DOGE Weighs Recommendations to Cut Federal Diversity Programs*, Wash. Post (Jan. 16, 2025), https://perma.cc/XV3F-HJGA.

[12] *See also* Ryan Mac et al., *Meet Elon Musk's Top Lieutenant Who Oversees DOGE*, N.Y. Times (Mar. 21, 2025), https://perma.cc/GCQ3-5X8G.

[13] Wis. Inst. for L. & Liberty ("WILL"), *Roadmap to Equality—Terminate, Settle, Investigate: Dismantling the "Equity Agenda,"* at 2-3 (Feb. 7, 2025), https://perma.cc/8QBN-6YUY ("WILL Feb. 7"), updated March 2025, https://perma.cc/Z5A2-2XZN ("WILL March 2025"); *see also id.* at 16 (linking to a page on Plaintiffs' counsel's website announcing the Court's Order on the Motion to Clarify, Dkt. 50, and recommending "Settle" as the "Action to Take" with respect to the "Federal DBE Program"). Plaintiffs' counsel's website is currently tracking the new administration's progress in implementing their "Roadmap to Equality." As of June 9, 2025, after Intervenor DBEs had filed their notice to oppose the PCO, Notice of Intent to File Opp'n, that site listed the "Proposed Outcome" for the "Federal DBE Program" as "Settle," and marked that as 50% completed. *See* WILL, *Roadmap to Equality*, https://perma.cc/VG9R-UKHX (captured June 9, 2025). Merely days later, as of June 17, 2025, the site listed that same goal as 100% completed. WILL, *Roadmap to Equality*, https://perma.cc/37G5-BKKX (captured June 17, 2025). If the Original Parties have entered a private settlement to resolve their claims during the intervening time, they have not notified Intervenor DBEs, *see* Ex. 1 ¶ 4, or filed anything on the docket.

[14] Exec. Order No. 14151, 90 Fed. Reg. 8339, 8340 (Jan. 29, 2025).

[15] Press Release, WILL, *WILL Applauds Trump Executive Orders Ending Unconstitutional "DEI" Practices* (Jan. 21, 2025), https://perma.cc/8MBK-DGHP.

of position in the Original Parties' joint motion for a stay "to permit Defendants the opportunity to consider their litigating position in this case and the Parties an opportunity to explore settlement." Mot. to Stay 2, Dkt. 69.

For three and a half months, the Original Parties provided no updates on the potential settlement. Then, one week after the Court granted Intervenor DBEs' motion, the Original Parties filed the PCO, documenting the Administration's announcement that, as Plaintiffs foreshadowed, it had decided "that the [DBE] program's use of race- and sex-based presumptions is unconstitutional." PCO ¶ 5.[16] The steady, predictable march from Plaintiffs' counsel's urging that the Administration settle this case to a proposed consent order that wholeheartedly endorses Plaintiffs' legal positions[17] has not been marked by the kind of "adversarial negotiations" that lead to a just agreement. *See Cruz v. JKS Ventures, Inc.*, No. 23-cv-8311, 2024 WL 814563, at *6 (S.D.N.Y. Feb. 26, 2024). The pre-ordained change in the Administration's position, unaccompanied by any new briefing or discovery since the presidential transition, resulted in the "anomaly that both litigants desire precisely the same result." *Moore v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 47, 47-48 (1971) (dismissing appeal). This Court should not permit the

---

[16] Any "presumption in favor of voluntary settlement," *Akzo Coatings*, 949 F.2d at 1436, is overcome where, like here, there are "concerns about the possibility of collusion … that the parties' Joint Brief does not resolve" or where the parties have not demonstrated that "the proposed settlement is fair, adequate, reasonable and in the public's interest." *326 Land Co.*, 2023 WL 3033175, at *13-14 (declining to approve a proposed consent decree even over the plaintiff's argument that "public policy supports a presumption in favor of voluntary settlement of lawsuits").

