UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT FRANKFORT

| | |
|---|---|
| MID-AMERICA MILLING COMPANY, LLC, *et al.*, | ) ) ) ) Case No. 3:23-cv-00072-GFVT-EBA ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*, | ) ) ) *Electronically filed* |
| Defendant. | ) |

**BRIEF OF DBEs OF AMERICA AS AMICUS CURIAE
IN OPPOSITION TO ENTRY OF THE CONSENT ORDER**

**I.   Introduction**

DBEs of America is a nonprofit organization dedicated to supporting Disadvantaged Business Enterprises under the Department of Transportation's Disadvantaged Business Enterprises Program, 49 C.F.R. § 26.1, *et seq.*, advocating for the DBE Program, and fostering collaboration and unity within the DBE community.[1] The DBEs it represents have successfully bid on a wide variety of DOT contracts seeking to provide services ranging from engineering to architecture to heavy construction. And many of these DBEs believe they would not have been able to get their foot in the door, despite being fully qualified to perform the work, absent the DOT's DBE Program. As a result of the DBE Program, DBEs across this

---

[1] DBEs of America is registered as a nonprofit organization in Illinois. It has filed a notice of intent to operate under 26 U.S.C. § 501(c)(4).

country have employed thousands of workers, contributing substantially to those employees' standard of living and ability to engage in commerce in their local communities.

Simply put: The award of a federal contract to a DBE impacts an entire community—the DBE's employees, the families of those employees, and the businesses those employees and families patronize.

Despite the success of each of these DBEs in winning some DOT-funded contracts, they have in the past and continue today to experience difficulties in winning work for their companies as discussed below. If the Court approves the proposed Consent Order, it will seriously hamper the DBE Program, ensuring a swift return to openly discriminatory practices of the past. Instead, the Court should reject the Consent Order, require full development of the record, and listen to the voices of those impacted by and still experiencing this country's long history of discrimination before issuing a decision in this case.

II. **The Plaintiffs and Government demand that the Court upend a longstanding and critically important program without considering the experience of those affected.**

Over the last 40 years, nearly 50,000 DBEs have been certified and deemed eligible to bid on federal contracts through the DBE Program. The DBE Program is implemented by departments of transportation in all 50 states, the District of Columbia, Puerto Rico, and the U.S. Virgin Islands.[2] As this Court is aware, the

---

[2] U.S. Dep't of Transp., *USDOT Significantly Modernizes the Disadvantaged Business Enterprise Program and Airport Concession Disadvantaged Business Enterprise Program Regulations,* (Apr. 9, 2024), https://www.transportation.gov/briefing-room/usdot-significantly-modernizes-disadvantaged-business-enterprise-program-and-

program is limited to small, independent businesses that are majority owned by socially and economically disadvantaged individuals. And yet, despite the fact that the outcome of this litigation will affect tens of thousands of these businesses, their voices are glaringly absent in this litigation. The Court is now being asked to enter a Consent Order without the benefit of full development of the record, a record that, if developed, will include those voices.

Failing to consider the DBE's experiences guarantees any record in this case will be absent evidence of the critical impact of hundreds of years of discrimination and disparate treatment on the success of women- and minority-owned businesses in the construction industry. Permitting the development of the record will provide the Court opportunity to consider evidence about the forms and impact of past and current discrimination on women and minority owned businesses and will contradict the assertions of Plaintiffs, the Government, and others that discrimination has been remedied, thereby eliminating the need for the DBE Program. A developed record will also contradict unsupported assertions that the Program somehow discriminates against the white male majority, which continues to disproportionately win DOT-funded contracts.

Development of the record will further dispel common, incorrect tropes that demean DBEs. For instance, absent development of the record, the argument that inclusion of DBEs increases the costs associated with a federally funded contract will remain unchallenged. But a DBE that has prepared bids for a construction

---

airport#:~:text=Nationwide%2C%20the%20program%20is%20implemented,opportunities%20in%20nearly%20every%20jurisdiction.

3

project can explain that they receive less favorable pricing from suppliers and less favorable bond pricing from sureties.[3] That is, the increased cost is not due to greed, inefficiency, or incompetence by the DBE but rather reflects discrimination in their treatment by other businesses.

