UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

---

MID-AMERICA MILLING COMPANY,
LLC, *et al.*,

        Plaintiffs,

     v.                                    Case No. 3:23-cv-00072-GFVT

UNITED STATES DEPARTMENT
OF TRANSPORTATION, *et al.*,

        Defendants.

---

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF
PLAINTIFFS' & GOVERNMENT DEFENDANTS' JOINT MOTION
FOR ENTRY OF CONSENT ORDER**

---

## TABLE OF CONTENTS

ARGUMENT IN REPLY ................................................................................................1

I.    The PCO is Entirely Appropriate Here Because it is Fair, Adequate, and Reasonable, and Consistent with the Public Interest. ...................................................2

   A.  The Strength of Plaintiffs' Public Interest Case Weighs Heavily in Favor of the PCO, which Springs From and Resolves Plaintiffs' Claims. ......................2

   B.  Other Factors Also Counsel in Favor of the PCO...................................................7

II.   Intervenor DBEs' Objections Do *Not* Defeat Entry of the PCO. ...............................8

   A.  IDBEs Have *Not* Identified Anything That Would Render the DBE Program's Presumptions Constitutional, *Nor* Could They. .............................8

   B.  The PCO Does *Not* Dispose of Valid Third Party Claims, Does *Not* Bind Third Parties, and Does *Not* Require IDBEs' Consent. ...................................10

   C.  The PCO Does *Not* "Usurp Court Authority," and *Neither* Violates the Separation of Powers *Nor* Federal Law. ........................................................15

   D.  There Was No "Collusion," And This Case Is *Not* a "Faux Dispute."..................19

   E.  The PCO's Scope of Relief is Entirely Proper........................................................22

CONCLUSION...............................................................................................................30

**ARGUMENT IN REPLY**

When considering a proposed consent decree, courts evaluate whether the decree is "fair, adequate, and reasonable, as well as consistent with the public interest." *E.g.*, *United States v. Lexington-Fayette Urban Cnty. Gov't*, 591 F.3d 484, 489 (6th Cir. 2010) (quoted case omitted). In making this determination, courts must ensure that a consent decree "spring[s] from and serve[s] to resolve" the plaintiffs' claims in addition to assessing other factors, including "the strength of plaintiffs' case," "the opinions of counsel," "the good faith efforts of the negotiators," and the burdens, inefficiencies, and "risks involved in the litigation if the settlement is not approved." *See Loc. No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 525 (1986); *Lexington-Fayette*, 591 F.3d at 489.

Notably, in assessing public interest considerations, the Sixth Circuit and this Court have recognized that "it is always in the public interest to prevent [constitutional] violation[s]" and that "the Government's violation of a constitutional right [n]ever serves the public's interest." *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001); ECF 44:25 (citing cases). Likewise, "public policy generally supports 'a presumption in favor of voluntary settlement,'" and a "particularly strong [presumption] where a consent decree has been negotiated by the Department of Justice on behalf of a federal administrative agency." *Lexington-Fayette*, 591 F.3d at 490 (quoted case omitted); *United States v. City of Miami*, 614 F.2d 1322, 1332 (5th Cir. 1980) (favoring approval of consent decree when supported by a "government department charged with seeing that the laws are enforced" and considering "the interests of all affected [parties]"). Indeed, the use of consent decrees "is in high judicial favor" because it is "[n]ot only the parties, but the general public as well" who "benefit from the saving of time and money that results from the voluntary settlement of litigation." *Citizens for a Better Env't v. Gorsuch*, 718 F.2nd 1117, 1126 (D.C. Cir. 1983) (quoted case omitted).

I.  **The PCO is Entirely Appropriate Here Because it is Fair, Adequate, and Reasonable, and Consistent with the Public Interest.**

Here, Plaintiffs—Mid-America Milling Company, LLC ("MAMCO") and Bagshaw Trucking, Inc. ("Bagshaw")—and Government Defendants (the "Original Parties") have proposed a consent order (the "PCO") that is fair, adequate, reasonable, and consistent with the public interest. Indeed, the PCO (1) "spring[s] from and serve[s] to resolve" the equal protection challenge set forth by Plaintiffs' complaint in furtherance of the Fifth Amendment, "upon which the complaint was based"; (2) is supported by "the strength of [P]laintiffs' case"; (3) advances the public interest through the vindication of a constitutional right; (4) is the product of "the good faith efforts of the negotiators"; (5) avoids "risks involved in the litigation" of certain complex issues that are not essential to resolving Plaintiffs' claims, including needless costs, burdens, and inefficiencies; and (6) is entitled to the "general[] … presumption … favor[ing] … voluntary settlement of litigation." *See Firefighters*, 478 U.S. 501 at 525; *Deja Vu*, 274 F.3d at 400; ECF 44:25; *Lexington-Fayette*, 591 F.3d at 489, 490 (quoted case omitted); *Gorsuch*, 718 F.2nd at 1126.

A.  **The Strength of Plaintiffs' Public Interest Case Weighs Heavily in Favor of the PCO, which Springs From and Resolves Plaintiffs' Claims.**

The United States Supreme Court's decision in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College* ("*SFFA*") marked a sea-change in the Court's Equal Protection jurisprudence. *See* 600 U.S. 181 (2023). As this Court confirmed in granting Plaintiffs' preliminary injunction, *SFFA*'s reasoning "extend[s] to all race-conscious programs," and Plaintiffs have a "strong likelihood of success on the merits." ECF 44:15, 21, 24.

A race-based program, like the DBE Program's presumption at issue here, is unconstitutional unless it can meet *all* five of the following requirements under strict scrutiny. *First*, a race-based program may only be used to remedy "specific, identified instances of past discrimination that violated the Constitution or a statute." *E.g.*, *SFFA*, 600 U.S. at 207. *Second*, a

race-based program must contain "a meaningful connection between the means … employ[ed] and the goals … pursue[d], meaning that the program cannot rely on "imprecise," "overbroad," "underinclusive," "arbitrary," or "undefined" racial categories. *Id.* at 215–16; *Vitolo v. Guzman*, 999 F.3d 353, 362 (6th Cir. 2021) ("[A] policy is not narrowly tailored if it is either overbroad or underinclusive."). *Third and fourth*, a race-based program must comply with "the twin commands" of equal protection, requiring "the Government … [to] treat citizens as individuals"—that is, "race may never be used as a 'negative'" against an individual, nor "operate as a stereotype" that "treat[s] individuals as the product of their race." *SFFA*, 600 U.S. at 218, 221, 223; *Smyer v. Kroger Ltd. P'ship I*, No. 22-3692, 2024 WL 1007116, at *9 (6th Cir. Mar. 8, 2024) (Readler, J. concurring) ("The Supreme Court's command was unambiguous: 'race may never be used as a 'negative.'") (unpublished). *Finally*, a race-based program "must have" the "critical" requirement of a "logical end point." *SFFA*, 600 U.S. at 212 (quoted case omitted).[1]

The DBE Program's failure to comply with *even one* of these criteria is fatal to its race-based presumption. And, indeed, after two years of case development and briefing on the issues, this Court determined that "[e]ven if the Government could establish a compelling interest, the race-based rebuttable presumption is not narrowly tailored." ECF 44:19. Recognizing that the DBE Program is over four decades old and "has been around since the Cold War" "during the same year that the Space Shuttle *Challenger* launched its maiden voyage," this Court determined that

---

[1] The first criterion addresses strict scrutiny's compelling interest prong. Criteria two through five identify *requirements* of narrow tailoring under Supreme Court and Sixth Circuit precedent. *See also Middleton v. City of Flint, Mich.*, 92 F.3d 396, 409 (6th Cir. 1996) (noting additional narrow tailoring "factors to consider": "(1) the necessity for the relief; (2) the efficacy of alternative remedies; (3) the flexibility and duration of the relief …; (4) the relationship of the numerical goals to the relevant labor market; and (5) the impact of the relief on the rights of third parties.").

"[b]ecause the DBE [P]rogram's racial preferences are not tethered to a foreseeable conclusion, the race-based presumption fails to be narrowly tailored." ECF 44:20–22.

