UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

**MID-AMERICA MILLING COMPANY,
LLC, *et al.*,**

**Plaintiffs,**

**v.**

**UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,**

**Defendants.**

**Case No. 3:23-cv-00072-GFVT-EBA**

## DOT DEFENDANTS' REPLY IN SUPPORT OF THE JOINT MOTION FOR ENTRY OF CONSENT ORDER

The Court should grant the joint motion of Plaintiffs, Mid-America Milling Company, LLC ("MAMCO") and Bagshaw Trucking, Inc. ("Bagshaw"), and Defendants United States Department of Transportation, Sean Duffy, Secretary of Transportation, the Administrator of the Federal Highway Administration, and Shundreka Givan, Division Administrator of the Federal Highway Administration's Kentucky Division (collectively, "DOT Defendants") to enter into the Proposed Consent Order. ECF No. 82. The Proposed Consent Order reflects this Court's determination that the race- and sex-based presumptions in the DOT Disadvantaged Business Enterprise (DBE) program can no longer satisfy strict scrutiny. *See* ECF No. 44 at 18-20. This Court has already entered a broad preliminary injunction prohibiting the DOT from approving transportation construction contracts that include DOT DBE goals based on the race- and sex-based presumptions included in the program. *See id.* at 27. The Proposed Consent Order converts that preliminary injunction into a permanent injunction that allows DOT to continue to operate the DOT DBE program absent the race- and sex-based presumptions. The Proposed Consent Order

1

was the result of months of arm's length negotiations between the parties. Defendant-Intervenor DBEs have made their objections heard on Plaintiffs' and DOT Defendants' Joint Motion for Entry of Consent Order, but they have not established a basis to prevent this Court from entering this agreement between Plaintiffs and DOT Defendants.

## I.    BACKGROUND

The Infrastructure Investment and Jobs Act ("IIJA" or "Infrastructure Act") was signed into law on November 15, 2021.[1] As part of the Infrastructure Act, Congress reauthorized the Disadvantaged Business Enterprise program, known as the DOT DBE program, which as in prior reauthorizations, directed that "[e]xcept to the extent that the Secretary determines otherwise, not less than 10 percent of the amounts made available for" specified federally-funded highway and transit programs "shall be expended" through DBEs, which are small businesses owned and controlled by one or more "socially and economically disadvantaged" individuals. IIJA § 11101(e), 135 Stat. at 448–50. Earlier versions of the DBE program, including the Minority Business Enterprise and Women Business Enterprise programs, have been in place since 1980. *See* 64 Fed. Reg. 5096, 5096 (Feb. 2, 1999). In 1983, Congress enacted the first DBE program[2] and has since reauthorized the program for highway and transit projects in surface transportation bills.[3] In 2024, Congress reauthorized a substantively-identical program with respect to federal airport

---

[1] *See* Pub. L. No. 177-58, 135 Stat. 429 (Nov. 15, 2021), https://www.congress.gov/bill/117th-congress/house-bill/3684/text.
[2] *See* Surface Transportation Assistance Act of 1982, Pub. L. No. 97-424, § 105(f) (1983).
[3] *See* Surface Transportation and Uniform Relocation Assistance Act of 1987, Pub. L. No. 100-17, § 106(c) (1987); Intermodal Surface Transportation Efficiency Act of 1991, Pub. L. No. 102-240, §1003(b)(1) (1991); Transportation Equity Act for the 21st Century, Pub. L. No. 105-178, § 1101(b)(1) (1998); Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users, Pub. L. No. 109-59, § 1101(b)(2) (2005); Moving Ahead for Progress in the 21st Century Act, Pub. L. No. 112-141, § 1101(b)(3) (2012); Fixing America's Surface Transportation Act, Pub. L. No. 114-94, § 1101(b)(3) (2015).

construction funding.[4] Congress has not materially changed the scope or definition of the DOT DBE program for decades.

The statutory provisions governing the DBE program provide that the term "socially and economically disadvantaged individuals" has the meaning given by "section 8(d) of the Small Business Act (15 U.S.C. 637(d)) and relevant subcontracting regulations issued pursuant to that Act, except that women shall be presumed to be socially and economically disadvantaged individuals for purposes of this subsection."[5] Section 8(d) of the Small Business Act and its implementing regulations create a rebuttable presumption that "Black Americans," "Hispanic Americans," "Native Americans," "Asian Pacific Americans," and "Subcontinent Asian Americans" are disadvantaged.[6] Accordingly, USDOT's DBE regulations consider the following groups as presumed to be socially and economically disadvantaged:

> (i) "Black Americans," which includes persons having origins in any of the Black racial groups of Africa;
> (ii) "Hispanic Americans," which includes persons of Mexican, Puerto Rican, Cuban, Dominican, Central or South American, or other Spanish or Portuguese culture or origin, regardless of race;
> (iii) "Native Americans," which includes persons who are enrolled members of a federally or State recognized Indian tribe, Alaska Natives, or Native Hawaiians;
> (iv) "Asian-Pacific Americans," which includes persons whose origins are from Japan, China, Taiwan, Korea, Burma (Myanmar), Vietnam, Laos, Cambodia (Kampuchea), Thailand, Malaysia, Indonesia, the Philippines, Brunei, Samoa, Guam, the U.S. Trust Territories of the Pacific Islands (Republic of Palau), Republic of the Northern Mariana Islands, Samoa, Macao, Fiji, Tonga, Kiribati, Tuvalu, Nauru, Federated States of Micronesia, or Hong Kong;
> (v) "Subcontinent Asian Americans," which includes persons whose origins are from India, Pakistan, Bangladesh, Bhutan, Maldives, Nepal or Sri Lanka;
> (vi) Women;[7]

---

[4] FAA Reauthorization Act of 2024 § 730(a), Pub. L. No. 118-63; *see also* 49 U.S.C. § 47113(b).
[5] IIJA § 11101(e)(2)(B); *see also* 49 U.S.C. § 47113(a)(2).
[6] *See* 15 U.S.C. § 637(d)(3); 13 C.F.R. §§ 124.103(b)(1), 124.104(a).
[7] 49 C.F.R. § 26.5.

