# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
## CENTRAL DIVISION AT FRANKFORT

|  |  |  |
|---|---|---|
| MID-AMERICA MILLING COMPANY, LLC, *et al.*, | ) | |
|  | ) | |
|  | ) | |
| *Plaintiffs*, | ) | |
|  | ) | |
| v. | ) | **Case No. 3:23-cv-00072-GFVT-EBA** |
|  | ) | |
| UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*, | ) | |
|  | ) | |
|  | ) | |
| *Defendants*. | ) | |

## INTERVENOR DBEs' SURREPLY IN OPPOSITION TO JOINT MOTION FOR CONSENT DECREE

# TABLE OF CONTENTS

ARGUMENT ...................................................................................................................3

I.  The PCO Improperly Impedes the Court's Jurisdiction ......................................4

    *A.*  *The Original Parties Failed to Adequately Support the PCO* ...........................4

    *B.*  *The PCO Fails to Resolve a Live Case or Controversy*.........................................11

II.  Original Parties failed to demonstrate that the PCO is not the product of collusion ............................................................................................................15

III.  The Sixth Circuit's Decision in *Holman* Provides the Proper Framework for Applying *SFFA* Here ..........................................................................................20

IV.  Original Parties failed to establish that the PCO does not violate the letter and spirit of Supreme Court's *CASA* decision .........................................................22

CONCLUSION.............................................................................................................27

About 50,000[1] minority- and women-owned small businesses face race- and sex-based discrimination so severe that it prevents their full participation in the economy.[2] The Department of Transportation's Disadvantaged Business Enterprise Program ("DBE") is narrowly tailored to remedy that exclusion. *See, e.g.*, *Midwest Fence Corp. v. Department of Transportation*, 840 F.3d 932, 935-36 (7th Cir. 2016) *cert. denied*, 582 U.S. 930 (2017) (stating the DBE "program serves a compelling government interest in remedying a history of discrimination in highway construction contracting," and "provides states with ample discretion to tailor their DBE programs to the realities of their own markets and requires the use of race- and gender-neutral measures before turning to race- and gender-conscious ones."). A group of minority- and women-owned businesses and representative organizations sought intervention here because without the DBE program, "they would be unable to obtain" federally funded contracts due to the "'pervasive discrimination' within their respective industries." *See* Order Granting Mot. to Intervene ("Interv. Order") at 11, Dkt. 78 (quoting Intervenor Mot. to Intervene ("Interv. Mot.") at 20-21, Dkt. 57).[3] The Court granted their motion, recognizing that "'because the federal government has demonstrated that it may not defend this lawsuit going forward, Intervenor DBEs . . . will fill a critical role by providing an adequate defense of' the DBE Program." *Id.* at 9 (quoting Intervenor Mot. at 17).

---

[1] Press Release, U.S. Dep't of Transp., U.S.DOT Significantly Modernizes the Disadvantaged Business Enterprise Program and Airport Concession Disadvantaged Business Enterprise Program Regulations, https://perma.cc/Y4YP-TEMW.

[2] This Court has also recognized the hurdles facing others like Intervenor DBEs, noting that the Court "in no way doubts that racial barriers still persist when it comes to the success of minority-owned businesses." PI & MTD Op. at 18.

[3] Citations to specific filings or documents within this matter's docket include the document's name (e.g., "Interv. Mot." for Intervenor DEB's Motion to Intervene), followed by the relevant pinpoint citations. Page numbers within those documents refer to the sequential page identification numbers (Page ID Numbers) created by the PDF Header functionality within CM/ECF (Case Management/Electronic Case File) system. These Page ID numbers are the ones which appear in blue font at the top of a court filing.

Now, the Administration and two plaintiff companies (together "Original Parties") seek to upend local economies, undermine tens of thousands of small businesses, override Congressional authorizations, and circumvent discovery by asking the Court to forgo its independent judgment and rubber stamp a sweeping Proposed Consent Order ("PCO"), Dkt. 82-1, that would dismantle the DBE program. They have mustered no evidence or pertinent authority to warrant such a result. The proposed resolution is patently unfair, inadequate, and unreasonable. It contravenes controlling precedent and infringes on the rights of Intervenor DBEs and countless third parties. It lacks precision, is startlingly overbroad, reeks of vagueness, and is tainted by collusion. Nothing before the Court counsels any other conclusion.

Original Parties' arguments in support of the PCO, *see* Pls.' Reply Br., Dkt. 121, Gov't Reply Br., Dkt. 122, boil down to attempts to shoehorn full briefing on the merits into the "fairness" factor of the PCO analysis. They ask the Court to ignore controlling precedent, relying instead on inapplicable or mischaracterized decisions, and deprive the Court of full briefing and evidence. They ask the Court to violate the doctrine of constitutional avoidance to reach a result they contend they could achieve without Court involvement. They point to the very reasons that the proposed consent order is inappropriate and concede, in their own ways, that significant factual disputes remain: The Administration concedes that the Court may well benefit from receiving additional evidence while the Plaintiffs raise considerable as-yet-untested factual questions that should, at the very least, give the Court pause. Well-settled principles easily dispose of the PCO. Because the Original Parties have failed to demonstrate that the PCO is fair, adequate, and reasonable to those it affects and is in the public interest, the Court should reject the Original Parties' effort and should instead instruct the parties to proceed through discovery.

# ARGUMENT

A cursory review of the limited record already before the Court, including the Court's own evaluation of the Plaintiffs' claims, establishes that the PCO is hardly "fair, adequate, and reasonable, as well as consistent with the public interest," *Pedreira v. Sunrise Children's Servs., Inc.*, 802 F.3d 865 872 (6th Cir. 2015), nor is it "fair and reasonable to those it affects." *Williams v. Vukovich*, 720 F.2d 909, 921 (6th Cir 1983). If entered, the PCO would allow the Original Parties to infringe on the Court's authority and shirk their own litigation obligations, provide a remedy beyond the scope of the complaint, and infringe on the rights of Intervenor DBEs, states, municipalities, and countless third parties.  The fact that the PCO itself is tainted by collusion and so vague that its impact is unpredictable exacerbates its unreasonableness and inadequacy. That the PCO is contrary to both substantive and procedural law compounds the unfairness. "[S]ettlement is not an end in itself. It is a means of resolving disputes harmoniously. Many things are more important: preserving democratic governance, separating the judicial and political spheres, respecting state autonomy in the absence of a federal rule." *Evans v. City of Chicago*, 10 F.3d 474, 482 (7th Cir. 1993) *cert denied* 519 U.S. 1006 (1996).[4] Here, the PCO violates each of those principles, and then some.

---

[4] Plaintiffs cite *Evans*, allegedly for the principle that "probable violations of law support entry of consent decrees." Pls.' Reply at 16 (citing *Evans*, 10 F.3d at 180). But as described further *infra*, *e.g.*, nn. 6,8, *Evans* is one of numerous cases mischaracterized in Plaintiffs' brief. The Seventh Circuit did not say anything about whether a probable violation of law is sufficient to support, or even weighs in favor of, entry of a consent decree, only that a probable violation of law is a necessary element for any such ruling: "All of these cases illustrate the principle we recognize today: entry and continued enforcement of a consent decree regulating the operation of a governmental body depend on the existence of a substantial claim under federal law." *Evans*, 10 F.3d at 180; *cf. Charter Twp. of Muskegon v. City of Muskegon*, 303 F.3d 755, 763 (6th Cir. 2002) (describing the Seventh Circuit's decision in *Evans* as "the court found that it could not monitor a consent decree because the law upon which the decree was based had changed, leaving nothing to monitor" and distinguishing the decision based on the facts).

