**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT FRANKFORT**

| | | |
|---|---|---|
| MID-AMERICA MILLING COMPANY, LLC, et al., | ) ) ) | |
| *Plaintiffs*, | ) ) ) | **Case No. 3:23-cv-00072-GFVT-EBA** |
| v. | ) ) | |
| UNITED STATES DEPARTMENT OF TRANSPORTATION, et al., | ) ) ) | |
| *Defendants*. | ) | |

**INTERVENOR DBEs' MOTION TO DISMISS AND VACATE**

The Disadvantaged Business Enterprise ("DBE") program that Plaintiffs challenged in this action ceased to exist on October 3, 2025, the effective date of a Department of Transportation ("DOT") Interim Final Rule ("IFR") eliminating or revising components of the DBE program. The challenged portions of the DBE program that the Plaintiffs alleged caused them harm are no longer in effect. Further, Government Defendants have—through Court filings, Congressional notification, and regulatory action—taken the position that enforcement of those pre-existing provisions would violate their interpretation of the Constitution. In light of these developments, Intervenor DBEs respectfully request that the Court dismiss all of Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(h)(3), and vacate the existing preliminary injunction pursuant to Federal Rule of Civil Procedure 60(b)(5) or (b)(6).

1

## BACKGROUND

### I.    The Disadvantaged Business Enterprise Program

The DBE program was created in 1983 and has been repeatedly reauthorized to help remedy unlawful discrimination in the transportation and construction industry by encouraging DOT funding recipients to set participation goals for "socially and economically disadvantaged" small businesses. 49 C.F.R. §§ 26.41, 26.5. Following the Supreme Court's decision in *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995), the program's regulations were revised to clarify, among other changes, that the regulatory 10 percent goal was a national goal, not per contract or jurisdiction, and that it was aspirational, not mandatory. The DBE program affords Secretaries of Transportation discretion to adjust the national goal as they see fit. Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, § 11101(e)(3), 135 Stat 429 (2021); 49 C.F.R. § 26.41(a). On a state and local level, each jurisdiction could set its own aspirational, data-based goals. *Id*. §§ 26.45, 26.51(a). Goals—both annually for recipients and on a contract basis—are non-binding, and funding recipients and contractors need only demonstrate that they made good faith efforts to meet a goal. 49 C.F.R. §§ 26.1, 26.51. There is no penalty for funding recipients or contractors who exercise good faith but do not meet a goal. 49 C.F.R. §§ 26.47, 26.53(a).

To qualify as a DBE, a business must be majority-owned by an individual or individuals who are both socially and economically disadvantaged. Economic disadvantage is defined by meeting certain size and economic requirements. 49 C.F.R. §§ 26.65, 26.68. Social disadvantage is established by demonstrating hardships, systemic barriers, or denied opportunities that impeded a person's success or progress in education, employment, or business. 49 C.F.R. § 26.67. Under prior regulations, certain individuals were rebuttably presumed to be socially disadvantaged. That presumption is no longer in effect as of October 3, 2025.

## II.    This Litigation

On October 26, 2023, Plaintiffs Mid-America Milling and Bagshaw Trucking sued the United States Department of Transportation and numerous agency officials in their official capacity (collectively "DOT" or "Government Defendants"), challenging the constitutionality of particular provisions of the DBE program. Compl., ECF No. 1. Plaintiffs specifically targeted the then-effective rebuttable presumption, which presumed that women and certain racial minorities are socially and economically disadvantaged. Compl. 15 ¶ 52; 16-17 at A-C. Plaintiffs sought to preliminarily and permanently enjoin the use of the presumption, and to set aside the then-existing regulatory presumption. Compl. 16-17 at A, C, D.

