UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

MID-AMERICA MILLING COMPANY,        )
LLC, *et al.*,                       )
                                     )          Case No. 3:23-cv-00072-GFVT
        Plaintiffs,                  )
                                     )
v.                                   )          **OPINION**
                                     )          **&**
UNITED STATES DEPARTMENT OF          )          **ORDER**
TRANSPORTATION, *et al.*,            )
                                     )
        Defendants.                  )

\*\*\*    \*\*\*    \*\*\*    \*\*\*

The directive of Article III is clear: the federal courts possess the power to adjudicate only live cases and controversies. Although courts over the last two-and-a-half centuries have added nuance to what it means for a controversy to truly be "live," the Framers of the Constitution placed this jurisdictional limitation upon the federal court without exception. At bottom, it reflects the Framers' desire to place clear jurisdictional limitations on the federal judiciary. Thus, even where the underlying merits of a plaintiff's case are robust and raise interesting and pensive questions about Constitutional principles, the court's authority to pass on such questions lapses when the matter becomes moot. This is one such case.

This matter is before the Court on a Motion to Dismiss and Vacate, filed by the Intervenor DBEs. [R. 129.] Also pending before this Court is a Joint Motion for Entry of a Consent Order [R. 82] filed by the Plaintiffs and the Government Defendants. Now, the Intervenor DBEs contend that entry of this Consent Order would exceed this Court's jurisdiction, because the underlying dispute has been mooted by executive action taken by the Department of Transportation in October 2025. Thus, the Intervenor DBEs move to dismiss the above-captioned matter pursuant to Fed. R. Civ. P. 4(h)(3). For the reasons outlined below, the

Intervenor DBEs' Motion to Dismiss and Vacate **[R. 129]** is **GRANTED,** the September 24, 2024, Preliminary Injunction **[R. 44]** is **DISSOLVED**, and the Parties' Joint Motion for Entry of a Consent Order **[R. 82]** is **DENIED AS MOOT**.

**I**

This case was originally filed on October 26, 2023. [R. 1.]  The Plaintiffs challenged the use of race- and gender-based presumptions that apply to United States Department of Transportation contracts in connection with the Disadvantaged Business Enterprise Program, seeking a declaratory judgment.  Among the relief originally sought by the parties was to permanently enjoin the Defendants from applying these race- and gender-based classifications in the federal DBE program.  On September 23, 2024, this Court considered and ultimately granted the Plaintiffs' request for a preliminary injunction.  [R. 44.]

In a prior Order, the undersigned discussed at length the nature and scope of the Department of Transportation DBE Program, as it existed prior to the significant regulatory changes giving rise to this motion:

> [The DBE Program] require[s] that ten percent of federal highway construction funds be paid to small businesses owned and controlled by "socially and economically disadvantaged individuals," as that term is defined in 8(d) of the Small Business Act (15 U.S.C. 637). [R. 1 at 7-8.]; *Sherbrooke Turf, Inc. v. Minn. DOT*, 345 F.3d 964, 967 (8th Cir. 2003).  "[S]ocially disadvantaged individuals" are "those who have been subjected to racial or ethnic prejudice or cultural bias within American society[.]" 49 C.F.R. Part 26 app. E.  "Economically disadvantaged individuals are socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired … as compared to others in the same … line of business who are not socially disadvantaged." *Id*.
>
> Any person may qualify as socially and economically disadvantaged regardless of their race or gender. 49 C.F.R. § 26.67(d) & app. E.  But under the law, certain racial groups and women are rebuttably presumed to be disadvantaged. 49 C.F.R. § 26.5.  All other applicants for DBE certification who are not presumed disadvantaged on the basis of their racial or female status must prove, by a

preponderance of the evidence, that they are socially and economically disadvantaged. 49 C.F.R. § 26.67(a)(3)(i)-(d).

Under federal law, fund recipients, such as state departments of transportation, are required to have a DBE Program and must set a DBE participation goal "based on demonstrable evidence of the availability of ready, willing, and able DBEs relative to all businesses ready, willing, and able to participate on" federally funded contracts. 49 C.F.R. §§ 26.21, 26.45(a)-(b).  To the extent feasible, state-recipients of federal highway funds attempt to meet their overall goals through the use of race and gender-neutral means. 49 C.F.R. § 26.51(a).  But to the extent they cannot meet their overall goals, the state must utilize "contract goals" to meet its overall goal. 49 C.F.R. § 26.51(d).  On these particular contracts, the recipient sets goals for DBE subcontractor participation on specific contracts. *Id*.  On contracts with goals, states must meet the goal for DBE participation or otherwise document that a bidder has made "good faith efforts" to meet the DBE goals. 49 C.F.R. § 26.53.