[17] And indeed, the Administration, through the PCO, offers the Plaintiffs more than they originally asked for in this case. *Compare, e.g.*, Compl. 16-17, Dkt. 1 (seeking relief including a declaration that "Sections 11101(e)(2)-(3) of the Infrastructure Act, the Small Business Act, 49 C.F.R pt. 26, and 13 C.F.R. pt. 124, are unconstitutional"; and seeking to enjoin "Defendants from applying race and gender-based classifications in the *federal* DBE program" (emphasis added)), *with* PCO ¶¶ 1-2, 9, 12 (including "the FAA Reauthorization Act of 2024" in the statutes it seeks to stipulate are unconstitutional and claiming to apply to "federal, state or local DOT-funded projects"); *cf. also infra* Sec. III.E (describing ways the PCO would expand on the Court's preliminary relief).

Original Parties to wreak generational change on a nationwide, statutorily authorized contracting program at the constitutional level by a collusive agreement with the Court's imprimatur.

## III. The Proposed Consent Order Should be Rejected Because it is Inconsistent with Federal Law

The PCO should also be rejected because it is inconsistent with the text and fundamental principles of multiple areas of federal statutory, constitutional, and common law.

### A. The PCO is Inconsistent with the Law on the Merits of the DBE Program

It goes without saying that the PCO is inconsistent with the statute and regulations that it seeks to undermine. But it also stands in stark contrast with decades of precedent.

Congress, this Court, and at least four other circuits have acknowledged that the DBE program seeks to remedy past discrimination. This Court explained that "racial barriers still persist when it comes to the success of minority-owned businesses," even while granting preliminary relief. PI & MTD Op. 18, Dkt. 44 (finding the Administration's evidence "too broad," but leaving open the possibility that more precise evidence could be marshalled at a later stage of this litigation). When reauthorizing the DBE program in 2021, Congress concluded "discrimination and related barriers continue to pose significant obstacles for minority- and women-owned businesses seeking to do business in Federally assisted surface transportation markets across the United States" based on a review of "testimony and documentation of race and gender discrimination from numerous sources" demonstrating that "race- and gender-neutral efforts alone are insufficient to address the problem." IIJA §§ 11101(e)(1)(A), (C). At least four other circuits[18] have concluded the program is constitutional. But the Administration, which previously agreed on constitutionality and the purpose of remedying discrimination, has, apparently, "reevaluated" both

---

[18] *See, e.g.*, *Midwest Fence Corp.*, 840 F.3d 932; *W. States Paving*, 407 F.3d 983; *Sherbrooke Turf*, 345 F.3d at 967; *Adarand Constructors*, 228 F.3d 1147.

positions. PCO ¶ 6 ("Defendants previously defended the presumption as seeking to remedy past discrimination. Defendants, however, have reevaluated their position[.]") (citation omitted).

Instead of addressing these findings or comporting with those holdings, the PCO seems to suggest that "strict scrutiny is strict in theory, but fatal in fact," a concept that the Supreme Court denounced in its precedent explaining that the DBE program can survive strict scrutiny if appropriately tailored. *See Adarand*, 515 U.S. at 237 (citation modified); *compare* PCO ¶¶ 6-7. To justify their position, the Original Parties appear to rely entirely on *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023) ("*SFFA*"), Supreme Court precedent applicable to higher education admissions. PCO ¶¶ 6-7. But *SFFA* was issued months before this case was filed,[19] and the government has defended the DBE Program, distinguishing *SFFA*, since its first substantive filing in this litigation. *See* MTD 16-17, Dkt. 31 (clarifying that *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989), controls and explaining that "[n]othing in *SFFA* affects *Croson*'s conclusion that 'evidence of a pattern of individual discriminatory acts can, if supported by appropriate statistical proof, lend support to a local government's determination that broader remedial relief is justified'" (quoting *Croson*, 488 U.S. at 509)).