The public may be led to believe that DBEs are less qualified if it listens solely to the voice of the majority. But with development of the record, it will learn that majority-owned prime contractors openly ignore qualified DBEs or, worse yet, steal their work and give it to their competitors.[4]

The public may question whether discrimination still exists in 2025 if it relies on a white male majority that swears it doesn't see race but may reach a far different conclusion if it hears from a DBE owner who was arrested in retaliation for having had the audacity to try to collect pay for work completed on a project.[5]

The public might even believe that DBEs are merely fronts for majority-controlled businesses without development of a record of women-owned DBEs who will explain that they are regularly questioned about their husband's profession and challenged to admit that a man is really in charge of their business.[6]

Although this Court knows better than to believe tired racist and sexist stereotypes, the record in this case does not yet reflect this knowledge because it entirely omits the voices of women and minority business owners. If the Court

---

[3] *See, e.g.*, DN 57-8, Declaration of L. Chmielowiec at ¶ 13; DN 57-1 Declaration of W. Stemley at ¶ 14.
[4] *See, e.g.*, DN 57-4, Declaration of D. Daniels at ¶ 35; DN 57-8, Declaration of L. Chmielowiec at ¶ 22.
[5] *See, e.g.*, DN 57-7, Declaration of K. Canty at ¶¶ 43-49.
[6] *See e.g.*, DN 57-6, Declaration of T. Kern at ¶¶ 15, 17.

4

accepts the Consent Order, it will do so in reliance on evidence brought to it by the majority and will have effectively denied that same opportunity to the DBEs—the parties most affected by the Court's decision.

DBEs of America asks this Court to give DBEs the opportunity to dispel the myths about the DBE Program on the record. Although the DOJ's own studies firmly establish the intentional barriers to entry that women and minority business owners continue to experience, permitting discovery will result in a much more robust record than the DOJ's pages of statistics can convey. And regardless of the Court's ultimate decision, the Court will only benefit from a fuller, richer record.

DBEs of America asks the Court to refrain from ruling based on just the tip of the iceberg that it has seen to date and permit full development of the record through the standard discovery process.

### III. DBEs suffer from ongoing discrimination; the DBE Program remedies this to some extent and must be continued.

The DBE Program was created in 1983 to address systemic discrimination against women and minority owned businesses in the construction industry. In 1999, 16 years after the initiation of the Program, substantial disparities in the success of non-DBE and DBE certified businesses continued to abound. For instance, an April 1998 Colorado DOT disparity study revealed that more than 99% of contracts were awarded to businesses owned by white men.[7] More specifically, "African Americans received none of the state-funded highway construction

---

[7] S. Rep., No. 144-67 at S5414 (available at https://www.govinfo.gov/content/pkg/CREC-1998-05-22/pdf/CREC-1998-05-22-senate.pdf).

contracts over $500,000. Hispanic firms received less than one-half of one percent (.26%), and women-owned businesses were awarded less than one-quarter of one percent (.18%)."[8]

The Department of Justice has studied evidence regarding the effectiveness of programs intended to reduce discrimination in federal contracts on at least three occasions since the implementation of the DBE Program. In 1996, the DOJ issued *The Compelling Interest for Affirmative Action in Federal Procurement: A Preliminary Survey*.[9] The report analyzed substantial data from a myriad of sources. The conclusions were disheartening, finding that minorities were underrepresented in business as a result of discrimination and neglect.[10] It found women and minority business owners faced systemic barriers to entry including lack of access to capital, discrimination by prime contractors and private sector customers, discrimination in access to business networks, discrimination in bonding and discrimination by suppliers. As examples, when reviewing loan applications from minority and non-minority applicants with identical qualifications, banks were more likely to reject black applicants and, if not rejected, loaned them substantially less.[11] With respect to contracting networks, prime contractors were likely to rely on a "closed network" that excludes women and minority-owned businesses.[12] Women and minority-owned business were less likely to receive information from business

---

[8] *Id.*
[9] *The Compelling Interest for Affirmative Action in Federal Procurement: A Preliminary Survey*, 61 Fed. Reg. 26050 (May 23, 1996) (available at https://www.govinfo.gov/content/pkg/FR-1996-05-23/pdf/FR-1996-05-23.pdf).
[10] *Id.* at 26054.
[11] *Id.* at 26057-58.
[12] *Id.* at 26058.

6

networks that permit them to prepare a timely and competitive bid.[13] And finally, women and minority-owned business who have long been excluded from federal contracts, struggle to meet the experience requirements necessary to obtain the surety bond required for larger projects.[14] And even if they have the requisite experience, their bond applications are rejected a significantly higher rates – two to three times more often than white-owned firms.[15] When they are able to obtain a bond, they are charged higher rates than comparable white-owned firms.[16]

In 2010, the DOJ undertook an updated analysis of discrimination in federal contracting and found that while the program has resulted in more women and minority-owned businesses obtaining federal contracts "the needle has not moved" to an appropriate degree in terms of "disparities in almost every aspect of business enterprise activity."[17] In 2022, the DOJ reprised its analysis and issued an updated report.[18] The DOJ found that "substantial and pervasive disparities" persist.[19] For example, a 2020 study of the Commonwealth of Virginia's contracts revealed that while women and minority owned businesses comprised 32.8% of businesses in construction, professional services, and goods and other services, they "received only

---

[13] *Id.* at 26059.
[14] *Id.* at 26060.
[15] *Id.*
[16] *Id.*
[17] *Compelling Interest for Race- and Gender-Conscious Federal Contracting Programs: An Update to the May 23, 1996 Review of Barriers for Minority- and Women-Owned Businesses* 10 (2010) (quoting *The Department of Transportation's Disadvantaged Business Enterprise Program: Hearing Before the H. Comm. on Transp. and Infrastructure*, 111th Cong. 326 (2009) (statement of Jon Wainwright, Vice President, NERA Economic Consulting)).
[18] *The Compelling Interest to Remedy the Effects of Discrimination in Federal Contracting: A Survey of Recent Evidence* (available at https://www.justice.gov/crt/page/file/1463921/dl?inline).
[19] *Id.* at 17.