Likewise, this Court noted problematic issues with the presumption's overbroad sweep and under-inclusion of groups and individuals whose inclusion would serve the government's purported remedial goal—both of which problems ultimately flow from the arbitrary imprecision inherent to sorting individuals by race. ECF 44:20 (noting that Pakistanis receive the benefit of the rebuttable presumption, but Afghanis a few miles down the road are subject to a "high[er] hurdle"); *Vitolo*, 999 F.3d at 364 ("[i]magin[ing] two childhood friends—one Indian, one Afghan," in which "the Indian applicant will presumptively receive priority consideration over his Afghan friend" "[b]ecause of his ethnic heritage" and condemning this "sordid," "scattershot approach"); *see also* 49 C.F.R. §§ 26.67, 26.5; 13 C.F.R. §§ 124.103–.04 (all defining "socially and economically disadvantaged individual").[2, 3] As one district court recently put it when describing similar racial categories for "socially and economically disadvantaged individuals": "Nothing says 'stereotype' quite like assuming that all members of certain racial groups are disadvantaged." *Nuziard v. Minority Bus. Dev. Agency*, 721 F. Supp. 3d 431, 493 (N.D. Tex. 2024), appeal dismissed, (5th Cir. July 22, 2024). Further, allotting benefits based on such stereotyping and/or otherwise excluding those whose inclusion would have served the government's purported remedial goal

---

[2] The government's historic policies and practices to include some races while excluding others is undeniably arbitrary, capricious, irrational and indefensible, as thoroughly documented in David E. Bernstein, *Classified: The Untold Story of Racial Classification in America* (Bombardier Books 2022).

[3] While statutory funding for the DBE Program specifically adopts Small Business Administration ("SBA") regulatory provisions—including those provisions under 15 U.S.C. ch. 14A and 13 C.F.R. ch. I—the United States Department of Transportation ("USDOT") has chosen to duplicate this framework in its own regulatory scheme at 49 C.F.R. pt. 26. *See, e.g.*, P.L. 117-58 § 11101(e) (2021); P.L. 118-63 § 730 (2024); 49 U.S.C. § 47113(b); ECF 1: ¶¶ 19–30 (explaining the history of this "patchwork quilt" of regulation). Plaintiffs have requested relief as to both frameworks because Defendants must also rely on the SBA framework to implement the DBE Program's race and sex-based classifications. *E.g.*, ECF 27.

"necessarily use[s] race 'as a negative'" to advantage some groups and not others. *See, e.g.*, *id.* (quoting *SFFA*, 600 U.S. at 218–19).

Nor does the presumption's "rebuttable" nature address these issues: *the presumption does not permit individualized narrow tailoring to deliver the race-based remedy to particular (disadvantaged) individuals as opposed to an entire favored racial class*. Rather, the presumption is "virtually impossible" to disprove and therefore "dispositive," absent the agency's belief that it must prove otherwise—an effort that is strongly discouraged "as a matter of course." 49 C.F.R. §§ 26.67(a)(3), (b), (c) ("Certifiers may not question claims of group membership as a matter of course. … The certifier must not attempt to rebut presumed economic disadvantage as a matter of course."); *Vitolo*, 999 F.3d at 363 (discussing the "virtually … dispositive" nature of the rebuttable presumption); *Ultima Servs. Corp. v. U.S. Dep't of Agric.*, 683 F. Supp. 3d 745, 770 (E.D. Tenn. 2023) (same).[4] Thus, the DBE Program's presumption, by sheer design, is inherently and impermissibly overbroad, in addition to its underinclusivity issues. A program that broadly grants a general racial preference to all members of a racial class in this manner is *not* narrowly tailored.[5]

The DBE Program's race- and sex-based classifications have *not* materially changed in scope or definition for decades. *Compare* P.L. 97-424, § 105(f) (1983) and 64 Fed. Reg. 5096, 5096, 5128 (Feb. 2, 1999) *with* P.L. 117-58 § 11101(e) (2021) and 49 C.F.R. pt. 26. This fact

---

[4] The existence of additional neutral requirements—such as the generally applicable net worth requirement for DBE certification—does not change this calculus. "The fact of the matter is that some minority groups receive a presumption … while others" are held to a higher standard. ECF 44:20.

[5] For similar reasons applying to race-based classifications, the DBE Program's sex-based presumption—under which "*all* women-owned [businesses] are prioritized"—also fails intermediate constitutional scrutiny. *See, e.g.*, *Vitolo*, 999 F.3d at 365 (emphasis in original). Among other deficiencies, where there is "no effort to tailor" a system that uses sex as a qualification, the policy "cannot serve a valid governmental objective." *Id.; see also* ECF 27-1:21–23.

alone—that the DBE Program's continuing 45 year endeavor is "not tethered to a foreseeable conclusion"—defeats any claim of constitutionality. ECF 44:22; *Ultima*, 683 F. Supp. 3d at 771 (because "there is no temporal limit on the use of the rebuttable presumption," "there is no reason to believe that Defendants will—even acting in good faith—comply with the Equal Protection Clause any time soon.") (quoting *SFFA*, 600 U.S. at 225).[6]

Given all this, the PCO is firmly supported by the strength of Plaintiffs' equal protection challenge against the continuation of the DBE Program's race- and sex-based presumptions—and conversely, the weaknesses of any continued defense—particularly given "the Supreme Court's decision in [*SFFA*]." ECF 82-1:3 ¶ 6. Consistent with *SFFA*, Sixth Circuit precedent, and this Court's preliminary injunction, the PCO recognizes that such classifications are "constitutionally infirm" when they are "indefinite in length" or "overbroad or underinclusive." *Id.* at § II. ¶ 7. Because the presumptions have been operating for 45 years with no end in sight, the PCO requires Government Defendants to correct the longtime "deviation from the norm of equal treatment." *SFFA*, 600 U.S. at 212.

Thus, the PCO "represents a reasonable factual and legal determination based on the record," "spring[ing] from and serv[ing] to resolve" Plaintiffs' claims without any further need for constitutional inquiry and debate. *E.g.*, *Firefighters*, 478 U.S. 501 at 525; *Howard v. McLucas*, 871 F.2d 1000, 1008 (11th Cir. 1989); *United States v. Oregon*, 913 F.2d 576, 581 (9th Cir. 1990).

---

[6] Continual re-authorization of the race and sex-based presumptions into perpetuity merely repeats an apparently failed approach, undermining the "necessity" and "efficacy" of the remedy, *Middleton*, 92 F.3d at 409, and revealing an interest in "an amorphous concept of injury" that is "ageless in its reach into the past," and "timeless in [its] ability to affect the future." *E.g.*, *SFFA*, 600 U.S. at 226; *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 276 (1986) (plurality) (both discussing societal discrimination). Such a remedy is aimed at curing societal disparities and ultimately seeks to "outright …balanc[e]" the population by race and sex—a "patently unconstitutional" endeavor. *E.g.*, *SFFA*, 600 U.S. at 223 (quoted case omitted).

### B.     Other Factors Also Counsel in Favor of the PCO.

Likewise, acknowledging "the strength of [P]laintiffs' case" and "the opinions of counsel," the PCO is a product of the Original Parties' "good faith efforts" to avoid continued litigation of certain constitutional inquiries into Plaintiffs' equal protection claims that would be unnecessary and superfluous to resolving Plaintiffs' claims. *See Lexington-Fayette*, 591 F.3d at 489. Prior to filing the PCO, the Original Parties spent nearly four months engaged in good-faith negotiations regarding a potential settlement of Plaintiffs' claims. Second Decl. Lennington ¶¶ 7–8. These negotiations included various phone calls, conferences, and emails and multiple settlement drafts and revisions, and were "adversarial" in that Plaintiffs' perspective and position were different from that of Government Defendants'. *Id.* at 8. As Attorney Lennington confirms, based on his 23 years of experience negotiating resolutions to lawsuits, the negotiation period was "longer than average," and the back-and-forth dialogue was "robust," "detailed," and "arms-length," just "as would be expected in a typical case." *Id.* at ¶ 9.  Following these discussions, the Original Parties finally came to an agreement to resolve Plaintiffs' claims and outlined a mechanism for resolving the costs and expenses Plaintiffs have incurred in litigating their claims. *Id.* at ¶ 8; ECF 82-1. Although Government Defendants have now properly concluded that the DBE Program's presumptions cannot withstand the governing standards of constitutional scrutiny, ECF 82-1, Plaintiffs' claims nevertheless remain a live controversy until Government Defendants are no longer permitted to exact their unconstitutional discrimination.[7]

---

[7] Indeed, Government Defendants have *not* relented and *continue* to implement their discriminatory DBE contracting goals throughout the United States. *See infra* p.20–21 & n.21. While the preliminary injunction attempts to afford Plaintiffs temporary relief from Government Defendants' unconstitutional DBE goals, it requires a time consuming and cumbersome implementation process, does *not* remove the stigma imposed by Government Defendants' discrimination—and, in fact, has only emphasized the injuries complained of through the imposition of burdens and resources needed to implement the process—and does *not* remove the unfair advantage granted to DBEs based solely on their race and sex. *See infra* § II.E.