Most recently, in reauthorizing the DOT DBE program in the Infrastructure Act, Congress found that "while significant progress has occurred due to the establishment of the disadvantaged business enterprise program, discrimination and related barriers continue to pose significant obstacles for minority- and women-owned businesses seeking to do business in Federally assisted surface transportation markets across the United States."[8] The Infrastructure Act did not explicitly list specific acts of discrimination committed by the federal government against individuals in the groups required to be presumed disadvantaged, it did not explain why certain races were included as presumptively disadvantaged, and why many were not, and it did not include a sunset date.

On October 26, 2023, Plaintiffs filed a Complaint challenging the constitutionality of certain provisions of the DOT DBE program that apply to "socially and economically disadvantaged individuals." *See* ECF No. 1 (Complaint), ¶ 3. Plaintiffs also filed a Motion for Preliminary Injunction on December 15, 2023. *See* ECF No. 27. On January 16, 2024, DOT Defendants filed a motion to dismiss, which Plaintiffs opposed. *See* ECF Nos. 31, 36. Throughout January and February 2024, both Plaintiffs and DOT Defendants filed extensive adversarial briefing related to Plaintiffs' Complaint and Motion for Preliminary Injunction, which included substantive briefing on the proper scope of a preliminary injunction. *See* ECF Nos. 31, 32, 36, 38, 40. On September 23, 2024, the Court granted Plaintiffs' Motion for Preliminary Injunction and denied without prejudice DOT Defendants' Motion to Dismiss, enjoining the U.S. Department of Transportation from using the DBE program's race- and sex-based presumptions for contracts with DBE goals on which Plaintiffs bid. *See* ECF No. 44. In granting Plaintiffs' Motion for a Preliminary Injunction, the Court stated it was likely that Plaintiffs would prevail on the merits, in particular because DOT Defendants had not established a compelling interest by demonstrating

---

[8] IIJA § 11101(e)(1)(A) (2021).

evidence of past discrimination for each of the groups addressed by the race- and sex-based presumptions used as part of the DBE program, and because the use of race-based presumptions was not narrowly tailored. *See id*. at 15-20. In addition, the Court noted that use of race- and sex-based presumptions was not narrowly tailored because "the DBE program's racial preferences are not tethered to a foreseeable conclusion." *Id*. at 22.

DOT Defendants answered Plaintiffs' Complaint on October 7, 2024. *See* ECF No. 45. On October 31, 2024, following additional briefing by the Plaintiffs and DOT Defendants, the Court granted Plaintiffs' Motion to Clarify Scope of the Preliminary Injunction, holding it applies to DOT DBE contracts outside of Kentucky and Indiana where Plaintiffs operated, over DOT Defendants' objections. *See* ECF No. 50.

In effectuating the preliminary injunction, Plaintiffs and DOT Defendants entered into an agreement to permit DOT to notify affected states of contracts that might violate the order in advance of making any awards. *See* App. C (Enloe Decl.) ¶ 4. Plaintiffs would review initial DOT contract letting schedules released by DOT recipients and identify contracts in states and airport authorities across the nation that included DBE goals on awards on which they might bid. *See id.* DOT would then be responsible for notifying those states of the injunction, and the impermissibility of a DBE goal on those contracts and the states would either award or relet those projects without DBE goals or cancel the projects altogether. *See id.* In total, over the course of the injunction, Plaintiffs have identified at least 596 different contracts in at least 17 different states and airport authorities. *See id.* ¶ 5. The result of the injunction, although limited to the parties in the case, is a removal of DBE goals for all DBEs in all states on all contracts identified by Plaintiffs. *Id*. ¶ 4.

The result of the preliminary injunction has been to place new burdens on DOT, the associated state and airport transportation authorities, the prime contractors, and DBE and non-DBE subcontract bidders. *Id*. ¶¶ 4-7. The DBE program continues and so DOT has been, and continues to be, responsive to all of Plaintiffs' notifications of contracts potentially violative of the injunction and quickly notify state and local airport authorities. *Id*. ¶¶ 4, 7. The uncertain nature of the injunction means that state and airport authorities cannot be certain at the moment of letting which contracts might need to have their DBE goals removed. *See id*. Upon receipt of initial letting notices, prime contractors, DBE and non-DBE subcontract bidders, cannot be certain of which contracts might be relet or if the final contract will include DBE goals. *See id*. Because state and local authorities are not aware of which contracts may or may not be affected by the injunction, uncertainty prevails as to which contracts might go forward with DBE goals, and which might be relet or which might have their DBE goal removed. *See id*. ¶¶ 4-7. Because DOT approves and funds transportation-related contracts in all 50 states, and because Plaintiffs claim the ability to perform on contracts in many states across the country, there is no identifiable geographic limitation to the preliminary injunction. *See id*. ¶¶ 3-4.

Following entry of the preliminary injunction, Plaintiffs and DOT Defendants then moved jointly for a stay to allow the parties to engage in settlement discussions, which was granted on June 5, 2025. *See* ECF Nos. 69, 85. On May 28, 2025, Plaintiffs and DOT Defendants filed the instant joint motion, ECF No. 82, and Proposed Consent Order, ECF No. 82-1. The Proposed Consent Order removes the uncertainty for both the state and airport contract letting authorities and the DOT contract bidders. It also provides a path forward for states to implement a DBE program without the use of the presumptions in a constitutional manner. *See id*. The Proposed Consent Order provides that "[DOT] Defendants may not approve any federal, state or local DOT-

6

funded projects with DBE contract goals where any DBE in that jurisdiction was determined to be eligible based on a race- or sex-based presumption." ECF No. 82-1 ¶ 12. Pursuant to this simple and straightforward construction, state and airport recipients are free to requalify DBEs without the use of race- or sex-based presumptions and then resume setting DBE goals on DOT projects without the anxiety and potential disruption caused by the preliminary injunction. The Proposed Consent Order is only applicable to DOT Defendants in this matter and is limited to the claims brought in the Complaint. *See* ECF No. 1 at 17 (seeking an "order permanently enjoining [DOT] Defendants from applying race and gender-based classifications in the federal DBE program"). By entering the order, DOT will be relieved of its onerous duties under the preliminary injunction and may continue to focus on its vital projects of rebuilding America's infrastructure.