The Original Parties have provided nothing to support a different result. Rather, their arguments underscore the far-reaching effect that the PCO would have, rely on case law that largely contradicts their position, affirm the need for asserted facts to be tested, and demonstrate that the Court would benefit from further evidentiary presentations. And this Court cannot rewrite the PCO to cure its flaws. *See, e.g., United States v. BASF-Inmont Corp.*, 819 F. Supp. 601, 608 (E.D. Mich. 1993); *see also* Intervenor DBEs Opp. Brief ("Interv. Opp.") at 11-12, Dkt. 91.

## I. The PCO Improperly Impedes the Court's Jurisdiction

### A. The Original Parties Failed to Adequately Support the PCO

The Original Parties spill considerable ink arguing that the Court *may* enter the PCO over Intervenor DBEs' objections, yet offer nothing persuasive or binding to rebut Intervenor DBEs argument that the PCO "*Should* be Rejected Because It Would Resolve Intervenor DBEs' Interests Without Their Consent," *see* Interv. Opp. at 12 (emphasis added), and raises other separation of powers concerns. *See id.* at 22-24. The Original Parties misunderstand Intervenor DBEs' position. It is apparently uncontested that whether to enter the PCO is a decision for the Court. *Compare* Interv. Opp. at 11-12 *with* Pls.' Reply at 18 *and* Gov't Reply at 20.[5] Still, the Court plainly may not endorse an agreement that is unfair, inadequate, or unreasonable. *See generally* Interv. Opp. Intervenor DBEs posit that the PCO should not be entered because it is unfair, unreasonable,

---

[5] The cases Plaintiffs cite to support this uncontested proposition are either uncontroversial or support Intervenor DBEs' position. For example, in *Geier v. Alexander*, the Sixth Circuit found no abuse of discretion where a district court approved a proposed decree meant to resolve a desegregation suit after defendants' proposed desegregation plan had failed, where the contested decree was adopted more than 15 years into the litigation, after numerous remedial orders, and following three hearings on the decree itself. 801 F.2d 799, 807 (6th Cir. 1986). The objecting party (the United States) objected only to one portion, and the court found it especially noteworthy that the objecting party "participated in every phase of the case" following its intervention, "including many evidentiary hearings as well as the negotiations that produced the consent decree." *Id.* at 806. During that time, the objecting party "never indicated that there was any evidence in existence" that would be relevant to the district court's consideration of the consent decree. *Id.* at 807.

inadequate, contrary to the public interest, tainted by collusion, overrides Congressional authority, and is inconsistent with law. *See generally* Interv. Opp. The Original Parties have not proven otherwise.

While Original Parties support the PCO, "the parties' consent [to a proposed decree] is not automatically sufficient. Especially not when one of the parties did not consent." *Evans*, 10 F.3d at 478 (7th Cir. 1993) (citation modified). But that's precisely what the Original Parties seek. They claim that they are not asking the Court to blindly agree to their terms, *see, e.g.*, Pls.' Reply at 17; Gov't Reply at 20-23, but the record tells a different story. The Original Parties' joint motion was almost entirely unsupported until after Intervenor DBEs lodged their objections. *See generally* Joint Mot. for Entry for Consent Order ("Joint Mot. PCO"), Dkt. 82 (filing their motion containing only cursory support and failing to provide an accompanying memorandum of law). When the PCO was filed, the Original Parties' entire explanation for its fairness, reasonableness, and adequacy, and how and why the Court should agree to its terms, lacked any legal support, and provided no facts about the underlying claims or the DBE program itself:

> On October 26, 2023, Plaintiffs filed this action under the Fifth Amendment to the United States Constitution and the Administrative Procedure Act. ECF No.. 1. On October 7, 2024, DOT filed an Answer denying the allegations in the Complaint. ECF No. 45. Without admitting liability, DOT nevertheless wishes to resolve this matter, and they hereby consent to the Court's entry of judgment in this case and the permanent injunction embodied in Section III of the Consent Order. Therefore, Plaintiffs and DOT waive findings of fact and conclusions of law under Federal Rules of Civil Procedure 52 and 65 and request that the Court approve, sign, and enter the attached Consent Order as its final order and judgment in this case.

Joint Mot. PCO at 1.

Indeed, the Original Parties advanced no other substantive argument until they filed their respective "reply" briefs, nearly two months after they proposed the PCO. *Compare* Joint Mot. PCO and PCO (filed May 28, 2025) *with* Pls.' Reply and Gov't Reply (filed July 16, 2025). Even the Original Parties' responses to Intervenor DBEs' objections do little to rebut Intervenor DBEs'

arguments. The Original Parties' briefs misconstrue the plain language and effect of the PCO, and rely largely on the Court's preliminary injunction ruling, which applied a different, and lower, standard than that applied to assess a proposed consent order's propriety. *Compare* PI & MTD Op. 3-4, Dkt. 44 (describing the standard for preliminary injunctions) *with* Interv. Opp. at 11 (providing the standard for evaluating a proposed consent order). Any arguments the Original Parties do advance are based on case law that is either mischaracterized or factually distinct in a material fashion.

The Original Parties real request is that the Court rubber stamp their proposal. The Sixth Circuit rejected a similar request in *United States v. Michigan*, a case Plaintiffs themselves cite. There, a district court rejected the parties' joint request to dismiss portions of an existing consent decree. 18 F.3d 348 (6th Cir. 1994). Like here, a litigant "contend[ed] that it [was] not arguing for blind acceptance." *Id.* at 352; *compare* Pls.' Reply at 17; Gov't Reply at 22. The Sixth Circuit rejected that suggestion and found that the district court's authority extended beyond mere determinations that the parties' proposal was unworkable or unconstitutional. *Michigan*, 18 F.3d at 351. Instead the district court was "not simply empowered, but is actually obligated, to exercise its independent judgement" and "may not blindly defer to the stipulation of the parties.". *Id.* at 351-52. So too here. The Court should not blindly defer to the Original Parties' stipulations without a more searching review.

While this Court did consider Plaintiffs' claims at the preliminary injunction phase, that standard is built for stopgap relief provided while the parties make additional arguments and the Court conducts a more searching review. *See Cheetah Miner USA, Inc. v. 19200 Glendale, LLC*, No. 23-1410, 2023 WL 6601863, at *2 (6th Cir. Oct. 10, 2023) ("Preliminary relief . . . is procedural in nature as it merely preserves the relative positions of the parties until a trial on the

merits can be held." (citation modified)). "[A] trial court's disposition of the substantive issues . . . on a motion for extraordinary relief is not dispositive of those substantive issues on the merits" because of the "lesser burden of proof." *William G. Wilcox, D.O., P.C. Emps.' Defined Ben. Pension Trust v. U.S.*, 888 F.2d 1111, 1114 (6th Cir. 1989).

Nor is a ruling after briefing on a contested preliminary injunction the "law of the case," as Plaintiffs suggest, *see* Pls.' Reply at 19, that requires a particular outcome when considering a non-identical motion for a proposed consent order where the Court must exercise its independent judgement. "As a general rule, decisions on preliminary injunctions do not constitute law of the case and parties are free to litigate the merits." *Wilcox*, 888 F.2d at 1114 (citation modified); *cf. also John B. v. Emkes*, 710 F.3d 394, 403 (6th Cir. 2013) (explaining that the "law-of-the-case doctrine only applies to issues the court actually decided" and thus an earlier ruling on a related but narrower question did not constitute the law of the case). *United States v. Michigan*, the only precedent Plaintiffs offer to support their law-of-the-case argument, demonstrates why the argument fails. In *Michigan*, the Sixth Circuit confirmed that "[a]lthough not an 'inexorable command', the doctrine generally precludes a court from reconsideration of *identical* issues." 131 F.4th 417 (6th Cir. 2025) (citation modified) (emphasis added). Here, the issues are not identical. The standards are different for a preliminary injunction and a proposed consent order, and the Court has had no previous occasion to pass judgment on the specific language of the PCO. By contrast, in *Michigan*, the district court considered a proposed consent decree meant to replace prior versions. During litigation on the original proposed decree, the district court "considered several factors in determining whether a set of [fishing] regulations protected the reserved rights of the Tribes and preserved the resource." *Id.* at 415. Forty years later, the Circuit reiterated that

the original framework "governing review of proposed fishing regulations" constituted the law of the case. *Id.* at 417–18. The question there was identical. Not so here.