Plaintiffs moved for a nationwide preliminary injunction on December 15, 2023. ECF No. 27. In its September 23, 2024, ruling on the motion, the Court enjoined DOT from mandating the use of rebuttable presumptions. ECF No. 44. In doing so, the Court limited relief to contracts directly affecting Plaintiffs. ECF No. 50. To implement the preliminary injunction, DOT notifies states where Plaintiffs operate of "the impermissibility of a DBE goal on those contracts" that Plaintiffs identify on which they may bid. ECF No. 122 at 5. "The result of the injunction . . . is a removal of DBE goals for all DBEs in all states on all contracts identified by Plaintiffs." *Id.* According to Plaintiffs, the injunction applied in "at least" 29 states as of July 2025. ECF No. 121, at 28-29.

Government Defendants signaled that they would no longer defend the DBE program hours after the presidential inauguration, when two executive orders were issued. *See* Exec. Order No. 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing (Jan. 20, 2025); Exec. Order No. 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity (Jan. 21, 2025). In response, a coalition of DBEs and organizations that represent them

3

(collectively "Intervenor DBEs") moved to intervene to defend the DBE program. ECF No. 57. This Court granted their motion on May 21, 2025. ECF No. 78.

Just days later, Plaintiffs and DOT (together "Original Parties") filed a joint Proposed Consent Order ("PCO"). ECF No. 82. The PCO included numerous provisions addressing topics not raised in the PI or otherwise in this litigation. If entered, the PCO would:

- Prohibit DOT from approving any federal, state, or local DOT-funded project with DBE contract goal, in any jurisdiction where a DBE was eligible based on a determination under the previously authorized DBE program. PCO 3-5 ¶¶ 9, 11-12;
- Prohibit the use of any "DBE contract goals," without defining the term, in any jurisdiction where any DBE was at any point determined eligible under any program that included a presumption for social- or economic-disadvantage based on race or sex. PCO 3-5 ¶¶ 9, 11-12;
- Prohibit the use of any goals for Airport Concession Disadvantaged Business Enterprises ("ACDBEs")[1] in contracts funded by the Federal Aviation Administration (FAA), binding a non-party in this litigation. PCO 2-5 ¶¶ 1-2, 9, 11-12; and
- Bind future administrations in perpetuity. *See generally* PCO.

The day after the Original Parties filed the PCO, Intervenor DBEs notified the Court of their intent to oppose its entry. ECF No. 83. Three weeks later, on June 25, 2025, Solicitor General D. John Sauer notified Congress that the Administration would no longer defend the DBE program. *See generally* ECF No. 122-1. Intervenor DBEs filed their opposition to the PCO on June 18, 2025. ECF No. 91. Four coalitions filed amicus briefs in support of Intervenor DBEs' opposition to the PCO: 1) Twenty-two states argued the PCO would improperly regulate non-parties and violate precedent on nationwide injunctive relief (ECF No. 111); 2) Municipalities and government officials argued that the PCO ignores unique local government needs and harms their

---

[1] The ACDBE program is separate from the DBE program, has a different statutory and regulatory scheme, and specifically focuses on airport concessions, such as airport shops and restaurants. Those statutes and regulations were not challenged in the Complaint in this matter.

ability to self-govern (ECF No. 112); 3) Minority veterans detailed the barriers minority veteran business owners face in accessing capital and suggested the PCO would exacerbate the problem (ECF No. 117); and 4) other DBEs explained the program's role in remedying the effects of ongoing discrimination and emphasized its importance to their basic survival (ECF No. 115).

The case and all pending deadlines are currently stayed. ECF No. 85. The preliminary injunction remains in place.

### III.    Interim Final Rule Modifying the DBE Program

The Department of Transportation changed the regulatory scheme governing the DBE program[2] through an Interim Final Rule, effective October 3, 2025 ("IFR").[3] The changes fall into four broad categories:

1. Eliminating the race- and sex-based presumption challenged in this litigation from the DBE regulations;
2. Mandating certifying entities to reevaluate and recertify or decertify all DBEs;
3. Eliminating mandatory race- and sex-data-reporting requirements; and
4. Imposing new requirements on funding recipients seeking to use disparity studies in setting DBE goals.