[R. 44 at 2-3.]

Practically speaking, the posture of this case shifted substantially with the arrival of the second Trump administration in early 2025.  From the earliest days of the administration, President Trump has been clear on his view that programs akin to the Transportation Department's DBE Program violate the Constitution.  *See e.g.*, Exec. Order, No. 14151 (Jan. 20, 2025) ("[e]ach agency, department, or commission head, in consultation with the Attorney General, the Director of [the Office of Management and Budget], and the Director of [the Office of Personnel Management]" to "terminate … all 'equity action plans,' 'equity' actions, initiatives, or programs, [and] 'equity-related' grants or contracts"); *see also* Exec. Order. No. 14173 (Jan. 21, 2025) (directing the Office of Federal Contract Compliance Programs to "immediately cease … [a]llowing or encouraging Federal contractors and subcontractors to engage in workforce balancing based on race, color, sex, sexual preference, religion, or national origin").

3

In May 2025, a collected assortment of advocacy groups, trade organizations, and businesses[1] which claim to rely on the Transportation Department's DBE Program filed a Motion to Intervene, which was granted by Magistrate Judge Edward B. Atkins on May 21, 2025.  Thus, although the change in Presidential administrations effectively placed the Government Defendants in general agreement with the Plaintiffs as to the merits of this dispute, the Intervenor DBEs have vigorously defended the DBE Program, including the race- and sex-based presumptions.

On May 28, 2025, the Plaintiffs and Government Defendants moved jointly for entry of a consent order as the final order and judgment in this matter. [R. 82.]  In the proposed consent order, the Government Defendants "stipulate and agree that the DBE program's use of race- and sex-based presumptions of social and economic disadvantage … violates the equal protection component of the Due Process Clause of the Fifth Amendment of the U.S. Constitution." [R. 82-1 at 3.]  Further, the Government Defendants "stipulate for the purposes of this Consent Order that the determination of DBE eligibility using race- and sex-based presumptions, as reauthorized by the [Infrastructure Investment and Jobs Act] and in the FAA Reauthorization Act of 2024, is not supported by the Constitution as currently interpreted under equal protection jurisprudence." [*Id*. at 4.]  Notably, the parties also seek entry of a permanent injunction stating that "[b]ased on the stipulation in Paragraph 9 above and its independent analysis, the Court hereby holds and declares that the use of DBE contract goals in a jurisdiction, where any DBE in that jurisdiction was determined to be eligible based on a race- or sex-based presumption,

---

[1] More specifically, NAMC, WCOE, and AMAC are trade associations whose members are comprised of socially and economically disadvantaged businesses which benefit from the DBE Program; Women First is a "non-partisan grassroots organization" which has, *inter alia*, "fifteen women serving as Trustee Board members who own DBE-certified businesses" and thus depend on the DBE program for consistent business; and AMC-Civil and Upstate Steel are minority- and women-owned businesses which are purportedly reliant on the DBE Program. [R. 57 at 6-10.]

violates the equal protection component of the Due Process Clause of the Fifth Amendment." [*Id*.] Further, the parties proposed order also states that "the Court hereby holds and declares that Defendants may not approve any federal, state or local DOT-funded projects with DBE contract goals where any DBE in that jurisdiction was determined to be eligible based on a race- or sex-based presumption." [*Id*. at 4-5.]

As a precursor to the regulatory changes to come, the U.S. Solicitor General notified the Speaker of the U.S. House of Representatives Mike Johnson on June 25, 2025, that the Department of Justice would no longer defend the sex- and race-based presumptions of the DBE Program in court, as required by 28 U.S.C. § 530D, specifically including the above-captioned case. Letter from Solicitor General D. John Sauer to Hon. Mike Johnson (June 25, 2025), https://www.justice.gov/oip/media/1404871/dl?inline. He stated, "[c]onsistent with [*Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181]'s rejection of a similar justification in the university-admissions context, [DOJ] has determined that an interest in remedying the effects of societal discrimination does not justify the use of race- and sex-based presumptions in the DBE program." *Id*. at 2. The Solicitor General went on to assert that "like the admissions programs at issue in *SFFA*, the DBE program relies on arbitrary, overbroad, and underinclusive racial categories and lack any logical end point." *Id*.