Worse, the Administration attempts to rollback regulations authorizing the DBE program through the PCO, which would improperly sidestep its obligations under the Administrative Procedure Act. *See* 5 U.S.C. § 706(2). The federal government has long recognized that its settlements must "conform to the terms" of the APA, specifically noting that settlements committing the executive branch to promulgate rules without notice-and-comment were "likely to raise serious concerns." Mem. from Acting Ass't Att'y Gen. Randolph D. Moss to Assoc. Att'y Gen. Raymond C. Fisher, at 129, 164 (June 15, 1999). The same is true if a consent decree would

---

[19] *Compare SFFA*, 600 U.S. 181 (decided June 29, 2023), *with* Compl. (filed Oct. 26, 2023).

"permanently and substantially" amend a rule otherwise subject to statutory rulemaking. *See Conservation Nw. v. Sherman*, 715 F.3d 1181, 1187 (9th Cir. 2013). Here, the government is attempting to not just quietly amend existing regulations, but to upend them wholesale.

The PCO should be rejected because it fails to provide any explanation for the Administration changing its legal interpretation midstream and is inconsistent with Congressional reauthorizations, this Court's findings, the APA, and decades of relevant case law.

### B.      The PCO Violates 28 U.S.C. § 530D

The PCO also should be rejected because it skirts federal statutory notice requirements. *Cf. Conservation Nw.*, 715 F.3d at 1185 ("[A] district court may not approve a consent decree that 'conflicts with or violates' an applicable statute." (quoting *Firefighters*, 478 U.S. at 526)). When the Justice Department decides not to defend the constitutionality of "any Federal statute, rule, regulation, program, policy, or other law," it must submit a report, including specific contents, to Congress, 28 U.S.C. § 530D(a)(1)(B)(ii), (c).[20] It apparently failed to do so here.

Section 530D's requirements serve vital ends. It provides Congress, or any subset, a reasonable opportunity to defend the statute. 28 U.S.C. § 530D(b)(2). Numerous courts have recognized Congress's vital and unique interests in defending its duly enacted laws. *See, e.g., United States v. Windsor*, 570 U.S. 744, 744 (2013) (noting intervention by House Bipartisan Legal Advisory Group to defend the Defense of Marriage Act); Order Denying Mot. to Expedite Appeal, *Texas v. United States*, No. 19-10011 (5th Cir. Feb. 14, 2019), Dkt. 106 (granting intervention to the House to defend the Affordable Care Act). The transparency Section 530D guarantees "can help guard against the erosion of the distinction between constitutional law and pure politics" since

---

[20] Under Section 530D(a)(2), reports must be submitted to the majority and minority leaders of the Senate; the Speaker and the majority and minority leaders of the House; the Chairpersons and ranking minority members of the Senate and House Judiciary Committees; and the Senate Legal Counsel and the General Counsel of the House of Representatives.

the requirement to "publicly articulate their objections in constitutional terms" reduces the chances that the executive "will refuse to defend laws they find merely politically troubling, rather than genuinely constitutionally objectionable."[21]

Despite the clear obligation to promptly notify Congress upon a change of position, there is no indication that the Administration provided a 530D notice here.[22] And not for lack of opportunity. The Administration's failure to abide by Section 530D is inexcusable as it contemplated settlement as early as February 10, 2025, *see* Mot. to Stay 2, and publicly announced its change of position and determination it would no longer fully defend the DBE program in this litigation on May 28. PCO ¶¶ 5-9. While the Administration has not satisfied its statutory obligations under Section 530D, there is no question that it is aware of its obligations. In 2025 alone, the Justice Department has issued twelve Section 530D reports to Congress, including two in May and one in June. None of those reports address the DBE program. The Court should not allow the Administration to flout its statutory notice obligations by approving the PCO.

### C.    The PCO Violates the Separation of Powers

This Court should also reject the PCO because it would permit the executive branch to hamstring by agreement a statutorily created program, without any congressional act or holding of unconstitutionality following full merits briefing or a trial before a duly authorized federal court.