7

13.4% of the relevant contract and procurement dollars" between 2014 and 2019.[20] A California study revealed that the average business loan for women and minority owned businesses was $289,131, but for white men, the average loan was $455,636.[21] The DOJ found ongoing evidence of bid manipulation to favor non-minority/women contractors,[22] exclusion from business networks,[23] and continued discrimination in bonding and supplier networks.[24]

Beyond these quantifiable differences in their treatment by government agencies, banks, bonding agencies, and supplier networks, women and minority contractors report that they suffer more personal affronts than their white counterparts: they are subjected to racial slurs, sexist nicknames, and exclusion from the places where business deals are made.[25] The DOJ isn't the only source of information supporting the fact that women and minority owned business experience discrimination in federal (and private) contracting. This Court has before it abbreviated testimony of Americans affected by ongoing, pervasive, persistent discrimination:

- A black architect turned down for financing until his white partner made the request with him[26] who also lost a contract despite being fully qualified to perform the work;[27]

---

[20] *Id.* at 18.
[21] *Id.*
[22] *Id.* at 23
[23] *Id.* at 24
[24] *Id.* at 25.
[25] *Id.* at 21-22, 24.
[26] DN 57-4 Declaration of D. Daniels at ¶ 29.
[27] *Id.* at ¶ 35

8

- A female business owner who is forcibly kissed by a customer each time she sees him[28] and subjected to unwanted sexual comments regarding her appearance[29] while also having her work stolen by a project lead and shared with a non-female owned business that won the contract;[30]
- A black engineer who was required to pledge substantial collateral for a small loan while his white counterparts did not[31] and subjected to Ku Klux Klan graffiti at the job site;[32] and
- Another female business owner who was subjected to an aggressive quid pro quo demand for sex in order to obtain payment for work her company had completed[33] and who was not even permitted to bid on a private contract because, according to the prime, it did not require DBE contractors.[34]

The United States aspires to be a place where all people are created equal and all Americans have the opportunity to achieve success. But the reality is the United States continues to reflect the deep-seated racism and sexism of our history. The hundreds of years during which women and minorities were openly excluded from business ownership and the ability to generate wealth continues more subtlety today in the form of exclusion from bank resources, business networks, and the

---

[28] DN 57-8, Declaration of L. Chmielowiec at ¶ 18.
[29] *Id.* at ¶ 20
[30] *Id.* at ¶ 22.
[31] DN 57-7, Declaration of K. Canty at ¶ 37.
[32] *Id.* at ¶ 55.
[33] DN 57-6, Declaration of T. Kerns at ¶ 10
[34] *Id.* at ¶ 13.

9

information necessary to be successful. And even when limited access to these resources is available, women and minorities face overt and even violent racism and sexism as a result of their efforts to obtain them.

The DBE Program's attempts to combat our country's continuing history of discrimination is laudable. And while progress under the DBE Program has been slow, it had been made. This move toward equality can feel like discrimination to those Americans who have long benefitted from inequality, but it is not. In fact, as is clear from the data, non-DBEs still win most contracts leaving DBEs small dollar contracts around the edges of projects.

## IV. Conclusion

The Plaintiffs, the Government, and other amici ask this Court to "reject the evidence of your eyes and ears,"[35] find that efforts to eliminate discrimination against Disadvantaged Business Enterprises are in fact, discrimination, and return federal contracting to an earlier time when women and minority business owners were fully excluded without recourse. DBEs of America asks the Court to reject that request, decline to enter the Consent Order, and permit DBEs voices to be heard through a complete development of the record prior to ruling on the merits of this case.

---

[35] George Orwell, *1984*, 81 (75th Anniversary ed. 2023).

Respectfully submitted,

LAW OFFICE OF MICHELE HENRY PLC

/s/ Michele Henry
Michele Henry
517 West Ormsby Avenue
Louisville, KY 40203
mhenry@michelehenrylaw.com
502.536.0085
*Counsel for Amicus Curiae DBEs of America*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was served by operation of the Court's CM/ECF system on June 25, 2025 on all counsel of record.

/s/ Michele Henry
*Counsel for Amicus Curiae,*
*DBEs of America*