7

Given all this, "the strength of [P]laintiffs' case" further underpins other factors counseling in favor of the PCO. The PCO recognizes that the DBE Program's presumptions are not only plagued with over- and underinclusivity issues, but also extend into perpetuity without any defined endpoint. All of these issues, or any one of them, render the presumptions unconstitutional. As such, the PCO reflects a deliberate good faith effort to avoid any further unnecessary litigation and entanglement with other issues immaterial to resolving Plaintiffs' claims. In opting to resolve this case now, "[n]ot only the parties, but the general public as well" avoid the "risks involved in the litigation if the settlement is not approved" and "benefit from the saving of time and money that results from the voluntary settlement of litigation." *See Gorsuch*, 718 F.2nd at 1126; *Lexington-Fayette*, 591 F.3d at 489. Accordingly, the PCO is based on "the good faith efforts of the negotiators" and seeks to avoid needless and time-consuming litigation, costs, burdens, and inefficiencies. *See id.* In turn, the PCO not only advances the public policy favoring the vindication of a constitutional right, but also the public policy favoring voluntary settlement of litigation, which is "particularly strong" here, given that the PCO "has been negotiated by the Department of Justice on behalf of a federal administrative agency." ECF 44:25; *Deja Vu*, 274 F.3d at 400; *Lexington-Fayette*, 591 F.3d at 490.

## II.    Intervenor DBEs' Objections Do *Not* Defeat Entry of the PCO.

Defendant-Intervenor DBEs ("IDBEs") take a shotgun approach against the PCO, firing off various attacks and hoping one of their arguments sticks. None do.

### A.    IDBEs Have *Not* Identified Anything That Would Render the DBE Program's Presumptions Constitutional, *Nor* Could They.

IDBEs argue that they have not had an opportunity to defend the constitutionality of the DBE Program, describing this case as "undeveloped" and in a "nascent stage[]". *E.g.*, ECF 91:16, 29–30. Yet despite the opportunity "to present evidence and have [their] objections heard,"

*Firefighters*, 478 U.S. at 529, IDBEs have failed to provide any explanation *at all* that could even possibly support their position that the DBE Program's presumptions are constitutional. If IDBEs wanted to defend the constitutionality of the DBE Program, now was the time to do it.[8]

Moreover, this case has been before the Court for almost two years. During that time, the Original Parties—infused with adversarial fervor—briefed the Court on the DBE Program in relation to applicable equal protection precedent through several motions, including a motion for a preliminary injunction and a motion to dismiss that were further argued before the Court, which, in turn, has issued two opinions and two orders in Plaintiffs' favor. Government Defendants have now concluded—rightfully so—that, given the Supreme Court's decision in *SFFA* and this Court's rulings, they can no longer defend the constitutionality of the DBE Program's presumptions.[9]

Yet in the face of this case's history and governing precedent, IDBEs argue that this case requires continued development before the PCO is considered, noting that in *some* cases, the "results of discovery" may be relevant to determining whether a consent decree is fair. ECF 91:29–30. IDBEs do *not* explain why this factor is important for considering *this* PCO in *this case*, in light of the last two years of development and given that further development *cannot* cure the

---

[8] Nothing prevented IDBEs from "asserting their position" here. *See* ECF 91:16. Indeed, the congressional record is publicly available. IDBEs admit that the record's already hundreds of pages in support of a compelling interest is the very same type of defense the government has advanced in past challenges to the DBE Program. *Id.* at 19. However, IDBEs ignore that this general variety of "proffered proof is too dull of a scalpel," "point[s] generally to societal discrimination," ECF 44:17–18, and does not "cut it" "to establish intentional discrimination" or narrow tailoring. *Vitolo*, 999 F.3d at 361–64.

[9] Remarkably, IDBEs maintain that "the weight of the case law" controls and that *SFFA*'s reemphasis and clarification of several decades of equal protection principles apply only "to higher education admissions." ECF 91:7, 20. However, this Court has specifically rejected those contentions. ECF 44:18, 21 ("The Court is compelled to follow [the Sixth Circuit.]") ("There is no reason to believe that ... [*SFFA*], does not extend to all race-conscious programs."); *see also United States v. Michigan*, 131 F.4th 409, 417 (6th Cir. 2025) ("when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.").

presumptions' temporal violations.[10] Regardless, it simply does not matter whether IDBEs might amass a "robust" record purporting to show "evidence of discrimination" in support of a compelling interest. ECF 91:30. Nor would it matter if IDBEs might successfully argue strengths as to a few mere *factors* of narrow tailoring. Whether the record is hundreds or thousands of pages, the DBE Program fails narrow tailing *requirements—no quantity* of paper changes the fact that the Program has been anything but "a temporary matter." *SFFA*, 600 U.S. at 212; *see also Geier v. Alexander*, 801 F.2d 799, 809 (6th Cir. 1986) ("Even if [intervenor] had been prepared to offer evidence, it is clear from its detailed written objections that such evidence would have been in support of its now-discredited theory.") IDBEs have *no* valid argument in contending otherwise.[11]

## B.    The PCO Does *Not* Dispose of Valid Third Party Claims, Does *Not* Bind Third Parties, and Does *Not* Require IDBEs' Consent.

IDBEs also argue that the PCO must be denied because third parties "have not consented" and "agreement of the parties is likewise lacking." *E.g.*, ECF 91:12–16 (internal quotation marks omitted). However, so long as a consent decree does "not dispose of the claims of a third party" or "impose duties or obligations on a third party," an intervenor "does not have power to block the

---

[10] IDBEs also briefly assert that the PCO will improperly deprive them of developing their "affirmative defenses" against Plaintiffs' case. ECF 91:30; *see also* ECF 44 (denying Government Defendants' motion to dismiss). However, IDBEs misunderstand the predicate for a consent decree. The Sixth Circuit has been clear that there is no requirement to first decide an intervenor's motion to dismiss before entering a consent decree between the settling parties. *See Benalcazar v. Genoa Twp.*, 1 F.4th 421, 425 (6th Cir. 2021) (explaining that parties settle cases for an entire "variety of reasons" and that all of those reasons "would be undermined if we imposed a Civil Rule 12(b)(6), or for that matter a Civil Rule 56, hurdle to approving settlements"). Here, IDBEs have not even filed a proper motion. But, even if they had, IDBEs' suggestion that a motion to dismiss must be litigated before the PCO is entered has no merit.

[11] For example, IDBEs would need to invent an endpoint for the DBE Program's classifications that Congress has not identified in the past 45 years, that USDOT was unable to specify in the preliminary stages of this case, and that USDOT admits it cannot specify now. Likewise, IDBEs also encounter a barrier as to DBE Program's overbroad and underinclusive classifications, which are indefensible under *SFFA* and Sixth Circuit precedent. Overall, it appears that IDBE's only goal is *not* to mount any meritorious objection, but to delay the inevitable result that the presumptions can no longer survive constitutional scrutiny.

decree merely by withholding its consent" and is entitled only "to present evidence and have its objections heard" on whether to approve the decree. *Firefighters*, 478 U.S. at 529. While IDBEs vaguely suggest that the PCO disposes of their claims and binds third parties, *see, e.g.*, ECF 91:7–8, 12–16, 24, 27, both arguments rely on the empty assertion that IDBEs have legal rights impacted by the PCO; and as such, both arguments fail.

Under their first argument, IDBEs posit that their claims will be affected by the PCO if it is entered. *See* ECF 91:13. However, because IDBEs have *not* appropriately raised *any* claim, the PCO *cannot*—as IDBEs suggest—"dispose of the valid claims of nonconsenting intervenors." *Firefighters*, 478 U.S. at 529; *see* ECF 91:13. As the Supreme Court noted in *Firefighters*, third party claims must be both "properly raised" and "valid." 478 U.S. at 529. Here, neither criterion has been met. In place of a "properly raised" claim, IDBEs assert only loose objections to the PCO. They have not filed their own complaint raising any claims, nor raised any counterclaims against either of the Original Parties.

More problematically yet, even considering their loose objections, IDBEs do not even begin to present a "valid" cause of action in their own right. IDBEs do *not* convert their objections into "properly raised," "valid claims" by contending that the PCO "harms" them and that their intervention interest under Fed. R. Civ. Pro. 24 directs for the litigation to proceed in defense of that interest. *See* ECF 91:14–16. Indeed, the argument that Rule 24 intervention itself permits an objector to block a consent decree has been rejected as "misconceiv[ing] [an intervenor's] rights in the litigation." *See Firefighters*, 478 U.S. at 511, 528–30 (an objecting party has no legal rights affected by a consent decree where the party fails to assert any substantive legal claims that would be affected by the entry of the decree); *Texas v. New Mexico*, 602 U.S. 943, 951, 954, 957 (2024) (determining that United States-intervenor—based on its "own complaint," alleging "essentially

the same claims" as the plaintiff—"could validly claim that [the defendant] was effectively breaching its [statutory and contractual obligations owed to the United States-intervenor]") (internal quotations omitted); *S. Cal. Edison Co. v. Lynch*, 307 F.3d 794, 807 (9th Cir. 2002) (intervenor's consent to a settlement "not required" because interests in securing lower utility rates under state law "and in preventing the rate increases that will inevitably result from this judgment" "do not amount to the kind of 'valid claims' the *Firefighters* Court had in mind").