On June 25, 2025, twenty-eight days after the filing of the motion, United States Solicitor General D. John Sauer, sent a letter to Speaker of the U.S. House of Representatives Mike Johnson, in accordance with 28 U.S.C. § 530D informing Congress that the Department of Justice will no longer defend the constitutionality of the DBE program's race- and sex-based presumptions.[9]

In their opposition to the Proposed Consent Order, Defendant-Intervenor DBEs seek to have this Court maintain the status quo of the preliminary injunction. ECF No. 91. They maintain that the Court cannot enter the Proposed Consent Order without their consent, that it is the result of improper collusion and is illegal, that it violates 28 U.S.C. § 530D, that it falls beyond the jurisdictional limits of the case, and that it is not fair, adequate, or reasonable resolution of this matter. None of these arguments stands up to scrutiny. The Proposed Consent Order may be entered

---

[9] *See* App. A, *Race- and Sex-Based Presumptions in USDOT Disadvantaged Business Enterprise Program, Letter to Congress*, June 25, 2025. *See also* D. John Sauer, *Race- and Sex-Based Presumptions in USDOT Disadvantaged Business Enterprise Program,* (June 25, 2025), *reprinted by* U.S. DEP'T OF JUST., https://www.justice.gov/oip/media/1404871/dl?inline.

without the consent of the Defendant-Intervenor DBEs and there is no proof of collusion or illegality. DOT Defendants have satisfied 28 U.S.C. § 530D. Finally, the Proposed Consent Order is well within the jurisdictional limits of this Court because it is based on the Complaint and codifies the restrictions of the preliminary injunction.

## II.    ARGUMENT

### A. The Court may enter the Proposed Consent Order over the objections of the Defendant-Intervenor DBEs.

In cases involving consent decrees, "[t]he criteria to be applied when a district court decides whether to approve and enter a proposed consent decree, are whether the decree is 'fair, adequate, and reasonable, as well as consistent with the public interest.'" *United States v. Lexington-Fayette Urban Cty. Gov't*, 591 F.3d 484, 489 (6th Cir. 2010) (internal citations omitted). In approving a consent decree in the Sixth Circuit, a court "(i) preliminarily approves the decree based on whether the compromise is 'illegal or tainted with collusion,' (ii) confirms that notice is provided to all affected parties, and (iii) conducts a reasonableness hearing to decide whether the decree is 'fair, adequate and reasonable.'" *United States v. Michigan*, 131 F.4th 409, 425 (6th Cir. 2025) (citing *Williams v. Vukovich*, 720 F.2d 909, 920-21 (6th Cir. 1983)).

In particular, the Supreme Court has held that although an intervenor that does not consent to the entry of a decree is entitled to present evidence and have its objections heard on whether to approve a consent decree, *see Local No. 93, Int'l Asso. of Firefighters, etc. v. Cleveland*, 478 U.S. 501, 529 (1986), "this does not create a broad right of intervenors to a quasi-trial, but rather simply require[s] a district court conducting a fairness hearing to allow a party to a proposed settlement agreement to present evidence and have its objections heard." *United States v. Michigan*, 131 F.4th 409, 425 (6th Cir. 2025) (quoting *Tenn. Ass'n of Health Maint. Orgs., Inc. v. Grier*, 262 F.3d 559, 567 (6th Cir. 2001) (internal quotations marks and citation omitted)). "[T]he district court may

limit the fairness hearing to whatever is necessary to aid it in reaching an informed, just and reasoned decision." *Grier*, 262 F.3d at 567 (*citing United States v. Oregon*, 913 F.2d 576, 582 (9th Cir. 1990) (internal quotations and citations omitted)).

Here, Defendant-Intervenor DBEs have filed a substantial brief detailing their objections on whether to approve the Proposed Consent Order. *See* ECF No. 91. DOT Defendants address these objections below, but the opposition and forthcoming surreply represent a full and complete opportunity to address any concerns with the Proposed Consent Order.[10] Defendant-Intervenor DBEs do not possess a veto over any agreement entered between the original parties to resolve this litigation, nor do they possess any rights to materially alter the terms of the legal agreement reached at arm's length and without the taint of collusion.

### 1. Defendant-Intervenor DBEs have not demonstrated that the Proposed Consent Order is tainted with collusion.

To assess whether a consent agreement is tainted with collusion, a court must determine whether there is any evidence to believe collusion occurred. *See In re Domestic Air Transp. Antitrust Litigation*, 148 F.R.D. 297, 313 (N.D. Ga. 1993) ("The conclusion that the parties did not collude in arriving at a settlement involves a negative analysis: whether there is any reason to believe otherwise."); s*ee also In re Progressive Insurance Corporation Underwriting and Rating Practices Litigation,* No. 1:03-cv-01519-MP-AK, 2008 WL 11348505, at *2 (N.D. Fla. Oct. 1, 2008) (applying *Domestic Air's* negative analysis to determine that the agreement at issue was not the result of collusion). In *Domestic Air*, the court considered various factors in determining whether collusion occurred, including whether: 1) fraud was suggested in the settlement process; 2) evidence suggested improper conduct; 3) counsel for the involved parties were "experienced,

---

[10] Should this Court order a fairness hearing on the Proposed Consent Order, DOT Defendants will not object to the participation of Defendant-Intervenor DBEs.

highly capable, and well-known [] counsel;" 4) counsels zealously pursued the best interest of their clients; and 5) the course of negotiations involved good-faith bargaining. *See Domestic Air*, 148 F.R.D. at 313. Another factor that the courts can consider is the terms of the proposed agreement. *See e.g., Swinton v. SquareTrade, Inc.*, No. 4:18-CV-00144-SMR-SBJ, 2018 WL 8458862, at *7 (S.D. Ia. Sept. 21, 2018) (noting that "the [proposed] agreement [was] not so lopsided on its face that it reflect[ed] collusion by the parties.").

None of the indications of collusion are present in this agreement. First, this case has been vigorously litigated since its inception. Shortly after filing the Complaint, Plaintiffs filed a Motion for a Preliminary Injunction, seeking a complete injunction of the DOT DBE program. *See* ECF No. 27. Plaintiffs specifically sought to prevent "Defendants from implementing or enforcing the DBE Program's race and gender presumptions and DBE participation goal as set forth in P[ub.] L. 117-58, § 11101(e) and [associated regulations]." *Id.* at 27-4. DOT Defendants opposed this motion, both on its merits and in its scope, ECF No. 32, and participated in oral argument defending those positions. ECF. No. 43. DOT Defendants simultaneously filed a Motion to Dismiss, ECF No. 31, based on standing concerns, and these issues were also raised and argued at oral argument before the Court. *See* ECF No. 43.