While the Court *may* approve the PCO over Intervenor DBEs objection, a contested consent decree warrants special precautions, as the very cases Plaintiffs cite make clear. For instance, in *United States v. Oregon*, the Ninth Circuit found no abuse of discretion where the district court approved a contested consent decree. 913 F.2d 576 (9th Cir. 1990). The circuit suggested, though, that in situations involving a contested consent decree, the district court should go beyond determining if the proposal is fundamentally fair, adequate, reasonable, and conforms with applicable laws. Rather when a consent decree is contested, district courts have a "heightened responsibility" and "duty" to protect the interests of "those who did not participate in negotiating" the "compromise." 913 F.2d 576, 581 (9th Cir. 1990); *cf. also Evans*, 10 F.3d at 478 (7th Cir. 1993) (citation modified) ("[T]he parties' consent [to a proposed decree] is not automatically sufficient. Especially not when one of the parties did not consent."). Even participants in negotiations who object to the final result of those negotiations deserve special accommodations. "A disputed decree that *lacks the consent of those who negotiated it* may be approved, so long as each party is given the opportunity to 'air its objections' at a reasonableness or fairness hearing." *Oregon*, 913 F.2d at 582 (citations modified) (emphasis added).[6] Under *Oregon*, then, the Court has a "heightened responsibility" to protect Intervenor DBEs' interests because they did not participate in the negotiations. Further, because Intervenor DBEs are party litigants and were wholly excluded—by no fault of their own—from any negotiations, their interests require more than a reasonableness or fairness hearing, which the Ninth Circuit described as the bare minimum

---

[6] Idaho, an objecting party in *Oregon*, who notably–per the court–did not contend that the negotiations were collusive, had an opportunity but refused to participate in negotiations and thus did not warrant such heightened responsibility. 913 F.2d at 580-81.

for an objecting party who had participated in negotiations. At the very least, though, if the Court determines that the PCO is likely fair, adequate, reasonable, and consistent with the law (which it cannot, *see generally* Interv. Opp.) despite Intervenor DBEs' written objections and the objections set forth in four amicus briefs,[7] *Oregon* would require the Court to hold a fairness or reasonableness hearing before finalizing any approval.[8]

---

[7] *See generally* States' Amicus Curiae Br. in Supp. of Interv. Opp. ("States' Amicus Br."), Dkt. 111; Municipalities' Amicus Curiae Br. in Supp. of Interv. Opp. ("Municipalities' Amicus Br."), Dkt. 112; DBEs of America Amicus Curiae Br. in Supp. of Interv. Opp. ("DBEs Org. Amicus Br."), Dkt. 115; Minority Veterans of America Amicus Curiae Br. in Supp. of Interv. Opp. ("Minority Veterans Amicus Br."), Dkt. 117.

[8] Plaintiffs unhelpfully rely on mischaracterized or unrelated out-of-circuit citations. For example, Plaintiffs argue that under *United States v. BP Amoco Oil PLC*, concerns over "mechanistically 'rubber stamp[ing]'" a consent order are overcome when the district court carefully considers the underlying facts or legal arguments. Pls.' Reply at 18. Beyond the mischaracterized quote–the Eighth Circuit never sets out a broader rule that extends beyond the consent order in that case–Plaintiffs fail to highlight key features that easily distinguish *BP Amoco*. *See* 277 F.3d 1012, 1019-20 (8th Cir. 2002) ("In the present case, the district court's order granting the government's motion for entry of the consent decree reveals to us that the district court carefully considered the underlying facts and legal arguments and did not mechanistically 'rubber stamp' the consent decree, as [the objector] suggests."). In *BP Amoco*, the objecting party "had been provided sufficient opportunities to supplement the record before and after the consent decree had been lodged in the district court," had refused to participate in negotiations, had objections based on claims that were otherwise barred, and the decree followed "careful consideration" and the district court's independent conclusion that it "resulted from a fair process," was "substantively fair," and "was reasonable and consistent with" the underlying law. 277 F.3d at 1015–16. Nor does *Perkins v. City of Chicago Heights*, 47 F.3d 212 (7th Cir. 1995), stand for the proposition that the district court can simply override state law if it finds a federal law violation. *See* Pls.' Reply at 16. The Seventh Circuit found that the district court abused its discretion by approving a decree that modified a state constitution without adequate basis to forgo a constitutional referendum. 47 F.3d at 216–17 (emphasizing that "[w]hile parties can settle their litigation with consent decrees, they . . . cannot consent to do something together that they lack the power to do individually."). *Howard v. McLucas* is no more helpful, as the Eleventh Circuit merely noted that the district court "was required to examine the consent decree, ascertain whether it represented a reasonable factual and legal determination based on the record, and ensure that it did not violate federal law." 871 F.2d 1000, 1007–08 (11th Cir. 1989); *contra* Pls.' Reply at 16.  Intervenor DBEs agree. And contrary to Plaintiffs' representation, Pls.' Reply at 18, the District of Columbia Circuit did not validate any consent decree in *Cleveland Cnty. Ass'n for Gov. by People v. Cleveland Cnty. Bd. of Comm'rs*, 142 F.3d 468 (D.C. Cir. 1998). Rather, the circuit struck down a previously entered consent decree that conflicted with a state law. Plaintiffs' out-of-context parenthetical is from a hypothetical about the validity of a decree where state and federal laws conflict. *Cleveland Cnty.*, 142 F.3d at 477 ("In this case, then, if the election plan set forth in the consent decree were intended to remedy an

But a "fairness hearing" alone is inadequate here. When "some, but not all, of the litigants agree to" a proposed consent decree that affects the rights of a nonconsenting party, "its validity must be tested by the same standards that are applicable in any other adversary proceeding." *United States v. City of Miami, Florida*, 664 F.2d 435 (5th Cir 1981) (per curiam) (Rubin, J., concurring); *Oregon*, 913 F.2d at 582 n.4 ("If a remedy is sought against a nonconsenting party, the matter must be remanded for trial." (citing *Miami*, 664 F.2d at 436)); *see also Vukovich*, 720 at 909 (citing *Miami* favorably).

 For their part, Plaintiffs posit—incorrectly—that Intervenor DBEs had an "opportunity" to "present evidence and have their objections heard." Pls.' Reply at 10. In essence, they argue that Intervenor DBEs must advance their whole defense in the context of briefing about the fairness, reasonableness, and adequacy, or lack thereof, of the PCO. *Id.* at 10-11. This proposition is unsupported in law. Plaintiffs omit key language from the only case on which they rely for this argument. Specifically, the U.S. Supreme Court in *Firefighters* makes clear that "parties who choose to resolve litigation through settlement may not dispose of the claims of a third party, and *a fortiori* may not impose duties or obligations on a third party, without that party's agreement." *Loc. No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 529 (1986). Moreover, "[a] court's approval of a consent decree between some of the parties therefore cannot dispose of the valid claims of nonconsenting intervenors; if properly raised, these claims remain and may be litigated by the intervenor." *Id*.