The IFR removed the race- and sex-based presumptions from the DBE regulation entirely by changing the definition of and process for determining social and economic disadvantage. Pursuant to the IFR, the term is defined as a person determined by a certifier "to be socially and economically disadvantaged on a case-by-case basis . . . not based in whole or in part on race or sex." 49 C.F.R. § 26.5. That marked a shift from the preexisting regulation, which expressly specified that members of certain groups "are rebuttably presumed to be socially and economically

---

[2] The IFR makes near-identical changes to those discussed here to the ACDBE program, which was not the subject of any challenge in this litigation, but which the Original Parties sought to reach through the PCO. *See generally* Compl.; IFR II(B)(13)-(15); 49 C.F.R. Part 23.

[3] Department of Transportation, Disadvantaged Business Enterprise Program and Disadvantaged Business Enterprise in Airport Concessions Program Implementation Modifications, 90 Fed. Reg. 47,969-47,982 (Oct. 3, 2025) (interim final rule).

disadvantaged." 49 C.F.R. § 26.5 (version effective July 3, 2024-Oct. 2, 2025). The regulation governing how certifiers may determine social and economic disadvantage likewise changed from including a rebuttable presumption, 49 C.F.R. § 26.27 (version effective July 3, 2024-Oct. 2, 2025), to requiring that "[a]ll applicants must demonstrate social and economic disadvantage (SED) affirmatively based on their own experiences and circumstances within American society, and without regard to race or sex." 49 C.F.R. § 26.67. The new regulatory section is explicit about the "Non-presumptive Disadvantage," and confirms that owners must "establish the existence of disadvantage by a preponderance of the evidence based on individualized proof regarding specific instances of economic hardship, systemic barriers, and denied opportunities that impeded the owner's progress or success in education, employment, or business." *Id.* § (a)(1). Further, the IFR replaced all "race-neutral" and "race-conscious" language throughout the regulations with "DBE-neutral" and "DBE-conscious." IFR II(A)(2); (B)(4)-(8); *Compare* 49 C.F.R. §§ 26.5, 26.37(b), 26.39(b)(1), 26.39(b)(5), 26.45(a)(2), 26.47(c)(4), 26.47(d), 26.51, *with* same sections, version effective July 3, 2024-Oct. 2, 2025.

To "ensure[] that existing DBEs do not continue to receive any benefits" from the presumption or other provisions of the preexisting regulations, the IFR requires that certifying entities reevaluate all DBEs and recertify or decertify them based on the new regulations. IFR II(C)(8)-(9), (F)(12); *see also* 49 C.F.R. § 26.11. Until the certifying entity completes that process, a recipient covered by that entity cannot set contract goals or count any DBE participation toward goals. 49 C.F.R. §§ 26.51(h), 26.55. Other changes imposed by the IFR, including changes to mandatory data gathering and the permissible use of disparity studies, likewise eliminate any vestiges of consideration of race or sex from the DBE program. *See, e.g.*, IFR II(A)(3), (C)(6).

Following the IFR's effective date, DOT released a frequently-asked questions document to allegedly help "provide clarity" on the IFR ("October FAQs").[4] Among other provisions, the October FAQs provided general guidance on the recertification process, noting that it should be completed "as quickly as practicable" but failing to provide a specific deadline. October FAQs at 5. It also noted that new DBE applicants would be required to submit a personal narrative and linked to the Uniform Application Form. *Id.* at 7. On December 1, 2025, DOT released an "updated" frequently-asked questions document ("December FAQs").[5] The December FAQs added language that "if a DBE performing work on a contract is not recertified during the reevaluation process, the recipient will be required to take appropriate action to discontinue the effect of the unconstitutional certification," and stated that the funding "recipient must . . . take all measures to ameliorate prior unconstitutional actions." December FAQs at 2.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(h)(3) provides that "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3); *see also Perna v. Health One Credit Union*, 983 F.3d 258, 274 (6th Cir. 2020) (noting that a Rule 12(h)(3) motion to dismiss for lack of jurisdiction "may be filed at any time"); *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011) ("Objections to subject-matter jurisdiction . . . may be raised at any time."). The standard for Rule 12(h)(3) motions is the same as the standard for Rule 12(b)(1) motions. *Loos v. Wayne Westland Fed. Credit Union,* No. 24-