Then, on October 3, 2025, the Department of Transportation published an Interim Final Rule, stating that "[i]n light of DOT and DOJ's determination that the DBE program's race- and sex-based presumptions are unconstitutional, DOT is issuing this IFR to remove the presumptions from the DBE program regulations set forth in 49 C.F.R., part 26." Disadvantaged Business Enterprise Program and Disadvantaged Business Enterprise in Airport Concessions Program Implementation Modifications, 90 Fed. Reg. 47969 (Oct. 3, 2025) (to be codified at 49

C.F.R., part 26).  Because of the functional similarities between programs, the interim final rule also rendered the same alterations to the presumptions in the Airport Concession Disadvantaged Business Enterprise (ACDBE) programs. *Id.*

Further, the Transportation Department directed, "[t]o ensure a level playing field between existing participants and new applicants, while also eliminating the effects of the unconstitutional presumptions and reliance in whole or in part on claims of disadvantage based on race or sex, this IFR requires each Unified Certification Program (UCP) to reevaluate any current certified DBE or ACDBE, to recertify any DBE or ACDBE that meets the new certification standards, and to decertify any DBE or ACDBE that does not meet the new certification standards." *Id.*  Consequently, it is uncontested that this significant regulatory overhaul provides the full slate of relief sought by the Plaintiffs in their Complaint in this case.[2]

In response to the publication of the interim final rule, the Intervenor DBEs filed a motion to dismiss this case for lack of subject matter jurisdiction on December 23, 2025.  In response, the Court held in abeyance the final pretrial conference and bench trial dates, pending resolution of this motion.  The matter is now fully briefed and ripe for consideration by this Court.

## II

### A

"Under Article III of the United States Constitution, federal courts have the power to adjudicate only 'Cases' and 'Controversies.'" *Mokdad v. Sessions*, 876 F.3d 167, 169 (6th Cir. 2017) (citing *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90 (2013)).  Implicit within this

---

[2] As a result, there is no need to parse through each regulatory change one-by-one to ensure that the full relief sought by the Plaintiffs was provided by the interim final rule.  In fact, the interim final rule stretches beyond the relief that could have been afforded by virtue of the equitable remedies sought in the Complaint.  Because this issue is uncontested, we need not elaborate further on the specifics of the regulatory changes.

Constitutional directive is a requirement that there be a *live* case or controversy; "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome," a case is rendered moot. *Cal. Palms Addiction Recovery Campus, Inc. v. United States*, 158 F.4th 726, 730 (6th Cir. 2025) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (per curiam)).  And, in turn, where a "court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action," sua sponte. Fed. R. Civ. P. 12(h)(3).  This obligation to ensure subject-matter jurisdiction is a continuing one, because federal courts are, ultimately, courts of limited jurisdiction restrained by Article III guidelines. *Fialka-Feldman v. Oakland Univ. Bd. of Trs.*, 639 F.3d 711, 713 (6th Cir. 2011) (labeling this continued obligation as a "cradle-to-grave requirement").

A case becomes moot, and therefore nonjusticiable, when "events during the course of litigation, even while a case is on appeal, 'make it impossible for the relevant federal court to grant any effectual relief[.]'" *Gun Owners of Am., Inc. v. U.S. Dep't of Justice*, 157 F.4th 834, 837 (6th Cir. 2025) (quoting *Brown v. Yost*, 122 F.4th 597, 601 (6th Cir. 2024) (en banc)).  Put differently, a federal court can "hear a case only when deciding it would have some 'practical effect' on the parties." *Id*. (quoting *Ohio v. U.S. Env't Prot. Agency*, 969 F.3d 306, 308 (6th Cir. 2020).  Further, it is a long-held principle that a case could be rendered moot due to "intervening events," even where the matter was not moot at the time the complaint was filed. *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 458 (6th Cir. 1997).