> [C]onsent decrees in government-defendant cases raise serious separation-of-powers problems because they allow executive officials and agencies to improperly entrench their preferred policies, interpretations of the law, and enforcement priorities against changes by subsequent administrations, without having a court decide whether such restrictions are legally or constitutionally required.[23]

---

[21] Katherine Shaw, *Constitutional Nondefense in the States*, 114 Colum. L. Rev. 213, 274 (2014).
[22] *See* DOJ, *Letters Submitted to Congress Pursuant to 28 U.S.C. § 530D: 2009 to Present*, https://perma.cc/QFH3-8X99 (updated June 12, 2025).
[23] Michael T. Morley, *Consent of the Governed or Consent of the Government? The Problems with Consent Decrees in Government-Defendant Cases*, 16 U. Pa. J. Const. L. 637, 675 (2014).

The DBE program was re-authorized by Congress just four years ago. IIJA § 11101(e). "[W]hen Congress has passed a statute and a President has signed it, it poses grave challenges to the separation of powers for the Executive at a particular moment to be able to nullify Congress' enactment solely on its own initiative and without any determination from the Court." *Windsor*, 570 U.S. at 762.[24] As a result, "district judges should be on the lookout for attempts to use consent decrees to make end runs around the legislature." *Kasper v. Bd. of Election Comm'rs of Chi.*, 814 F.2d 332, 340 (7th Cir. 1987).[25]

Since the proposed consent order has no end date, it purports to bind all future administrations. As the Supreme Court has acknowledged, "public officials sometimes consent to, or refrain from vigorously opposing, decrees that go well beyond what is required by federal law," which can then "bind … officials to the policy preferences of their predecessors and may thereby improperly deprive future officials of their designated … executive powers." *Horne v. Flores*, 557 U.S. 433, 449 (2009) (citation modified); *see also Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 441 (2004) ("If not limited to reasonable and necessary implementations of federal law, remedies outlined in consent decrees involving state officeholders may improperly deprive future officials of their designated legislative and executive powers.").

Ultimately, a court evaluating a proposed consent decree must "be alert to the possibility that the consent decree is a ploy in some other struggle," *Dunn v. Carey*, 808 F.2d 555, 560 (7th Cir. 1986). Such is the case here. Plaintiffs and the Administration hope to accomplish through

---

[24] In the February 7 version of its report, Plaintiffs' counsel agreed, noting that changing "federal law is not simply an exercise of executive power, but of legislative power." That language, and an entire paragraph about the president's role in crafting law, was deleted in the March version. *Compare* WILL Feb. 7 at 3 *with* WILL March 2025 at 3; *see also supra* n.13.

[25] *See also Ragsdale v. Turnock*, 941 F.2d 501, 517 (7th Cir. 1991) (Flaum, J., concurring in part and dissenting in part) ("[I]t is not uncommon for consent decrees to be entered into on terms favorable to those challenging governmental action because of rifts within the bureaucracy or between the executive and legislative branches.").

agreement what they cannot muster the political will to do through appropriate, lawful processes:
Significantly dismantle a federal program that has been regularly reauthorized by Congress with
broad, bipartisan support and repeatedly held constitutional by successive federal courts of
appeals. *See* IIJA; *see also supra* n.18 and accompanying text. This Court should not permit the
Original Parties to make an end-run around the other two, co-equal branches of government.

      D.     *The PCO is Inconsistent with Jurisdictional Law and is Not Administrable*

      The Court should not approve the PCO because it raises jurisdictional concerns, would
primarily benefit non-parties not capable of enforcing it, and would indirectly bind non-parties
who have not been afforded notice and an opportunity to be heard.

      This Court lacks jurisdiction to enter the PCO because it sweeps beyond the bounds of this
case by seeking to impair the FAA Reauthorization Act of 2024, a statute which Plaintiffs have
never challenged. A consent decree "must come within the general scope of the case made by the
pleadings, and must further the objectives of the law upon which the complaint was based."
*Firefighters*, 478 U.S. at 525 (citation modified). Here the PCO fails on both counts. Plaintiffs did
not levy any claims against the FAA Reauthorization Act in their complaint nor did they even cite
the statute. *See generally* Compl. Nor could they have; the FAA Reauthorization Act of 2024 was
signed into law on May 16, 2024, more than six months after Plaintiffs commenced this action.
*See* Pub. L. No. 118–63, 138 Stat. 1025, 1025 (2024). There is no evidence in the record that they
bid on any projects related to airport construction. This Court lacks jurisdiction to issue the relief
sought by the Original Parties from a statute that has never been at issue in this case.