While IDBEs assert an interest in defending the DBE Program, ultimately, this interest does not point to any sort of claim that IDBEs could validly assert in their own right. Indeed, a claim purporting to compel the government to continue administering such a program would be wholly without merit, where, as here, the DBE Program's presumptions are hopelessly doomed by their indefinite time limits and other narrow tailoring deficiencies (*regardless* of any demonstration of a compelling interest) and are further administered at the *discretion* of USDOT, under which no party is at liberty to compel.[12]

---

[12] Under the statutes authorizing federal funding for the DBE Program, Government Defendants are *not* precluded from determining that aspects of the DBE Program are unconstitutional or simply halting funding in whole or in part *for any reason at all. See, e.g.*, P.L. 117-58 § 11101(e) (2021) ("*Except to the extent that the Secretary determines otherwise*, not less than 10 percent of the amounts made available …, shall be expended through small business concerns owned and controlled by socially and economically disadvantaged individuals") (emphasis added). In consideration of governing case law, Government Defendants have determined that the DBE Program's presumptions are unconstitutional. *See* ECF 82-1. And while here, Plaintiffs have a constitutional right not be discriminated against, IDBEs provide no authority for any cause of action here, and no party has a "valid claim" in compelling the government's discretionary authority to continue administering race- and sex-based preferences. *See, e.g.*, *Huron Mountain Club v. U.S. Army Corps of Eng'rs*, 545 Fed. Appx. 390, 393 (6th Cir. 2013) ("[C]laims against an agency for a failure to act are available only under limited circumstances; specifically, 'only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required* to take.'") (emphases in original) (quoting *Norton v. S. Utah Wilderness Alliance ("SUWA")*, 542 U.S. 55, 63 (2004)); *Gonzalez v. Cuccinelli*, 985 F.3d 357, 365 (4th Cir. 2021) ("[W]here an agency is *not required* to do something, we cannot compel the agency to act.") (emphasis in original).

Rule 24 does *not* mandate *any* particular disposition for *any* case, let alone this one. Rather, "an intervenor is admitted to the proceeding as it stands, and in respect of the pending issues." *Vinson v. Washington Gas Light Co.*, 321 U.S. 489, 498 (1944). As it stands here, there is no doubt IDBEs would *prefer* that DBE firms continue to receive the competitive advantages of the presumptions. *See* ECF 91:8, 9, 24, 31 (characterizing the DBE Program as a "decades" old, "regularly reauthorized," "longstanding," "public interest" "lifeline," upon which DBEs rely). But IDBEs may *not* block the PCO based on Rule 24 interests that do not give rise to an independent and valid cause of action.[13] Neither the Constitution nor a statute entitles DBE firms to race and sex-based preferences. *See supra* p.11–12 & n.12. Moreover, there is no long-term reliance interest in a race-based program, which eventually, "must end," *SFFA*, 600 U.S. at 212, 213, and there is no "harm" in the PCO's prevention of such a constitutional violation. ECF 44:25 ("[N]o cognizable harm results from stopping unconstitutional conduct") (quoting *Vitolo*, 999 F.3d at 360).

Given the absence of any "valid" and "properly raised" claims here, there simply is no "remaining question" on "whether the consent decree would dispose of those claims." *Firefighters*, 478 U.S. at 529; *Texas*, 602 U.S. at 961–62.

---

[13] Consequently, IDBEs are *not* like the objector in *Ward* that "had not consented and could have adduced evidence ... that would have justified the requested relief." ECF 91:16. Unlike IDBEs, the *Ward* objector was the *plaintiff—the party that had the cause of action* and the right to seek the requested relief. *See United States v. Ward Baking Co.*, 376 U.S. 327 (1964). IDBEs do not have a cause of action in their own right; and any event, even if IDBEs could satisfy *some* components of the strict scrutiny inquiry, they simply *cannot* do so in whole. Nor does *Pedreira v. Sunrise Children's Servs., Inc.*, 802 F.3d 865 (6th Cir. 2015) offer any help to IDBEs. *See* ECF 91:14. That case merely addressed a court's failure to evaluate a settlement as a consent decree so as to permit the objections of non-settlers. It did not point to any legal claims of an objecting party, but instead questioned whether "the agreement [was] 'fair, adequate, and reasonable'" since it "single[d] out [the objecting defendant] by name for special monitoring." *Pedreira*, 802 F.3d at 872. Unlike the agreement in *Pedreira*, the PCO does not deprive an objecting defendant—to whom "the complaint's allegations of wrongdoing [were] directed"—the opportunity to receive the desired "merits adjudication to clear its name" and avoid "unique reputational harm." *See id.* Thus, neither this case, nor the PCO implicates the sort of circumstances or "fairness" considerations noted in *Pedreira*.

13

Under a second line of argument, IDBEs also seek to block the PCO based on their contention that PCO impermissibly imposes legal "duties or obligations" on nonconsenting third parties and is "not enforceable or administrable." *See, e.g.*, ECF 91:7–8, 24. But this argument is another non-starter. Indeed, IDBEs advance only an internally inconsistent theory on this point—first contending that the PCO only binds, and is enforceable by, the Original Parties, *id.* at 25, and then insisting that "other jurisdiction[s]," such as "state and local agencies" are somehow bound by its terms. *See id.* at 27–28, 30. To the extent IDBEs propose that "only [the Original Parties] may enforce the PCO's terms," Plaintiffs agree. *See id.* at 25. The PCO requires Plaintiffs to drop their claims and Government Defendants to correct the DBE Program's "deviation from the norm of equal treatment." *SFFA*, 600 U.S. at 212; ECF 82-1. As in *Firefighters*, the PCO does *not* bind IDBEs or other third parties "to do or not do anything." 478 U.S. at 529–30. "It imposes no legal duties or obligations on [them] at all; only the [Original Parties] to the decree can be held in contempt of court for failure to comply with its terms." *Id.*

IDBEs' concern for "state and local agencies" appears to incorrectly ascribe some kind of authority to state and local entities over the DBE Program that such local entities do *not* have, as if the PCO requires these local entities to implement its terms. *See* ECF 91:11, 27, 30. It does not. The PCO concerns only *Government Defendants'* implementation of the DBE Program, which is a program of the *federal government* enforced by the *federal government*—not "state and local agencies." Consequently, the PCO cannot, and does not, create "coercive requirements that no jurisdiction could comply with even if it wanted," and "state and local agencies" cannot be "bound by" its terms. *See* ECF 91:27, 30. Of course, a third party may proffer its opinions on whether to approve a consent decree, and indeed may provide such input in *any* publicly filed lawsuit. Third parties are not, as IDBEs contend, "barred from registering" their input, ECF 91:30—even when

14

they have "no cognizable harm." ECF 44:25; *Vitolo*, 999 F.3d at 360. And indeed, nearly all states

and a growing number of third parties have done exactly this. *See* ECF 86–104.[14]

In sum, IDBEs' repeating objections that the PCO must be blocked on the basis that third

parties "have not consented" necessarily fail. *See, e.g.*, ECF 91:12. The PCO does *not* bind or

obligate any third parties; and because IDBEs have no "valid claims" here, they "do[] not have

power to block the decree merely by withholding [their] consent." *Firefighters*, 478 U.S. at 529.

### C.    The PCO Does *Not* "Usurp Court Authority," and *Neither* Violates the Separation of Powers *Nor* Federal Law.

IDBEs also complain about consent decrees generally to attack the PCO, claiming that the

PCO "usurp[s] the Court's role" and violates the separation of powers. ECF 91:12–14, 22–24. But

contrary to these generic arguments, "the custom of entering consent decrees is longstanding and

familiar—repeatedly discussed, without apparent objection, by appellate courts." *E.g.*, *Lexington

Ins. Co. v. Ambassador Grp. LLC*, 581 F. Supp. 3d 863, 867 (W.D. Ky. 2021) (collecting cases).