Despite these efforts, DOT Defendants were unsuccessful in persuading the Court as to either the constitutionality of the DOT DBE program or any standing concerns regarding Plaintiffs. On September 23, 2024, the Court found that the DOT DBE Program likely violated the Equal Protection Clause, granted Plaintiffs' Motion for Preliminary Injunction, enjoined DOT Defendants from "mandating the use of race-and gender-based rebuttable presumptions for [DOT] contracts impacted by DBE goals upon which Plaintiffs bid," and denied DOT Defendants' Motion to Dismiss. ECF No. 44 at 27. Subsequently, Plaintiffs filed a Motion to Clarify the scope of the

injunction, ECF No. 46, which DOT Defendants opposed, ECF No. 48, and which the Court granted, explaining that the injunction was "effective in any state in which Plaintiffs operate or bid on [DOT] contracts [impacted by the DBE Program]," ECF No. 50 at 8. At every stage of the litigation, DOT Defendants have contested Plaintiffs' allegations and have represented their interests independent of any collusion or coordination. To wit, the DOT DBE program continues in the presence of the injunction through today.

While Plaintiffs and DOT Defendants were implementing the preliminary injunction, on January 20, 2025, President Trump signed an Executive Order titled "Ending Radical and Wasteful Government DEI Programs and Preferencing." Exec. Order, No. 14151 (Jan. 20, 2025).[11] The EO directs "[e]ach agency, department, or commission head, in consultation with the Attorney General, the Director of [the Office of Management and Budget], and the Director of [the Office of Personnel Management]" to "terminate . . . all 'equity action plans,' 'equity' actions, initiatives, or programs, [and] 'equity-related' grants or contracts." *Id.* The following day, the President issued a subsequent Executive Order titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity." Exec. Order, No. 14173 (Jan. 21, 2025).[12] In this order, President Trump directed the Office of Federal Contract Compliance Programs to "immediately cease . . . [a]llowing or encouraging Federal contractors and subcontractors to engage in workforce balancing based on race, color, sex, sexual preference, religion, or national origin." *Id.* Shortly thereafter, Attorney General Pamela Bondi issued a public directive to the Department of Justice titled *Memorandum*

---

[11] Exec. Order No. 14151 (January 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/ending-radical-and-wasteful-government-dei-programs-and-preferencing/.

[12] Exec. Order No. 14173 (January 21, 2025) https://www.whitehouse.gov/presidential-actions/2025/01/ending-illegal-discrimination-and-restoring-merit-based-opportunity/.

*for all Department of Justice Employees: Eliminating Internal Discriminatory Practices.*[13] The directive required that "all Department components must thoroughly evaluate . . . *litigation positions* . . . [and t]here is no place in these materials for race- or sex-based preferences, diversity hiring targets, or preferential treatment based on DEI- or DEIA-related criteria." *Id*. (emphasis added). These were public documents that announced the official change in the position of the agencies and litigating positions.[14]

Based on these directives, and the prior orders of this Court, DOT Defendants and Plaintiffs immediately filed a Joint Motion to Stay, ECF No. 69, and an Unopposed Motion to Extend all Deadlines, ECF No. 71. The motion and extension sought a 90-day stay of all deadlines based on the original parties' anticipated timeline of negotiations. *Id*. During this time, the parties engaged in arm's length settlement negotiations over several months to arrive at the consent agreement, which was presented to the Court on May 28, 2025, 107 days after Plaintiffs' and DOT Defendants' request for a stay and an extension. ECF No. 82. Contrary to Defendant-Intervenors DBE's allegations, the agreement was not based on the order permitting their intervention on May 21, 2025, but was the result of extended negotiations and was completed very close to the time anticipated by the parties in February. *See* ECF No. 78.

---

[13] Pamela Bondi, *Memorandum for all Department of Justice Employees: Eliminating Internal Discriminatory Practices,* U.S. Dep't of Just. (February 5, 2025), https://www.justice.gov/ag/media/1388556/dl?inline.

[14] Defendant-Intervenor DBEs claim that prior to these notices, DOT Defendants colluded with Plaintiffs' counsel. ECF No. 91 at 11. However, DOT Defendants' counsel were unaware of either the reports issued by Plaintiffs, or any statements of Plaintiffs' counsel cited in Defendant-Intervenor DBEs' brief, ECF No. 91 at 11 n.13, until they were notified of their existence in the brief. *See* App. B (Braniff Decl.), ¶¶ 4-5. These materials have played no role in the defense of the DOT DBE program, the change in position of the federal government, or the ultimate settlement from Defendants perspective. *See id.* ¶¶ 1-6. Moreover, the published date of the WILL report is listed as February 7, 2025, which is after the publication of both executive orders and Attorney General memorandum which led to the parties filing the motion to stay this litigation. *See id.*

Defendant-Intervenor DBEs allegations of collusion based on the agreement between the parties on the scope of the Proposed Consent Order would effectively render all settlements unenforceable. While it is true that both parties seeking entry of the Proposed Consent Order are doing so to settle this matter now and stipulate to the unconstitutionality of the race- and sex-based presumptions in the DOT DBE program as currently implemented, that has not been the case over the course of this litigation.

Unlike the cases cited by Defendant-Intervenor DBEs, this case still represents a case or controversy. In *Moore v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 47 (1971), the Supreme Court denied appellate jurisdiction of an appeal from an order where both parties had argued the same position to the lower court. *Id.* at 47-48. Moreover, the Court noted in *Moore* that "neither party sought an injunction to restrain a state officer from enforcing a state statute alleged to be unconstitutional." *Id.* at 48. Neither of these issues are present here. The original parties contested this matter leading up to the preliminary injunction currently in effect. The Court addressed both the original parties' arguments and determined that the DOT DBE program cannot be supported by a compelling interest, and even if it could, the program is not narrowly tailored. *See* ECF No. 44 at 18-24. The settlement in this case recognizes the scope and effect of the preliminary injunction and seeks to implement it in a permanent manner that permits the DOT DBE program to continue without its unconstitutional elements.