Intervention is designed to protect an applicant's interest when that interest is not adequately represented by existing parties (i.e., to ensure adequate representation). *See* Interv.

---

admitted or adjudged violation of the Voting Rights Act, the fact that the Board's actions collided with the state statutory scheme just discussed would not stand in the way of the plan's implementation.")

Opp. at 12-16 (discussing the impact of the PCO on Intervenor DBEs' interests and the purpose of Federal Rule of Civil Procedure 24). Here, Intervenor DBEs' interests must include presenting evidence necessary to defend the constitutionality of the DBE Program, which likely involves presenting facts and expert testimony. *See, e.g.*, *Holman v. Vilsack*, 117 F.4th 906, 915 (6th Cir. 2024) (acknowledging that evaluating "when and how the Government may permissibly act to remedy past discrimination," "remains" a "controversial, thorny, and unsettled," issue.). Because the "thorniness" of the questions at issue here "flow in part from legal tests in this area of law, many of which are matters of degree rather than cleanly drawn lines," *Holman* 117 F.4th at 915, Intervenor DBEs cannot merely rely on the record previously offered by the prior government defendants. Since Intervenor DBEs are differently situated, they can offer insights not available from the federal government's vantage point such as evidence on the subcontracting process, which is a more nuanced operation that Plaintiffs consistently mischaracterize. The law favors allowing Intervenor DBEs ample opportunity to present evidence on questions of law that the Sixth Circuit itself has identified as "controversial, thorny, and unsettled." *Id.* (where key issues turned on constitutionality of a federal government program providing debt-relief for "socially disadvantaged" farmers and ranchers).

### B. The PCO Fails to Resolve a Live Case or Controversy

Nor have the Original Parties demonstrated that a live case or controversy remains to provide the Court with ongoing jurisdiction here. First, the parties agree that Plaintiffs may obtain the substantive relief sought here – ceasing to apply all "race and gender-based classifications in the federal DBE program, including those set out in Sections 11101(e)(2)–(3) of the Infrastructure Act and the Small Business Act[9] – through administrative action taken by the Defendant Secretary

---

[9] 49 C.F.R. pt. 26, and 13 C.F.R. pt. 124.

of Transportation Sean Duffy. *Compare* Pls.' Reply at 14 (arguing that a claim "purporting to compel the government to continue administering" the DBE Program in its current form "would be wholly without merit" because it is "administered at the *discretion* of" Government Defendants, and that Government Defendants may "simply halt[] funding [of the DBE Program] in whole or in part *for any reason at all*") (emphasis original) *with* Gov't Reply at 14 ("[Congress] grant[ed] the Secretary of Transportation sole discretion to set the DBE goal for small business concerns owned and controlled by socially and economically disadvantaged individuals. In the absence of the Proposed Consent Order, the Secretary could set the DOT DBE goal at zero percent nationwide. . . . The legislature has already given the Secretary of Transportation discretion to remove the DBE goals in their entirety") (internal citations omitted). And indeed, the Secretary of Transportation has already signaled a retreat on implementation and enforcement of the DBE Program.[10]

Second, the Original Parties now apparently agree on the merits of Plaintiffs' claims. *Compare* Pls.' Reply at 24 ("Defendants now acknowledge that they cannot possibly defend the constitutionality of the DBE program.") *with* Gov't Reply at 7 (describing the Solicitor General's letter "informing Congress that the Department of Justice will no longer defend the constitutionality of the DBE program's race- and sex-based presumptions"). So the PCO's only purpose is as a judicial order on the purported unconstitutionality of the DBE Program. This is insufficient to maintain a live case or controversy.

---

[10]    Dep't of Transp., *President Trump's Transportation Secretary Sean Duffy Announces Availability of $5.4 Billion in Bridge Funding to Get America Building Again* (June 2, 2025), https://perma.cc/L5NP-RK24 (claiming to "remove[]" the standard that contract proposals 'should address how the project promotes local inclusive economic development and entrepreneurship such as the use of [DBEs]").

The Original Parties' claims otherwise are not persuasive. For instance, the Administration's argument that agreement of parties on legal issues does not alone defeat a consent decree misses the point. *See* Gov't Reply at 15-17. The Original Parties do not merely agree on a legal issue. They also agree that the Administration has authority to provide such relief.[11] They are already implementing the very relief that Plaintiffs seek.[12] And they both suggest that no court order is necessary to wholly eliminate the entire DBE Program. Indeed there is no indication that entry of the PCO would in any way "*affect[] the behavior of the defendant towards the plaintiff*." *See Law. v. Dep't of Just.*, 521 U.S. 567, 579–80 (1997) (citation omitted) (emphasis original).[13] Just a few weeks ago the D.C. Circuit found the district court lacked jurisdiction to enter a settlement in a case concerning loosely analogous procedural facts. Following the change of administration, the federal government defendants in *Cortes v. National Labor Relations Board* notified the court that it was changing its position on the constitutionality of the challenged action based on a change in the executive branch's position. No. 24-5152, 2025 WL 2045795 at *2 (D.C. Cir. July 22, 2025) (noting the statement of the National Labor Relations Board, the defendant in the case, that "consistent with the position of the acting Solicitor General," it would "no longer

---

[11] Intervenor DBEs do not take a position on whether the Original Parties' paraphrased descriptions of the statute are accurate but agree that the Infrastructure Investment and Jobs Act § 11101(e)(3), 135 Stat. 429, 449 states: "Except to the extent that the Secretary determines otherwise, not less than 10 percent of the amounts made available for any program under this division (other than section 14004), division C, and section 403 of title 23, United States Code, shall be expended through small business concerns owned and controlled by socially and economically disadvantaged individuals." Intervenor DBEs do not waive any arguments that may be available to them to challenge any actions by the Secretary concerning the DBE Program.

[12] *Immigr. & Naturalization Srvs. v. Chadha*, 462 U.S. 919, 939–40 (1983), does not support a different conclusion. In *Chadha*, both the Petitioner and the executive agency agreed on the legal issue before the Supreme Court, but the agency could not provide the requested relief without court intervention. *Id.* at 939. The Court acknowledged its "decision will have real meaning" because if they ruled for the Petitioner, he would get the requested relief, but if they upheld the underlying statute, the agency would be bound to deny relief on the facts there. *Id.* at 939–40.

[13] *See also* Intervenors' Resp. at 12 n.17 (explaining that the PCO gives Plaintiffs everything they want and more).

rely[] on its previous argument" that the challenged policies "are constitutional") (citation omitted). The D.C. Circuit noted that the remedy the plaintiffs now sought was nothing more than "a judicial statement of law with which the government fully agrees." *Id.* The circuit held that was an inadequate case or controversy for purposes of Article III jurisdiction because "the parties must have adverse interests" and thus "a judgment benefiting the plaintiff's concrete interests must adversely affect a concrete interest of [a] defendant." *Id.* at *3;[14] *cf. also* Order to Provide Additional Information at 2, 7, *326 Land Co. v. City of Traverse City*, No. 1:22-cv-45 Dkt. 36, (W.D. Mich. Jun. 28, 2022) (noting allegations that the city "thought [the ordinance] was unconstitutional and some of the city commissioners had campaigned against passage of the proposal," observing that the "parties do not appear to be truly adversarial," and explaining that "the Court will not participate in a friendly scrimmage under the guise of arms-length litigation"). The circumstances here—where the parties do not have adverse interests, any judgment that would benefit Plaintiffs would not negatively affect the Administration's concrete interests, and the sweeping PCO furthers the Original Parties' shared public disdain for programs they characterize as "DEI" by enshrining in constitutional law their shared policy goals—are simply insufficient to give rise to a live case or controversy. *See also* States' Amicus Br., at 11–14.