---

[4] U.S. Dep't of Transp., *Official Frequently Asked Questions on the U.S. Disadvantaged Business Enterprise (DBE) Program and Disadvantaged Business Enterprise in Airport Concessions (ACDBE) Program Implementation Modifications, Interim Final Rule, Effective October 3, 2025* (issued October 2025), https://perma.cc/QK34-JGM7.
[5] U.S. Dep't of Transp., *Official Frequently Asked Questions on the U.S. Disadvantaged Business Enterprise (DBE) Program and Disadvantaged Business Enterprise in Airport Concessions (ACDBE) Program Implementation Modifications, Interim Final Rule, Updated December 1, 2025* (issued December 1, 2025), https://perma.cc/M3CE-CV4B.

12839, 2025 WL 2086035 at *1 (E.D. Mich. July 24, 2025) (quoting *Anagonyebentley v. Vill. Cap. & Inv., LLC*, No. 20-10713, 2022 WL 193015 at *3 (E.D. Mich. Jan. 19, 2022)).

Subject-matter jurisdiction is a threshold question that is "inflexible and without exception." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998) (citation modified). If a case becomes moot, a district court lacks jurisdiction. *See United States v. City of Detroit*, 401 F.3d 448, 450 (6th Cir. 2005) ("A federal court has no authority to render a decision upon moot questions or to declare rules of law that cannot affect the matter at issue.") (citation omitted). Ruling on the merits when the court lacks jurisdiction is "beyond the bounds of authorized judicial action." *Steel Co.*, 523 U.S. at 94.

Federal Rule of Civil Procedure 60(b) provides "grounds for relief from" an order "on motion and just terms." A court may relieve a party under Rule 60(b)(5) when "applying [an order] prospectively is no longer equitable," or under Rule 60(b)(6) for "any other reason that justifies relief." Courts may properly provide relief from an order that "is not carried out in accordance with its intended effect" under Rule 60(b)(5). *Olle v. Henry & Wright Corp.*, 910 F.2d 357, 364 (6th Cir. 1990). And a court's discretion to grant relief under Rule 60(b)(6) "as a means to achieve substantial justice" is "especially broad." *Hopper v. Euclid Manor Nursing Home, Inc.*, 867 F.2d 291, 294 (6th Cir. 1989).

## ARGUMENT

As the IFR eliminated and barred use of any race- or sex-based presumption in federal transportation contracts, noting that they—including the one challenged in Plaintiffs' complaint— "must be disregarded," IFR at 47971, the complaint no longer states a valid claim for relief. Because the plaintiffs have received, through agency action, the relief they sought through this

litigation, and there is no longer a live case or controversy, the Court no longer has subject-matter jurisdiction, and this matter should be dismissed as moot.

## I.    Plaintiffs' Claim is Moot

The Constitution "mandates that a claim must not become moot prior to the court's decisions on the merits." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 767 (6th Cir. 2019). This assessment must be repeated at "every stage" of a case. *City of Detroit*, 401 F.3d at 451 (citation modified). A case is moot when the issues are no longer live, or parties no longer have a legally cognizable interest in the outcome. *Id.* at 450. For there to be a live case or controversy, the requested relief must have a "real impact" on the legal interests of the parties. *Thompson v. DeWine*, 7 F.4th 521, 523 (6th Cir. 2021) (citation omitted). Absent the ability to "affect the rights of the litigants in the case before" the court, a federal court lacks the power to decide a case by issuing an impermissible advisory opinion. *Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emp. of Am., Div. 998 v. Wisconsin Emp. Rels. Bd.*, 340 U.S. 416, 418 (1951) (citation modified); *see also Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990) ("Article III…confines [courts] to resolving 'real and substantial controvers[ies]...as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'"). If "events during the course of litigation . . . make it impossible for the relevant federal court to grant any effectual relief, the court must dismiss the case as moot." *Gun Owners of Am., Inc. v. United States Dep't of Just.*, 157 F.4th 834, 837 (6th Cir. 2025) (citation modified).