There are two narrow exceptions to mootness which, if applicable, can allow an otherwise "stale" case to remain justiciable in federal court.  First, a defendant's "voluntary cessation," of the activity giving rise to the dispute does not moot a case, unless "there is clearly no reasonable expectation that the alleged violation will recur." *Resurrection Sch. v. Hertel*, 35

F.4th 524, 528 (6th Cir. 2022) (en banc).  Second, a case is not mooted if the underlying conduct is "capable of repetition, yet evading review." *Id*. at 530.  This second exception applies where the defendant's conduct is of a short duration, fully elapsing before the conclusion of litigation, yet creates "a reasonable expectation that the same complaining party will be subject to the same action again." *Thompson v. DeWine*, 7 F.4th 521, 525 (6th Cir. 2021) (per curiam).  The Plaintiffs and Government Defendants, however, contend only that the "voluntary cessation" exception applies to salvage subject matter jurisdiction in the case at bar. [R. 132; R. 133.]

In determining whether the "voluntary cessation," exception applies to a given dispute, "we presume that the same allegedly wrongful conduct by the government is unlikely to recur." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 767 (6th Cir. 2019).  In the regulatory context, however, the weight of this presumption "depends on the process used to create the policy." *Gun Owners*, 157 F.4th at 838 (citing *Speech First*, 939 F.3d at 768).  "If the discretion to effect the change lies with one agency or individual, or there are no formal processes required to effect the change," then "significantly more … is necessary to show that the voluntary cessation moots the claim." *Speech First*, 939 F.3d at 768.  An additional factor to consider is whether the government altered their conduct "in response to [the] lawsuit." *Resurrection Sch.*, 35 F.4th at 529; see also *Davis v. Colerain Township, Ohio*, 51 F.4th 164, 174-75 (6th Cir. 2022) ("[W]e presume [the government] will not resume their challenged conduct unless objective evidence suggests that they have made a bad-faith change to avoid judicial review").  However, a "theoretical possibility of reversion to an allegedly unconstitutional policy is simply not sufficient to warrant an exception to mootness." *Thomas v. City of Memphis*, 996 F.3d 318, 328 (6th Cir. 2021).

8

The Intervenor DBEs contend that the regulatory changes brought about by the October 2025 IFR provided precisely the relief sought by the Plaintiffs at the outset of this litigation, and, thus, the above-captioned case is rendered moot. First, in terms of Plaintiffs' request for permanent injunctive relief, Intervenor DBEs contend that "[n]othing the court could order would impact the rewritten DBE program regulations since the challenged presumption is longer in effect or a part of the regulatory text." [R. 129 at 11.] In terms of the Plaintiffs' request for a declaration that the race- and sex-based presumptions of the DBE Program are unconstitutional, the Intervenor DBEs contend this is equally moot, "as the DBE program no longer includes any presumption, and there is no indication that the preexisting presumption will be reinstated at any point in the future." [*Id*. at 11-12.] Intervenor DBEs further contend that neither of the above-highlighted exception are applicable here. [*Id*. at 12-15.] Consequently, in the Plaintiff's view, the Court would exceed its subject matter jurisdiction by ruling on the Parties' Motion for Consent Order, premised upon a now-stale dispute. [*Id*. at 15.]

The Plaintiffs, on the other hand, contend that the "voluntary cessation" exception serves to salvage subject matter jurisdiction in this case. In their view, regulatory change via rulemaking is insufficient where the underlying statutory scheme remains unchanged by Congress. [R. 132 at 5-6.] Thus, they contend that "it is not 'absolutely clear' that the next administration would refuse to reimpose the discriminatory DBE provisions." [*Id*.] Plaintiffs request that the Court enter the Parties' Proposed Consent Order, thus crystallizing the relief sought by the Plaintiffs and binding future administrations, or alternatively, to construe the Motion for Consent Order as a motion for summary judgment. [*Id*. at 7.] At bottom, Plaintiffs contend that the matter remains ripe and the Court retains subject matter jurisdiction.

The Government Defendants, for their part, effectively concede that the IFR provided the slate of relief sought by Plaintiffs in this lawsuit.  Nonetheless, they urge the Court to instead enter the Parties' Consent Order because, "[i]t is entirely possible that the IFR will be challenged in litigation – perhaps even by the DBE Intervenors – and such litigation could lead to the IFR being stayed or vacated." [R. 133 at 2.]  The Government Defendants suggest neither that this is a "voluntary cessation" of the challenged conduct by the Department of Transportation, nor do they indicate that the current administration, or even future administrations, will reverse course and return to the prior scheme.