      The Court should also reject the PCO because it imposes a sprawling, nationwide
injunction that is largely not enforceable or administrable. "A consent decree 'is not enforceable
directly or in collateral proceedings by those who are not parties to it,'" and "[e]ven intended third-

party beneficiaries of a consent decree lack standing to enforce its terms." *Evoqua Water Techs., LLC v. M.W. Watermark, LLC*, 940 F.3d 222, 229 (6th Cir. 2019) (citation modified). By its terms, the PCO would prohibit DOT from approving "any federal, state or local DOT-funded projects with DBE contract goals" in any jurisdiction where "any DBE in that jurisdiction was determined to be eligible based on a race- or sex-based presumption." PCO ¶ 12. Clearly, this extends beyond contracts to which Plaintiffs are or will be a party, yet only Plaintiffs may enforce the PCO's terms. Any contractor who is not a party to this action would have no way to enforce the PCO. Nor could Plaintiffs reasonably take on the role of private attorney general, moving for enforcement whenever they suspect a potential violation, without "mak[ing] an unwarranted claim on scarce judicial resources." *CFPB v. Fifth Third Bank, N.A.*, No. 21-cv-262, 2024 WL 3451080, at *2 (S.D. Ohio Jul. 18, 2024) (noting that "courts should hesitate to enter judicial orders that are difficult to administer").

### E.  The PCO is Inconsistent with Remedies Law

The PCO should also be rejected as a collusive attempt by the Original Parties, without articulating a legal basis, to broaden the scope of relief preliminarily issued by this Court. PI & MTD Op. 25-27 (holding that "redressability in the present case is properly limited to the parties before the Court" and characterizing the nationwide injunction Plaintiffs sought as "unwise"); Order on Mot. to Clarify 8 (continuing to limit relief to Plaintiffs when clarifying scope of injunction). A court-ordered remedy must "be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis v. Casey*, 518 U.S. 343, 357 (1996). And courts "should not issue an equitable remedy 'more burdensome to the defendant than necessary to redress' Plaintiffs' injuries." *Strickland v. USDA*, 736 F. Supp. 3d 469, 487 (N.D. Tex. 2024) (citation omitted). In *Strickland*, this principle prompted the district court to limit preliminary relief

to protect only the plaintiffs. *Id.* Similarly, this Court already once concluded that "redressability in the present case is properly limited to the parties before the Court." PI & MTD Op. 27.

By contrast, through the PCO, the Original Parties seek an order significantly expanding that relief,[26] including by taking it nationwide based on six stipulations. PCO ¶¶ 5-10, 12. These include stipulations in seeming tension with one another. *Compare id.* ¶ 8 ("Defendants stipulate and agree that the DBE program's use of race- and sex-based presumptions of social and economic disadvantage, as described above, violates the" Fifth Amendment's Due Process Clause.), *with id.* ¶ 9 ("Defendants do not admit to liability under the Constitution or laws of the United States and assert that they acted in full compliance with all applicable laws" except that "Defendants stipulate for the purposes of this Consent Order that the determination of DBE eligibility using race- and sex-based presumptions … is not supported by the Constitution as currently interpreted under equal protection jurisprudence."). This Court should require more before it signs off on such an expansion of relief, particularly where, as here, there is a credible allegation of collusion. *See supra* Sec. II; *cf. Louisville Jefferson*, 2025 WL 238010, at *6 ("Having chosen the 'extraordinary' device of a consent decree, the United States and the City of Louisville owe it to this Court and the people to explain the facts that led them here.").[27]

## IV. The Proposed Consent Order Should Be Rejected because it would Not Be a Fair, Adequate, or Reasonable Resolution of the Dispute

Likewise, the PCO should also be rejected because it is not fair, adequate, and reasonable. *See Pedreira,* 802 F.3d at 872. Although there is "little in the way of specific guidance" for courts

---

[26] *See e.g.*, *supra* pp. 3-5 (Background); *supra* nn.14-15 and accompanying text; *infra* Sec. III(e).