The PCO does *not* "[u]surp [c]ourt [a]uthority" because it does not require this Court to

"blindly agree … that the DBE Program violates equal protection," nor does it determine "highly

controversial" facts or establish "highly debatable" "principles of law." ECF 91:12–14. Rather, as

discussed *supra* §§ I.A. & II.A, the narrow tailoring violations the PCO points to—including the

---

[14] Thus, IDBEs' speculation on how third-parties might construe the PCO is irrelevant. *See* ECF 91:26–28. The PCO addresses the enjoinment of *Government Defendant*'s implementation of the DBE Program's unconstitutional presumptions in a similar manner as this Court has done before, *see* ECF 44 & 50, and in such manner that might be expected should this Court do so again. Government Defendants— *not* third parties—must implement the order accordingly. Likewise, IDBEs do not advance any serious arguments that the PCO's terms are truly in "tension with one another," are "undefined, unfair term[s]," or are "patently unreasonable." *See* ECF 91:26–28. While IDBEs have a right to be "heard," *Firefighters*, 478 U.S. at 529, their agreement is not required, and their disagreement does *not* render the PCO unreasonable, unlawful, or harmful. *See supra* § II.A.–B.; *Williams v. Vukovich*, 720 F.2d 909, 921 (6th Cir. 1983) (objectors "ha[ve] a heavy burden of demonstrating that the decree is unreasonable"); *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1435 (6th Cir. 1991) (effect on non-settlers "not determinative in the court's evaluation" of a consent decree); ECF 44:25 (no harm in stopping unconstitutional conduct).

"critical" failure to tether the "deviation from the norm of equal treatment" to "reasonable durational" parameters that are "limited in time," *SFFA*, 600 U.S. at 212—are glaring flaws of the DBE Program, and this Court is *not* "blind" to these issues and has already issued preliminary relief on the matter. ECF 44:20–22 (quoted cases omitted).

Accordingly, the Court *can* "exercise its independent judgment" and find the PCO to be "a reasonable factual and legal determination based on the record." *United States v. Michigan*, 18 F.3d 348, 351 (6th Cir. 1994); *Howard*, 871 F.2d at 1008; *Oregon*, 913 F.2d at 581; *Geier*, 801 F.2d at 800 (affirming consent decree based on district court's strict scrutiny analysis); *United States v. Louisville Jefferson Cnty. Metro Gov't*, No. 3:24-CV-722-BJB, 2025 WL 238010, at *5 (W.D. Ky. Jan. 18, 2025) (approval of a "consent decree necessarily envisions a reasoned consideration of the basis for the agreement"); *United States v. BP Amoco Oil PLC*, 277 F.3d 1012, 1019 (8th Cir. 2002) (a district court that "carefully consider[s] the underlying facts and legal arguments" "d[oes] not mechanistically 'rubber stamp' the consent decree"); *Perkins v. City of Chicago Heights*, 47 F.3d 212, 216 (7th Cir. 1995) ("upon properly supported findings that such a remedy is necessary to rectify a violation of federal law, the district court can approve a consent decree" even one overriding state law); *Evans v. City of Chicago*, 10 F.3d 474, 480 (7th Cir. 1993) (probable violations of law support entry of consent decrees); *Cleveland Cnty. Ass'n for Gov't by People v. Cleveland Cnty. Bd. of Comm'rs*, 142 F.3d 468, 477 (D.C. Cir. 1998) (validating consent decrees "intended to remedy an admitted or adjudged violation").

Here, the PCO's order—"hold[ing] and declar[ing] that the use of DBE contract goals … based on a race- or sex-based presumption, violates the equal protection [guarantee]"—is premised on the Court's own "independent analysis" and Government Defendants' stipulation that "the determination of DBE eligibility using race- and sex-based presumptions … is not supported by

the Constitution as currently interpreted under equal protection jurisprudence." ECF 82-1:3–4 ¶¶ 9, 11. This is entirely consistent with the Court's prior finding that "the race and gender classifications" challenged in this action "violate the Constitution's guarantee of equal protection," which, in turn, is based on governing Supreme Court and Sixth Circuit precedent. ECF 44:1, 18, 21. Maintaining the Court's holding would also be consistent with the "law of the case" doctrine. *E.g.*, *Michigan*, 131 F.4th at 417.

IDBEs also contend that the PCO "[v]iolates the [s]eparation of [p]owers" because it "permit[s] the executive branch to hamstring … a statutorily created program" and "purports to bind all future administrations" without a "holding of unconstitutionality." ECF 91:22–23. These brief assertions do not point to any separation of powers issues and only indicate a misunderstanding of what a consent decree is. The entry of a consent decree is a "judicial act." *United States v. Swift & Co.*, 286 U.S. 106, 115 (1932). And the use of a consent decree as a remedy for a constitutional violation is a proper exercise of the judicial power. *See, e.g., Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 389 (1992) (finding no abuse of discretion in the entry of "the agreed-upon decree, which clearly was related to the conditions found to offend the Constitution."). As explained, the Court can "exercise its independent judgment" here and find the PCO to be "a reasonable factual and legal determination based on the record." *See supra* p.16 (citing cases); *see also* Third Decl. Koetter; Second Decl. Bagshaw. Indeed, the Court has already done just that, ECF 44 & 50, and the PCO contemplates the Court's issuance of a declaration and injunction yet again. ECF 82-1:4 ¶¶ 11–12. It is irrefutable that an Article III court has the power to issue equitable relief, and "the custom of entering consent decrees" is not novel. *Califano v. Yamasaki*, 442 U.S. 682, 705 (1979) ("Absent the clearest command to the contrary from Congress, federal courts retain their equitable power"); *Lexington Ins. Co.*, 581 F. Supp. 3d at 867.

Finally, in a last-ditch effort, IDBEs briefly assert that the PCO violates federal law. First, they suggest that the PCO "attempts to rollback regulations authorizing the DBE [P]rogram" and does not "conform to the terms" of the federal Administrative Procedure Act ("APA"). ECF 91:20. But while the PCO certainly does set forth the basis for "changing its legal interpretation," the PCO does *not* address agency rulemaking in any way, and therefore *cannot* "commit[] the executive branch to promulgate rules without notice-and-comment." *Id*. at 20–21. IDBEs' brief assertions to the contrary are factually inaccurate, and accordingly without merit.[15]

Similarly, in another futile attack, IDBEs claim that the PCO does not comply with a statute requiring the United States Department of Justice ("USDOJ") to report to Congress the agency's decision to refrain from defending the constitutionality of a federal policy. *See* ECF 91:21–22; *see also* 28 U.S.C. § 530D(a)(1)(B), (b)(2). Setting aside the issue that the requirement is specific to *USDOJ*'s actions and that the PCO itself does *not* violate the requirement, USDOJ was under no obligation to transmit the 530D report *prior* to 30 days of its May 28, 2025 determination to cease its defense of the DBE Program's presumptions "on the grounds that [its] provision[s] [are] unconstitutional." 28 U.S.C. § 530D(a)(1)(B), (b)(2). By all accounts, it appears that USDOJ did in fact comply as required, providing its notice on June 25, 2025.[16]

---

[15] Moreover, even when a consent decree *does* stipulate that an administrative rule be vacated and remanded to an agency for a new rulemaking—which is *not* at all the case here—the APA does *not* apply. As discussed, the entry of the PCO is a "judicial act," and the APA applies to *agency acts*. *Home Builders Ass'ns of N. Cal. v. Norton*, 293 F. Supp. 2d 1, 5 (D.D.C. 2002) (citing *Swift & Co.*, 286 U.S. at 115) ("As such, the Court does not find that the notice and comment requirements of 5 U.S.C. § 553 apply before the Court's adoption of a consent decree, as adoption of a consent decree is not an agency act under the APA.").

[16] Letter from D. John Sauer, Solicitor General to M. Johnson, Speaker of the U.S. House of Representatives, *Re: Race- and Sex-Based Presumptions in USDOT Disadvantaged Business Enterprise Program* (June 25, 2025), available here.

### D.        There Was No "Collusion," And This Case Is *Not* a "Faux Dispute."

IDBEs and Amici-States Maryland, *et al.* ("Maryland Amici") also appear to attack Plaintiffs' counsel, Wisconsin Institute for Law & Liberty, Inc. ("WILL"), and Government Defendants to allege that the PCO is the "product of egregious collusion" "baldly urged" by WILL. ECF 91:16–17; 111:12. For their part, IDBEs center this accusation around WILL's January 2025 "Roadmap to Equality" report, in which WILL—consistent with its First Amendment rights and public interest mission in equality—advocated for an end to racially discriminatory programs, identifying general actions that the federal government might take to restore constitutionally mandated equality. Second Decl. Lennington ¶¶ 3–4.[17] Among the dozens of discriminatory programs identified, WILL publicly called on the new Administration to settle this case and end the DBE Program's discrimination—a message that was entirely consistent with Plaintiffs' and WILL's public statements since this case was filed in October 2023. *Id.* at ¶ 5 (capturing MAMCO's plea to "the Biden Administration to dismantle this discriminatory program and embrace the right of equality for all").[18] In short, Plaintiffs' and WILL's position has been unwavering over the past two years: the DBE Program's discrimination is unconstitutional, and Government Defendants should stop enforcing its race- and sex-based preferences. *Id.* Additionally, when advocating for DBE Program reform, WILL communicated directly with members of Congress and their staff. *Id.* at ¶ 6. WILL did *not* communicate with any USDOT officials and is only aware that WILL's report was shared with executive officials by way of press accounts on the matter. *Id.* Likewise, WILL only communicated with USDOJ about this case in the context of routine, attorney-to-attorney communications with USDOJ counsel providing

---

[17] *See also* WILL, *Roadmap to Equality*, available here.