In Defendant-Intervenor DBEs' other example of collusion, *Cruz v. JKS Ventures, Inc.*, the court declined to approve a court-monitored settlement agreement that resolved Rule 23 class allegations in the complete absence of any litigation by the parties, without a fairness hearing. *See* No. 23-cv-8311 (LJL), 2024 WL 814563, at *5-6 (S.D.N.Y 2024). The court noted that the "settlement was reached within days, perhaps hours, of defendant being made aware of the lawsuit

and on the eve of the Christmas holiday." *Id.* The opposite happened here. DOT Defendants have strongly litigated their position since the filing of this case and are currently subject to an onerous preliminary injunction. *See* ECF No. 50. Additionally, in *Cruz,* the court was concerned that the settlement reached by the parties exceeded the scope of the parties' legal capabilities because it interfered with third parties' ability to sue to enforce the Americans with Disabilities Act, which frustrated the statutory scheme. *Cruz,* 2024 WL 814563 at *6. The court stated that under "the law Congress designed visually-impaired persons are intended to be incented to bring lawsuits as soon as they have a basis to claim a violation, under the consent decree designed by the parties, a party seeking to challenge Defendant's website compliance faces legal hurdles." *Id.* This is not the case for this Proposed Consent Order, which addresses the constitutionality of a portion of the DOT DBE Program and does not interfere with a statutory scheme designed for private parties to enforce a federal law though litigation.

The Infrastructure Investment and Jobs Act, which is the subject of this litigation, grants the Secretary of Transportation sole discretion to set the DBE goal for small business concerns owned and controlled by socially and economically disadvantaged individuals. *See* IIJA § 11101(e)(7), 135 Stat. 429, 450. In the absence of this Proposed Consent Order, the Secretary could set the DOT DBE goal at zero percent nationwide. *See* IIJA § 11101(e)(3). This Proposed Consent Order, in contrast, will permit the DOT DBE program, and associated DBE goals on all contracts to continue, provided that no DBE has qualified to the program through race- or sex-based presumptions. As a result, this Proposed Consent Order is no way an attempt, as Defendant-Intervenor DBEs assert, "to make end runs around the legislature." ECF No. 91 at 23 (citing *Kasper v. Bd. of Election Comm'rs of Chi.*, 814 F.2d 332, 340 (7th Cir. 1987)). The legislature has already given the Secretary of Transportation discretion to remove the DBE goals in their entirety.

14

*See* IIJA § 11101(e)(3). This Proposed Consent Order recognizes that authority, but attempts to implement the program, and maintain the goals, in a manner that comports with the Constitution.

Finally, there are no allegations of fraud, improper conduct, or inexperienced counsel. The government publicly announced its position on issues affecting the Proposed Consent Order through executive order on the first and second day of this administration. Neither Plaintiffs nor DOT Defendants have been accused of inexperience or improper conduct. Accordingly, DOT Defendants urge the court to preliminarily approve the Proposed Consent Decree, as there is no evidence to suggest collusion occurred.

### 2. Defendant-Intervenor DBEs have not demonstrated that the Proposed Consent Order is outside this Court's jurisdiction or the law.

#### a. A case or controversy enabling settlement exists.

Defendant-Intervenor DBEs have likewise failed to show that the Proposed Consent Order is either outside this Court's jurisdiction or the law. Both parties still have standing to conclude this matter, a preliminary injunction remains in effect, and "the Supreme Court has long endorsed the propriety of the use and entry of consent judgments." *SEC v. Randolph,* 736 F.2d 525, 528 (9th Cir. 1984) (citing *United States v. Armour & Co.,* 402 U.S. 673, 681 (1971); *Pope v. United States,* 323 U.S. 1, 12 (1944); *Swift & Co. v. United States,* 276 U.S. 311, 325–326 (1928).

First, with regard to jurisdiction, *amici*[15] suggest that no case or controversy remains because DOT Defendants and Plaintiffs views of equal protection jurisprudence now align. *See* ECF No. 111 at 7-8. However, a case need not be dismissed solely because two of the parties ultimately agree, especially with the presence of a disagreeing intervenor. Although matters are

---

[15] In this brief, *amici* refers to States of Maryland, Illinois, Washington, Arizona, California, Colorado, Connecticut, Delaware, District of Columbia, Hawaii, Maine, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, and Wisconsin. *See* ECF No. 111.

moot for Article III purposes if the issues are no longer live or if the parties "lack a legally cognizable interest in the outcome," *Sierra Club v. Glickman*, 156 F.3d 606, 619 (5th Cir. 1998), with consent decrees, "a certain amount of cooperation between the parties is to be expected." *Missouri v. Westinghouse Elec., LLC,* 487 F. Supp. 2d 1076, 1080 (E.D. Mo. 2007). To consider an issue as "live," the plaintiff must generally demonstrate an injury linked to the defendant that is subject to some form of judicial remedy. *See Baccus v. Parrish*, 45 F.3d 958, 961 (5th Cir. 1995). The Supreme Court has opined that it would be a "curious result" if a person was denied access to suit because "the Attorney General of the United States agreed with the legal arguments" of the individual. *See Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 939 (1983). "The real value of the judicial pronouncement—what makes it a proper judicial resolution of a 'case or controversy' rather than an advisory opinion—is in the settling of some dispute *which affects the behavior of the defendant towards the plaintiff.* "' *Lawyer v. U.S. Dep't of Just.*, 521 U.S. 567, 579-80 (1997) (quoting *Hewitt v. Helms,* 482 U.S. 755, 761 (1987) (emphasis in original). Moreover, in cases with intervenors, even if the original parties agree to a consent decree, and now lack an adversarial relationship, an intervenor-defendant who seeks "enforcement of [the] law may supply the necessary controversy." *Mont. Env't Ctr. v. Mont. Dep't of Env't Quality,* No. CV-23-28-BMM, 2025 WL 263462, at *2 (D. Mont. Jan. 22, 2025) (citing *Chadha*, 462 U.S. at 939). So long as the challenged activity would have a "continuing and brooding presence" that would have "a substantial adverse effect" on the plaintiffs, then the matter is not moot. *See Jevons v. Inslee*, No. 22-35050, 2023 WL 5031498, at *1 (9th Cir. Aug. 8, 2023) (citing *Bayer v. Neiman Marcus Grp.*, 861 F.3d 853, 868 (9th Cir. 2017) (quoting *Seven Words LLC v. Network Sols.*, 260 F.3d 1089, 1098–99 (9th Cir. 2001))).