---

[14] Cases the Original Parties cite in a failed effort to rebut Intervenor DBEs' argument that the PCO is tainted by collusion likewise demonstrate that a proposed consent order should not be approved where, as here, there are insufficient indicia of adversarial interests. *See, e.g. Swinton v. SquareTrade, Inc.*, No. 4:18-CV-00144-SMR-SBJ, 2018 WL 8458862, at *7 (S.D. Ia. Sept. 21, 2018) (denying a motion to intervene where the proposed class action settlement was "not so lopsided on its face that it reflect[ed] collusion by the parties"); *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 313 (N.D. Ga. 1993) (endorsing the view that "[i]nherent in compromise is a yielding of absolutes and an abandoning of highest hopes" (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977))); *Money Store, Inc. v. Harriscorp Fin.*, 885 F.2d 369, 376 (7th Cir. 1989) (Posner, J. concurring) ("A court should be wary of efforts by government officials to use a tacitly collusive suit to bind the officials' successors [or] otherwise thwart the interests of the public.").

The Administration's position creates another paradox. Although ambiguous, the Administration seems to suggest that they are currently continuing to operate and enforce most of the contested elements of the DBE Program. *See, e.g.*, Gov't Reply at 11 ("To wit, the DOT DBE program continues in the presence of the injunction through today."). But the Administration also now claims, based on its newfound interpretation of prior case law, that operating those contested elements amounts to a violation of the Equal Protection Clause, *see* PCO ¶¶ 5–7, and is essentially prohibited under two Executive Orders. *See* Gov't Reply at 11-12. And, as discussed *supra* n.10, the Administration claims that it can voluntarily "set the DOT DBE goal at zero percent nationwide" or even "remove the DBE goals in their entirety." So either 1) the Administration concedes it believes it is *voluntarily* violating the Equal Protection Clause; 2) statements in the PCO and their brief about their understanding that the DBE Program violates the Equal Protection Clause are untrue; or 3) the Administration is not implementing the contested components of the DBE Program at all. If the first, the Administration would have (seemingly) admitted to violating the Constitution. If the second, the Administration would have (seemingly) violated its duty to the Court. And if the third, there can be no question that no case or controversy exists.

## II.    Original Parties failed to demonstrate that the PCO is not the product of collusion

When it came to settling this challenge to the DBE Program's constitutionality, Plaintiffs and the Government were sitting on the same side of the negotiating table. While that may be preferable from a policy perspective and acceptable in certain litigation contexts, here the absence of adversity impedes the Court's jurisdiction. *See supra* Sec. I.B. Far from offering anything to dispel the "concerns about the possibility of collusion" that should prompt this court to have "reservations about whether the proposed settlement is fair," *see 326 Land Co. v. City of Traverse*

*City*, No. 22-cv-45, 2023 WL 3033175, at *13 (W.D. Mich. Apr. 21, 2023), the Original Parties
only provide facts and case law that raise additional reservations.

First, the Original Parties fail to effectively rebut any of the facts that suggest collusion,
and the additional facts they offer simply do not help their cause. Government Defendants suggest
that their litigation posture during the prior Administration should be viewed as evidence that no
collusion exists. *See* Gov't Reply at 10 (arguing that the case "has been vigorously litigated since
its inception"). But merely two pages later, the Administration acknowledges that it began
changing its litigation position in the earliest days of the new administration in January 2025. *Id.*
at 12. And it is simply untrue that "[a]t every stage of the litigation, DOT Defendants have
contested Plaintiffs' allegations." *Id.* at 11. They have not contested Plaintiffs allegations in any
way since the new Administration took office. Government Defendants cannot have it both ways:
They cannot claim to have consistently, and vigorously, defended the DBE Program while
simultaneously acknowledging it began changing its litigation position at the first opportunity. *See
also supra* Sec. I.B.

The Original Parties' claims about the report issued by Plaintiffs' counsel also fail.
Plaintiffs acknowledge that they "publicly called upon the new Administration to settle this case"
in a report issued just before inauguration. Second Decl. of Daniel P. Lennington ("Second
Lennington Decl."), Dkt. 121-1 ¶ 4-5. Neither Plaintiffs nor Government Defendants deny public
reporting that the report was shared with high-level incoming executive officials. Notably,
Plaintiffs' counsel says only that he "do[es] not know which officials saw or reviewed the report,"
and makes no statement about whether he or other Plaintiffs' counsel communicated either directly
or indirectly with any White House officials or executive officials from parts of the Administration
*other than the* Department of Transportation or the Department of Justice. Second Lennington

Decl. ¶6. And Plaintiffs' counsel does not deny having indirect communications with the Department of Transportation. *Id.* (remaining silent on communicating indirectly with the Department of Transportation, even while denying "communicating directly"); *compare id.* (making claims about "the only communications" Plaintiffs' counsel had with the Department of Justice).

The Administration also fails to effectively rebut Intervenor DBEs' argument here.[15] Andrew Braniff, an attorney at the Department of Justice, provides sworn testimony that he did not personally know about the reports. Respectfully, that is immaterial: while Intervenor DBEs' do not challenge the veracity of Mr. Braniff's affirmative statements, he does not deny that others at DOJ or elsewhere in the Administration knew or may have known of the cited documents. *See* App. B, Decl. of Andrew Braniff ("Braniff Decl.") ¶¶ 3-5, Dkt. 122-2 (asserting that he is "not aware" and has no "knowledge" of certain impacts the documents produced by Plaintiffs' counsel may have had on the litigation, but failing to assert that he would know if members of the trial team were aware of the documents or that he would have known if they played a role in the litigation). It is also unsurprising. Steve Davis, who initially oversaw the "Department of Government Efficiency" in the early days of the new administration, reportedly requested the report.[16] Plaintiffs' counsel's report "broadly aligns" with the "political views" of the Administration. *See id.* Mr. Braniff is not a political appointee and does not, by regulation, have

---

[15] Government Defendants' argument that "the published date of the WILL report" was "after the publication of both executive orders and Attorney General memorandum which led to the parties filing the motion to stay this litigation," Gov't Reply at 12 n.14, also fails. Plaintiffs' counsel confirmed that the report WILL published before the inauguration is the same one that Intervenors cited. *See* Second Lennington Decl. ¶ 4 & n.1 (explaining that WILL released its "Roadmap to Equality" on January 16, 2025, representing that it is "available here," and linking to the same document that Intervenors linked to in their opposition, Interv. Opp. at 17 n.13).

[16] *See* Interv. Opp. at 17 & n.13 (citing Jacob Bogage & Faiz Siddiqui, *Musk's DOGE Weighs Recommendations to Cut Federal Diversity Programs*, Wash. Post (Jan. 16, 2025), https://perma.cc/XV3F-HJGA).

the authority to approve the PCO.[17] It is also a glaring, and telling, omission that counsel for the Department of Transportation, who already submitted a declaration in support of the Administration's brief, *see* App. C, Decl. of Charles E. Enloe, Dkt. 122-3, failed to provide any sworn testimony about the reports published by Plaintiffs' counsel. Simply put, the Administration has utterly failed to establish that the reports issued by Plaintiffs' counsel did not affect the Administration's position on the PCO.[18]

---

[17] *See generally* Gov't Reply at 27 (listing Mr. Braniff as "Attorney" under the Acting Chief of the Employment Litigation Section of the Civil Rights Division) 28 C.F.R. subpart Y § 0.160 (noting, in part, that Assistant Attorneys General are authorized to approve certain settlements while the Deputy Attorney General or Associate Attorney General must approve others including where, as here, the "proposed settlement converts into a mandatory duty the otherwise discretionary authority of a department or agency to promulgate, revise, or rescind regulations" or "limits the discretion of a department or agency to make policy . . . decisions committed to the department or agency by Congress").