The availability of relief is essential to determining mootness: if an intervening event makes it impossible for the court to "give plaintiffs what they ask for," the case is moot and must be dismissed. *Thompson*, 7 F.4th at 525 (citing *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (mootness occurs when a court cannot "grant any effectual relief")). "When a plaintiff does not

9

stand to gain from a judicial decision, the decision enters the forbidden territory of advice." *Jarrett v. United States*, 79 F.4th 675, 678 (6th Cir. 2023) (citation omitted). And where, as here, a plaintiff requests declaratory relief, the question of mootness revolves around "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, *of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.*" *Preiser v. Newkirk*, 422 U.S. 395, 402 (1975) (emphasis in original) (citation omitted).[6]

The Sixth Circuit's 2021 decision in *Thompson* is instructive. There, the Circuit determined that a case was moot because it challenged Ohio's enforcement of requirements to place an initiative on a ballot in the November 2020 election, and the election had passed. 7 F.4th at 523. The *Thompson* plaintiffs requested two forms of relief: 1) an injunction setting aside certain ballot-access laws and placing their initiatives on the ballot for the November 2020 election; and 2) a declaration that particular provisions of Ohio's ballot-access law were unconstitutional in the context of the November 2020 election. Noting that the request for injunctive relief was moot because "[w]ithout a time machine," the court could not "go back" and place the initiatives on the ballot, nor could it issue an injunction that would affect an election that had already passed. *Id.* at 524. The *Thompson* plaintiffs requested a declaration that certain laws were unconstitutional in light of particular government orders pertaining to the November 2020 election. "But those orders [we]re no longer in place, and the election [wa]s over," rendering the request for declaratory relief moot. *Id.* at 525. Because intervening events made it impossible for the court to grant plaintiffs the relief they requested, the court lacked subject matter jurisdiction and the case was moot. *Id.* Likewise, in *Fieger v. Gromek*, 373 F. App'x 567, 572 (6th Cir. 2010), the Sixth Circuit found a case moot where a challenged rule changed mid-litigation. Dismissing the case, the Sixth Circuit

---

[6] An interest in attorneys' fees also does not defeat mootness or "create an Article III case or controversy where none exists on the merits of the underlying claim." *Lewis*, 494 U.S. at 480.

10

held that it "must 'apply the law as it is now'" and that the new rule "deprive[d] this court of a live case or controversy." *Id*.

So too here, where the IFR—issued midway through this litigation—substantively and significantly changed the legality of the program challenged in this case. Plaintiffs seek three main categories of relief from the court: (1) a preliminary, and eventually permanent, injunction enjoining DOT from applying race and gender-based classifications in the federal DBE program; (2) a declaratory judgment "that the race and gender-based classifications in the federal DBE program" violate the constitution; and (3) an order setting aside "the race and gender classifications" in the relevant regulations. ECF No. 1, at 16-17. As a result of the complete revamping of the DBE program through the IFR and its express prohibition of presumptions, including the one challenged here, Plaintiffs have either directly or indirectly obtained everything they sought and there is no remaining relief left for the court to provide.

The IFR addressed the first and third categories of requested relief directly. First, it expressly eliminated the race- and sex-based presumption in the DBE program regulations. *See* IFR at 47971-72. Moreover, it prohibited the use of any race- or sex-based presumption in the DBE program at all. *Id*. Nothing the court could order would impact the rewritten DBE program regulations since the challenged presumption is no longer in effect or a part of the regulatory text. That Plaintiffs got exactly what they asked for in this litigation—barring the use of any race- or sex-based presumption in the DBE program—through rulemaking rather than a court order does not change that they obtained the relief they wanted.

Plaintiffs' request for a declaratory judgment fares no better. Plaintiffs asked the court to declare that the race- and sex-based presumption of the DBE program is unconstitutional. But that is impossible, as the DBE program no longer includes any presumption, and there is no indication

11

that the preexisting presumption will be reinstated at any point in the future.[7] There is simply no "substantial controversy" that bears the hallmarks of "immediacy and reality" sufficient to warrant a declaratory judgment. *See, e.g.*, *Preiser*, 422 U.S. at 402.