The Sixth Circuit's recent opinion in *Gun Owners* is particularly instructive.  The dispute in *Gun Owners* began when, in 2020, plaintiff Donald Roberts, a Michigan resident, sought to purchase a firearm. *Gun Owners*, 157 F.4th at 836.  Under the Brady Handgun Violence Prevention Act, firearms purchasers must undergo and pass a background check before they can purchase a firearm. *Id*.  The National Instant Criminal Background Check System (NICS) serves as a database for sellers to determine whether a person's purchase would violate either state of federal law. *Id*. (citing 34 U.S.C. § 40901(b)).  The Brady Act contains an exception, however, that permits buyers who hold certain approved state firearm permits to forgo the background check. *Id*. (citing 18 U.S.C. § 922(t)(1)).  The ATF is tasked with determining which states' licenses qualify for this exemption. *Id*. (citing 28 C.F.R. § 0.130(a)).

Prior to 2020, Michigan's concealed-carry pistol licenses qualified for this Brady exemption, but the ATF removed them from the approved state license list in 2020 after "gr[owing] concerned that Michigan inadequately investigated red flags raised in the federal background check database before it issued permits." *Id*.  When Mr. Roberts's purchase was denied after he presented his Michigan concealed-carry license instead of undergoing a separate

NICS background check, he filed suit seeking, among other relief, an injunction to prohibit future enforcement of the 2020 advisory which removed Michigan from the approved list. *Id*.

There, as here, the ATF took action in response to a post-inauguration executive order signed by President Trump directing the Attorney General to "examine all … actions of executive departments and agencies … to assess any ongoing infringements of the Second Amendment rights of our citizens. *Gun Owners*, 157 F.4th at 837 (quoting Exec. Order No. 14206, Protecting Second Amendment Rights, 90 Fed. Reg. 9503 (Feb. 7, 2025)).  Responding to this directive, the ATF "circulated a new advisory to gun sellers about which state firearm licenses qualified as NICS background-check alternatives." *Id*.  A chart accompanying that circular included Michigan licenses as a valid NICS alternative. *Id*.  The ATF was clear that "this letter and the new chart … supersede[] all previous AFT open letter on NICS alternate permits." *Id*.  Thus, put simply, the new ATF circular provided the complete relief sought by the plaintiffs in the case before a final judgment had been reached by the district court.  And, importantly, the new ATF circular was not issued in direct response to the plaintiffs'' suit, but rather in response to a policy initiative launched by the President. *Id*. ("nothing suggests that the ATF reversed course in "response to this lawsuit" … The superseding advisory came five years after Roberts filed this lawsuit.")

The Sixth Circuit first readily concluded that the case was moot.  In concluding that the issuance of the new circular did, in fact, fully moot the case, the Sixth Circuit observed that "[n]either the superseded 2020 advisory nor the outcome of this lawsuit has the potential to affect Roberts.  He sought only forward-looking relief – a declaratory judgment and injunction – not money damages to compensate him for past injuries.  We thus cannot give him 'any effectual

relief.'" *Id*. at 838 (citing *Chafin v. Chafin*, 568 U.S. 165, 172 (2013)).  Put simply, the issuance of the circular provided full relief to the plaintiffs, and the case was rendered moot.

After concluding that the case was, in fact, moot, the Sixth Circuit turned to the question of whether an exception salvaged jurisdiction.  Plaintiffs in *Gun Owners* contended that the issuance of the new advisory did not moot their case because it amounted to a "voluntary cessation" and that the ATF could merely re-issue a new advisory removing Michigan from the "approved" list. *Id*. at 839-40.  The Sixth Circuit rejected this argument.  In doing so, it concluded that "it is exceedingly unlikely that the agency will suddenly turn around and subject Roberts to the same alleged harm." *Id*. at 840.  The superseding advisory was issued because the ATF sought to effectuate a bona fide policy shift, and did not act "in response to this lawsuit." The Sixth Circuit likewise rejected plaintiffs' argument that a future Presidential administration might change course, noting that "such 'speculative contingencies' do not prevent mootness." Id. (citing *Hall v. Beals*, 396 U.S. 45, 49 (1969)).