[27] While courts may issue broader, even nationwide, injunctive relief in an appropriate case, *see Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 582 (2017) (leaving in place nationwide injunctions to the extent they covered "parties similarly situated to" the plaintiffs), this Court should not permit the Original Parties to expand the scope of relief that the Court deemed proper without subjecting that expansion to the crucible of adversarial litigation.

to assess that standard, fairness, adequacy, and reasonableness are general guideposts. *E.g.*, *Louisville Jefferson*, 2025 WL 238010, at *3 n.3. In conducting these evaluations, courts regularly consider factors including: the level of candor during negotiations, openness, bargaining balance, and time spent reaching the settlement. *See, e.g.*, *United States v. Dayton Indus. Drum, Inc.,* No. 16-cv-232, 2021 WL 1248136, at *5 (S.D. Ohio Apr. 5, 2021). Other relevant factors include weighing the "[P]laintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement," the public interest, and, if enforcing a statute, if it's consistent with the "public objectives sought to be attained by Congress." *Vukovich*, 720 F.2d at 922-23.

Even a cursory review of the facts around the PCO demonstrates that it is not a fair, adequate, or reasonable resolution of this matter.[28] The PCO seeks to permanently impair the DBE program by creating coercive requirements that no jurisdiction could comply with even if it wanted. And it asks the Court to exercise jurisdiction over its terms in perpetuity, without any duration or time limit. Paragraph 12 prohibits the use of DBE contract goals, an undefined, unfair term (*see infra* p. 24), "where any DBE in that jurisdiction was determined to be eligible based on a race- or sex-based presumption." PCO ¶ 12. Who must have made that determination? And when? By the plain language of the provision, a jurisdiction would be barred from using DBE goals if it had ever previously certified any DBE under the federal race- and sex-based rebuttable

---

[28] Intervenor DBEs were provided a courtesy copy, by email, of an amicus brief signed by the State of Idaho. As of this filing, no such brief currently appears on the docket and thus Intervenor DBEs are unsure if or when it may appear or its contents. Without waiving any arguments or opportunities to address any amicus brief that is subsequently docketed in support of the PCO, Intervenor DBEs state that the brief in their possession is rife with disparaging claims about DBEs, irrelevant facts and law, mischaracterizations of data and precedent, and does not support the fairness, adequacy, or reasonableness of the PCO. Instead, it argues only that the DBE program itself is unfair, relying largely on non-binding precedent and unsupported assertions. But that is not the question before the Court on this motion. *See, e.g.*, *supra* "Legal Standard," "Argument." Even if the brief was on point, amici's cost argument necessarily fails by not accounting for the trillions of dollars in costs that race and sex discrimination impose on the economy by reducing development of new minority- and women-owned firms. *See generally, e.g.*, Harold Butler et al., *Closing the Racial Wealth Gap*, Citi GPS: Glob. Persps. & Sols. (2024), https://perma.cc/9Y2L-6GWM.

presumption, even if the jurisdiction had no such current active certifications. So, too, would a jurisdiction be barred from using DBE goals if even a single DBE was certified 15 years ago using a presumption, but that certification had lapsed and not been renewed. And most shockingly, a jurisdiction would be barred from using DBE goals if a solo practitioner, certified in one state using a presumption, relocated to another state but maintained their out-of-state certification. No jurisdiction could guarantee that no DBE physically in their jurisdiction had ever been certified by any other jurisdiction. Nor should they have to. Yet that is exactly what the PCO demands.