[18] *See also* Press Release, *WILL Opens New Front in Anti-discrimination Battle* (October 2023), available here.

representation in this case. *Id.* Thus, while IDBEs' present an undeveloped argument, their insinuations that there are improper relationships between the Original Parties are baseless.

In another similarly underdeveloped argument, IDBEs also appear to suggest that the PCO *must* be collusive because both Plaintiffs and Government Defendants agree to it. But if mere agreement between parties—or one party's proposal and urging of the other to settle—were sufficient to establish "collusion," *every* consent decree would be problematic. To the contrary, courts are concerned with collusive agreements that seek "to defraud another or to do or obtain something forbidden by law." *Black's Law Dictionary* (12th ed. 2024). For example, collusion might be indicated by the initiation of a "welcome[d] suit[]" in which the parties attempt—in some underhanded or illegitimate way—to "bypass" the "democratic" and/or "adversarial process," or to form an agreement that is "in no way related to" the underlying claim. *See Money Store, Inc. v. Harriscorp Fin., Inc.*, 885 F.2d 369, 376 (7th Cir. 1989) (Posner, J., concurring); *Martin v. Wilks*, 490 U.S. 755, 789 (1989) (Stevens, J., dissenting); *infra* p.20–21 (discussing two cases implicating welcomed suits); *see also* 69 A.L.R.2d 755 § 22(a) (1960) (finding no cases in which a decree was reversed on the basis of collusion). Nothing here points to anything approaching these situations.[19]

Likewise, Maryland Amici's claim that the PCO is collusive is based on their erroneous contention that this case presents *no* "Article III case or controversy." ECF 111:12. This case is *not* a "faux dispute" in which "all parties have agreed from the beginning of this case that [the DBE Program's presumptions] are unconstitutional" and "both litigants desire precisely the same

---

[19] IDBEs general complaints about consent decrees lack merit and do not change this calculus. *See supra* § II.C. IDBEs also attempt to liken the circumstances here to *Cruz v. JKS Ventures, Inc.*, No. 23-CV-8311 (LJL), 2024 WL 814563 (S.D.N.Y. Feb. 26, 2024). There, the court found evidence of improper behavior between the parties raising a suspicion of collusion, where a settlement was reached in hurried fashion "perhaps hours" after the defendant became aware of the lawsuit and the "plan to remediate" the at issue ADA violation was "superficial and cosmetic" because it did not respond to the specific problems that had given rise to the complaint. *Id.* at *6. The case is inapposite here.

result." *See id.* (citing *Pool v. City of Houston*, 87 F.4th 733, 734 (5th Cir. 2023) and *Moore v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 47, 48 (1971)). Nor has "[t]he [government] … repeatedly and consistently emphasized its agreement with the plaintiffs throughout this suit." *Pool*, 87 F.4th at 734. Moreover, this not a case in which "[t]he [government] also agreed that it would and could not enforce the [at issue] provisions." *Id.* (internal quotation marks omitted).[20] In fact, here, Government Defendants are *still* enforcing the DBE Program's presumptions and have *not* agreed to do otherwise, absent the entry of the PCO. And Plaintiffs certainly have no reason to believe that Government Defendants plan to start complying with the Constitution anytime soon, absent this Court's entry of the PCO. After all, the federal government has a 45 year history of enforcing the DBE Program's unconstitutional preferences, and Plaintiffs have an equally "long history of being discriminated against by the DBE [P]rogram." *E.g.*, ECF 1: ¶ 8; 27-2; 27-3.[21]

Ultimately, IDBEs and Maryland Amici contend that the process for reaching the PCO was not "adversarial" enough, ECF 91:18, 29; 111:12, because they ignore the "adversarial" process

---

[20] As in *Pool*, in *Moore*, there was *never* any controversy whatsoever between the parties. *Moore* involved a collateral attack brought in state court against a federal court order related to a school desegregation plan, and was consolidated with various other cases. *See Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 312 F. Supp. 503, 505–07 (W.D.N.C. 1970). Both the plaintiffs and state defendants in that collateral suit sought the same relief and took similar positions. When the cases reached the Supreme Court, the Court *only* dismissed the appeal as to the collateral case (where the parties were aligned), while resolving the merits of two appeals from the other, related cases. *See* 402 U.S. 1 (1971); 402 U.S. 43 (1971). There is *nothing* like that here; and nothing in *Moore*'s two-paragraph, per curiam decision suggests or holds that a case must be dismissed whenever the parties, having assessed their respective cases, reach a settlement.

[21] Moreover, even *if* Government Defendants were to cease their enforcement of the DBE Program's presumptions, Plaintiffs could *not* accept, without additional assurances, such a "voluntary cessation," given that the at-issue conduct remains "capable of repetition." *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) ("It is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'") (quoted case omitted); *see also Lindke v. Freed*, 114 F.4th 812, 820 (6th Cir. 2024) (quoting *Friends of the Earth* and explaining that a party claiming mootness "bears a 'heavy burden of persuading' the court that the challenged conduct 'cannot reasonably be expected to start up again'").

that has culminated in two opinions and orders from this Court based on controlling precedent. *See* ECF 91:7, 20 (claiming that governing authority "contradicts" the PCO's position on the DBE Program). Plaintiffs challenged the DBE Program because it is blatantly unconstitutional, particularly given *SFFA*. Given that decision, Sixth Circuit precedent, and this Court's preliminary rulings, Defendants now acknowledge that they cannot possibly defend the constitutionality of the DBE Program. That does not render the consent decree collusive. *See Common Cause Rhode Island v. Gorbea*, 970 F.3d 11, 17 (1st Cir. 2020) ("[I]t would be odd indeed to say that a plaintiff cannot get relief from an unconstitutional law merely because" "[government] officials fairly conclude, as credibly happened here, that enforcement of a law is unconstitutional").[22]

### E.    The PCO's Scope of Relief is Entirely Proper.

In yet another line of argument, IDBEs and Maryland Amici contend that the PCO's scope of relief is too "sprawling" and "[i]nconsistent with [r]emedies [l]aw" because it would apply "nationwide." ECF 91:24–26; 111:9–11. There are multiple problems with this argument.

As a preliminary matter, this argument misunderstands the nature of consent decrees. Because consent decrees are a "hybrid" between "contracts and … judicial decrees," the Supreme Court has held that they can contain "broader relief than the court could have awarded after a trial." *E.g.*, *Firefighters*, 478 U.S. at 519, 525; *Williams*, 720 F.2d at 920 (discussing the hybrid nature of consent decrees); *see also Rufo*, 502 U.S. at 389 (a district court "do[es] not abuse its discretion"

---

[22] Nor does "collusion" arise, in the slightest, from the Original Parties' ethically-mandated duty to confine confidential settlement discussions as between them. *See* ECF 91:18. Throughout nearly the entirety of the Original Parties' lengthy settlement discussions, IDBEs were *not* parties to this case, and there was no obligation to "provide[] … updates on the potential settlement" to them. *See id*. By the time IDBEs' motion to intervene was granted, the PCO was in its final preparation stages and was filed days later with a specific indication that the PCO did not purport to represent IDBEs' position. Second Decl. Lennington. ¶ 8; ECF 82. IDBEs also suggest that the Original Parties may have entered into some other "private settlement to resolve their claims" without "notif[ying] Intervenor DBEs." *Id.* at n.13. To be sure, there is no agreement between the Original Parties other than the PCO. Second Decl. Lennington ¶ 10.

in entering a consent decree that "undertak[es] to do … more than what a court would have ordered") (cited cases omitted); *Pelzer v. Vassalle*, 655 F. App'x 352, 362 (6th Cir. 2016) (rejecting the argument that there was no lawful authority for a "nationwide injunction" by emphasizing "the contractual nature of a settlement agreement"). Given the *Firefighters*' holding, lower courts have recognized that "[p]arties enjoy wide latitude in terms of what they may agree to by consent decree and have sanctioned by a court." *Conservation L. Found. of New England, Inc. v. Franklin*, 989 F.2d 54, 59 (1st Cir. 1993).[23]

Moreover, even setting that initial point aside, the PCO's relief is *not* "broader" than what Plaintiffs could have obtained after a trial. The Supreme Court has long recognized that equitable relief for a constitutional violation should be "tailored to cure the condition that offends the Constitution" and "provide complete relief to the plaintiffs." *Milliken v. Bradley*, 433 U.S. 267, 282 (1977) (quoted case omitted); *Califano*, 442 U.S. at 702. As the Court recently acknowledged, "the complete-relief principle has deep roots in equity" and providing "complete relief" sometimes requires injunctions that "incidental[ly]" "benefit[ ] nonparties." *CASA*, WL 1773631 at 10–11.