A case or controversy also remains between the parties when, as here, a preliminary injunction exists, but the parties' proposed settlement would resolve open questions that the preliminary injunction did not resolve. In *Consumers Union of United States, Inc. v. Consumer Product Safety Commission,* 561 F.2d 349 (D.C. Cir. 1977), the D.C. Circuit held that case or controversy still existed between two parties who had litigated to a preliminary injunction and fully agreed on its scope, but disagreed on a particular application. *Id.* at 355-56. While implementing the preliminary injunction in this case, it is possible that DOT Defendants and Plaintiffs might disagree about whether particular contracts require adjustments. Were this Court to concur with the *amici*, DOT Defendants would have no opportunity to contest particular contract requests made by Plaintiffs pursuant to the preliminary injunction, despite now concurring in the unconstitutionality of the underlying presumptions in the DOT DBE program. The absurd result would render the preliminary injunction permanent without the ability of the parties to contest a specific application of the injunction. *See id.* at 354 ("The scope and effect of a prior judgment are always legitimate subjects of argument and resolution in a subsequent action.")

### b. The Proposed Consent Order is lawful.

Defendant-Intervenor DBEs contend that the Proposed Consent Order stands in stark contrast to decades of precedent upholding the constitutionality of the DOT DBE program. DOT Defendants are well aware of this precedent, as is the Court. *See* ECF 31 at 16 (listing cases that have upheld the constitutionality of the DOT DBE program). But these cases, are not controlling in this Court, and predate *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023) (*SFFA*).

In *SFFA*, the Supreme Court held that race-based preferences in the admissions programs at Harvard and the University of North Carolina violated Title VI of the Civil Rights Act and the

Fourteenth Amendment's Equal Protection Clause. *Id.* at 213. In so holding, the Court rejected the argument that race-based admissions programs can be justified by the government's interest in "remedy[ing] the effects of societal discrimination." *Id.* at 226. In addition, the Court explained that by relying on "racial categories" that were "arbitrary," "overbroad," and "underinclusive," the admissions programs at issue had "fail[ ed] to articulate a meaningful connection between the means they employ and the goals they pursue." *Id.* at 215-16. The Court also emphasized that the programs' reliance on race had no "logical end point." *Id.* at 221 (citation omitted).

Following the entry of the executive orders, and the Attorney General's memorandum, the Department of Justice and DOT have now reevaluated their litigating position in this matter and have determined that the DOT DBE program is unconstitutional to the extent that it creates a presumption of social or economic disadvantage based on race or sex. This Court held that the government had defended the DOT DBE program's race- and sex-based presumptions in this case by "point[ing] to societal discrimination against minority-owned businesses generally." ECF No. 44 at 18. Thus, consistent with *SFFA*'s rejection of a similar justification in the university-admissions context, DOT Defendants have determined that an interest in remedying the effects of societal discrimination does not justify the use of race- and sex-based presumptions in the DOT DBE program. DOT Defendants have also determined that, like the admissions programs at issue in *SFFA*, the DOT DBE program relies on arbitrary, overbroad, and underinclusive racial categories and lacks any logical end point.

Moreover, all recent precedents in this area of the law support the entry of this Proposed Consent Order. The Sixth Circuit has provided a recent and clear statement of what DOT Defendants must show to demonstrate a compelling government interest in remedying past discrimination. In *Vitolo v. Guzman*, 999 F.3d 353, 361 (6th Cir. 2021), the court set out a three-

part test: 1) the remedy or policy must address specific episodes of past discrimination, and cannot rest on a general statement that there has been discrimination in an entire industry; 2) the past discrimination must have been intentional; and 3) the government must have had a hand in that discrimination. In *Vitolo*, the Sixth Circuit evaluated the Small Business Association's restaurant revitalization program, which prioritized federal funds for restaurants owned at least 51% by "socially and economically disadvantaged" individuals, using the same categories employed by the DOT DBE program. *Id.* at 357. The court concluded these race-based presumptions did not serve a compelling interest. *Id.; see also Nuziard v. Minority Bus. Dev. Agency,* No. 4:23-CV-0278-P, 2023 WL 3869323, at *6 (N.D. Tex. June 5, 2023) (holding that the race-based preferences for participation in the Minority Business Development Agency's business program could not withstand strict scrutiny); *Ultima Servs. Corp. v. U.S. Dep't of Agric.*, 683 F. Supp. 3d 745, 766-68 (E.D. Tenn. 2023) (holding that the race-based presumptions of SBA's 8(a) program could not withstand strict scrutiny).

The DOT DBE program shares many of the constitutional infirmities that courts have recently held violate strict scrutiny in the wake of *SFFA*. It has no set end-date. It has been reauthorized, largely without change, for over 40 years. The Congressional record fails to identify specific acts of intentional discrimination by a government actor against all of the races deemed to be deserving of a presumption of social and economic disadvantage. In the wake of *SFFA*, and in its current implementation, the program simply cannot be constitutionally defended and thus the Proposed Consent Order recognizing this legal infirmity may be legally entered.

Congress recognized the potential constitutional infirmities in the Infrastructure Act by creating a mechanism for recipients to continue to receive funding under the statute should a court

determine that the 10% goal for socially and economically disadvantaged businesses be deemed unconstitutional. The Act states:

> (7) Nothing in this sub-section limits the eligibility of an individual or entity to receive funds made available under this division, division C, and section 403 of title 23, United States Code, if the entity or person is prevented, in whole or in part, from complying with paragraph (3) because a Federal court issues a final order in which the court finds that a requirement or the implementation of paragraph (3) is unconstitutional.

IIJA §1101(e)(7), 135 Stat. at 450. The "paragraph (3)" in the above section refers to the requirement that "not less than 10% . . . shall be expended through small business concerns owned and controlled by socially and economically disadvantaged individuals." IIJA §1101(e)(3), 135 Stat. at 449. This stopgap measure demonstrates that the Proposed Consent Order is consistent with the statute and does not exceed Congressional authority. It also ensures that once the Proposed Consent Order is entered, finding the presumptions of social and economic disadvantage unconstitutional, recipients may still receive funds and have projects approved by DOT.