[18] Even assuming the broadest reading of the declarations submitted by Plaintiffs' counsel and DOJ counsel, neither the absence of direct communication between WILL and Department of Transportation officials nor counsel's lack of knowledge about which, or whether, executive officials saw or received the report are surprising given public reporting that the then-incoming executive officials at issue "requested the study from WILL through intermediaries." Jacob Bogage & Faiz Siddiqui, *Musk's DOGE Weighs Recommendations to Cut Federal Diversity Programs*, Wash. Post (Jan. 16, 2025), https://perma.cc/XV3F-HJGA.

The Original Parties legal arguments fare no better. Their attack on Intervenor DBEs' authorities are largely misplaced.[19] And with one exception,[20] their affirmative authorities are entirely out-of-circuit cases in vastly different procedural postures and with significantly different factual circumstances. *See supra* n.14. Some stand for the unremarkable proposition that a court's "conclusion that the parties did not collude in arriving at a settlement involves a negative analysis: whether there is any reason to believe otherwise." *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 313 (N.D. Ga. 1993);[21] *see also In re Progressive Ins. Corp. Underwriting and Rating Practices Litig.*, No. 1:03-cv-01519-MP-AK, 2008 WL 11348505, at *2 (N.D. Fla. Oct. 1, 2008) (approving a class-action attorneys' fee agreement where there was "no record evidence before the

_____

[19] For example, the difference in procedural posture between *Moore v. Charlotte-Mecklenburg Board of Education* and this case is of no moment because in both *Moore* and this case, the courts were "confronted with the anomaly that both litigants desire precisely the same result, namely a holding" on a statute's constitutionality. 402 U.S. 47, 48 (1971). Government Defendants' attempt to distinguish *Cruz v. JKS Ventures, Inc.*, No. 23-cv-8311, 2024 WL 814563, at *6 (S.D.N.Y. Feb. 26, 2024), is equally unavailing. There is no meaningful distinction between the proposed consent decree there, which occurred "in the complete absence of any litigation by the parties," Gov't Reply, at 13-14, and here, where the new administration effectively wiped the slate and the Original Parties indicated settlement was likely in light of Day 1 and 2 Executive Orders. *See* Joint Stay Mot. at 1–2, Dkt. 69. Since January 20, there has been no demonstrated litigation adversity between the Original Parties. *See supra* at Sec. I.B. There has only been a march to the PCO. Plaintiffs' attempt to distinguish *Cruz* on similar grounds fails for the same reason. Pls. Reply at 20 n.19. So too fails Plaintiffs' attempt to distinguish *Moore* on the grounds that in that case "there was *never* any controversy whatsoever between the parties." Pls'. Reply at 23 n.20. Further, Plaintiffs' assertion that they see "no reason to believe that Government Defendants" will stop enforcing the challenged provisions of the DBE Program absent a lawsuit, *compare* Pls' Reply at 23, contradicts Government's public denouncement of those same provisions, *with* Gov't Reply at 13; App. A, Race- and Sex-Based Presumptions in USDOT Disadvantage Business Enterprise Program, 530D Letter to Congress, June 25, 2025, Dkt. 122-1; *and* PCO at 3.

[20] Plaintiffs cite to a dissent in a case that did not involve an allegation of collusion and instead merely listed an instance of collusion. *See* Pls.' Reply at 22 (*citing Martin v. Wilks*, 490 U.S. 755, 789 (1989) (Stevens, J., dissenting)); *Martin*, 490 U.S. at 784; *id.* at 789.

[21] In *In re Domestic Air Transportation Antitrust Litigation*, the Northern District of Georgia noted the lack of "indicia of fraud or collusion" by pointing to the absence of evidence of "fraud in the settlement process" or "improper conduct," the experience of the parties' counsel, and the vigor of the litigation between the parties. 148 F.R.D. at 313–14. It did not suggest that this list of factors was exclusive or that it would have concerns about collusion only if each factor was met.

Court indicating that Class Counsel's fee agreement was the result of collusion"). Here, however,
Intervenor DBEs have established, there is "reason to believe otherwise." *In re Domestic Air
Transp. Antitrust Litigation*, 148 F.R.D. at 313.

### III.  The Sixth Circuit's Decision in *Holman* Provides the Proper Framework for Applying *SFFA* Here

The crux of the Original Parties' support for the PCO largely rests on a joint view that
*Students for Fair Admissions*[22] renders the DBE program unconstitutional as it "marked a sea-
change in the Court's Equal Protection jurisprudence." Pls.' Reply at 4; *see also* Gov't Reply at
17 (similar). The Sixth Circuit rejected precisely this view in an order that this Court did not have
the benefit of reviewing before issuing the preliminary injunction in this case. *Holman*, 117 F.4th
at 906. In this circuit, *SFFA* is understood as "reiterat[ing] that remedying past intentional
discrimination constitutes a compelling interest" sufficient to withstand strict scrutiny. *Id.* at 914
n.3. The Circuit in *Holman* clarified that *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021), did
not set a new evidentiary standard, but rather was issued in a context where the government's
defense failed on the strength of factual presentation in that particular case. *Holman*, 117 F.4th at
916. Evaluating "when and how the Government may permissibly act to remedy past
discrimination," was a "controversial, thorny, unsettled" issue, and that the "thorniness flows in
part from the legal tests in this area of the law, many of which are matters of degree rather than
cleanly drawn lines."  *Id.* at 915.[23] Moreover, "thoughtful judges could, on this record, readily
reach different answers," "suggest[ing] that the Government 'lost because an unsettled question

---

[22] *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.* ("*SFFA*"), 600
U.S. 181 (2023)
[23] The *Holman* court asked, "[f]or example, when do statistical disparities between racial groups,
which may be insufficient by themselves to show intentional discrimination, nonetheless
represent sufficiently probative 'evidence [of] intentional discrimination' that a court may infer
intent? And how many options must the Government evaluate to show a 'serious, good faith
consideration of race-neutral alternatives?'" *Holman*, 117 F.4th at 915.

was resolved unfavorably,' not because it 'vainly pressed a position flatly at odds with the controlling case law.'" *Holman*, 117 F.4th at 915. Because the Original Parties' arguments in support of the PCO rely almost entirely on the idea that *SFFA*, and then *Vitolo*, marked a stark change in the framework for evaluating the DBE Program, and *Holman* clarified that they did not, the PCO necessarily fails.[24]

 *Holman* affirms that the proper framework for evaluating the DBE Program was and remains *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995) and the closely-related *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) (plurality). Those cases unquestionably remain binding law in this case. *See, e.g.*, *SFFA*, 600 U.S. at 207, 211, 226-27 (citing *Adarand* and *Croson*); *Vitolo*, 999 F.3d at 361 (same). Proper application of *Adarand*, *Croson*, and their progeny, require the Court to consider the government's compelling interest in remedying discrimination in governmental contracting and how the narrow tailoring analysis applies. *Holman* allows the Court to tightly focus its analysis on the narrow tailoring factors that actually apply in this case, factors that have been well-established in *Croson, Adarand,* and their progeny:

> (1) "the necessity for the relief and the efficacy of alternative remedies"; (2) "the flexibility and duration of the relief, including the availability of waiver provisions"; (3) "the relationship of the numerical goals to the relevant labor market"; and (4) "the impact of the relief on the rights of third parties." *Rutherford*, 179 F. App'x at 377–78 (quoting *United States v. Paradise*, 480 U.S. 149, 171 (1987)). Additionally, "a policy is not narrowly tailored if it is either overbroad or underinclusive in its use of racial classifications." *Vitolo*, 999 F.3d at 362.