The IFR revamped the definition of who qualifies as disadvantaged to no longer include a race- or sex-based presumption, rooted out every instance of race-neutral or race-conscious language in the DBE program regulation, eliminated federal data gathering requirements that had collected race or sex information, and mandated a decertification and recertification process that ensures no DBE is certified based on race or sex. Because the Plaintiffs have "receive[d] all the relief [they] requested or could receive in the case," this case is moot and should be dismissed. *Jarrett*, 79 F.4th at 678 (citing *Alvarez v. Smith*, 558 U.S. 87, 92-94 (2009)).

## II.    No Mootness Exception Saves the Case

While mootness jurisprudence provides exceptions to the general doctrine—particularly where a conflict is resolved because of "voluntary cessation," or the dispute is "capable of repetition yet evading review"—none of the recognized exceptions save Plaintiffs' claims here.

### A.    The voluntary cessation exception does not apply

While voluntary cessation of a challenged action "does not deprive the tribunal" of authority to hear a legal dispute, that principle does not save a case where—as here—(1) there is "no reasonable expectation that the alleged violation will recur," and (2) "interim relief or events have completely and irrevocably eradicated the effects of the challenged action." *Los Angeles Cnty. v. Davis*, 440 U.S. 625, 631 (1979) (citation modified). This is especially true when the party ceasing the challenged conduct is the government. *Bench Billboard Co. v. City of Cincinnati*, 675

---

[7] Indeed, as the Government Defendants have taken the position that the presumption is unconstitutional, *see infra* Sec. II.A., reinstating or enforcing the presumption would seemingly violate their constitutional obligations.

F.3d 974, 981 (6th Cir. 2012) (finding that deleting a challenged section of an ordinance mooted litigation). "[W]e presume [governments] will not resume their challenged conduct unless objective evidence suggests that they have made a bad-faith change to avoid judicial review." *Davis v. Colerain Twnsp., Ohio*, 51 F.4th 164, 174-75 (2022). For instance, where an agency, like DOT here, no longer believes that the challenged policy is lawful, there is "no basis" for expecting the agency to "snap back" to a prior policy "once freed from this litigation." *See Gun Owners*, 157 F.4th at 839. Government changes in conduct are even less likely to constitute voluntary cessation when they were achieved through a "formal process" that would render it more difficult to revert to the old policy or practice later. *Davis*, 51 F.4th at 175. This Circuit has explicitly recognized that policies that have been "formally promulgated and approved," or rulemaking through an administrative tribunal, are the type of formal procedure likely to defeat a voluntary cessation defense to mootness. *Thomas v. City of Memphis*, 996 F.3d 318, 325 (6th Cir. 2021). Voluntary cessation is particularly unlikely to save a case where the change in conduct was prompted by something external to the litigation. *Davis*, 51 F.4th at 175.

Here, the Government Defendants have wholly reimagined—and rewritten—the DBE program, and the challenged components are no longer in effect. The government, the party that ceased the challenged conduct, has repeatedly and emphatically stated its position that the DBE program, in the form challenged in this litigation, violated the Constitution. *See, e.g.*, PCO 3; ECF No. 122, at 1-2, 7, 18-19; ECF No. 122-1 (letter informing Congress that the administration believed the presumption to be unconstitutional); IFR. Moreover, the IFR was issued through formal administrative procedures, including accepting public comments, as contemplated by the Administrative Procedure Act. IFR at 47974. On the facts here, voluntary cessation simply does not prevent a finding of mootness.

13

*B. The capable of repetition yet evading review exception does not apply*

The capable of repetition yet evading review exception does not rescue this case either. The exception applies to challenged conduct that "has a short period of relevance" and gives rise to "exceptional" circumstances. *Gun Owners*, 157 F.4th at 838-39 (citation modified). Action is considered capable of repetition yet evading review if it (1) is too fleeting to be litigated fully before it expires or ceases; and (2) raises "a reasonable expectation that the same complaining party will be subject to the same action again." *Gun Owners*, 157 F.4th at 838; *Kingdomware*, 579 U.S. at 170.