In reaching this conclusion, the Sixth Circuit observed that this was in accord with other circuits which have addressed similar issues. *Gun Owners*, 157 F.4th 834 at 840-41 (citing *DeOtte v. Nevada*, 20 F.4th 1055, 1064 (5th Cir. 2021) (holding that the possibility that a "new Presidential Administration could change the rules … does not support that an injury is actual or imminent"); *Prison Legal News v. Fed. Bureau of Prisons*, 944 F.3d 868, 881 (10th Cir. 2019) ("[A]bsent evidence the voluntary cessation is a sham, the mere possibility a successor official may shift course does not necessarily keep a case live"); *Larsen v. U.S. Navy*, 525 F.3d 1, 4 (D.C. Cir. 2008) ("[T]he mere power to reenact a challenged policy is not a sufficient basis on which a court can conclude that a reasonable expectation of recurrence exists.  Rather, there must be evidence indicating that the challenged policy likely will be reenacted").

Additionally, the Court flatly stated, "[t]he mootness inquiry does not require us to layer hypotheticals on top of possibilities on top of what-ifs." *Id*. The Court observed that such an argument "overlooks the reality in this case that any new position would be unlikely to look just like the old position." *Id*. To conclude otherwise, "does not honor our mandate to vigorously monitor the case-and-controversy imperative." *Id*. Thus, the Sixth Circuit remanded the case with instructions to dismiss it below as moot. *Id*. at 841.

The nature and sequence of events evaluated by the Sixth Circuit in *Gun Owners* is remarkably akin to the present case. Here, in response to an executive order signed by President Trump, the Department of Transportation undertook to substantially overhaul the DBE Program and ultimately eliminated the disputed race- and sex-based presumptions by promulgating an interim final rule. The Transportation Department did not undertake this regulatory change in direct response to this litigation; rather, it was motivated by broader policymaking goals originating from the White House.[3] Even if the Court were to allow litigation to continue, it cannot grant the Plaintiffs any additional relief beyond what they have already received by virtue of the regulatory change.

Compared to the method used by the ATF in *Gun Owners* to bring about policy change, an agency circular with modified chart, the Transportation Department employed an even more concrete process here, an interim final rule. Put simply, when compared to an agency circular, an interim final rule is, at a minimum, less susceptible to rapid and transformative modification

---

[3] Although the text accompanying the interim final rule cites to the preliminary injunction in this case to illustrate the potentially unconstitutional nature of the race- and sex-based presumptions, this mere reference does not establish that the rule was enacted in response to the litigation itself. Rather, the Department of Transportation clearly states that the change was brought about by their own independent determination about the constitutionality of the presumptions. 90 Fed. Reg. 47969, 47971 (Oct. 3, 2025) ("In light of DOT and DOJ's determination that the DBE program's race- and sex-based presumptions are unconstitutional, DOT is issuing this IFR …").

13

in future years.  Again, it is presumed that the government will not resume the challenged conduct.  There are simply no facts proffered by the Plaintiffs to overcome this presumption.

Nor have the Government Defendants so much as suggested that they will reverse course, which would be an exceedingly unlikely policy shift at this juncture.  And nearly three years removed from the next presidential election, claiming that a future administration could change course is sheer speculation.

Even more speculative, and frankly unlikely, is a future administration of any political persuasion returning to the *exact same* regulatory framework challenged here.  To salvage jurisdiction under such speculative bases would be akin to declaring a yet-unborn racehorse as the betting favorite to win the 2029 Kentucky Derby.

The fact that the underlying statutory framework for the DBE Program remains intact does not change the analysis.  The race- and sex-based presumptions challenged by Plaintiffs here are a creature of administrative regulations – regulations that have now been superseded.  And, if a change in policy brought about by a new agency circular is enough to moot a case, as *Gun Owners* directs, then the replacement of federal administrative regulations by interim final rule certainly is.

Nor is it of consequence that people in the future may ultimately seek to challenge the interim final rule in federal court.  Again, this argument falters for the same "what if" arguments for voluntary cessation raised by the Plaintiffs regarding the potential actions of future administrations.  While it is certainly possible that the interim final rule will be challenged, that litigation will examine the legal propriety of the new rule, not the old structure that has been superseded.  Thus, insofar as future litigation arises with respect to the October 3, 2025, IFR,

14

such litigation is separate and distinct from questions about the constitutionality of the now-defunct race- and sex-based presumptions.