This type of vagueness and lack of clarity runs rampant through undefined terms, unspecified requirements not clear on the face of the document, and other ambiguous components of the PCO to render it unfair and patently unreasonable. *Id.* For instance, the PCO would declare "the use of DBE contract goals" unconstitutional. *Id.* ¶ 11. It decidedly does not limit that declaration to "the use of any presumption." *Id.* The DBE program is much more than the rebuttable presumption contained in regulations.[29] And yet, the PCO attempts to undermine all efforts to assist socially and economically disadvantaged businesses in the transportation sector. PCO ¶ 11. The constitutionality of the DBE program writ large, rather than the rebuttable presumption specifically, is beyond the scope of the evidence and arguments in this case.

The specific language, too, raises concerns. For example, the proposed decree hinges on blocking "the use of DBE contract goals," yet does not define "DBE contract goals" or explain how they are used. *Id.* ¶ 11. Moreover, while projects with those same undefined "DBE contract goals" could not be "approve[d]" anywhere DBEs have been certified using the rebuttable presumption according to the PCO, *id.* ¶ 12, the document fails to explain how that contemplated

---

[29] *See, e.g.*, 49 C.F.R. § 26.1 (objectives, *e.g.*, to "ensure nondiscrimination" and "remove barriers to the participation of DBEs"); *id.* § 26.29 (race neutral prompt pay provisions); *id.* § 26.35 (optional business development and mentor protégé programs); *id.* § 26.39 (mandatory small business enterprise program), 26.67(d) (certification for those not in rebuttably presumed groups).

project approval process would work across all of surface transportation funding. Further, the PCO targets any eligibility determinations "based on a race- or sex-based presumption," but does not clarify whether it is targeting the rebuttable presumption set forth in the DBE program regulations, *see* 49 C.F.R. § 26.5, or is aimed at something broader. PCO ¶¶ 11-12. The PCO's vagueness, overbreadth, and lack of clarity is yet another reason it should be rejected. *See, e.g.*, *United States v. Brown*, No. 11-13640, 2011 WL 5508922, at *2 (E.D. Mich. Oct. 28, 2011) (rejecting proposed consent order in part because it "impose[d] numerous undertakings and standards of conduct … which are not clear by the terms …" but were to be determined "at the sole discretion of the Government" and "includes many undefined terms").

It should also be rejected because the process for reaching the PCO was not "fair and full of 'adversarial vigor'"—such as by incorporating independent mediation, multiple offers, or extensive discovery—which is a sign of fairness. *Dayton*, 2021 WL 1248136, at *5-6 (quoting *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 86 (1st Cir. 1990)). Those indicators are entirely absent here. *See supra* Sec. II (highlighting evidence of collusion in the PCO). As a result of having little to no daylight between the two interested parties, this decree is a capitulation, not a compromise.

The stage of the case, including the "results of discovery," is also relevant when determining fairness. *Vukovich*, 770 F.2d at 921. Courts must understand "'sufficient facts'" about the terms of an agreement familiarly enough to "'intelligently'" decide whether it should be approved. *Louisville Jefferson*, 2025 WL 238010, at *3 (citation omitted); *Vukovich*, 770 F.2d at 921; *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1975) (explaining that the close of discovery is relevant to determining if there has been "sufficient development of the facts" to permit judgment). That is nearly impossible where, as here, discovery has been virtually non-

existent. Although the Original Parties initially proposed an aggressive briefing schedule, Scheduling Order, Dkt. 52, they sought multiple extensions and a stay before the first deadline for exchanging discovery requests, Mot. to Stay; Mot. for Extension of Time, Dkt. 71. And Intervenor DBEs have had no opportunity to engage in discovery, or present their arguments to the Court, since their motion was granted. Order Granting Mot. to Intervene; *supra* Sec. I(a). Facts are undeveloped, documentary evidence and testimony have not been identified or produced, and experts have not opined.[30] With the opportunity to develop their case and present fact and expert evidence and witnesses, Intervenor DBEs expect to present a robust defense of the DBE program, including evidence of discrimination that they and countless others face and how the DBE program helps remedy it, and to support their affirmative defenses. Here, because no trial has been set, no discovery completed, and the case is still in its early stages, the PCO represents a "hurried agreement reached in the initial stages of a lawsuit." *See Bronson*, 604 F. Supp. at 70, 77 (approving agreement as not "hurried," where—during the decade-long case—the parties "undertook exhaustive discovery," exchanged "[t]housands of documents," conducted "[n]umerous depositions," docketed more than 700 entries, and the parties reached an agreement after the close of discovery and on the eve of a repeatedly delayed trial).