Here, an injunction that is limited to the specific contracts that Plaintiffs bid (like the preliminary injunction) would *not* provide "complete relief" to Plaintiffs. Instead, such an injunction would impose substantial and unequal implementation costs and burdens on Plaintiffs and would further fall short in permitting Plaintiffs to pursue desired projects without being subject to the discriminatory components of DBE goals. Plaintiffs' DBE competitors do *not* bear these

---

[23] The recent decision in *Trump v. CASA, Inc.*, No. 24A884, WL 1773631 (U.S. June 27, 2025) did not consider the scope of injunctions entered pursuant to a consent decree, nor overrule *Firefighters*. Thus, *Firefighters*' holding that consent decrees can contain "broader relief than the court could have awarded after a trial," *id*. at 525, remains good law. *See Hohn v. United States*, 524 U.S. 236, 252–53 (1998) ("Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality."); *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000) ("This Court does not normally overturn … earlier authority *sub silentio*.").

added burdens and costs and, in fact, have continued to enjoy the benefits of being DBE firms, which ultimately distorts the market in their favor. Thus, an injunction that is limited in this way would *not* resolve the equal protection injuries at issue; it would perpetuate them.

Since late September, 2024, the Original Parties have been implementing the Court's preliminary injunction. Second Decl. Tolliver ¶ 3. During that time, Plaintiffs and their counsel have devoted hundreds of hours to the implementation of the order—a process which requires, among other things, a continuous, daily dialogue between Plaintiffs and their counsel; Plaintiffs' counsel and counsel for Government Defendants; counsel for Government Defendants and Government Defendants; and Government Defendants and the scores of federal, state, and local governmental authorities involved with letting those federally funded DBE contracts upon which Plaintiffs intend to bid. Second Decl. Tolliver ¶ 4–7; Third Decl. Koetter ¶¶ 6–7; Second Decl. Bagshaw ¶¶ 4–5. In identifying specific DBE contracts, Plaintiffs must research and retrieve certain documents required to transmit their bidding plans to USDOT, and then monitor transmitted projects to ensure that DBE goals are removed from the identified contracts prior to a letting. Third Decl. Koetter ¶¶ 6–7; Second Decl. Bagshaw ¶¶ 4–5. Over the past nine and a half months of implementing the preliminary injunction, MAMCO, through its counsel, has transmitted "hundreds of DBE contracts [with] related project information" to USDOT, and "hundreds of [back and forth] correspondences … have accompanied these requests." Third Decl. Koetter ¶¶ 7–9 (setting forth "a small sampling of the *numerous* plans MAMCO has transmitted to USDOT … regarding MAMCO's intention to bid federal DBE contracts" pursuant to the preliminary injunction) (emphasis in original); *see also* Second Decl. Bagshaw ¶ 6 (setting forth a similar sampling of Bagshaw's post-injunction bidding plans); Second Decl. Tolliver ¶ 7.

Confirming Plaintiffs' initial concerns, the inherent deficiencies and burdens attendant to the current, as-applied preliminary injunction demonstrate that a permanent as-applied injunction would *not* afford "complete relief" to Plaintiffs. *E.g.*, *Califano*, 442 U.S. at 702; *see* ECF 40:21–26. MAMCO bids hundreds and thousands of transportation-related construction projects each year in an expanding number of states across the country. Third Decl. Koetter ¶¶ 2–4. As MAMCO confirms, "[t]o present, MAMCO's scope of work for [contracts that are federally funded and subject to the federal DBE Program] extends to … 29 states." Third Decl. Koetter ¶¶ 3–5 (providing an "evolving" list of the states in which MAMCO operates and "a *very small sampling*" of MAMCO's bids and work, including bids on DBE contracts); *see also* Second Decl. Bagshaw ¶¶ 2–3 (setting forth a similar sampling of Bagshaw's bids and work); ECF 27-2, 27-3, 46-7.

As of July 14, 2025, MAMCO estimates that it has spent approximately $42,000 to $63,000 to implement the preliminary injunction, and that if the as-applied preliminary injunction were to become permanent, the company would need to create a new employment position and budget new funds to pay at least a part-time employee to manage the implementation process. Third Decl. Koetter ¶¶ 12–13. MAMCO objects to the imposition of a final remedy that would afford *not* relief, but punishment, requiring the company to indefinitely fund a new "DBE Contract Coordinator" role. *Id.* at ¶¶ 13–14.

What is more, the current as-applied remedy is *not* even "complete" in allowing Plaintiffs to pursue *all* the DBE contracts that they would like to bid without being subject to the discriminatory components of DBE goals. Because of the numerous steps, actors, and communicative components involved in adjusting DBE goals for individual contracts prior to a letting, the implementation process necessarily requires Plaintiffs to identify DBE contracts upon which they intend to bid within mere days of a letting notice—an arbitrary timeframe that does not

consider the fact that federal subcontractors, like Plaintiffs, often learn of and evaluate contracting opportunities *well after* the first few days of a published notice. Third Decl. Koetter ¶ 10; Second Decl. Bagshaw ¶ 7. This narrow notice window means that Plaintiffs may not receive the protection of the injunction when they discover DBE contracts after the brief notice window closes as has been the case a number of times. Second Decl. Bagshaw ¶¶ 7–8 (explaining that "most of Bagshaw's opportunities are obtained through word of mouth" and that Bagshaw is not always able to avail itself of the preliminary injunction because its process is difficult to implement against the company's business model); Third Decl. Koetter ¶ 11. The narrow window also forces Plaintiffs to attempt to discover information that may not be discoverable to them through their regular business operations and scramble to specially prioritize their consideration of DBE projects over all others. Third Decl. Koetter ¶ 11; Second Decl. Bagshaw ¶ 8. All the while, Plaintiffs' DBE competitors continue to benefit from being DBE firms based on race- and sex- discrimination, which drives up prices and their income, and accordingly, distorts the market in their favor. Third Decl. Koetter ¶ 15; Second Decl. Bagshaw ¶ 9.

As the preliminary injunction has revealed, an as-applied remedy requires Plaintiffs to avail themselves of a laborious and incomplete process aimed at remedying their competitive disadvantage, while the fundamental stigma inherent to race- and sex-based discrimination remains unaddressed—and in fact—is, and has been, only further amplified through the very remedy meant to protect them. As Bagshaw explains, the entire "cumbersome process" reflects the fact that the government's DBE Program is designed, and continues, to discriminate against individuals on the basis of race and sex. Second Decl. Bagshaw ¶¶ 5, 9–11; Third Decl. Koetter ¶ 16 (explaining how the stigmatizing effect of the DBE Program's race and sex discrimination has been amplified in light of the preliminary injunction's costs and burdens). A permanent injunction

of this nature would be no different. Ultimately, an as-applied injunction forces Plaintiffs to implement separate processes in their respective businesses, requiring time, money, and resources that otherwise would not be needed if the "playing field" was truly "level." *See* 49 C.F.R. § 26.1(b). Such as-applied relief can *only* serve to re-inflict the equal protection injuries that brought Plaintiffs to court in the first place. Indeed, *to conclude otherwise would be to deny the essence of what an equal protection injury is.* True, the denial of equal treatment consists of a competitive harm sustained from "the inability to compete on an equal footing." *E.g.*, *Ne. Fla. Ch. of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666, (1993). However, even more profound and fundamental than a competitive injury is "the dignitary harm inherent in racial discrimination." *Inner City Contracting, LLC v. Charter Twp. of Northville*, 87 F.4th 743, 751–52 (6th Cir. 2023); Thus, where there is a denial of equal treatment, there is always a "twofold" injury. *Id.* (explaining that a contracting business that has been denied equal protection sustains a "twofold" injury); *Heckler v. Mathews*, 465 U.S. 728, 739–40 (1984) (recognizing the Court's "repeated[] emphasi[s]" on the "stigmatizing" effect of racial discrimination as a "serious non-economic injur[y]"); *Moore v. U.S. Dep't of Agric. ex rel. Farmers Home Admin.*, 993 F.2d 1222, 1224 (5th Cir. 1993) ("The badge of inequality and stigmatization conferred by racial discrimination is a cognizable harm in and of itself"); *SFFA*, 600 U.S. at 208, 217 (reemphasizing the "odious" and "pernicious" nature of racial classifications); *United States v. Virginia*, 518 U.S. 515, 534 (1996) (recognizing the stigma inherent to gender discrimination); *Smith v. Howard Univ.*, 605 F. Supp. 3d 103, 108 (D.D.C. 2022) ("[I]f race discrimination is a fundamental injury[,] . . . [then] gender discrimination must be as well") (quoted case omitted).