### c.  The Proposed Consent Order is fair, reasonable, and adequate.

The Sixth Circuit has confirmed that the courts, in assessing a consent order for reasonableness, must conduct an "independent evaluation" and avoid "rubber stamp approval" of proposed consent decrees. *See United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1435 (6th Cir. 1991) (citing *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974)). However, the Court should presume in favor of the Proposed Consent Decree, because "the presumption in favor of government-negotiated settlements 'is particularly strong where a consent decree has been negotiated by the Department of Justice on behalf of a federal administrative agency. . . .'" *United States v. BASF-Inmont Corp.*, 819 F. Supp. 601, 608 (E.D. Mich. 1993) (quoting *Akzo Coatings of Am., Inc.*, 949 F.2d at 1436). Ultimately, in its review the Court may not

"substitute [its] own judgment for that of the parties to the decree." *Id.* (citing *United States v. Jones & Laughlin Steel Corp.*, 804 F.2d 348 (6th Cir. 1986)).

To prevent the Court from substituting its judgment for that of the parties to the proposed decree, courts consider various factors to determine whether a proposed consent decree is a "fair, reasonable, and adequate" resolution of the claims at issue. *See Vukovich*, 720 F.2d at 921 (citing *Stotts v. Memphis Fire Department,* 679 F.2d 541, 552 (6th Cir. 1982)). Importantly, in this process, the Court does not determine the "merits of the controversy" or the facts at issue. *See Vukovich,* 720 F.2d at 921 (citing *Carson v. American Brands,* 450 U.S. 79, 88 (1981)). Rather, in making the reasonableness determination, courts consider: (1) the decree's fairness to those affected; (2) the settlement's adequacy to the class or group of affected parties; (3) the burden on affected parties, and (4) the public's interest. *Vukovich,* 720 F.2d at 921; *see, e.g., Airline Stewards and Stewardesses Ass'n v. Am. Airlines,* 573 F.2d 960, 964 (6th Cir. 1978) (assessing the court's decision to allow both sides to argue as to the likely effect of the proposed consent decree on affected parties); *United States v. Trucking Employers, Inc.,* 561 F.2d 313, 317 (D.C. Cir. 1977) (recognizing that a court must assess the "overall fairness to beneficiaries" and that the proposed consent order is "consistent" with the public's interest); *Plummer v. Chemical Bank*, 668 F.2d 654, 660 (2d Cir. 1982) (determining that the lower court should have analyzed the preferential treatment accorded to plaintiffs in the proposed consent decree, as well as the strength of the claimants' case against the settlement offer).

To assess whether a consent order is fair, courts consider factors such as the strength of the plaintiff's case, the good faith efforts of the negotiators, the opinions of counsel, the possible risks involved in the litigation if the settlement is not approved, the proposed monitoring period of the consent decree, and the burden on affected parties. *See Firefighters*, 478 U.S. at 508; *Lexington-*

*Fayette Urban Cnty. Gov't*, 591 F.3d 484, 489 (6th Cir. 2010) (citing *Akzo Coatings of Am., Inc.*, 949 F.2d at 1435) (internal quotations omitted); *Vukovich*, 720 F.2d at 921-22.

The fairness determination here is straightforward because this Court has already ruled that DOT Defendants are unlikely to prevail on the merits. *See* ECF No. 44 at 18-24. The Court held that the DOT DBE Program could pass neither strict scrutiny for race-based preferences nor intermediate scrutiny for sex-based preferences. *Id.* at 23-24. With regard to the race-based preferences, the Court noted that "compiling an extensive portfolio of studies that show disparities exist for minority-owned businesses generally speaking does not support a government imposed racial preference for only *some* of those groups. The Government's imprecision is its fatal flaw." *Id.* at 18-19. For the sex-based preferences, the Court held that "[w]ithout evidence that it participated in intentional discrimination within the context of DOT funded contracts, the Government fails to meet its burden of proving that the DOT's rebuttable presumption serves an important government interest." *Id.* at 23. Because the Court has already considered DOT Defendants' likelihood of success on the merits, an order codifying the Court's preliminary injunction and providing a permanent resolution to the DOT DBE program is more than fair.

The Proposed Consent Order also is fair and reasonable to the group of affected parties, in this case Plaintiffs and DOT Defendants, and limits the burden on these parties already imposed by the preliminary injunction. Plaintiffs will be receiving the relief that was requested in the complaint, namely the removal of the unconstitutional presumptions in the DOT DBE program. DOT and DOT recipients will be able to continue to operate the DOT DBE program, without the burden of the preliminary injunction. And, once the Proposed Consent Order is entered, DBEs, including those represented by Defendant-Intervenor DBEs, will be presented an opportunity to reenter the DOT DBE program through race-neutral means. *See, e.g., Ultima*, 683 F. Supp. 3d at

774 (enjoining the use of the rebuttable presumption of social disadvantage in administering Defendant SBA's 8(a) program). In *Ultima,* after the court enjoined the use of the rebuttable race-based presumption of disadvantage, SBA purged all presumptions from the 8(a) program administration, and rebooted the 8(a) program by requalifying all of the participants through race neutral means.[16] The only path to that remedy in this case is through the entry of the Proposed Consent Order.

Finally, when assessing the consistency of the consent decree with the public interest, courts consider how decrees minimize "the delay, expense, psychological bitterness, and adverse publicity" that frequently occurs with litigation. *Vukovich*, 720 F.2d at 923 (citing *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights,* 616 F.2d 1006, 1014 (7th Cir. 1980)). These factors weigh in favor of entry of the Proposed Consent Order. DBE and non-DBE contractors have been living with the uncertainty of the preliminary injunction for eight months. The method of implementation of the order leaves contractors and state recipients in the dark as to whether a particular project will have a DBE goal when it is awarded until the moment it is either rescinded or awarded. The Proposed Consent Order removes this uncertainty and provides a path to continue the DOT DBE program without the unconstitutional presumptions based on race and sex.

### 3.  The Proposed Consent Order does not violate 28 U.S.C. § 530D.

Pursuant to 28 U.S.C. § 530D, the Department of Justice is required to submit to Congress a report of any instance in which the Attorney General will refrain from "enforcing . . .any provision of any Federal statute . . . on the grounds that such provision is unconstitutional." 28

---

[16] *See* "Updates on the 8(a) Business Development Program" *available at* https://www.sba.gov/federal-contracting/contracting-assistance-programs/8a-business-development-program/updates-8a-business-development-program#guidance-and-faqs-for-current-8a-participants.