Gov. Opp. to PI, Dkt. 32 at 20.

---

[24] That *Vitolo*, and *SFFA*, also informed this Court's preliminary injunction merely highlights the importance of going forward with full consideration of the merits. *See, e.g.*, Interv. Opp. at 19-21. The preliminary injunction is not the law of the case, *see supra* Sec. I.A., and the Court would benefit from full briefing on the impact of *Holman* and other factual and legal developments since its preliminary injunction.

With the benefit of the Sixth Circuit's guidance in *Holman* on how *SFFA* and *Vitolo* impact the analysis here, the Court may view the evidence in a different light.[25]

Even if the Court's assessment of evidence in the record remains unchanged, the evidence that Intervenor DBEs have started to identify,[26] and the evidence of discrimination noted in the briefs put forward by *amicus curiae*,[27] with an adequate opportunity—will develop through discovery and present to the Court to adjudicate at trial, is likely to meet the standards identified in *Holman*.[28] *See Holman*, 117 F.4th at 915–16. Intervenor DBEs should not be expected to prove their case in a sur-reply opposing an ill-advised consent order that they did not participate in negotiating. *See also generally* Interv. Opp.

## IV.   Original Parties failed to establish that the PCO does not violate the letter and spirit of Supreme Court's *CASA* decision

Defendants also fail to provide an adequate justification for why the Court should enter the PCO, which provides universal relief, particularly in light of this Court's earlier ruling that doing

---

[25] *See, e.g.*, Resp. in Opp'n to Mot. for PI ("PI Resp.") at 15-16, Dkt. 32 (highlighting the statements and testimony of Evalynn Williams, Geri E. Boyer, and Jon S. Wainwright detailing recent instances and evidence of discrimination in industries that DOT regulates and the need for the DOT DBE program to remediate such discrimination. *Driving Equity: The U.S. Department of Transportation's Disadvantaged Business Enterprise Program*, *Remote Hearing Before the Committee on Transportation and Infrastructure*, 116th Cong. 64 (Sept. 23, 2020), https://perma.cc/R98E-B2T2); PI Resp. at 15 (highlighting 200 disparity studies, other reports and studies, and congressional testimony that, since 2010, have documented the discrimination and its lingering effects that continue to affect the ability of DBEs to compete equally for government contracts); *cf. also*, *Promoting Opportunity: The Need for Targeted Federal Business Programs to Address Ongoing Racial Discrimination*, S.Hrg. 118-385 (May 6, 2024), https://perma.cc/N8J3-ZUDC (2024 hearing on discrimination against minority-owned businesses not yet discussed in this case).

[26] *See, e.g.*, Ex. A, Decl. of Wendell R. Stemley, Dkt. 57-1; Ex. B, Decl. of Joanna Payne, Dkt. 57-2;  Ex. C, Decl. of Eboni Wimbush, Dkt. 57-3; Ex. D, Decl. of Darryl H. Daniels, Dkt. 57-4; Ex. E, Decl. of Mary Kay Minaghan, Dkt. 57-5; Ex. F, Decl. of Theresa Kern, Dkt. 57-6; Ex. G, Decl. of Kenneth B. Canty, Dkt. 57-7; *and* Ex. H, Decl. of Lauren Chmielowiec, Dkt. 57-8.

[27] *See generally* States' Amicus Br., Municipalities' Amicus Br., DBEs Org. Amicus Br., Minority Veterans Amicus Br.

[28] The Court would also benefit from expert testimony and factual evidence about how the bidding process actually works. *See, infra*, Sec. IV.

so would be "unwise," PI & MTD Op. at 25-27, and the Supreme Court's recent decision in *Trump v. CASA*, *Inc.*, 145 S. Ct. 2540 (2025). Under *CASA*, an injunction that offers complete relief "to the plaintiffs before the court" need not extend to "everyone potentially affected." *CASA*, at 2557. The Original Parties cannot use the PCO to sidestep *CASA* or the Court's prior determination that any relief can be appropriately tailored to the Plaintiffs in this case.

Despite Plaintiffs' argument, Pls.' Reply at 30 n.24, *CASA*'s exception for "incidental" benefits to nonparties where a court cannot "peel off" just one portion of the harm is inapplicable here. *See* 145 S.Ct. at 2557. This Court has already "peel[ed] off" the portion of the DBE program that allegedly harms Plaintiffs. *See generally* PI & MTD Opinion. And the PCO is a far cry from providing the type of "incidental benefit" to nonparties contemplated in *CASA*. Instead, it would permanently enjoin the Government from approving "any federal, state or local" project using federal transportation funds that contains DBE goals, if "any DBE in that jurisdiction" had been made eligible based on a race or sex-based presumption. PCO ¶ 12; Interv. Opp. at 25. And it would apply nationwide, far beyond Plaintiffs themselves. *Id.* Plaintiffs do not convincingly explain how "extending the injunction to cover all other similarly situated individuals" would make their "relief any more complete." *CASA*, 145 S.Ct. at 2557–58. Nor do Plaintiffs address the argument that the PCO is so sprawling that it would become effectively unenforceable and render Plaintiffs a "private attorney general." *See* Interv. Opp. at 24-25.

Further, Plaintiffs' attempt to distinguish *CASA* because it did not specifically address equal protection violations or injunctions entered as consent decrees, Pls.' Reply at 30 n.24, is wholly unsupported. The equal protection argument fails because *CASA* focused on the statutory *source* of the Court's authority to issue an injunction rather than a particular substantive violation. *See, e.g.*, 145 S.Ct. at 2549–50; *see also id.*, at 2550 ("The issue before us is one of remedy:

23

whether, under the Judiciary Act of 1789, federal courts have equitable authority to issue universal injunctions"). Nor do Plaintiffs convincingly explain why injunctions entered as consent decrees should be treated differently from injunctions entered following adjudication on the merits. This Circuit has held that, once approved, the provisions of a consent decree operate as an injunction. *Vukovich*, 720 F.2d at 920 . And the PCO itself asks for a "Permanent Injunction." PCO at 4.

*Firefighters*' language that consent decrees may contain relief broader than the court might issue at trial is both inapplicable and beside the point. 478 U.S. 501 (1986). *See* Pls. Reply at 25 n.23. *Firefighters* said only that courts were "not necessarily barred" from approving a consent decree in the context of an independent, statutory limitation on the scope of relief that courts could order in Title VII cases. *Firefighters*, 478 U.S. at 518, 521-22, 525. By contrast, *CASA*'s instructions on scope apply to all injunctions issued pursuant to the Judiciary Act of 1789.

Plaintiffs' factual arguments for a universal injunction fare no better. What Plaintiffs describe as the burdensome work of implementing the injunction is mostly just the routine work of bidding as subcontractors.[29] Subcontractors who do not have access to exclusive networks, which routinely exclude minority and women subcontractors, must regularly rely on official government announcements to learn about opportunities. *See, e.g.*, Ex. C, Decl. of Eboni Wimbush ¶ 24, Dkt. 57-3 ("AMAC is trying to create its own ecosystem on how to notify people [of opportunities], because minority firms just do not have access to that good old boys network."); Ex. F, Decl. of Theresa Kern  ¶ 19, Dkt. 57-6 ("We need to have a network and an information source because we are cut out of so many of the others."). The allegedly burdensome process that

---

[29] Plaintiffs' "business model" of obtaining work through "word of mouth," Pls.' Reply at 28, precisely the type of unfair, exclusionary system that the DBE program was intended to disrupt. *See generally* Intervene Mot.; *see also id.* at 6-10 (discussing Intervenor DBEs individual experiences).