*Gun Owners* is a helpful analog. The Sixth Circuit there concluded that a Bureau of Alcohol, Tobacco, Firearms decision to withdraw a public safety advisory and issue a new one mooted litigation challenging the preexisting version. *Gun Owners*, 157 F.4th at 835-37. The Circuit reasoned that the dispute was not capable of repetition yet evading review because (1) gun licenses were not sufficiently brief under the first prong, and (2) the possibility that the agency could "hypothetically restart" a policy was merely the type of "speculative contingenc[y]" insufficient to prevent mootness. *Id*. at 839-41. Even if the new policy *were* to be reversed, nothing prevented the plaintiffs from bringing a new suit or the courts from providing complete relief in such litigation. *Id*. at 839, 841.

This case fares no better than the challenge in *Gun Owners*. DOT's revamped DBE program, set forth in the IFR and replacing the preexisting DBE program that was challenged in this litigation, was allegedly developed following the same type of review of policies prompted by President Trump's instruction as those at issue in *Gun Owners*. *Compare* IFR at 47973-74 *with Gun Owners*, 157 F.4th at 837-38. The challenged policies do not involve any conduct "too brief in its duration" to prevent full litigation: to the contrary, the DBE program in its original form was

replaced three years into litigation, having already been preliminarily enjoined, *see generally* ECF No. 44, and has now ceased to exist. There is no ticking timer. And any suggestion that Government Defendants' might reinstate the old rule and enforce it in a fashion that would injure Plaintiffs is purely speculative. *See supra*, Sec. II.A (describing Government Defendants' position on the constitutionality of the DBE program in the form it existed when challenged in this litigation); *Gun Owners*, 157 F.4th at 839-41. Simply put, "[n]othing stands in the way of courts resolving challenges like this one before they become moot." *Id.* at 839.

**III.    The Court should vacate the preliminary injunction**

It is "established practice" to vacate a merits order when a civil case becomes moot. *Arizonans for Official English v. Arizona*, 520 U.S. 43, 71 (1997) (citing *United States v. Munsingwear, Inc.*, 340 U.S. 36, 40 (1950)). This "clears the path for future relitigation," especially when the case becomes moot because of an external "happenstance." *Id*. (citation modified).

Vacatur is appropriate here under Federal Rule of Civil Procedure 60(b)(5) or (b)(6). Rule 60(b)(5) allows a court to set aside an order—including an injunction, declaratory judgment, or consent decree—where "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5); *Doe v. Briley*, 562 F.3d 777, 781 (6th Cir. 2009) (citation modified). The rule builds on "the historic power of a court of equity to modify its decree in the light of changed circumstances." *Franklin v. Haak*, No. 1:19-cv-10137, 2021 WL 1811556 (E.D. Mich. May 6, 2021) (citation modified). Where, as here, an order "has not been carried out in accordance with its intended effect" and the "purposes of [an] order have not been fully achieved," Rule 60(b)(5) justifies vacating the order. *See Olle v. Henry & Wright Corp.*, 910 F.2d 357, 364 (6th Cir. 1990) (citation modified).

15

Meanwhile, Rule 60(b)(6)'s "catchall provision" provides a vehicle in "exceptional or extraordinary circumstances" where principles of equity mandate relief to "achieve substantial justice" but the circumstances do not fit into 60(b)'s first five clauses. *Olle,* 910 F.2d at 365. The Rule 60(b)(6) inquiry is an expression of "incessant command of the court's conscience" that "justice be done in light of all the facts." *Thompson v. Bell*, 580 F.3d 423, 442 (6th Cir. 2009); *see also Olle*, 910 F.2d at 365 (noting that Rule 60(b)(6) should apply as a means of achieving "substantial justice"). Because of the underlying equitable principles, a district court's discretion in deciding a Rule 60(b)(6) motion is "especially broad." *Hopper v. Euclid Manor Nursing Home, Inc.*, 867 F.2d 291, 294 (6th Cir. 1989).