The Plaintiffs' reliance on the Supreme Court's recent opinion in *Lackey* is misplaced. First, and foremost, the primary focus of the Court's opinion in *Lackey* was whether the respondents were "prevailing parties," who were entitled to attorney's fees under 42 U.S.C. § 1988(b), with the mootness question an ancillary consideration. *Lackey v. Stinnie*, 604 U.S. 192, 196 (2025). It is not, as Plaintiffs imply, a watershed case in Article III jurisprudence. The *Lackey* Court stated, in dicta, that "voluntary cessation of the challenged conduct does not moot an action 'unless it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."'" *Id*. at 204 (quoting *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189 (2000)). This language further urges this Court to dismiss this matter as moot, however, despite Plaintiffs' arguments to the contrary. When this statement from *Lackey* is considered alongside the Sixth Circuit's opinion in *Gun Owners*, it becomes clear that cessation in the form of a major regulatory change clarifies that the government will not reverse course and resume the challenged conduct. Even though *Gun Owners* does not cite to *Lackey* for this proposition, it certainly builds upon its logical framework in this respect. Thus, rather than cutting against the Intervenor DBEs' argument, this statement from *Lackey* reinforces the Sixth Circuit's directive from *Gun Owners*.

To summarize, the issuance of the October 3, 2025, IFR moots the present dispute, because the regulatory change provided precisely the relief sought by the Plaintiffs in their complaint – elimination of the race- and sex-based presumptions under the Transportation Department's DBE Program. No mootness exception salvages jurisdiction. Although the Department of Transportation voluntarily altered its regulatory scheme in accord with President

15

Trump's executive orders, this does not amount to "voluntary cessation."  And, as *Gun Owners* directs, the mere fact that a future administration may again change the regulatory scheme does not permit a district court to examine the constitutionality of a prior, revoked scheme.  While the original parties seek to keep this dispute alive to seek entry of their proposed consent order, it would exceed our jurisdiction to do so.  Put simply, to enter the consent order at this junction would effectively require this Court to declare that a now-defunct regulatory scheme is unconstitutional, couched on the back of a now-stale dispute.  Despite the strong merits of the Plaintiffs' position in this case, we are limited by the jurisdictional limitations of Article III.  Thus, we must dismiss this case, pursuant to our continuing obligation to ensure subject matter jurisdiction throughout the life cycle of a case, under Fed. R. Civ. P. 4(h)(3).

### B

"As a matter of course, an injunction may dissolve when a case becomes moot and the injunction is no longer necessary." *Ramsek v. Beshear*, 2021 U.S. Dist. LEXIS 212749, at *9 (E.D. Ky. Nov. 2, 2021) (citing *Planned Parenthood Sw. Ohio Region v. Dewine*, 931 F.3d 530, 540 (6th Cir. 2019)).  Additionally, neither the Plaintiffs, nor the Government Defendants, contest that Plaintiffs have been afforded the full relief sought in their complaint, and that the preliminary injunction is no longer effective in serving its original purpose.  In other words, the Intervenor DBEs do not dispute that dissolution of the preliminary injunction is proper at this time.  Rather, the entire focus of their briefing is restricted to the question of whether the case is rendered moot by the regulatory overhaul.  Consequently, because the entire dispute is rendered moot for the reasons set forth above, dissolution of this Court's September 23, 2024, preliminary injunction is proper.

## III

In dismissing this action, the Court does not purport to speak any further as to the merits of Plaintiffs' claim.  Rather, the Court finds that its jurisdiction is restrained, and it would exceed it by taking further action in this case.  Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

1. The Intervenor DBE's Motion to Dismiss **[R. 129]** is **GRANTED**;

2. The Motion for Reconsideration **[R. 124]** filed by Central Seal Company and Charbon Contracting, LLC is **DENIED AS MOOT**;

3. The Parties' Joint Motion for Entry of Consent Order **[R. 82]** is **DENIED AS MOOT**

4. Although the Court declines to vacate the preliminary injunction, the injunction in this matter, entered September 23, 2024, **[R. 44]** is **DISSOLVED** because the entire matter has become moot**.**

This the 19th day of March 2026.

Gregory F. Van Tatenhove
United States District Judge