Likewise, the Court should not approve the PCO because relevant state and local agencies—who will be indirectly bound by the PCO's proposed restrictions—will be barred from registering their objections as "affected" parties. *See Pedreira*, 802 F.3d at 872 ("[T]he court must allow anyone affected by the decree to present evidence and have its objections heard." (citation modified). The PCO goes further than just restricting the Administration from setting DBE

---

[30] In support of their Motion to Intervene, Intervenor DBEs did highlight specific instances of discrimination that they have experienced repeatedly in the industry. *E.g.*, Dkts. 57-1 to 57-3, 57-5, 57-7, 57-8 (declarations of Intervenor DBEs); *see also* Dkts. 57-4, 57-6 (declarations of declarant DBEs). But those are merely examples of a broader pattern of persistent discrimination.

contract goals. As drafted, it would forbid the Administration from approving "*any* federal, *state or local* DOT-funded projects with DBE contract goals where any DBE in that jurisdiction was determined to be eligible based on a race- or sex-based presumption." PCO ¶ 12 (emphases added). In essence, the PCO would put state and local agencies to a difficult choice: Refrain from remediating past discrimination through the carefully crafted congressionally authorized DBE program, or give up hope of federal funding from the United States Department of Transportation. This Court should not permit the Original Parties to pull the rug out from under those state and local agencies without affording them notice and an opportunity to be heard.

Finally, the PCO is simply not in the public interest. As an initial matter, the Original Parties have not explained how they intend to implement and enforce the proposed agreement without cutting off a lifeline for tens of thousands of minority- and women-owned businesses around the country who rely on the DBE program to break into an industry where they are still largely excluded due to the effects of longstanding discrimination.[31] Intervenor DBEs' experiences[32] are tragically not unique. With an opportunity to fully develop and present their case, they intend to demonstrate that the DBE program is a narrowly tailored remedial program helping address the effects of a long history of discrimination in the transportation industry.

## CONCLUSION

For the foregoing reasons, Intervenor DBEs respectfully request that the Court deny the Original Parties' Motion for an Entry of Consent Order and allow this case to proceed to discovery.

---

[31] *See, e.g.*, *Driving Equity: The U.S. Department of Transportation's Disadvantaged Business Enterprise Program Before the H. Comm. on Transp. & Infrastructure*, 116th Cong. (Sep. 23, 2020), https://perma.cc/2MSM-T8YN (written testimony of Jon S. Wainwright).
[32] *See, e.g.*, *supra* n.30.

Dated: June 18, 2025

Respectfully submitted,

Sarah von der Lippe*
D.C. Bar No. 454585
Minority Business Enterprise Legal Defense
and Education Fund, Inc.
1104 East Capitol St. NE
Washington, DC 20002
(202) 744-5415
outsidecounsel1@mbeldefwatchdog.org

Douglas L. McSwain
KY Bar No. 46895
Wyatt, Tarrant & Combs LLP
250 West Main Street
Suite 1600
Lexington, KY 40507
(859) 288-7415
dmcswain@wyattfirm.com

*/s/ Brooke Menschel*
Brooke Menschel*
D.C. Bar No. 9000389
Adnan Perwez*
D.C. Bar No. 90027532
Audrey Wiggins*
D.C. Bar No. 482877
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090 Ext. 1011
bmenschel@democracyforward.org
aperwez@democracyforward.org
awiggins@democracyforward.org

*Counsel for Intervenor DBEs*
*Admitted pro hac vice*