"The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case." *Hecht Co. v. Bowles*, 321 U.S. 321,

329 (1944). In the context of an equal protection injury, relief is not "complete" when it requires the harmed plaintiffs to implement a separate process—and here, moreover, a separate, costly and burdensome process—memorializing the inequality at play. After all, "[s]eparate cannot be equal." *E.g.*, *SFFA*, 600 U.S. at 203. Equal treatment means equal treatment. Here, where Plaintiffs may bid any contract under 49 C.F.R. pt. 26 anytime, anywhere, and where "separate [processes] are inherently equal" and incomplete, an as-applied injunction is wholly insufficient. *See, e.g.*, *Brown v. Bd. of Educ.*, 347 U.S. 483, 495 (1954); *SFFA*, 600 U.S. at 203–06 (recounting various illegal constructs of race-based separatism).[24]

For the reasons discussed, an as-applied injunction extending only to the specific contracts Plaintiffs bid is an insufficient, *incomplete* remedy for the equal protection injuries at issue. The PCO's nationwide scope is "necessary" "to cure" the DBE Program's unlawful discrimination and "to provide complete relief" for Plaintiffs' "twofold" equal protection injury. *See, e.g.*, *Milliken*, 433 U.S. at 282; *Califano*, 442 U.S. at 702; *Inner City Contracting*, 87 F.4th at 751–52.[25] At a minimum, Government Defendants' implementation of the presumptions in *at least* the 29 states

---

[24] Notably, *CASA* did not consider the unique injuries caused by an equal protection violation, nor contemplate the scope of injunctions entered pursuant to a consent decree. Here, the PCO's broader relief will necessarily benefit third parties similarly situated to Plaintiffs. However, "that benefit [is] merely incidental," as *CASA* recognized may sometimes be the case. WL 177363 at 11 (quoted case omitted). Here, as explained, there is no way "to peel off just the portion of the [DBE Program] that harm[s] the plaintiff[s]" while still providing Plaintiffs "complete relief" from the equal protection injuries they have suffered and continue to suffer. *See id.* (citing *Rodgers v. Bryant*, 942 F.3d 451, 462 (8th Cir. 2019) (Stras, J., concurring in part) (explaining that in such situations, "[a] court accordingly ha[s] no choice but to enjoin the whole thing." But that "as far as the court [i]s concerned, the injunction [i]s still about protecting the *plaintiff's* "'private rights,' not preventing harm to 'the public at large.'") (emphasis in original; citations omitted)).

[25] It is also hard to see how a permanent, contract-specific injunction that would create ever-changing rules could be anything but burdensome to Government Defendants and unfair to *everyone*. *See Califano*, 442 U.S. at 702 (an injunction "should be no more burdensome to the defendant than necessary").

in which Plaintiffs operate *must be completely and totally enjoined*, with the option to add states as Plaintiffs expand their operations.

Finally, in a separate argument, IDBEs also contend that the PCO exceeds the scope of the case because it references the FAA Reauthorization Act of 2024 funding for the DBE Program. ECF 91:24. Yet this new law simply incorporates the DBE Program's presumptions challenged in this lawsuit. *See* P.L. 118-63 § 730 (2024). Indeed, Plaintiffs *have* challenged—and pursuant to the Court's preliminary order, *are currently receiving relief* as to—the race and sex-based presumptions in USDOT's DBE Program, which are implemented across USDOT's various operating administrations, including the Federal Highway Administration (FHWA), Federal Transit Administration (FTA), and the Federal Aviation Administration (FAA), through the SBA framework and USDOT Title 49 regulations regarding "highway, transit, and airport financial assistance programs." *E.g.*, 49 C.F.R. §§ 26.1(a), 26.5 ("Operating Administration or OA"); ECF 1: ¶¶ 19–30; ECF 27; 44; *see also supra* n.3.[26] Plaintiffs have explained Congress's periodic, "reflexive" re-authorization of DBE Program funding that has persisted for decades with no end. ECF 1 ¶ 20; 27-1:16–17. The FAA Reauthorization Act is "within the general scope of the case made by the pleadings," *Firefighters*, 478 U.S. at 525, demonstrating Plaintiffs' plight; and indeed, Plaintiffs' specifically requested relief from further implementations of the DBE Program's presumptions and goals as set forth in numerous listed authorities "and/or as otherwise applied to the DBE Program and other DBE programs and services." *E.g.*, ECF 1; 27.

---

[26] Accordingly, IDBEs' allegation that Plaintiffs "[do not] bid on any projects related to airport construction," ECF 91:24, misunderstands the scope of Plaintiffs' claims. Plaintiffs are not limited to bidding projects at a particular venue but rather may bid *any* federal DBE contract that includes milling or hauling and trucking construction. *E.g.*, ECF 1: ¶¶ 11–12. And indeed, Plaintiffs do bid such contracts, and have continued to do so, pursuant to the preliminary injunction. *E.g.*, ECF 27-2; 27-3; 44; 50; 46-7; Third Decl. Koetter ¶¶ 5, 8 (listing bids and work that MAMCO has performed, including several airport-related DBE projects, as transmitted to Government Defendants pursuant to the Court's preliminary injunction").

## CONCLUSION

In short, IDBEs' general position "is that by merely objecting, they are entitled to stop the settlement in its tracks, without demonstrating any factual basis for their objections and to force the parties to expend large amounts of time, money and effort to" unwind arguments that have little foundation and "answer … rhetorical questions" that do not change the outcome of this case. *See Geier*, 801 F.2d at 809 (quoted case omitted). "To allow the objectors to disrupt the settlement on th[is] basis" "would be to permit too much." *See id.* Under their theory, this case could *never* be settled, "so long as there was at least a single lawyer around who would like to replace counsel … and start the case anew." *Id.* "Although the Original Parties "have the obligation to support their conclusion to the satisfaction of the District Court, once they have done so, they are not under any recurring obligation to take up their burden again and again *ad infinitum* unless the objectors have made a clear and specific showing that vital material was ignored by the District Court." *Id.*

As the Sixth Circuit has instructed, if a court believes a "decree is problematic, it should inform the parties of its precise concerns and give them an opportunity to reach a reasonable accommodation." *Williams*, 720 F.2d at 921 (citing *City of Miami*, 614 F.2d at 1333) (A court "must … lend every possible assistance to reach a reasonable accommodation.")). "Only if it clearly appears that the proposed settlement cannot be modified to meet the standard [for fairness, adequacy, and reasonableness] set out above should [a court] refuse to grant [its] approval," and then "[t]he court should articulate its 'principled reasons' for rejecting a decree if the accommodation is not satisfactory." *City of Miami*, 614 F.2d at 1333; *Williams*, 720 F.2d at 921.

For the foregoing reasons, and for those reasons stated in Plaintiffs' briefing throughout this case as well as this Court's opinions and orders, *see* ECF 27-1; 36; 40; 44; 46; 49; 50, Plaintiffs respectfully request this Court to grant Plaintiffs' and Government Defendants' Joint Motion for Entry of Consent Order. *See* ECF 82; 82-1.

Dated: July 16, 2025                    Respectfully submitted,

                                        WISCONSIN INSTITUTE FOR
                                        LAW & LIBERTY, INC.

                                        *s/ Cara Tolliver*
                                        _____
                                        Richard M. Esenberg (WI Bar No. 1005622)
                                        Daniel P. Lennington (WI Bar No. 1088694)
                                        Cara M. Tolliver (WI Bar No. 1112818)
                                        330 East Kilbourn Avenue, Suite 725
                                        Milwaukee, WI 53202
                                        Telephone: (414) 727-9455
                                        Rick@will-law.org
                                        Dan@will-law.org
                                        Cara@will-law.org

                                        COMMONWEALTH COUNSEL GROUP, PLLC
                                        Jason M. Nemes (KBA# 90546)
                                        Greg Healey (KBA# 99546)
                                        10343 Linn Station Road, Suite 100
                                        Louisville, KY 40223
                                        jason@ccgattorneys.com
                                        greg@ccgattorneys.com

                                        *Attorneys for Plaintiffs*