U.S.C. § 530D(a)(1)(A)(i). The deadline to submit such a report to Congress is "not later than 30 days after the establishment or implementation of each policy." §530D(b)(1). On June 25, 2025, twenty-eight days after the filing of the Proposed Consent Order motion implementing the new policy of not defending the constitutionality of the DOT DBE program, the Solicitor General sent a 28 U.S.C. § 530D letter to the Speaker of the House. The letter informed Congress that the Department of Justice will no longer defend the constitutionality of the DBE program's race- and sex-based presumptions.[17] Thus, the Proposed Consent Order does not violate the statute.

### 4. The remaining objections raised by Intervenor-Defendant DBEs and *amici curiae* are not specific in nature and fail to assert a legal claim.

When evaluating the Consent Order, the Court must allow affected individuals to "present evidence and have their objections heard," *see Pedreira v. Sunrise Children's Servs., Inc.*, 802 F.3d 865, 872 (6th Cir. 2015) (quoting *Tenn. Ass'n of Health Maint. Orgs.,* 262 F.3d at 566–67 (internal quotation marks and alterations omitted)), and should carefully consider objections. *See Vukovich*, 720 F.2d at 923. However, any objections must be specific in nature and assert a legal claim. *See Firefighters,* 478 U.S. at 508 and 511 (noting that intervenors needed to make their objections "more specific to accomplish anything" and stating that intervenors "failed to assert any legal claims" against the other parties). And further, the Court *may not* reject the proposed decree "merely because" class members object to it. *Bronson v. Bd. of Educ. of the City Sch. Dist. of Cincinnati,* 604 F. Supp. 68, at 73 (S.D. Ohio 1984) (citing *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1975); *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 803 (3d Cir. 1974)). Courts cannot draft or "fashion" settlements. *Cochran v. Zeon D.P., LLC*, 638 F. Supp. 2d 759, 761 (W.D. Ky. 2009). Nor do courts have the power to require specific changes or modifications if the

---

[17] *See* Appx. A.

proposed decree is problematic; indeed, only the parties have the power to agree upon changes. *See Bronson*, 604 F. Supp. at 73 ("The Court's power, should it not approve the agreement as written, is therefore limited to either rejecting the agreement, without comment, or, in the alternative, to rejecting the agreement with suggestions and recommendations."); *see also Vukovich*, 720 F.2d at 921 ("If the Court determines that the decree is problematic, the Court should inform the parties of its precise concerns and give them an opportunity to reach a reasonable accommodation.").

Accordingly, Defendant-Intervenor DBEs have been afforded an opportunity to raise their objections to the Proposed Consent Order and present evidence in support, and they are being afforded the appropriate opportunity to oppose the Proposed Consent Order. *See, e.g.,* ECF No. 91. As expressly stated in the joint motion, neither Plaintiffs nor DOT Defendants purported to represent the interests of the Defendant-Intervenors in the motion for entry of the Proposed Consent Order. *See* ECF No. 82 at 2. Defendant-Intervenor DBEs are entitled to the Court's evaluation of fairness and reasonableness of the Proposed Consent Order, but not to a trial of underlying disputed issues. *Vukovich*, 720 F.2d at 921 (citing *Carson,* 450 U.S. at 88).

To the extent that *amici curiae* have submitted facts or information relating to discrimination suffered by DBE businesses, funds spent on the DBE program, or difficulty in addressing racial or sex disparities on a local level, such information is relevant only to the extent it bears on whether the Proposed Consent Order is fair, adequate, or reasonable; the Court's inquiry at this stage is limited to assessing the fairness, adequacy, and reasonableness of the order, not the merits of the underlying controversy. *See, e.g.,* ECF No. 115 (Br. of *Amici Curiae* DBEs of America), 117 (Br. of *Amici Curiae* Minority Veterans of America); *see also* ECF No. 112 (Br. of *Amici Curiae* Local Governments, Local Government Agencies, and Local Government Officials);

*see Vukovich,* 720 F.2d at 921 (citing *Carson,* 450 U.S. 79, 88 (1981)). To the extent that *amicus curiae* claim that the information they present should be part of the record, they are free to raise such matters as they have in an *amicus brief* or at any fairness hearing. *See Vukovich*, 720 F.2d at 921.

To the extent Defendant-Intervenor DBEs or any *amici curiae* argue that the merits are incorrect, in the Court may consider such information when assessing the Proposed Consent Order's fairness, but the fairness hearing is not a place to relitigate the merits. *See id.* at 920.

### B. DOT Defendants are amenable to providing additional notice of the Proposed Consent Order to affected entities.

Although Defendant-Intervenor DBEs have obviously received notice of the Proposed Consent Order, as demonstrated by their filing of an opposition, *see* ECF No. 91, DOT Defendants are also amenable to providing notice of the Proposed Consent Order in accordance with applicable standards. Generally, notice can be provided to affected parties via public forum, such as television, newspapers, or press conferences. *See e.g., Lawyer*, 521 U.S. at 573 (the court scheduled a hearing, provided notice in 13 local newspapers and made the plan available for review in the clerk's office); *Vukovich,* 720 F.2d at 917 (the parties sent out notices announcing the final decree, placed legal notice of proposed settlement in local newspaper for two weeks, and invited interested individuals file any objections with the court within 30 days); *Bronson*, 604 F. Supp. at 72 (notice and the entire text of the proposed settlement agreement were published once each in four different local newspapers, and the proposal was discussed in local media and at a televised press conference).

Following that notice, DOT Defendants are amendable to the Court conducting a fairness hearing to determine the reasonableness of the Proposed Consent Order, during which interested

parties may voice their objections, and during which the moving parties may support their arguments. *See Vukovich*, 720 F.2d at 921 (citing *Stotts*, 679 F.2d at 552).

### III.    CONCLUSION

For the above stated reasons, this Court should enter Plaintiffs' and DOT Defendants' Proposed Consent Order.

Dated: July 16, 2025                                   Respectfully submitted,

**COUNSEL FOR DEFENDANTS:**                ERIC A. SELL
                                                                    Acting Chief
                                                                    Employment Litigation Section
                                                                    Civil Rights Division

                                                                    /s/Andrew Braniff
                                                                    ANDREW BRANIFF
                                                                    (IN Bar No. 23430-71)
                                                                    Attorney
                                                                    Civil Rights Division
                                                                    United States Department of Justice
                                                                    950 Pennsylvania Avenue NW
                                                                    Washington, DC 20530
                                                                    (202) 532-5987
                                                                    Andrew.Braniff@usdoj.gov