Plaintiffs identify is substantively the same process that other subcontractors, and certainly Intervenor DBEs, must navigate. *Cf. generally id.*; *see also supra* n.30.[30]

Moreover, Plaintiffs' claim that they regularly work in 29 states is puzzling and warrants further development. *See* Pls.' Reply at 25. In support of the preliminary injunction, Bagshaw provided sworn testimony that it "works throughout southern Indiana and Kentucky." Decl. of Gregory Bagshaw ¶ 2, Dkt. 27. Both Bagshaw's website and the "sampling of bids" they provide confirm this coverage area. *See* Bagshaw Trucking, Inc., https://perma.cc/N9PL-P3K2 (last visited Aug. 13, 2025) (stating they serve "Southern Indiana and the Louisville metropolitan area"); Pls.' Reply Exhs. A-B (relating only to Indiana and Kentucky).[31] For its part, Mid-America Milling ("MAMCO") alleges that its "scope of work for" transportation-related projects extends to 29 states, *see* Third Decl. of Kramer Koetter ¶ 3, Dkt. 121-3, but it provides nothing to back up the breadth of that claim. Indeed, the alleged "sampling of bids" MAMCO provides are mostly publicly available lists of projects or project announcements from 11 states and one city, some of

---

[30] To the extent the Plaintiffs argue that the burden of notifying their counsel of their intent to bid on a particular project is so burdensome as to justify a universal injunction, they are woefully mistaken. *See, e.g.*, Pls.' Reply at 26 (complaining that implementing the Court's preliminary injunction motion "requires . . . a continuous, daily dialogue between Plaintiffs and their counsel"). If having to talk to your lawyer met *CASA*'s burden bar, every injunction would necessarily be universal. Nor is effort expended by any government actors or counsel for either Plaintiffs or Government Defendants relevant to whether a universal injunction is necessary to provide complete relief *to Plaintiffs* in this instance. *Compare id.* (listing alleged burdens stemming from the Court's preliminary injunction motion as including "dialogue" between "Plaintiffs' counsel and counsel for Government Defendants; counsel for Government Defendants and Government Defendants; and Government Defendants and scores of federal, state, and local governmental authorities") *with CASA*, 145 S.Ct. at 2557 ("[T]he question is . . . whether an injunction will offer complete relief *to the plaintiffs before the court.*").

[31] Bagshaw Trucking claims it "has been getting calls from contractors" that are "out of town" who are "interested in us bidding on a job" because it means that "if we're on a job, then the DBE goes away." Wisconsin Inst. for L. & Liberty, *How Two Small Businesses from Flyover Country Beat the Federal Government in Court*, (Jan. 22, 2025), at 0:59.  https://perma.cc/ARE5-Q7AR.

which have been highlighted without any explanation.[32] MAMCO only provides actual bidding documents, quotes, or subcontracts, heavily redacted, for projects in three of those 11 states, Kentucky, Illinois, and Indiana.[33] Beyond its vague, unsupported assertion, MAMCO provides no evidence that it is registered to work, currently working, or making competitive bids in the remaining states.[34]

---

[32] *See e.g.* Ex. 5, Sampling of Plans at 5, Dkt. 121-5 (highlighted project list that does not include any project descriptions); *see also* Exs. 4-6, Dkts. 121–4–121-6 (providing documents related to Delaware, Georgia, Illinois, Indiana, Kentucky, New York, Ohio, Oklahoma, Tennessee, Texas, Utah, and the City of Chicago).

[33] *See* Ex. 4, Ex. 6.

[34] The nature of asphalt work itself casts doubt that a milling company with 35 "power units" (on road vehicles/machines), 26 drivers, and under 400,000 in annual mileage is actually bidding work in 29 states. Indeed, larger companies, in the same industry, offering a wider array of services than MAMCO, claim much smaller geographic market areas. *See* Dep't of Transportation Safer Lookup, *Company Snapshot*, Mid America Milling Co LLC, https://safer.fmcsa.dot.gov/query.asp?searchtype=ANY&query_type=queryCarrierSnapshot&query_param=USDOT&original_query_param=NAME&query_string=345387&original_query_string=MAMCO (last visited Aug. 13, 2025); *contra* Dep't of Transportation Safer Lookup, *Company Snapshot*, Morgan Asphalt, https://safer.fmcsa.dot.gov/query.asp?searchtype=ANY&query_type=queryCarrierSnapshot&query_param=USDOT&original_query_param=NAME&query_string=561380&original_query_string=MORGAN%20ASPHALT (last visited Aug. 13, 2025); Morgan Asphalt, https://morganasphalt.com/ (last visited Aug. 13, 2025) (showing that in 2024, the Utah-based Morgan Asphalt had 69 "power units" and 65 drivers in 2024 and logged almost 2 million miles, but worked primarily in Utah); Dep't of Transportation Safer Lookup, *Company Snapshot*, Northeast Asphalt, https://safer.fmcsa.dot.gov/query.asp?searchtype=ANY&query_type=queryCarrierSnapshot&query_param=USDOT&original_query_param=NAME&query_string=548041&original_query_string=NORTHEAST%20ASPHALT%20INC (last visited Aug. 13, 2025) and Northeast Asphalt, https://www.walbecgroup.com/projects/ (last visited Aug. 13, 2025) (showing that in 2023, the Wisconsin-based Northeast Asphalt had 110 power units, 219 drivers, and logged almost 2 million miles, and including a gallery of projects depicting work predominantly in Wisconsin while a sister company also works in Michigan); Dept. of Transportation Safer Lookup, *Company Snapshot*, Banks Construction Company, https://safer.fmcsa.dot.gov/query.asp?searchtype=ANY&query_type=queryCarrierSnapshot&query_param=USDOT&original_query_param=NAME&query_string=492663&original_query_string=BANKS%20CONSTRUCTION%20COMPANY and Banks Construction Company, https://perma.cc/36L6-VPNP (last visited Aug. 13, 2025) (showing that in 2024, Banks Construction Company had 68 power units, 75 drivers, and logged almost 2 million in miles, and touting the business focus on South Carolina's Lowcounty).

## CONCLUSION

For the foregoing reasons, Intervenor DBEs respectfully request that the Court deny the Original Parties' Motion for an Entry of Consent Order.

Dated: August 13, 2025                        Respectfully submitted,

                                              */s/ Brooke Menschel*

Sarah von der Lippe*                          Brooke Menschel*
D.C. Bar No. 454585                           D.C. Bar No. 9000389
Minority Business Enterprise Legal Defense    Adnan Perwez*
and Education Fund, Inc.                       D.C. Bar No. 90027532
1104 East Capitol St. NE                       Audrey Wiggins*
Washington, DC 20002                          D.C. Bar No. 482877
(202) 744-5415                                Democracy Forward Foundation
outsidecounsel1@mbeldefwatchdog.org           P.O. Box 34553
                                              Washington, DC 20043
Douglas L. McSwain                            (202) 448-9090 Ext. 1011
KY Bar No. 46895                              bmenschel@democracyforward.org
Wyatt, Tarrant & Combs LLP                    aperwez@democracyforward.org
250 West Main Street                          awiggins@democracyforward.org
Suite 1600
Lexington, KY 40507
(859) 288-7415
dmcswain@wyattfirm.com

                                              *Counsel for Intervenor DBEs*
                                              *Admitted pro hac vice*

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Civil Procedure 5(d)(1)(B), service of the foregoing is made on all parties of record through the Court's electronic service system.

Dated: August 13, 2025

/s/ *Brooke Menschel*
Brooke Menschel

*Counsel for Intervenor DBEs*
*\*Admitted pro hac vice*

28