Under either Rule 60(b)(5) or (b)(6), principles of equity mandate relief from the existing preliminary injunction—based on now-stale facts—and the exceptionally unjust circumstances it creates in light of the IFR. The preliminary injunction was crafted to prevent alleged harm to Plaintiffs stemming from the then-existing race- and sex-based presumption. *See generally* ECF No. 44. But Government Defendants acknowledge that the injunction's reach is broader, as it removes "DBE goals for all DBEs in all states on all contracts identified by Plaintiffs." ECF No. 122, at 5-6; ECF No. 122-3 ¶ 4 (stating DOT "remove[s] goals on projects that Plaintiffs bid.").[8] There is no mechanism to assess whether other bidders on relevant contracts were certified based on the then-existing presumption. As implemented, the existing injunction will still prevent the use of DBE goals on countless projects, even though the IFR eliminated the race- and sex-based presumption and any DBEs who are certified going forward will have been found to be socially and economically disadvantaged, without reliance on any presumption based on race or sex. *Cf.*

---

[8] These restrictions reach "a wide range of construction projects, such as bridge replacement, maintenance, highway resurfacing, and airport runway maintenance." ECF No. 122-3 ¶ 4. DBE goals have been removed in at least 17 states, according to Government Defendants, *id.*, or at least 29 states, according to Plaintiffs. ECF No. 121, at 28-29.

*e.g.*, 122-3 ¶ 5 (noting that, as of July 16, 2025, Plaintiffs had identified at least 596 bidding projects for adjustment). Because the "purposes of the order have not been fully achieved," and it simply was not the "intended effect" of the preliminary injunction to prevent the use of race- and gender-*neutral* DBE goals in any circumstance, Rule 60(b)(5) justifies vacating the order. *See Olle*, 910 F.2d at 364 (citation modified). Further, while the IFR itself purports to "ensure a level playing field," IFR at 47971, the existing preliminary injunction does the opposite by preventing the use of even race- and gender-*neutral* DBE goals in jurisdictions where Plaintiffs indicate they intend to, but ultimately may not, bid. If, and when, Intervenor DBEs—or any DBEs—are certified consistent with the IFR, the existing PI will prevent these small businesses who bid on contracts that Plaintiffs also indicate they may bid from benefiting from the IFR-authorized DBE program at all. Moreover, it harms the public by diminishing the number of bidders on projects, which in turn may allow for unfair marketplace conditions and increased prices. These are precisely the type of extraordinary circumstances that warrants vacatur under Rule 60(b)(6).

To prevent further injustice, the Court should exercise its broad discretion under 60(b)(5) or (b)(6) and vacate the preliminary injunction.

**CONCLUSION**

For the foregoing reasons, Intervenor DBEs respectfully request that the Court vacate the preliminary injunction and dismiss the case as moot.

Dated: December 23, 2025                                  Respectfully submitted,

                                                         /s/ Brooke Menschel
Sarah von der Lippe*                                     Brooke Menschel*
D.C. Bar No. 454585                                      D.C. Bar No. 9000389
Minority Business Enterprise Legal Defense               Adnan Perwez*
and Education Fund, Inc.                                  D.C. Bar No. 90027532
1104 East Capitol St. NE                                 Audrey Wiggins*
Washington, DC 20002                                     D.C. Bar No. 482877
(202) 744-5415                                           Democracy Forward Foundation
outsidecounsel1@mbeldefwatchdog.org                      P.O. Box 34553
                                                         Washington, DC 20043
Douglas L. McSwain                                       (202) 448-9090 Ext. 1011
KY Bar No. 46895                                         bmenschel@democracyforward.org
Wyatt, Tarrant & Combs LLP                               aperwez@democracyforward.org
250 West Main Street                                     awiggins@democracyforward.org
Suite 1600
Lexington, KY 40507
(859) 288-7415
dmcswain@wyattfirm.com


                                                         *Counsel for Intervenor DBEs*
                                                         *Admitted pro hac vice*

18